92. On Sep 12, 2004, BRADSHAW first contacted the AG and spoke to "Heather" in the Criminal Division. She was briefed on the alleged fraudulent mailing receipts filed In 96-1320 and informed that I wished to file criminal charges against the person(s) who filed the receipts. She referred me to Mr. Lemons who was fully briefed on the alleged fraudulent mailing receipts. He referred me to Asst AG Ed Buckingham who was supposed to be my contact and the person who would conduct an investigation into my allegations.

93. BRADSHAW talked to Mr. Buckingham and informed him fully about the postal receipts and also the fact that the AG had accepted service on the case though SORENSEN had been expressly told that the AG would not accept service. In our discussion, BRADSHAW remarked that he thought that the AG had a file copy of the case file in its office. But Mr. Buckingham said that the AG did not have file copies of the cases it defended. Mr Buckingham added that he would check the file copy at SC.

94. BRADSHAW then faxed documents to Buckingham with notarized affidavits on this case (as are now filed in this complaint before the US District Court of the CNMI). BRADSHAW then called Mr. Buckingham back and he verified that he had seen the process service documents filed with the alleged postal return receipts and return of service forms and that the documents on file were as I described. BRADSHAW had the impression that Mr. Buckingham had the documents in front of him, although this might not have been the case.

95. BRADSHAW specifically noted to Mr. Buckingham that he wanted to file criminal charges against the persons responsible for the fraudulent mailing receipts and that he wanted the AG, which was supposed to be my lawyer in this case, to follow up with a court action in the Saipan SC to have the judgment stricken or voided on me as it was obtained by

fraud.  Otherwise, BRADSHAW specifically requested that the AG take action to pay the $139,000 to BISOM on the basis of the Indemnification Act.

96.  BRADSHAW strongly recommended to Mr Buckingham that certified true copies of the fraudulent receipts be made and used in the investigation and that his office or the court take action to secure the case file as it involved alleged fraud.  BRADSHAW also recommended to Buckingham that the documents or copies thereof be forwarded to the US postal authorities as they involved US postal fraud.  BRADSHAW then suggested that the AG make for me a certified true copy of the postal receipts and I would at once take them to the US postal inspector in Spokane for an investigation.  Mr Buckingham said that he would refer the case to AG BROWN for a decision.  Ms BROWN was off island but due back soon.

97.  Thereafter, BRADSHAW called Mr. Buckingham back on Sep 19 and thereafter to get a response on AG follow-up.  He told me that Ms BROWN was briefed and she had authorized the AG to investigate the fraud charges.  BRADSHAW noted to Buckingham that the mail receipts should also be sent to the FBI as the FBI lab has a capability to completely analyze both the writings and the ink used to try to determine who wrote them and if they were prepared by the same pen, and so forth.  While Mr. Buckingham did not confirm that he would go the FBI with the documents, he seemed receptive to the idea.

98.  BRADSHAW had a feeling that Buckingham was limited in what decisions he could make but would have to refer matters to BROWN for decisions.  BRADSHAW followed up thereafter in writing to the AG with my needs.  On Jan 25 and Feb 7, 2005, BRADSHAW sent letters to the AG at Exhibit E (sent by both fax and mail) which recaps the need to make copies of the alleged fraudulent documents, to secure them adequately, and/or mention of

the need an investigation--by postal people and the FBI.

99.  In late Sep 2004, Mr. Buckingham informed me that he had briefed and asked Mr. Joseph Race, acting director in charge of the CNMI investigations, to investigate the case.  In a Oct 7, 2004 letter from Mr. Race (Exhibit "A"), he noted that he tried to call me and that he had referred the case to Frank Kapileo and Alfred Teregeyo.  BRADSHAW called them a few times and on Oct 20, 2004 talked to Mr. Kapileo and offered my help and any information which he might need from me. Kapileo noted to me that he had the case file in front of himself and that he and Mr. Teregeyo were both reading it.  He did not say why or how that he came into possession of the case file.  But he acknowledged seeing the postal receipts in the file.

100.  BRADSHAW made several other contacts with Mr. Buckingham and the investigators over the next several weeks.  Their responses were always that they were investigating the case and would get back with me.  At a point in time, in January 2005, BRADSHAW discussed the case with Mr. Race.  His words to me were that it looked to him like I got a dirty deal from BISOM.  BRADSHAW had the impression that Mr. Race had personally seen the alleged postal receipts.  BRADSHAW asked to speak to Mr. Aldan, who had been appointed Chief of Investigations.  Mr. Race said that Mr. Aldan was in PAM BROWN's office briefing her--presumably on my case.

101.  In Jan 2005, BRADSHAW also tried to talk to Mr. Kapileo but he was out of the office, so Mr. Teregeyo took my call and we chatted about the case.  Mr. Teregeyo said that he had the file but that Mr. Kapileo had removed the postal return receipts and had taken them with him to the local Saipan Post Office--supposedly Mr. Kapileo was then talking to the Saipan Postmaster about the receipts (suggesting that he by then had shown the receipts to

the postmaster).  BRADSHAW also repeated my earlier comments that if the AG would send me copies, I would take the receipts to the US Postal Inspectors.

102.  In late Jan 2005, BRADSHAW became concerned that the CNMI would not supply him copies of the receipts and that the AG was not making any effort to involve the US postal inspectors or the FBI.  BRADSHAW called Mr. Buckingham several times in Jan and early Feb. 2005 and tried to encourage him to take some action since he was supposed to be the Asst AG in charge of the case, per Mr. Lemons' words.

103.  Mr. Buckingham was always friendly and seemed cooperative and concerned. He maintained several times that he had spoken to or was going to speak about the case to PAM BROWN, Mr. Race and/or Mr. Aldan.  Mr. Buckingham conveyed to me his desire to resolve the case.  At one time, he suggested that he would make copies of the file and/or the documents in question and mail them to me.  BRADSHAW said that this would be good.

104.  In the meantime, BRADSHAW continued to send faxes and write letters to the AG outlining the need for action to secure the documents by making copies and to pay the $139,000 to BISOM.  In my last telephone conversation with Mr. Buckingham in early Feb 2005, his demeanor to me had completely changed.  Whereas he had always been a nice, friendly person interested in trying to resolve the case, he abruptly became as cold as ice and was clearing putting some distance between himself and me.  In terms of sending me any of the documents, he said no that I had misunderstood him and that the case file was then in the possession of the AG "for review" as he put it.

105.  He further said that he had been taken off the case and that someone else in the AG's office would contact me in the future.  While he did not say so, it seemed clear to me that

Buckingham had been reprimanded and disciplined for trying to resolve the case with me.  It was clear that PAM BROWN herself or others had dressed him down, directly or indirectly.

106.  No other persons in the AG's office contacted me until BRADSHAW received Ms BROWN's letter of Feb 15, 2005 (Exhibit "A") which effectively said that the AG would do nothing further on the case.  It was then that I clearly understood that the AG had become an hostile, adversarial party who in the future would work against me and act to protect the guilty parties involved in 96-1320 who had filed the fraudulent documents.  I then filed a motion with the CNMI SC to void the judgment and filed suit in the Idaho US District Court.

107.  In June 2005, in a conversation I had with Ms Bernie Sablan, Clerk of the CNMI SC, she said that the case file on 96-1320, was in her possession for the judge to use in my motion to void.  She said that the alleged postal receipts showing service were not then in the file.  BRADSHAW had the impression that Ms Sablan was unaware that the AG had had possession of the receipts and evidently the 96-1320 case file.  In my contacts with the AG, BRADSHAW was led to believe that the AG had possession of certainly the mail receipts and indeed generally the whole 96-1320 file.

108.  In learning of the missing records, BRADSHAW contacted the CNMI lawyer, Hall Farley, who sent back the enclosed letter Exhibit "F."  In it, the CNMI AG denied ever seeing the alleged fraudulent postal receipts.  The AG pretended to be in total ignorance about its contacts with BRADSHAW from Sep 2004 until Mar 2005.  This AG alleged ignorance happened three months after the 05-84 suit was filed in the US court over this very question.

**FIRST CLAIM--Civil Rights Violations (42 USC 1983), Conspiracy and Interstate Fraud (18 USC 241-242) Using US Postal Material (18 USC 1341-**

30

**1342, 1349, 1707; and 39 USC 4005) and Violations of CNMI Court Rules**

109. Plaintiff BRADSHAW herein by reference paragraph 1-108 hereinabove alleged as if set forth here in full.

110. Defendants ROBERT A. BISOM, JAY H. SORENSEN (attorney for BISOM and officer of the court in case 96-1320) and/or employees and agents under their supervision violated CNMI court rules willfully and used US mail documents and resources in a conspiracy with others to defraud the CNMI and plaintiff BRADSHAW and to violate BRADSHAW's US Constitutional rights to due process and equal protection of the law (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property.  The judgment against plaintiff was obtained without allowing BRADSHAW to have his day in court to answer the complaint against him.

111. Defendants BISOM, SORENSEN and/or persons under their supervision acted deliberately, criminally, maliciously and with intent and foreknowledge in a conspiratorial mode with others to deceive and mislead the CNMI courts and to fraudulently misappropriate money from the CNMI and BRADSHAW and to violate CNMI court rules to bring hurt, damage and injury on BRADSHAW in order to misappropriate and steal as much money as possible from the CNMI and BRADSHAW and to violate BRADSHAW's due process and equal protections rights under the US Constitution.

112. BRADSHAW's professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants.  Plaintiff thus suffered much pain/distress (emotionally, mentally and physically) and expended much money, personal funds and recourses and efforts in an

attempt to obtain redress for the injury.  The remedy is for the court to order restitution, removal of the illegally gained CNMI judgment and payment of damages to plaintiff.

113.  In 1996-1998, BRADSHAW lived on Newport Highway in Elk, Washington and was physically present and available at home daily for legitimate service of process from BISOM without even suggesting a fraudulent action in court to effect service; thereby indicating that the fraudulent documents submitted by BISOM were not singularly designed just to effect service, but rather to deceptively and fraudulently obtain a judgment against BRADSHAW and misappropriate money from BRADSHAW and the CNMI.

114.  Defendants BISOM/SORENSEN entered into a conspiracy with a person or persons in the Office of the AG and/or possibly with judge CASTRO to deliberately and maliciously violate court rules and to defraud BRADSHAW in the 96-1320 case to obtain a default judgment against BRADSHAW and to keep BRADSHAW in a state of ignorance about what was happening in Saipan on case 96-1320.

## SECOND CLAIM--Civil Rights Violations (42 USC 1983), Gross Incompetence and Malpractice, Conspiracy and Fraud and Violations of CNMI Court Rules

115.  Plaintiff BRADSHAW herein by reference paragraphs 1-114 hereinabove alleged as if set forth here in full.

116.  Plaintiff's contact with the AG is described above.  While the AG acted to keep BRADSHAW informed in 1996-1998 on some events on Saipan relative to BRADSHAW, the AG entered into a process of silence in 1999 which eventually turned into an hostile adversarial relationship at least six days before the trial of 96-1320 in Feb 2000 when the AG formally withdrew from representing BRADSHAW but deliberately chose to not inform

BRADSHAW of its actions.  BRADSHAW had contact with the AG up until Jun 30, 1999 but nothing thereafter until late April 2004 when, at BRADSHAW's initiation, the AG notified BRADSHAW of the outcome of 96-1320 in 2000 and its appeal in 2002.

117.  The CNMI Supreme Court's decision, appeal nos. 00-0016 & 0023-GA, consolidated (on pages 12, 13, and 22), cited repeated cases of mistakes and mistaken actions (plural) by the AG.  On page 22, the Supreme Court decision opened the possibility that an attorney or attorneys in the Office of the AG had violated the Bar Association ethics rules.  The Supreme Court did not establish which person or persons individually were responsible for the malpractice, mistakes, and so forth.  In its decision (page 12), the Supreme Court also pointed out that in the AG appearance and presentation there was a conflict of interest between the CNMI and BRADSHAW.

118.  All of this translates to Supreme Court decided gross incompetence and malpractice by the AG; which contributes to violations of BRADSHAW's rights to due process and equal protection of the laws under the US Constitution.  The CNMI AG's actions were deliberate, malicious, intentional and extremely irresponsible in creating a total mess of case 96-1320 and great injury and damage being placed upon BRADSHAW and the CNMI.

119.  As a minimum, if the certified letters sent by BISOM (unclaimed by BRADSHAW) communicated an avoidance of service, the AG was fully informed by BRADSHAW on these letters and should have done something about them.  With the first one, whether identified or not, the AG should have immediately contacted BRADSHAW about the consequences of the letters being unclaimed and brought the issue to the court or filed an answer.

120.  During the filings of the several actions by BISOM, the AG accepted service for BRADSHAW on the complaints without BRADSHAW's knowledge, authorization and/or request (and also filed motions in court in BRADSHAW's name).  The AG made no answer in court on any of these served complaints it had accepted without BRADSHAW's authorization. BRADSHAW was never informed on these acceptances of service by the AG.  The AG violated the CNMI court rules and failed in not discharging its proper duties on this case.

121.  Despite being frequently informed that no service on the BISOM complaint in 96-1320 had ever been made personally on BRADSHAW and that constructive service was impossible, the AG made no effective effort to go into court and have the question of service resolved on the basis that BISOM and/or his attorney was practicing deception and fraud upon the CNMI courts (in their presentation of alleged postal documents showing alleged service/refusal of service by BRADSHAW when no actual/constructive service existed).

122.  In view of the BRADSHAW letter of Jul 14, 1999 notifying the AG of no service and no possibility for constructive service, all of these alleged postal documents should have been sufficient to alert members of the AG's office that they were openly suspicious and involved possible fraud and deception.  The AG should have been properly monitoring 96-1320 and promptly brought the discrepancies (between what BISOM was saying and BRADSHAW's letter to the AG on Jul 14, 1999) to the attention of the court.

123.  It is unclear when the AG first became aware of the fact that BISOM had alleged postal records which showed contrary and contradicting facts (two showed that BRADSHAW did not claim two certified letters to him while others showed that an unidentified party, possibly named Manny, accepted mailing documents allegedly sent by BISOM to him), but

34

the AG made no effort to resolve this paradox and contradiction of supposed reality. It's possible that the AG was simply so incompetent that this information was never comprehended though it was available in 1997 when most of the documents were allegedly prepared; or it's possible that BISOM simply hid the alleged postal records from the AG and did not allow the AG to find out about the 1997 documents until the 96-1320 trial in 2000.

124.  Whenever the AG found out about the postal documents (which were a total complete contradiction to BRADSHAW's letter of Jul 14, 1999), the AG should have protested to the court and at least filed an appeal to the Supreme Court on the illegal postal documents filed by BISOM.   Regardless of why, the AG was grossly incompetent, irresponsible and malpracticing in not addressing these fraudulent postal documents used by BISOM to get a default judgment against BRADSHAW.

125.  The primary action of the AG was to allow the court to enter a default judgment on BRADSHAW without exercising due care and recognizing the fiduciary responsibility which the AG had in its role of protecting and defending the CNMI and its officials, like BRADSHAW.  BRADSHAW was never notified or informed at all on what was happening in court on this case or on the AG's withdrawal.

126.  At some point in time, the AG violated CNMI court rules/laws and also produced alleged postal receipts on supposed letters sent by the AG to BRADSHAW by certified mail None of these communications were received by BRADSHAW.  But the postal receipts that were made out and submitted to the court by the AG showed receipt by allegedly the same unidentified and unknown party (Manny) as the receipts which were presented by BISOM to the SC; thus presenting prima facie evidence of conspiracy between BISOM and some

person(s) in the AG's office in violation of 18 USC 241-242, 1341-1342, 1349, 1707.

127.  The AG's presentation of fraudulent postal receipts in connection with alleged letters from the AG to BRADSHAW raise the spectrum that the AG's action not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his constitutional rights (violating 18 USC 241-242).  The US Supreme Court has ruled that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitations" (Supermarket of Marlinton v. Meadow Gold Dairies).

128.  The actions and omissions of the AG during the years 1997-2002 were sufficient to establish that there was gross incompetence, malfeasance, malpractice, omissions, lack of care, violations of court rules and fraud and conspiracy by the AG to deliberately and maliciously deny BRADSHAW his rights under the US Constitution.  The actions and omissions of person(s) with the AG in 1997-2002 allow for fraud and conspiracy with BISOM.

129.  Clearly, much of the AG malpractice and possible conspiracy and fraud must be placed on Asst AG L. DAVID SOSEBEE, the lead attorney on 96-1320.  But the problems evidently arose while defendant FORELLI was acting AG and while defendants BUSH and CLAYTON both also worked on the 96-1320 case.

130.  The actions of the CNMI and its AG agents FORELLI, SOSEBEE, CLAYTON and BUSH violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property.  The AG agents acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW.  BRADSHAW's

character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants.  BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury.  The remedy is for the court to order restitution, removal of the illegally gained judgment and payment of damages to plaintiff.

### THIRD CLAIM--Civil Rights Violations (42 USC section 1983), AG Gross Incompetence and Malpractice and AG Obstruction of Justice and Actions to Hide and Cover-up Criminal Actions Manifested in the CNMI Courts

131.   Plaintiff BRADSHAW herein by reference paragraph 1 to 130 hereinabove alleged as if set forth here in full.

132.  Upon learning of the default judgment against him in Apr 2004, plaintiff BRADSHAW undertook action during the summer of 2004; and unsuccessfully tried to find a lawyer (no Saipan attorneys were found who would take a case against judges because of economic prejudice.  As one lawyer said--it would be devastating to his legal career to take a case against CNMI judges) but eventually learned of the alleged postal return receipts.

133.  On Sep. 12, 2004, BRADSHAW contacted the AG by phone and from then until Feb 2005 plaintiff made some 25 phone calls and wrote letters to have the fraudulent mailing documents investigated by US postal inspectors and the FBI.  Reportedly AG PAMELA BROWN was fully informed on plaintiff's contacts and requests, but chose to essentially do nothing but lie, deceive, twist, distort, procrastinate, delay, stall, deny and obsfucate.

134.  Plaintiff's needs were simple with a request that the alleged fraudulent documents be sent to US investigatory people; that BROWN'S office take steps to file a motion in the CNMI court under civil rule 60 to void the judgment against BRADSHAW; and as an interim measure, that the CNMI pay the $139,000 judgment to BISOM.

135.  If BROWN would have acted responsibly to resolve the issues before her with some action as the chief law enforcement officer of the CNMI, BRADSHAW's litigation before the US courts would have been unnecessary.  Much of this case could have been easily handled by the CNMI without any particular expense or effort.  As a minimum, BROWN could have written BRADSHAW explaining the alleged basis, legality and propriety of the default judgment.  Yet, BROWN did nothing but acted to hide information from BRADSHAW and keep BRADSHAW in ignorance about what was in the case file and what the AG was doing on it.

136.  As described herein plaintiff learned from the Clerk that the fraudulent mailing receipts in the CNMI case file were, all of a sudden, missing.  Since these documents were in the possession of AG BROWN, the prima facie evidence is that defendant BROWN or persons under her supervision or some other CNMI employee have hidden or destroyed the receipts.

137.  This reality and the facts outlined above plainly suggest the obstruction of justice and hiding of criminal acts by defendant BROWN in cases which were before both the CNMI SC (96-1320) and the US District Court of Idaho (05-84).

138.  As far as the alleged mailing envelopes from BISOM to BRADSHAW, reportedly in the 96-1320 file supposedly justifying the default judgment, BROWN must have known about these documents, yet never informed BRADSHAW, thus, necessitating much guesswork by BRADSHAW in early March 2005 on what happened.

139.  Defendant BROWN appears to never put anything in writing, but rather to only commit to writing when it becomes absolutely necessary.  Without written documents, any contact with the AG becomes difficult.  Without things in writing, it is easy to lie, deceive, twist, distort, deny, obsfucate, stall and generally obstruct justice.

140.  After many letters and phone calls over a period of five months from BRADSHAW to the AG requesting indemnification on the BISOM judgment, BROWN finally acknowledged BRADSHAW's many attempts to resolve that issue.  On Feb. 23, 2005, BRADSHAW received the letter at Exhibit A from AG BROWN.  Though characterized by at least one mistake, this letter denied BRADSHAW indemnification by essentially citing the Supreme Court decision.

141.  On the mistake in this letter, the AG charged that since its April 2004 letter that "Almost six months later," BRADSHAW sent the AG a request for indemnification.  This charge is not correct and it does matter if the present AG is attempting to prove that BRADSHAW neglected this case with any unnecessary time delays after his notification in April 2004.   Actually, following the conversation with the AG on Sep. 12, 2004 (as elsewhere described herein), BRADSHAW, faxed a letter requesting indemnification to the AG (on Sep 13, 2004 and copies of the material covered under the affidavits at Exhibits A to C.

142.  Later, Ed Buckingham orally confirmed the receipt of these faxes in a telephone conversation.  BRADSHAW next sent the AG registered mail with the Sep. 12, 2004 request for indemnification on Sep. 13, 2004.  This registered letter was receipted by the AG on Sep. 28, 2004.  Yet the AG's letter seems disingenuous in alleging that BRADSHAW's request was received "almost six months later" on Sep. 29, 2004, a day after it was actually received (implying that BRADSHAW took almost six months to contact the AG).

143.  The initial notification letter from the AG, dated Apr. 6, 2004 (at Exhibit "A," which, per its mailing envelope, was mailed on Saipan on Apr. 7, 2004), was also received some fifteen days later by BRADSHAW about Apr. 22, 2004.  This means that the actual elapse of time between the AG notification to BRADSHAW and his contact of the AG was over four months and not almost six months as alleged by the AG.  This time was spent in pursuit of trying to find legal help and someone to actually check the 96-1320 file to determine what had happened.

144.  Thus, PAMELA BROWN made it plain that the AG would do nothing for me beyond a short "limited" telephone call to a local attorney on my options, meaning that henceforth BRADSHAW was denied any legal assistance from the AG.  Actually, it appears that AG discontinued legal assistance to BRADSHAW in early 2000 and has done nothing for BRADSHAW since then.  This means that all of BRADSHAW's letters, phone calls and contacts have been a total waste of time as the AG did nothing and made no effort to apprise BRADSHAW of the status of case 96-1320.

145.  So the official position of the CNMI government is that the decisions of the CNMI courts have ruled out any possibility of BRADSHAW receiving any form of reimbursement or restitution for the deliberate and malicious injustice, injury and damage put on BRADSHAW by BISOM, SORENSEN and the CNMI and its agents in the AG's office and courts in 1997-2005, beyond the option of a successful criminal action and/or this suit in Federal court.

146.  Otherwise, it is to be noted that paragraphs two, three and four of the AG letter of Feb. 15, 2005 also clearly acknowledge that BRADSHAW was first given notice in April 2004 of the CNMI court actions that took place to damage and hurt him in 1997-2002.

147.  Defendant BROWN'S actions (to obstruct justice and act to cover up criminal actions in the CNMI) from Sep 2004 to date have been to violate BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property.

148.  Defendant BROWN's actions were deliberate and malicious and were made in a possible conspiratorial mode to mislead the US and CNMI courts in cases before the courts; and thereby violate BRADSHAW's rights under the US Constitution. With such actions, BRADSHAW was denied due process.

149.  Defendant BROWN's actions have been deliberately designed to keep BRADSHAW in a state of ignorance about what had happened on case 96-1320 and not allow BRADSHAW to obtain needed documents to prove the conspiracy and fraud perpetuated upon him by BISOM and the CNMI.

150.  The actions of the CNMI and its agent BROWN violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property.  BROWN acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW.  BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants.  BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury.  The remedy is for the court to order restitution, removal of the illegally

gained CNMI judgment and payment of damages to BRADSHAW.

## FOURTH CLAIM--Civil Rights Violations (42 USC section 1981 and 1983), and Conspiracy and Fraud and Violations of CNMI Court Rules

151. Plaintiff BRADSHAW herein by reference paragraph 1-150 hereinabove alleged as if set forth here in full.

152. The trial of CNMI SC 96-1320 commenced about Feb 7, 2000. It was characterized by much confusion and contradictory paradoxes which defendant CASTRO allowed into evidence as well as BRADSHAW's letter of Jul 14, 1999 which he should have taken note of because of its relevance. Rather than obey CNMI court rules, CASTRO made his own rules and law as he went along to deprive BRADSHAW of his due process rights.

153. BISOM offered to the court postal documents which allegedly showed that BISOM twice mailed his complaint to BRADSHAW in a certified envelope showing the name and return address of "Jay H. Sorensen Esq." These mailings were allegedly returned as unclaimed. Contrariwise, BISOM also offered evidence in the form of alleged certified mailings and return receipts that service was made on BRADSHAW with the acceptance of the mailings by a person allegedly named "Manny." BISOM also introduced into evidence documents showing that the AG accepted service for BRADSHAW.

154. Defendant CASTRO violated CNMI court rules and allowed the conflicting, confusing and contradicting material from BISOM into evidence as truth with no effective opposition from the AG. Of course, it would be absolutely ludicrous to believe that BRADSHAW refused service all the while that BRADSHAW and his alleged AG lawyer also accepted service. Which way was it? Did BRADSHAW refuse service or did he accept

service?  Yet, defendant CASTRO allowed both options into evidence as true.

155.  The AG apparently did introduce at some point in time BRADSHAW's letter of Jul 14, 1999 which categorically acknowledged two things.  First two certified mail packets did come to BRADSHAW but without an identification as to the mailer.  Though BRADSHAW did at first assume that the first one came form SORENSEN, the contents of those two packets, unclaimed by BRADSHAW, remain a mystery.  No one, beyond the mailers, knows what was in the packets.  Second, BRADSHAW's Jul 14 letter also declared that no personal service was ever made on BRADSHAW and if BISOM claimed it in court it would be fraud on his part.

156.  Defendant CASTRO obviously read this letter and surely understood its message though he refused to allow it into evidence.  This letter was written back in 1999 when the facts were close and first hand knowledge to BRADSHAW.  It totally contradicted everything which BISOM submitted to the court on alleged evidence.  Defendant CASTRO made no effort to resolve the total contradicting, confusing and impossible pieces of evidence before him from BRADSHAW and BISOM.  Defendant CASTRO took the easy way out by ignoring the conflicts and accepting the evidence submitted by BISOM--though the BISOM evidence was likewise totally conflicting, confusing and contradicting and fraudulent per BRADSHAW.

157.  Too the AG apparently maintained six days before the trial and during the trial that the AG did not represent  BRADSHAW (as found by the CNMI Supreme Court); yet defendant CASTRO in his Feb 22, 2000 order actually found that the AG did represent BRADSHAW.  Which way was it?  Did BRADSHAW have AG representation or not?

158.  Anyway CASTRO in his Feb 22 order declared that BRADSHAW avoided service and that BRADSHAW had legal representation in court.  This order came out in the form of an

order denying motion to remove case from trial docket as made by the AG.  The service remarks were incidental to the issue of removal.  Though BISOM had filed a motion in mid Feb 2000 for a default judgment against BRADSHAW, it appears that CASTRO never issued any order on the motion beyond his remarks on the AG motion to remove the case from trial.

159.  Since the CNMI rules do not address the use of certified mail for service (unless 7 CMC was still in effect) and since the CNMI SC had never established personal jurisdiction over BRADSHAW in any previous legally authorized method of service, defendant CASTRO's decision that BRADSHAW avoided service was wrong and lacked legal justification.  BRADSHAW was daily at a retail business in 1996-1998 and could have been easily served.  He never avoided service as his letters to the AG substantiate that fact.

160.  As discussed previously herein, the CNMI civil procedures in 1997 specified "personal" service on defendants in the US and in a manner not prohibited by law, rules 4(e) and (k).  Plainly, defendant CASTRO allowed documents into court which were illegal and contrary to the CNMI's own rules.  As a minimum, judge CASTRO's actions violated Washington state's statutory laws and rules of civil procedure.

161.  As outlined earlier herein, CNMI rule 4(m) on time limit for service was simply never obeyed by any of the parties in 96-1320.  As a minimum, CASTRO was the presiding judge and during the trial would have been fully exposed to the facts on the non-compliance with rule 4(m).  Yet, CASTRO did nothing.  As a minimum, judge CASTRO should have been familiar with his own court rules and procedures.  Surely, he had a duty on April 5, 1997 (some 26 days before BISOM filed his first amended complaint on May 1, 1997) and again in Mar 1999 to dismiss the complaint against BRADSHAW under rule 4(m).

162.  Too, the first cite of allegations of avoidance of service and default apparently surfaced in the mid Feb 2000 motion by BISOM (either that or the AG was so incredibly incompetent to defy all reasonable explanations).  If CASTRO was doing his job, 96-1320 should have been dismissed against BRADSHAW long before the trial date.

163.  Thus, by the CNMI civil procedures, all actions taken by BISOM and the SC after April 5, 1997 were illegal and without force of law.  The AG was duty bound to file for a dismissal on Apr 5, 1997.  Failing that action from the AG, judge CASTRO was himself duty bound by rule 4(m) to initiate action on Apr 5, 1997 to dismiss the action against BRADSHAW unless BISOM showed good cause for the failure, and the court appropriately acted by court order to extend the time for service for a specified period of time as provided for in the rules. Manifestly CASTRO repeatedly denied BRADSHAW his due process rights under the US Constitution, starting in Apr 1997 and continuing until the trial in Feb 2000.

164.  Defendant CASTRO's illegal, confusing, unclear and contradicting actions were certifiably reckless, deliberate, malicious and intentional with an objective to place injury and hurt on BRADSHAW.  His actions could have been caused by gross incompetence, or possibly CASTRO was involved in the BISOM conspiracy and fraud against BRADSHAW, or possibly CASTRO exercised personal discrimination against BRADSHAW, a US state-sider (in violation of 42 US 1981.  Per an 10th Circuit Court of Appeals decision, 42 USC 1981 is not limited to the technical restrictive meaning of the word "race").  Some CNMI officials discriminate against stateside Americans in the vein of so-called reverse discrimination. While the American BISOM was at issue, it was far more practical and easier for judge CASTRO to simply decide issues against BRADSHAW than against BISOM since BISOM's

lawyer was in court demanding and arguing issues for BISOM.

165. BRADSHAW was not present and had no lawyer in court and without any notice of the action in progress in court. As a minimum, defendant CASTRO took the easy way out and found for BISOM and against the unrepresented BRADSHAW.

166. While defendant CASTRO declared in one order that BRADSHAW was represented by the AG, he otherwise knew and understood that the case was proceeding without any involvement from BRADSHAW or without BRADSHAW even having counsel present or of having notification from the AG or the court on the case.

167. BRADSHAW's Jul. 14, 1999 letter was presented to the court by his alleged former attorney, the AG--despite the AG's withdrawal from the case just before the trial started. Allegedly, the AG submitted to the court this Jul. 14, 1999 letter from BRADSHAW; not to help BRADSHAW, but rather to justify the actions of the AG in not properly representing BRADSHAW in SC 96-1320 and/or in collusion with defendants BISOM/SORENSEN and possibly defendant CASTRO in a conspiracy to defraud BRADSHAW and the CNMI.

168. This Jul. 14, 1999 letter seems to be the only evidence used in court to support the AG's allegation that BRADSHAW did not want AG representation or indemnification from the CNMI for any resulting judgment as argued by the AG and as found by the CNMI courts. But this letter, nor any other communications from BRADSHAW, allowed for those conclusions. BRADSHAW always wanted AG representation and indemnification.

169. BRADSHAW's message to the AG was always that upon service, the AG would be contacted to file an answer and to represent BRADSHAW in court on the complaint, and with an implied request from BRADSHAW for indemnification upon service (since this letter

was sent to the AG before the trial even took place and since the court found that service had occurred [with the court's acceptance of BISOM's documents used in his motion for a default judgment], the reality is that BRADSHAW did request both assistance and indemnification in the context of the alleged service stipulated by the court to enter the default judgment).

170.  In the absence of service on 96-1320, there was no need for the AG to file an answer or to represent BRADSHAW--beyond going into court and having BRADSHAW's name stricken from the case, as the AG was supposed to do and as authorized by BRADSHAW in July 1999.  Though BRADSHAW's communications were clear enough, the AG went on and accepted service (without the knowledge, consent or authorization of BRADSHAW) and then withdrew from the case just before the trial commenced (leaving BRADSHAW served in the case but without notice and without counsel in court).

171.  Defendant CASTRO, as the presiding judge, must have understood what was happening in his own court room.  He accepted the AG withdrawal and proceeded with the trial though BRADSHAW had no representation and was never given notice of the trial.

172.  The only evidence in court from BRADSHAW to support the AG withdrawal and the AG's argument that BRADSHAW did not want indemnification was the Jul. 14, 1999 letter which defendant CASTRO read, considered and refused to admit into evidence.

173.  Surely CASTRO grasped the content of the Jul. 14, 1999 letter which made it clear that the primary issue in the letter was service and not directly focusing on whether the AG should or should not be the attorney for BRADSHAW or whether the CNMI should or should not indemnify BRADSHAW upon a court judgment.  With service, there is the obvious fact that BRADSHAW expected both AG representation and indemnification.

174.  Defendant CASTRO must have been cognizant in court that something was wrong when a trial was proceeding and a default judgment of $139,000 was being entered against BRADSHAW with BRADSHAW not being present in court and BRADSHAW not having any legal representation present, and all in the context that BRADSHAW's alleged former counsel, the AG, had a written communication from BRADSHAW indicating that no service had ever taken place and that no constructive service was possible, and even that if BISOM tried to produce some such documentation, the documents would constitute fraud.

175.  After receiving the default judgment of $139,000, BISOM asked the court to order its payment on the basis of the Indemnification Act.  CASTRO refused to allow the payment on the premise that BRADSHAW had not asked for representation and indemnification.

176.  Since BRADSHAW was given no notice from the CNMI; knew nothing about the trial and the alleged service; had assumed that the AG was his counsel; and the fact that BRADSHAW honesty believed that the AG had went into court and had his name removed from 96-1320; and that no answer in court had ever been forthcoming from BRADSHAW or his alleged AG counsel, defendant CASTRO refused to allow BRADSHAW indemnification.

177.  Defendant CASTRO failed to exercise due care and responsibility as the trial judge by allowing the trial to proceed in the absence of BRADSHAW being present or having counsel present or of being given notice of the trial; and in view of documentation held by the AG from BRADSHAW showing no service and not even constructive service.

178.  The alleged postal receipts from an unknown party and the two unclaimed certified envelopes with SORENSEN's name of them, as submitted in the trial court, should have been sufficient for the trial judge to have immediate hard questions about the case and

whether it should proceed or not and especially in view of the letter produced by the AG showing two mysterious certified letters with no name, and evidence of no service and conclusions of fraud for any alleged service which might be introduced by BISOM.

179.  In the interest of justice, defendant CASTRO had a duty to exercise due care and concern over the interests and constitutional rights of BRADSHAW, who was not in court and who was not represented by his supposed legal and proper attorney, the AG.

180.  Yet, CASTRO did little or nothing in the trial to establish justice and entered a default judgment against BRADSHAW when there was substantial evidence of fraud and conspiracy on the part of BISOM; and evidence of fraud, conspiracy, malfeasance, malpractice, inexcusable neglect and general incompetence on the part of the AG, who was supposed to be representing and defending BRADSHAW.

181.  Though the evidence was plain enough of what was happening, defendant CASTRO denied BRADSHAW's basic rights under the US Constitution and proceeded to order a judgment of $139,000 individually against BRADSHAW and then refused to allow the imposition of the CNMI Indemnification Act to relieve the burden from BRADSHAW.

182.  The charges made against BRADSHAW by BISOM were effectively declared true by the actions of CASTRO.  BRADSHAW was found guilty of practicing discrimination against BISOM and of discharging BISOM illegally/improperly.  BRADSHAW never had his day in court to answer the charges--whether they be true or false.

183. CASTRO's decision to admit bogus documents into court and to refuse to grasp or apply BRADSHAW's communications with the AG resulted in the judgment of $139,000 against BRADSHAW and contributed to the payout of some $140,000 by the CNMI.  BISOM

49

did not earn these judgments in court; but rather, by a default judgment from CASTRO.

184.  While defendant CASTRO may have had some possible basis to question the BRADSHAW letter in terms of admittance into evidence, he certainly knew or should have known that something was wrong with the proceedings going on in his court.  He should have, as a minimum, issued a stay or delay in proceedings with an order to the AG to satisfactorily resolve the conflicting issues before the trial proceeded.

185.  Clearly, defendant CASTRO violated CNMI court rules and recklessly and maliciously misused and abused the power he possessed as the trial judge in 96-1320 to aid, abet, allow, promote, join-in and cover-up the commission of fraud and conspiracy in his court and deny plaintiff BRADSHAW of his rights, property and liberty under 42 USC 1983 and deny BRADSHAW his rights and benefits under the US Constitution.

186.  The actions of judge CASTRO to accept the presentation of fraudulent postal documents from BISOM and the AG also raise the spectrum that the Judge's actions not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud imposed on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his rights by the AG and Judge.

187.  Defendant CASTRO was charged with an affirmative duty to prevent the violation of US constitutional rights in his court.  Defendant CASTRO maliciously and irresponsibly failed in this duty.  He violated both the CNMI court rules and procedures and the US Constitution in his failures in court.

188. The actions of the CNMI and its agent judge CASTRO violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and