Robert D. Bradshaw
PO Box 473
1530 W. Trout Creek Road
Calder, Idaho 83808
Phone 208-245-1691

Plaintiff, Pro Se

F I L E D
Clerk
District Court

SEP 2 2 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT D. BRADSHAW )<br><br>    Plaintiff )<br><br>    v. )<br><br>COMMONWEALTH OF THE NORTHERN )<br>MARIANA ISLANDS (hereafter referred to )<br>as the CNMI); NICOLE C. FORELLI, former )<br>Acting Attorney General of the CNMI, in her )<br>personal/individual capacity; WILLIAM C. )<br>BUSH, former Assistant Attorney General of )<br>the CNMI, in his personal/individual capacity; )<br>**D. DOUGLAS COTTON, former** )<br>**Assistant Attorney General of the CNMI** )<br>**in his personal/individual capacity;** L. )<br>DAVID SOSEBEE, former Assistant Attorney )<br>General of the CNMI, in his personal/individual )<br>capacity; ANDREW CLAYTON, former )<br>Assistant Attorney General of the CNMI, in his )<br>personal/individual capacity; Other )<br>UNKNOWN and UNNAMED person or )<br>persons in the CNMI OFFICE OF THE )<br>ATTORNEY GENERAL, in their )<br>personal/individual capacity, in 1996-2002; )<br>ALEXANDRO C. CASTRO, former Judge Pro )<br>Tem of the CNMI SUPERIOR COURT, in his )<br>personal/individual capacity; JOHN A. ) | Case No. CV 05-0027<br><br><br><br><br>**AMENDED COMPLAINT** |

1

```
MANGLONA, Associate Justice of the      )
CNMI Supreme Court, in his              )
personal/individual capacity; TIMOTHY H. )
BELLAS, former Justice Pro Tem of the CNMI )
Supreme Court, in his personal/individual )
capacity; PAMELA S. BROWN, present      )
Attorney General of the CNMI; in her    )
personal/individual capacity;           )
ROBERT A. BISOM; and JAY H. SORENSEN.)
         Defendants                     )
```

Plaintiff alleges:

## JURISDICTION

1. This case was first filed in the US District Court of Idaho on Mar 7, 2005 (Civil case 05-84). It was dismissed on Mar 25, 2005 for lack of personal jurisdiction without prejudice with notice to plaintiff on Mar 29, 2005. It is being refiled in the US District Court of the CNMI.

2. It is a civil rights action seeking redress for plaintiff BRADSHAW due to acts and omissions by defendants, who, generally with alleged color of law and color of authority, have subjected the plaintiff to the deprivation of his rights and privileges under the US Constitution and laws; the Civil Rights Acts of 1870 and 1871; the Immigration Reform and Control Act of 1986; 42 USC sections 1981, 1983; 1985, 1986 and 2000; and for violations of 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1964; and for violations to plaintiff's constitutional rights under the Fifth, Ninth and 14th Amendments of the US Constitution.

3. While the defendant CNMI officials, officers, employees and agents, as cited herein, have pretended to be clothed with alleged color of law/authority in their acts and omissions against plaintiff, they have actually violated a number of US laws and the US Constitution

which they were duty bound to uphold and support, as will hereafter be described.

4. Section 903 of the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America," states: "Nothing herein shall prevent the presentation of cases or controversies arising under this Covenant to courts established by the Constitution or laws of the United States. It is intended that any such cases or controversies will be justifiable in such courts..." The CNMI, like the US states, is not immune for its actions involving discrimination on the basis of race, color, religion, age, sex, handicap, national origin and other forms, and/or violations of civil and/or constitutional rights, and/or violations against their own duties under law and/or when federal funding is involved. The CNMI is not immune from law suits involving situations related to incidents involving any program that receives assistance in federal funding (42 USC 2000). Much of CNMI activities involve US funding/grants.

5. As this case involves an action over $75,000 and between citizens of different US states and jurisdictions, the US Courts have jurisdiction. The issue herein offers both personal and subject matter jurisdiction to the Federal courts as per the US Constitution.

6. The court has original jurisdiction of the claims by virtue of the Federal Rules of Civil Procedure; Federal Rules of Evidence; The Immigration Reform and Control Act of 1986; Title 18 USC 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1965; Title 28 USC 1331, 1332, 1339, 1343, 1391, 1392, and 1652; Title 42 USC 1981 to 2000; and the Common Law. Title 28 USC 1339 applies because this suit involves alleged postal fraud under 18 USC 1341-1342, and 1707 in that some of the defendants misappropriated US postal forms to use in fraud and conspiracy upon plaintiff BRADSHAW. The court has supplemental jurisdiction

over the related claims arising under the laws of the CNMI pursuant to 28 USC 1367.

**PARTIES**

7. Plaintiff is a citizen of the United States and during the times relevant to this complaint was a resident of the CNMI, and the states of Washington and Idaho.

8. Defendant NICOLE C. FORELLI, former Acting Attorney General (hereafter referred to as AG) of the CNMI from on or about Jan. 25, 2000 to on or about Feb. 10, 2000, is a citizen of the United States and a resident of Hawaii.

9. Defendant WILLIAM C. BUSH, former Assistant (Asst) AG OF THE CNMI in 1999, is a citizen of the United States and a resident of Washington, DC.

10. Defendant L. DAVID SOSEBEE, former Asst AG OF THE CNMI, in 2000, is a citizen of the United States and a resident of Texas.

11. Defendant ANDREW CLAYTON, former Asst AG OF THE CNMI from about 2000 to 2002, is a citizen of the United States and possibly a resident of China or the US.

**12. Defendant D. DOUGLAS COTTON, former Asst AG OF THE CNMI in 1996-1999, is a citizen of the United States and a resident of Texas.**

13. Defendant(s) UNKNOWN and UNNAMED person or persons of the Office of the CNMI ATTORNEY GENERAL, in 1996-2005, are currently unidentified and/or unknown to plaintiff, and could not be reasonably discovered prior the filing of this Complaint, but whose identities plaintiff expects will become known through discovery. Plaintiff will amend this Complaint to allege said defendant(s) true names and capacities when that information becomes known through discovery. Plaintiff is informed, believes and thereon alleges that these UNKNOWN and UNNAMED defendants are also legally responsible and liable for the

incidents, injuries and damages hereinafter set forth, and that each of said defendant(s) proximately caused the injuries and damages by reason of gross negligence, carelessness, deliberately indifferent, intentional, willful or wanton misconduct, and fraud and conspiracy or conspiracies in creating and otherwise causing the incidents, conditions and circumstances hereinafter set forth, or by reason or impugned negligence or vicarious fault or breach of duty arising out of the matters herein alleged.

14.   Defendant ALEXANDRO C. CASTRO, former Judge Pro Tem of the SUPERIOR COURT (hereafter referred to as SC) from about 1996 to 2000, and now an Associate Justice of the Supreme Court, is a national/citizen of the United States and a resident of the CNMI.

15.   Defendant JOHN A. MANGLONA, Associate Justice of the Supreme Court of the CNMI, is a national/citizen of the United States and a resident of the CNMI.

16.   Defendant TIMOTHY H. BELLAS, former Justice Pro Tem of the Supreme Court of the CNMI in 2002, is a citizen of the United States and a resident of the CNMI.

17.   Defendant ROBERT A. BISOM, plaintiff in CNMI SP Civil Case 96-1320, is a citizen of the United States, and is possibly a resident of Japan or the US.

18.   Defendant JAY H. SORENSEN, attorney for ROBERT A. BISOM in SP Civil Case 96-1320, and an officer of the CNMI courts in that trial in Feb.-Mar. 2000 and during its 2002 appeal to the CNMI Supreme Court (Appeal Nos. 00-0016 & 0023-GA, Consolidated) is a citizen of the United States and possibly a resident of the US or China.

19   Defendant PAMELA S. BROWN is the Attorney General of the CNMI and a citizen of the United States and a resident of the CNMI.

20. Defendants BROWN, FORELLI, BUSH, **COTTON,** CLAYTON and SOSEBEE of the CNMI AG's office; and defendants CASTRO, MANGLONA and BELLAS of the CNMI Courts were all employees, officials, officers and agents of the defendant CNMI at the time of their actions and omissions involving plaintiff BRADSHAW.

21. Defendant COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS (CNMI) is a political and governmental entity in union with the United States of America with its primary and central government offices located on Saipan Island.

22. The relationship and linkage between the USA and the CNMI is set forth primarily in the 1976 "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America" and Title 48 USC 1801.

## FACTS AND GENERAL ALLEGATIONS

23. In 1993-1994, ROBERT A. BISOM worked as an CNMI employee under the supervision of the plaintiff, then Temporary Public Auditor. Plaintiff fired BISOM for cause. BISOM brought suit on Nov. 14, 1995 against the CNMI and BRADSHAW in a suit filed in the US District Court (case number 95-0042). BRADSHAW was duly served and contacted the CNMI AG to answer the complaint and represent BRADSHAW in court. The AG provided this service with much contact by mail and telephone between BRADSHAW and the AG's office in 1995-1997. The initial complaint was served on BRADSHAW, but BRADSHAW allowed the CNMI AG to accept all subsequent proceedings on his behalf in this one case. The suit was dismissed by the US District Court and the decision was upheld by the US Court of Appeals on Mar 27, 1997 (Ninth Circuit Court of Appeals, No. 96-17369).

24. BISOM made changes to his former US DC lawsuit and then filed it in the CNMI SC against BRADSHAW and others on Dec. 5, 1996 (case no. 96-1320). On Dec. 6, 1996, the CNMI AG advised BRADSHAW by letter (copy at Exhibit "A") that local news reports said that BISOM had filed the complaint in the CNMI SC and that BRADSHAW should contact the AG at once when he was served with the complaint. By letter, BRADSHAW advised the CNMI AG that the AG was not to accept service for BRADSHAW on this complaint and that BRADSHAW would immediately contact the AG for an answer upon service by BISOM.

25. Though the AG was properly BRADSHAW's attorney, BRADSHAW does not allow **other persons** to accept initial service of legal processes to establish court jurisdiction over him. BRADSHAW insists that any such initial services be made on him personally so that he can fully know and understand the complaint. Too, BRADSHAW was aware of competence problems with the AG and does not trust them to properly handle matters. Finally, the CNMI procedure for indemnification is for a party to be first served and then the party is to contact the AG to file an answer. This is the CNMI procedure which is to be followed.

26. In case number 95-0042 in 1995, BISOM served BRADSHAW by a certified letter without any identification as to mailer on the envelope. It came with only a return post office box, as typed directly on a large brown mailing envelope. Thereafter, BRADSHAW discussed with the AG the propriety of having to accept certified mailings from a party (Robert Kingsley; and likely also Robert Dunlap/Doug Cotton).

27. It was BRADSHAW's understanding from the AG that a person has no legal obligation to accept mail, certified or not, from anyone. While acceptance of such mail can create a legal tie, non-acceptance or refusal to accept or claim such mail does not establish a

legal binding relationship; although once a person is properly served with process and comes under the jurisdiction of the involved court, a legal need does then arise to accept further mailings and legal notices.

28. So while accepted mail can constitute service of process, non-accepted mail cannot be used to prove refusal of service of process in an initial service of process to establish court jurisdiction over a person. Section 1104(a) of 7 CMC, Div 1 (1987) tied certified mail service to section 1102 which said that "The Legislature intends that jurisdiction under this Section shall be coextensive with the minimum standards of due process as determined in the United States Federal Courts." Under the FRCP, it is erroneous to believe "that service could be effected by mail without the affirmative cooperation of the defendant" (v. 4, p. 9, 2000 ed, Wright & Miller," Federal Practice & Procedure"). Thus, mail service is limited and is totally dependent upon the cooperation of the defendant.

29. Failing any initial contact for a court to establish jurisdiction over a party, mail does not have to be accepted unless a waiver has been signed. Obviously, if non-accepted mail constituted a rejection or refusal of service of process and a default, it would make no sense for court rules to allow a party to question sufficiency of process. All that a complainant would have to do is to serve process by certified mail. The defendant would either have to accept the mailing (and be served) or if he rejects the mailing he would also automatically end up being served or purposefully avoiding service. There would be no need for process servers since certified mail to a party would automatically either prove service or a refusal of service.

30. In the pre-1996 US Rules of Civil Procedure (FRCP), there was a provision of service by certified mail return receipt. It provided for acceptance of service but did not prove

refusal of service. It provided simply that with a refusal to accept certified mailings, the complainant would have to use a process server (or publication in the CNMI, per Section 1104, 7 CMC, Div 1). The same applies in the 1996 revision (v. 4, p. 11, 2000 ed, Wright & Miller, "Federal Practice & Procedure"). In fact, the old rule 4c said that a second mailing was not to be made if a first mail attempt failed (v. 4, p. 59, ibid, 1987 ed). The civil court rules in some states expressly allow service of process by certified mail but other state rules do not address the subject (as is true with Idaho). Even when authorized, some states stipulate that only the clerk of court can make the mailings in order to control their propriety.

31. Washington state Superior Court Civil Rule 4(c) states: "Service of summons and process, except when service is by publication, shall be by the sheriff of the court wherein the service is made, or by his deputy, or by any person over 18 years of age who is competent to be a witness in the action, other than a party." Certified mail return receipt to establish initial service for court jurisdiction do not seem to have been authorized in the state of Washington in 1997 (though some certified mail return receipt practices are cited under rule 4.1 which address domestic relation actions, such as divorce).

32. The point is that a certified letter return receipt in Washington state will not provide a suitable witness in court in contrast to a human process server. Since BRADSHAW resided in Washington state in 1997, any service on him would have had to comply with Washington state laws in order to comply with the 14th amendment to the US Constitution which governs state to state relations in terms of due process **and equal protection** of law. The CNMI cannot come into Washington state and violate Washington state laws as would occur if the CNMI held the necessity for a person to accept certified mail service of process.

33. The Revised Code of Washington (4.28.80) has a case note which reads: "Failing to come to door to receive service of process does not constitute evasion of service; those who are to be served with process are under no obligation to arrange time and place for service or to otherwise accommodate process server. Weiss v. Glemp, 127 Wash. 2d 726, 903 P 2d 455 (1995)." Obviously, the same reasoning applies to certified mail. No one in the state of Washington has to accept it or be found avoiding service.

34. Even in the use of waivers in FRCP, there is a strange silence about the issue of certified mail. The use of the waiver (which have to be recognized as delivered) states that with a defendant's rejection, the use of process servers or service by publication must be followed in order to properly assess the costs of service on the defendant (v. 4, p. 11, 2000 ed, Wright & Miller). One Court of Appeals said a plaintiff had to use personal service after mailing a waiver to a defendant who did not respond (ibid).

35. Obviously, before the postal tracking services since 2004, US mail services offered opportunities for mail fraud and even certified mail was not totally reliable (as the US Congress foresaw--v, 4, p. 56, "Federal Practice & Procedure," Wright & Miller, 1987 ed).

36. The point is that in the absence of rules or law that expressly allow certified mailings and regulate them, it seems out of the question that non-claimed certified mail can be used to prove a refusal to be served and a default judgment on a party (in the absence of an initial imposition of service and court jurisdiction).

37. The CNMI rules of civil procedure (rule 4) do not address certified mail service at all (but in 7 CMC, Div 1 unless repealed). Thus, BRADSHAW understood from the AG that he did not have to accept certified letters from anyone, whether identified as to mailers or not.

38. In BRADSHAW v. CNMI et. al. (USDC Idaho 5-84), defendants SORENSEN and BISOM received notice of service of process. Yet both objected to it in their motion to dismiss on July 7, 2005 on the premise that "Knowledge does not constitute service... Actual notice does not substitute for proper service of process, otherwise it would be nonsensical for the Federal Rules of Civil Procedure to provide for a motion to dismiss based on insufficiency of service of process (Dahl v. Kanawha Inv. Holding Co., 161 f.R.D. 673, 681, N.D. Iowa 1995)."

39. So even if the AG had notified BRADSHAW of pending service (as happened) and even if BRADSHAW may have suspected that the first certified letter to him from an unidentified and unknown party was that service (as happened), it did not constitute proper service or alleviate the need for proper service as called for in the rules.

40. Thus, in early 1997, BRADSHAW was notified by the post office of a certified letter return receipt without an identification of a mailer. It simply had a typed return post office address on a large brown mailing envelope. BRADSHAW did not accept this mailing and left it unclaimed but was suspicious that it was from BISOM.

41. In any case, BRADSHAW immediately on Jun 2, 1997 brought this letter and his assumption about it (which may or may not have been correct) to the attention of the AG (Exhibit "B"). Since BRADSHAW brought this letter to the attention of his supposed attorney, the AG, the burden for any rejection of service clearly rests with the CNMI AG.

42. Subsequently, BRADSHAW received one more similar mailing with no identified mailer but only a post office return address. BRADSHAW did not write down the box numbers on these mailings and cannot be sure that they were the same or that they even came from BISOM's lawyer SORENSEN. Anyway, the second mailing made BRADSHAW

11

become suspicious that maybe the mailings were not from BISOM. So who knows who the mailers were and what was in the packets. Anyway, these two unidentified mailings were brought to the attention of the CNMI AG in BRADSHAW's letter of Jul 14, 1999 (Exhibit "B"). Again, BRADSHAW's attorney, the AG, was fully informed on these mailings.

43. In any case, BRADSHAW was available daily in Elk, WA in 1996-1998 for service of process as he operated a retail business. He never hid from a process server and certainly did not refuse legitimate service of process. He expected to be served by a process server at once. Yet, it never happened. Subsequently, BISOM filed four amended complaints on this case in SC **none of which were served on BRADSHAW.**

44. The AG contacted BRADSHAW on Jan. 22, 1997 (Exhibit "A") and included a copy of a letter that the AG sent BISOM's attorney, JAY H. SORENSEN, on Dec. 31, 1996 (copy enclosed therewith) advising SORENSEN that the AG would not accept service for BRADSHAW on the BISOM complaint in the CNMI SC. Yet, over the next three plus years, BISOM did make service on the AG for BRADSHAW. The AG accepted this service and it was filed in the case file and approved by the court.

45. Yet subsequent communications from the AG to BRADSHAW on Apr. 17, 1997; Jun. 2, 1997; Mar. 17, 1998; and Jun. 30, 1999 (Exhibit "A") all said essentially the same thing--that the AG had consistently notified SORENSEN that service on BRADSHAW would not be accepted by the AG; that BRADSHAW could expect service soon; and that BRADSHAW should contact the AG upon service so that the AG could prepare an answer.

46. In this interchange, BRADSHAW sent the AG letters on Jan 31, 1997; Jun. 2, 1997; Jul. 14, 1999; and Jul. 15, 2000; all of which said that BRADSHAW had not been served

12

(Exhibit "B"). BRADSHAW's affidavit on further CNMI contacts is at Exhibit "C."

47. In a letter to BRADSHAW on Jun. 30, 1999, Asst AG WILLIAM C. BUSH asked if I wanted the AG to continue representation and/or should the AG notify the SC to have the AG withdrawn as counsel for BRADSHAW; that if BRADSHAW wanted the AG to provide for his defense, then BRADSHAW should cooperate and answer several remaining questions; to include, was BRADSHAW ever served with the complaint?, and could constructive service have arisen?  Mr. BUSH, added that "If there has been no service perfected, then I might be able to get you out of 96-1320 on the two-year statute of limitations for tort claims."

48. BRADSHAW's letter of Jul. 14, 1999 to the AG (Attn: WILLIAM C. BUSH) addressed BUSH's questions and said:  "Regarding CNMI SC 96-1320 and all subsequent complaints, I have never been served on any of these complaints...

"Some two certified mail packets from an unidentified party came to me from Saipan in 1996 and 1997.  I refused to accept either of them and they were returned by the Post Office undelivered.  Possibly these mailings were an attempt to accomplish service although I cannot be sure what were in the packets and the sender's name was not identified (beyond a return address post office box).  Again, if Bisom wants an answer from me he will have to hire a process server.  As I said to Doug Cotton, if I am served I will contact the AG to make the answer.  Otherwise, I have not authorized the AG to make any answers for me on anything in the CNMI cases.  And I have never been served!

"As for as constructive service, I have no knowledge of any attempts by anyone to serve papers on me.  I live by myself and there is no one at my house except me.  I have no employees or anyone else present who could accept service on my behalf.  I don't have any

13

reason to believe that Bisom can come up with any basis of service. If he attempts it, surely it would constitute some type of a fraud. If he produces a signature, it is not mine.

"I assume that the CNMI has a cut off date for service like the 180 days or so for the feds. Surely, we are long past that date whatever it is. Couple that with the statute of limitations and I see no way that I am a part of the CNMI case. Should you file a motion to strike my name individually from the suit? Since you have suggested it, it seems like a good idea although I don't know that it is necessary (other than if this thing goes to trial and Bisom tries to later claim service on me; thus, a pre-trial motion as you suggest would flush out whatever case he might try to make).

"Accordingly, if you wish to file a motion to have me removed individually from the CNMI case, you have my permission and agreement... Should you represent me further? Again, I don't think I am a party to that CNMI case and if that is true, the answer is no (if the answer is yes then of course I would need representation;..."

49. BRADSHAW's letter of Jul. 14, 1999 plainly asked the AG to go into court and have BRADSHAW's name stricken from 96-1320 on the basis of no service--either at once by BUSH (as he suggested) or certainly later during the trial if BISOM attempted to fraudulently claim service (as actually happened). For sure, the AG should have contacted BRADSHAW at once if an affidavit or BRADSHAW's presence was needed for the court on Saipan.

50. From June 30, 1999 and thereafter until about April 22, 2004, BRADSHAW always believed and acted on the premise that indeed the AG had went into court and had BRADSHAW's name removed as a defendant from the BISOM suit. The BRADSHAW letter of Jul. 14, 1999 was clear that BRADSHAW was not served and that BRADSHAW expected

and anticipated further AG assistance in resolving the case.

51. But this letter did not authorize the AG to withdraw or deny BRADSHAW indemnification (if BRADSHAW was served). This letter made note that BRADSHAW lives alone and has no one in contact with him or with anyone on his property or at his household who could have or would have accepted service on any complaint.

52. The other questions by BUSH were addressed in communications from BRADSHAW to the AG previously and in later letters from BRADSHAW to the AG (per letters from BRADSHAW, one undated, but its contents suggests a date near Jul. 20, 1999, and another clearly on Jul. 20, 1999, copies attached herewith at Exhibit "B").

53. Subsequently, at BRADSHAW's initiation, the AG on Apr 6, 2004 sent him a copy of the SC order on 96-1320 (as entered on Mar 10, 2000) and the decision on the Supreme Court Appeal (of Sep. 13, 2002) which notified BRADSHAW that the SC entered a default judgment for BISOM against him, and that the AG had withdrawn as counsel for BRADSHAW some six days before the trial commencement date on Feb. 7, 2000 (copy of the Apr. 6, 2004 transmittal letter is at Exhibit "A"). This letter was a shock to BRADSHAW in that BRADSHAW had previously believed and acted on the premise that the AG had went into court and had BRADSHAW's name removed as a defendant from SC 96-1320.

54. In the summer of 2004, BRADSHAW began unsuccessful efforts to find a lawyer to undertake a case against the CNMI and to have someone on Saipan check the actual case file. BRADSHAW could not find a lawyer who would take the case (because of economic prejudice), but did learn from Micronesian Legal Services that BISOM entered into evidence documents showing alleged service on both the AG for BRADSHAW and on BRADSHAW via

alleged postal mail receipts which showed receipt of service on BRADSHAW by an unidentified/unknown third party (possibly named Manny) who incontrovertibly does not exist.

55. Though suspicious that person or persons in the AG office presently might be untrustworthy and unreliable and act to further damage BRADSHAW, plaintiff BRADSHAW, without funds to hire a counsel and unable to obtain much help from Idaho Legal Services or Micronesian Legal Services, reluctantly did turn to the AG on Sep. 12, 2004 for relief.

56. With the failure of receiving any known help or legal assistance from the AG, BRADSHAW, pro se, filed a petition in the SC asking the SC to void/vacate its judgment against BRADSHAW. This action is pending in the CNMI SC at this time.

57. From Sep. 12, 2004 to date, BRADSHAW went to great effort and exhausted all remedies available to him in the CNMI, but was unsuccessful in trying to resolve this case and the dispute without any further court actions and legal processes. The passage of a few days short of six months without resolution was sufficient to demand action on Mar 7, 2005.

58. A complaint was then filed in the US District Court of Idaho (case 05-84). It is now being filed in the US District court at Saipan as the CNMI claimed in its pleadings before the Idaho court that all CNMI defendants (which then did not include PAMELA BROWN and **DOUGLAS COTTON** who have now been added) were subject to personal jurisdiction of the US District Court in the CNMI.

### Available Evidence on What Happened In Court

59. In the Feb-Mar 2000 trial in SC, the CNMI was represented by Asst AG SOSEBEE and possibly some other AG lawyer. In the Supreme Court appeal in Mar-Sep 2002, the CNMI was represented by Asst AG CLAYTON.

60. Ever since trying to obtain some resolution on this case from the CNMI AG and courts (from Sep 2004 to date), the AG seems to have consistently avoided writing letters to BRADSHAW or allowing BRADSHAW to have any knowledge of the facts in the case. Instead, the AG has generally acted to lie, deceive, twist, distort, stall, delay, obfuscate, hide and deny BRADSHAW any information which would help him learn the facts.

61. BRADSHAW tried to obtain copies of documents from the AG--both before filing US civil action 05-84 and afterwards in the form of two requests for documents under discovery (in May and June 2005). The CNMI simply refused to honor the requests.

62. BRADSHAW has sent letters to the Clerk of Court with checks enclosed for copies of documents **(most of which have still not been received)**. But in a June 2005 telephone conversation, the Clerk said that the postal receipts in question are not now in the file. Otherwise, plaintiff is continuing efforts to obtain documents to authenticate what happened depending on whether the CNMI AG or other CNMI people have successfully hidden, altered, destroyed or otherwise acted to obstruct justice in a case before the courts (CNMI 96-1320 or USDC ID 05-84).

63. While BRADSHAW and his supposed AG attorney had contact up until July 1999 when L. David SOSEBEE became the lead attorney on the BISOM case, the AG discontinued contact with BRADSHAW. BRADSHAW wrote the AG later in 1999 and 2000 but his letters were never acknowledged or answered.

64. When the 96-1320 case went to trial the AG made no contact with BRADSHAW and seemingly little or no preparations for the trial. At least some documents on service were allegedly in the file, yet the AG apparently did not address them (like the alleged service on

the AG for BRADSHAW). Some six days before the trial, the AG formally withdrew from representing BRADSHAW and notified BISOM and the court of the withdrawal (per the CNMI Supreme Court) but made no effort to advise BRADSHAW of the withdrawal, the trial or the predicament that had resulted.

65. There was allegedly a communication from the AG to BRADSHAW which may have had this message. But this letter, if it existed, was predicated upon the same mysterious postal return receipts which never came from BRADSHAW (see Exhibit "D" on the affidavit of David Vanderholm, the postal carrier in Elk WA--the original of his affidavit is filed in BRADSHAW's Amended Motion to Void/Vacate Judgment in the CNMI SC 96-1320 file).

66. While not totally clear, the AG lead attorney L. DAVID SOSEBEE surely wrote the alleged AG letter(s) and/or prepared the fraudulent postal return receipts after Jun 30, 1999. But BRADSHAW herewith declares that any such letter(s) involved fraud and deception. It certainly was never mailed to BRADSHAW. In fact, after Jun 30, 1999 and before Apr 6, 2004, the AG had no contact with me and sent me nothing.

**67. When the trial commenced, the AG on Jan 31, 2000 filed a motion to have 96-1320 removed from the trial docket, apparently on the basis of BRADSHAW's letter of Jul 14, 1999 indicating that no service had taken place. Judge CASTRO refused to allow this letter into evidence.**

68. On Feb 14, 2000, BISOM entered a motion for default judgment against BRADSHAW which was supported on Feb 16, 2000 by a declaration **to the Court** in the request of entry of default. **The Clerk of Court entered this default in the official CNMI SC records on 2-14-00. The justification from BISOM for the default was**

18

"return of service" forms filed with the court showing service on BRADSHAW on the first and second amended complaints and service made on Asst AG COTTON on the fourth amended complaint.  Per legal dictionaries, these return of service forms are completed and filed with the court after service of process has been made to represent after the fact "proof of service."

69.  BISOM's request for default judgment stated and was precisely predicated upon the fact that service was made and that BRADSHAW did not answer the served complaints.  The alleged missing postal return receipts apparently were the basis for BISOM's filed "return of service" forms and his claim that BRADSHAW was served but did not answer the served complaint.

70.  In BISOM's Jul 2005 "Opposition to Motion to Void/Vacate Judgment" (p. 4), filed in 96-1320, BISOM referred to these receipts and acknowledged that BISOM had "represented to the court that he had served defendant (in reference to BRADSHAW) by certified mail and defendant had signed the receipt,...There is nothing to indicate that plaintiff (in reference to BISOM) had any way to know or even suspect that the postal receipt that was returned did not bear the signature of the person it was addressed to."  Both in 2000 and 2005, BISOM has acknowledged the submission of signed postal return receipt(s) which allegedly came from BRADSHAW or a representative of BRADSHAW for service of the summons and complaints.

71.  **At some point in time, BISOM possibly introduced** two alleged certified mailing **envelopes** of summons and complaint by BISOM on BRADSHAW which were

allegedly unclaimed by BRADSHAW. **It is unclear from the docket when these envelopes were introduced by BISOM (possibly they were introduced as late as July 2005 when BISOM attached them and referred to them in his filed opposition to BRADSHAW's motion to Void/Vacate Judgment), but they were in obvious conflict with BISOM's motion for default and the documents submitted by BISOM which allegedly showed that BRADSHAW was served and simply failed to file an answer to the served complaints (per return of service forms filed in court by BISOM).**

72. The problem with the two envelopes of alleged certified mailings by BISOM to BRADSHAW did not take place. In 1999, BRADSHAW acknowledged two certified mailings from "unidentified" mailers but of having a post office box for a return address. But the envelopes entered by BISOM in 96-1320 seem to have had the mailer(s) identified as "Jay H. Sorensen, Esq."

73. BRADSHAW had never seen these two envelopes before until they were brought to his attention in Jul 2005 when BISOM filed an answer to BRADSHAW's motion to void/vacate judgment **in 96-1320**. This answer included **the** two Xerox copies of two alleged envelopes sent BRADSHAW by certified mail in 1997 (as well as an allegation that the postal return receipts entered to help support BISOM's default judgment were receipts which had been returned to him by the US post office. So even if the CNMI has illegally and deceptively destroyed those receipts, BISOM has admitted in court that they once existed).

74. When a court is dealing with crooks who have and will enter fraudulent documents in court in order to obtain a default judgment, alleged mailings like these two certified mail