letters prove nothing simply because it is such a simple task to fraudulently prepare envelopes like these two were prepared. Admittedly, with the new post office tracking capability since 2004, certified documents are easier to now validate, But in 1997, this was out of the question. Thus, it is easy to have fraudulent rubber post office stamps made to stamp any document. For that matter, on Saipan, it would be easy to pay a bribe to a Saipan postal employee and have documents date stamped however desired.

75. In any case, the certified numbers on these two documents were only three numbers apart which seems awful strange that only three certified letters left the Saipan post office in a 30 day period. For sure, these two alleged documents should prove nothing since the CNMI civil procedure rules do not address any question about obtaining a default judgment based on the mailing of **an unclaimed** certified letter. **Per CNMI rules and laws in 1997, the remedy for unclaimed certified mail in initial service of process is to either make service by publication or personal service.**

76. CNMI rule 4(e), in 1997, provided that service may be effected by any manner authorized by CNMI law or "by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process." "Oran's Dictionary of the Law" (p. 316) says personal means "1. Having to do with a human being..." dictating a personal service on the person of the defendant (depending on the applicability of 7 CMC, Div 1).

**77. Unless repealed or amended, 7 CMC, Div 1 authorized service by mail but with the provision in Section 1104(b) that if such service could not be made by mail the court could order service by publication. This alternative procedure was not followed by BISOM or the CNMI SC.**

78. CNMI rule 4(k) provided for services beyond the territorial limits of the CNMI "when not prohibited by law." Washington state rules of civil procedure **and the Revised Code of Washington (4.28.80)** were cited earlier which did not allow service of process by certified mail. Apparently, no one in the state of Washington in 1997 had to accept certified mail or be found avoiding service.

79. CNMI rule 4(m) had a time limit for service in that "If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." BISOM's complaint was filed Dec 5, 1996 (a summons for BRADSHAW was issued by the SC that day) and 120 days was up on Apr 5, 1997. There is nothing in the case docket allowing that this rule was obeyed.

80. No motion was made by plaintiff for a time extension and the court issued no such order with a new time deadline for service. Though the docket has a Apr 2, 1997 letter cited, there is no cite or reference to any motion from BISOM for an extension of time; nor is there any evidence of a court order for an extension of time and a new deadline. Even if the AG and BISOM agreed or stipulated a time extension, it was invalid and illegal as far as

BRADSHAW was concerned since the AG was not authorized by BRADSHAW to accept service or to negotiate any extensions of time for service. With BRADSHAW's limitations on the AG accepting service, an extension of time would have had to involve a court order **or a stipulation by BISOM with BRADSHAW**.

81. Both the AG and BISOM fully knew and understood that they could not agree on service on BRADSHAW and that only a court order from the judge **or a stipulation with BRADSHAW** could extend service on BRADSHAW. No such order **or stipulation** came forth. Thus, all proceedings involving BRADSHAW after Apr 5, 1997 were illegal and without force of law. If there was any doubt on this, CASTRO became aware of it when it was revealed that the AG did not represent BRADSHAW.

82. Yet, BISOM's alleged certified letters with summons and complaint to BRADSHAW were mailed in May (over 150 days later) and June 1997 (over 180 days later). Not only were BISOM's actions fraudulent on these mailings, but they were illegal and without force of law per the CNMI civil procedure rule 4(m). BISOM's fourth amended complaint, filed on Nov 18, 1998, allowed 120 days to expire on Mar 18, 1999. Yet, the service status of none of these actions were evidently brought to the attention of the court within 120 days nor did the court make any effort to monitor this question in its proceedings. Regardless of the status of the 120 days on the original complaint and the next three amended complaints, the fact remains that BISOM's actions under rule 4(m) were illegal.

83. Certainly, CNMI rule 4 was established by the local courts and has no statutory authority. Even the cited certified mail in 7 CMC (unless later repealed) provided no default provision but only for publication if service could not be effected through certified mail.

84. As a part of normal court procedures, both plaintiff and defendant are obligated to keep each other informed on evidence. Thus, there is to be no surprises when a case goes to trial. The parties are to be fully informed on the anticipated evidence. But BISOM's default motion included documents which apparently had not been broached with the court or the AG previously. These documents covered events over a period of three years starting in early 1997. Possibly they were a surprise to the AG lawyer in court; or alternatively, the AG lawyer was grossly incompetent and he simply had made no effort to keep track of his case.

85. Since BISOM had mailed BRADSHAW two mailings lacking the identity of the mailers, as cited by BRADSHAW in 1999, it is believed that BRADSHAW's privileged letter of Jul 14, 1999 (and possibly all of his letters) to his AG attorney was shared with BISOM.

86. Regardless, BISOM knew what evidence the AG had and knew what fraudulent records would be needed to justify a default judgment. So the evidence is that BISOM entered two sets of fraudulent postal documents in court to justify his default request--return postal receipts from alleged certified mailings to BRADSHAW and envelopes of two alleged mailings to BRADSHAW which reportedly were returned to Saipan as unclaimed. With the service made on the AG, BISOM would easily get a default judgment (as happened).

87. BRADSHAW has so far, unsuccessfully, tried to obtain the actual courtroom tape recordings made of the trial. Thus, there is some question on if and when judge CASTRO heard the motion for default. As a minimum, he had by then approved into evidence the various documents on alleged service/non-service on BRADSHAW as submitted by BISOM.

88. But from a Feb 22, 2000 "Order Denying Motion to Remove Case From Trial Docket," as signed by judge CASTRO, the **CNMI's** motion on Jan 31, 2000 to have 96-1320

removed from the trial docket **was** heard on Feb 7, 2000 and this order appears on Feb 22, 2000 to confirm his decision to proceed with the trial.

89. In stating his denied on removing the case from the trial docket, judge CASTRO said: "1. The motion relies on facts set forth in a form that fails to comply with the requirements of a supporting affidavit **or** declaration.  2. Defendant Robert D. Bradshaw was properly served by mail, return receipt requested **but** purposely avoided service.  3. The Office of the Attorney General has appeared on behalf of Robert D. Bradshaw as his attorney of record.  4.  Defendant Robert D. Bradshaw, has waived any potential challenge to insufficiency of service of process by his previously bringing a motion to dismiss without joining such motion..."

90. **It was strange that Judge CASTRO issued this order claiming that proper service was made and that BRADSHAW avoided service all the while that BISOM's motion for a default judgment was predicated upon allegations that BRADSHAW was served (both by certified mail and with service on his AG attorney) and had failed to answer that service.  If "proper service was made," as stated by CASTRO, why is that CASTRO added that BRADSHAW "avoided service"?  It is unclear what basis CASTRO used for this order since there was no evidence in court to substantiate the allegation of avoiding service except for BRADSHAW's Jul 14, 1999 letter and its remarks about the two unidentified certified letters from unidentified mailers not claimed by BRADSHAW (which letter was never admitted into evidence but which must have influenced CASTRO's decision as there was nothing else present in the file to precipitate**

25

**CASTRO's decision). In this order**, judge CASTRO recognized the AG as the attorney of record for BRADSHAW (though the AG at oral arguments excluded a defense for BRADSHAW--per the Supreme Court's decision, p. 21).

91. This order first came to the attention of BRADSHAW in July 2005. Before that, BRADSHAW knew nothing about any of the SC proceedings, motions, service or anything else which defendant CASTRO was ruling on. The AG has consistently since Jun 1999 kept the facts of 96-1320 in secret from BRADSHAW.

92. Besides the several documents introduced by BISOM into evidence on alleged service or non-service on BRADSHAW, BRADSHAW's letter of Jul 14, 1999 was brought to the attention of judge CASTRO as it totally conflicted with everything happening in his court. Judge CASTRO refused to allow BRADSHAW's letter into evidence. Yet, he allowed in all of the documents submitted by BISOM on alleged service or non-service to BRADSHAW. With the default judgment, BISOM ultimately received $140,000 from the CNMI and a judgment against BRADSHAW for $139,000. BISOM asked the court to have the CNMI pay the judgment on the basis of the Indemnification Act. The SC denied this request.

93. BISOM appealed the SC decision because the trial court excluded certain evidence and denied plaintiff's request for indemnification for BRADSHAW. The Supreme Court upheld the trial court. But importantly, just as the trial court had BRADSHAW's letter of Jul 14, 1999, the Supreme Court also had it and quoted part of it in its decision.

94. Whereas defendant CASTRO found that the AG supposedly was BRADSHAW's attorney and supposedly represented BRADSHAW at the trial (per the CASTRO order of Feb 22, 2000), the Supreme Court (in its Sep 13, 2002 decision) said that the AG was not

26

BRADSHAW's attorney and that BISOM had been so informed by the AG at least six days prior to trial (p. 12 of the Supreme Court's decision) and that the trial court was so informed at the oral arguments presented by the AG (p. 21 of the decision).

95. The Supreme Court also found that "before the trial court... the Attorney General's Office allowed a default judgment to be taken against Bradshaw. This fact alone permits an equally persuasive inference that Bradshaw had not, in fact, requested a defense. The trial court's determination that Bradshaw did not request a defense was not clearly erroneous" (p. 21 of the decision). The court also found "As there has been no showing that BRADSHAW requested a defense or indemnification, it can not be said that BRADSHAW wants indemnification." These conclusions are not only wrong and against the evidence in the case but are impossible to believe by informed people.

96. In both the CNMI SC and Supreme Court cases, the report that the AG was not representing BRADSHAW was apparently predicated upon BRADSHAW's Jul. 14, 1999 letter which the trial court refused to allow into evidence. Despite not allowing this letter into evidence, this letter was really the primary/only evidence available which the AG had to support its contention that the AG had withdrawn from the case at BRADSHAW's request. This letter is partially quoted in the Supreme Court decision, establishing that it was addressed at some length by both the SC and the Supreme Court.

### BRADSHAW's Contacts with the AG Since 2004

97. In Apr 2004, BRADSHAW learned from the CNMI AG of the default judgment against him in SC 96-1320. In Aug 2004, BRADSHAW asked Tom J. Schweiger, former director of Micronesian Legal Services Corp (now employed with the CNMI AG), to find out

27

about the 96-1320 default that was entered. Schweiger checked the case file and on Sep 9th said that the basis of the judgment was that BISOM in 96-1320 filed in court documents showing process service upon me by two means--BISOM served the AG for me and he also allegedly served me by alleged certified mailings of summons and complaints which were allegedly receipted by a person apparently named "Manny." Schweiger said that the case files also showed some similar receipts for alleged mailings to me from the AG. He added that he remembered the BISOM case and that the two AG lawyers at the trial had a violent argument which almost turned into a fight.

98. During the period Sep 12, 2004 to Feb 15, 2005, BRADSHAW made some 25 phone calls and sent several faxes to the AG's office in an attempt to resolve the problems. Mr Ed Buckingham and Mr Joseph Race of the AG's office both called me a few times.

99. On Sep 12, 2004, BRADSHAW first contacted the AG and spoke to "Heather" in the Criminal Division. She was briefed on the alleged fraudulent mailing receipts filed In 96-1320 and informed that I wished to file criminal charges against the person(s) who filed the receipts. She referred me to Mr. Lemons who was fully briefed on the alleged fraudulent mailing receipts. He referred me to Asst AG Ed Buckingham who was supposed to be my contact and the person who would conduct an investigation into my allegations.

100. BRADSHAW talked to Mr. Buckingham and informed him fully about the postal receipts and also the fact that the AG had accepted service on the case though SORENSEN had been expressly told that the AG would not accept service. In our discussion, BRADSHAW remarked that he thought that the AG had a file copy of the case file in its office. But Mr. Buckingham said that the AG did not have file copies of the cases it defended. Mr

28

Buckingham added that he would check the file copy at SC.

101. BRADSHAW then faxed documents to Buckingham with notarized affidavits on this case (as are now filed in this complaint before the US District Court of the CNMI). BRADSHAW then called Mr. Buckingham back and he verified that he had seen the process service documents filed with the alleged postal return receipts and return of service forms and that the documents on file were as I described. BRADSHAW had the impression that Mr. Buckingham had the documents in front of him, although this might not have been the case.

102. BRADSHAW specifically noted to Mr. Buckingham that he wanted to file criminal charges against the persons responsible for the fraudulent mailing receipts and that he wanted the AG, which was supposed to be my lawyer in this case, to follow up with a court action in the Saipan SC to have the judgment stricken or voided on me as it was obtained by fraud. Otherwise, BRADSHAW specifically requested that the AG take action to pay the $139,000 to BISOM on the basis of the Indemnification Act.

103. BRADSHAW strongly recommended to Mr Buckingham that certified true copies of the fraudulent receipts be made and used in the investigation and that his office or the court take action to secure the case file as it involved alleged fraud. BRADSHAW also recommended to Buckingham that the documents or copies thereof be forwarded to the US postal authorities as they involved US postal fraud. BRADSHAW then suggested that the AG make for me a certified true copy of the postal receipts and I would at once take them to the US postal inspector in Spokane for an investigation. Mr Buckingham said that he would refer the case to AG BROWN for a decision. Ms BROWN was off island but due back soon.

104. Thereafter, BRADSHAW called Mr. Buckingham back on Sep 19 and thereafter to get a response on AG follow-up. He told me that Ms BROWN was briefed and she had authorized the AG to investigate the fraud charges. BRADSHAW noted to Buckingham that the mail receipts should also be sent to the FBI as the FBI lab has a capability to completely analyze both the writings and the ink used to try to determine who wrote them and if they were prepared by the same pen, and so forth. While Mr. Buckingham did not confirm that he would go the FBI with the documents, he seemed receptive to the idea.

105. BRADSHAW had a feeling that Buckingham was limited in what decisions he could make but would have to refer matters to BROWN for decisions. BRADSHAW followed up thereafter in writing to the AG with my needs. On Jan 25 and Feb 7, 2005, BRADSHAW sent letters to the AG at Exhibit E (sent by both fax and mail) which recaps the need to make copies of the alleged fraudulent documents, to secure them adequately, and/or mention of the need an investigation--by postal people and the FBI.

106. In late Sep 2004, Mr. Buckingham informed me that he had briefed and asked Mr. Joseph Race, acting director in charge of the CNMI investigations, to investigate the case. In a Oct 7, 2004 letter from Mr. Race (Exhibit "A"), he noted that he tried to call me and that he had referred the case to Frank Kapileo and Alfred Teregeyo. BRADSHAW called them a few times and on Oct 20, 2004 talked to Mr. Kapileo and offered my help and any information which he might need from me. Kapileo noted to me that he had the case file in front of himself and that he and Mr. Teregeyo were both reading it. He did not say why or how that he came into possession of the case file. But he acknowledged seeing the postal receipts in the file.

107. BRADSHAW made several other contacts with Mr. Buckingham and the investigators over the next several weeks. Their responses were always that they were investigating the case and would get back with me. At a point in time, in January 2005, BRADSHAW discussed the case with Mr. Race. His words to me were that it looked to him like I got a dirty deal from BISOM. BRADSHAW had the impression that Mr. Race had personally seen the alleged postal receipts. BRADSHAW asked to speak to Mr. Aldan, who had been appointed Chief of Investigations. Mr. Race said that Mr. Aldan was in PAM BROWN's office briefing her--presumably on my case.

108. In Jan 2005, BRADSHAW also tried to talk to Mr. Kapileo but he was out of the office, so Mr. Teregeyo took my call and we chatted about the case. Mr. Teregeyo said that he had the file but that Mr. Kapileo had removed the postal return receipts and had taken them with him to the local Saipan Post Office--supposedly Mr. Kapileo was then talking to the Saipan Postmaster about the receipts (suggesting that he by then had shown the receipts to the postmaster). BRADSHAW also repeated my earlier comments that if the AG would send me copies, I would take the receipts to the US Postal Inspectors.

109. In late Jan 2005, BRADSHAW became concerned that the CNMI would not supply him copies of the receipts and that the AG was not making any effort to involve the US postal inspectors or the FBI. BRADSHAW called Mr. Buckingham several times in Jan and early Feb. 2005 and tried to encourage him to take some action since he was supposed to be the Asst AG in charge of the case, per Mr. Lemons' words.

110. Mr. Buckingham was always friendly and seemed cooperative and concerned. He maintained several times that he had spoken to or was going to speak about the case to

31

PAM BROWN, Mr. Race and/or Mr. Aldan. Mr. Buckingham conveyed to me his desire to resolve the case. At one time, he suggested that he would make copies of the file and/or the documents in question and mail them to me. BRADSHAW said that this would be good.

111. In the meantime, BRADSHAW continued to send faxes and write letters to the AG outlining the need for action to secure the documents by making copies and to pay the $139,000 to BISOM. In my last telephone conversation with Mr. Buckingham in early Feb 2005, his demeanor to me had completely changed. Whereas he had always been a nice, friendly person interested in trying to resolve the case, he abruptly became as cold as ice and was clearing putting some distance between himself and me. In terms of sending me any of the documents, he said no that I had misunderstood him and that the case file was then in the possession of the AG "for review" as he put it.

112. He further said that he had been taken off the case and that someone else in the AG's office would contact me in the future. While he did not say so, it seemed clear to me that Buckingham had been reprimanded and disciplined for trying to resolve the case with me. It was clear that PAM BROWN herself or others had dressed him down, directly or indirectly.

113. No other persons in the AG's office contacted me until BRADSHAW received Ms BROWN's letter of Feb 15, 2005 (Exhibit "A") which effectively said that the AG would do nothing further on the case. It was then that I clearly understood that the AG had become an hostile, adversarial party who in the future would work against me and act to protect the guilty parties involved in 96-1320 who had filed the fraudulent documents. I then filed a motion with the CNMI SC to void the judgment and filed suit in the Idaho US District Court.

114. In June 2005, in a conversation I had with Ms Bernie Sablan, Clerk of the CNMI SC, she said that the case file on 96-1320, was in her possession for the judge to use in my motion to void.  She said that the alleged postal receipts showing service were not then in the file.  BRADSHAW had the impression that Ms Sablan was unaware that the AG had had possession of the receipts and evidently the 96-1320 case file.  In my contacts with the AG, BRADSHAW was led to believe that the AG had possession of certainly the mail receipts and indeed generally the whole 96-1320 file.

115. In learning of the missing records, BRADSHAW contacted the CNMI lawyer, Hall Farley, who sent back the enclosed letter Exhibit "F."  In it, the CNMI AG denied ever seeing the alleged fraudulent postal receipts.  The AG pretended to be in total ignorance about its contacts with BRADSHAW from Sep 2004 until Mar 2005.  This AG alleged ignorance happened three months after the 05-84 suit was filed in the US court over this very question.

**FIRST CLAIM--Civil Rights Violations (42 USC 1983), Conspiracy and Interstate Fraud (18 USC 241-242) Using US Postal Material (18 USC 1341-1342, 1349, 1707; and 39 USC 4005) and Violations of CNMI Court Rules**

116. Plaintiff BRADSHAW herein by reference paragraph 1-115 hereinabove alleged as if set forth here in full.

117. Defendants ROBERT A. BISOM, JAY H. SORENSEN (attorney for BISOM and officer of the court in case 96-1320) and/or employees and agents under their supervision violated CNMI court rules willfully and used US mail documents and resources in a conspiracy with others to defraud the CNMI and plaintiff BRADSHAW and to violate BRADSHAW's US Constitutional rights to due process and equal protection of the law (under

33

the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. The judgment against plaintiff was obtained without allowing BRADSHAW to have his day in court to answer the complaint against him.

118. Defendants BISOM, SORENSEN and/or persons under their supervision acted deliberately, criminally, maliciously and with intent and foreknowledge in a conspiratorial mode with others to deceive and mislead the CNMI courts and to fraudulently misappropriate money from the CNMI and BRADSHAW and to violate CNMI court rules/**laws** to bring hurt, damage and injury on BRADSHAW in order to misappropriate and steal as much money as possible from the CNMI and BRADSHAW and to violate BRADSHAW's due process and equal protections rights under the US Constitution.

119. BRADSHAW's professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. Plaintiff thus suffered much pain/distress (emotionally, mentally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress for the injury. The remedy is for the court to order restitution, removal of the illegally gained CNMI judgment and payment of damages to plaintiff.

120. In 1996-1998, BRADSHAW lived on Newport Highway in Elk, Washington and was physically present and available at home daily for legitimate service of process from BISOM without even suggesting a fraudulent action in court to effect service; thereby indicating that the fraudulent documents submitted by BISOM were not singularly designed just to effect service, but rather to deceptively and fraudulently obtain a judgment against BRADSHAW and misappropriate money from BRADSHAW and the CNMI.

121. Defendants BISOM/SORENSEN entered into a conspiracy with a person or persons in the Office of the AG and/or possibly with judge CASTRO to deliberately and maliciously violate court rules/laws and to defraud BRADSHAW in the 96-1320 case to obtain a default judgment against BRADSHAW and to keep BRADSHAW in a state of ignorance about what was happening in Saipan on case 96-1320.

**SECOND CLAIM--Civil Rights Violations (42 USC 1983), Violations of postal laws (18 USC 241-242, 1341-1342, 1349, 1707), Gross Incompetence and Malpractice, Conspiracy and Fraud and Violations of CNMI Court Rules**

122. Plaintiff BRADSHAW herein by reference paragraphs 1-121 hereinabove alleged as if set forth here in full.

123. Plaintiff's contact with the AG is described above. While the AG acted to keep BRADSHAW informed in 1996-1998 on some events on Saipan relative to BRADSHAW, the AG entered into a process of silence in 1999 which eventually turned into an hostile adversarial relationship at least six days before the trial of 96-1320 in Feb 2000 when the AG formally withdrew from representing BRADSHAW but deliberately chose to not inform BRADSHAW of its actions. BRADSHAW had contact with the AG up until Jun 30, 1999 but nothing thereafter until late April 2004 when, at BRADSHAW's initiation, the AG notified BRADSHAW of the outcome of 96-1320 in 2000 and its appeal in 2002.

124. The CNMI Supreme Court's decision, appeal nos. 00-0016 & 0023-GA, consolidated (on pages 12, 13, and 22), cited repeated cases of mistakes and mistaken actions (plural) by the AG. On page 22, the Supreme Court decision opened the possibility that an attorney or attorneys in the Office of the AG had violated the Bar Association ethics

rules. The Supreme Court did not establish which person or persons individually were responsible for the malpractice, mistakes, and so forth. In its decision (page 12), the Supreme Court also pointed out that in the AG appearance and presentation there was a conflict of interest between the CNMI and BRADSHAW.

125. All of this translates to Supreme Court decided gross incompetence and malpractice by the AG; which contributes to violations of BRADSHAW's rights to due process and equal protection of the laws under the US Constitution. The CNMI AG's actions were deliberate, malicious, intentional and extremely irresponsible in creating a total mess of case 96-1320 and great injury and damage being placed upon BRADSHAW and the CNMI.

126. As a minimum, if the certified letters sent by BISOM (unclaimed by BRADSHAW) communicated an avoidance of service, the AG was fully informed by BRADSHAW on these letters and should have done something about them. With the first one, whether identified or not, the AG should have immediately contacted BRADSHAW about the consequences of the letters being unclaimed and brought the issue to the court or filed an answer.

127. During the filings of the several actions by BISOM, the AG accepted service for BRADSHAW on **one or more of** the complaints without BRADSHAW's knowledge, authorization and/or request (and also filed motions in court in BRADSHAW's name). The AG made no answer in court on any of the **services** it had accepted without BRADSHAW's authorization. BRADSHAW was never informed on these acceptances of service by the AG. The AG violated the CNMI court rules and failed in not discharging its duties on this case.

128. Despite being frequently informed that no service on the BISOM complaint in 96-1320 had ever been made personally on BRADSHAW and that constructive service was

36

impossible, the AG made no effective effort to go into court and have the question of service resolved on the basis that BISOM and/or his attorney was practicing deception and fraud upon the CNMI courts (in their presentation of alleged postal documents showing alleged service/refusal of service by BRADSHAW when no actual/constructive service existed).

129. In view of the BRADSHAW letter of Jul 14, 1999 notifying the AG of no service and no possibility for constructive service, all of these alleged postal documents should have been sufficient to alert members of the AG's office that they were openly suspicious and involved possible fraud and deception. The AG should have been properly monitoring 96-1320 and promptly brought the discrepancies (between what BISOM was saying and BRADSHAW's letter to the AG on Jul 14, 1999) to the attention of the court.

130. It is unclear when the AG first became aware of the fact that BISOM had alleged postal records which showed contrary and contradicting facts (two showed that BRADSHAW did not claim two certified letters to him while others showed that an unidentified party, possibly named Manny, accepted mailing documents allegedly sent by BISOM to him), but the AG made no effort to resolve this paradox and contradiction of supposed reality. It's possible that the AG was simply so incompetent that this information was never comprehended though it was available in 1997 when most of the documents were allegedly prepared; or it's possible that BISOM simply hid the alleged postal records from the AG and did not allow the AG to find out about the 1997 documents until the 96-1320 trial in 2000.

131. Whenever the AG found out about the postal documents (which were a total complete contradiction to BRADSHAW's letter of Jul 14, 1999), the AG should have protested to the court and at least filed an appeal to the Supreme Court on the illegal postal documents

37

filed by BISOM.  Regardless of why, the AG was grossly incompetent, irresponsible and malpracticing in not addressing these fraudulent postal documents used by BISOM to get a default judgment against BRADSHAW.

132.  The primary action of the AG was to allow the court to enter a default judgment on BRADSHAW **(per the CNMI Supreme Court, p. 21) without any opposition and** without exercising due care and recognizing the fiduciary responsibility which the AG had in its role of protecting and defending the CNMI and its officials, like BRADSHAW.  BRADSHAW was never notified or informed at all on what was happening in court on this case or on the AG's withdrawal **or of the entry of the default judgment on BRADSHAW as made without opposition from the AG.  Thus, the AG sat back, did nothing and allowed the default judgment to take place (per the Supreme Court).**

133.  At some point in time, the AG violated CNMI court rules/laws and also produced alleged postal receipts on supposed letters sent by the AG to BRADSHAW by certified mail None of these communications were received by BRADSHAW.  But the postal receipts that were made out and submitted to the court by the AG showed receipt by allegedly the same unidentified and unknown party (Manny) as the receipts which were presented by BISOM to the SC; thus presenting prima facie evidence of conspiracy between BISOM and some person(s) in the AG's office in violation of 18 USC 241-242, 1341-1342, 1349, 1707.

134.  The AG's presentation of fraudulent postal receipts in connection with alleged letters from the AG to BRADSHAW raise the spectrum that the AG's action not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud on BRADSHAW to keep BRADSHAW ignorant of the proceedings

in court and the violation of his constitutional rights (violating 18 USC 241-242). The US Supreme Court has ruled that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitations" (Supermarket of Marlinton v. Meadow Gold Dairies).

135. The actions and omissions of the AG during the years 1997-2002 were sufficient to establish that there was gross incompetence, malfeasance, malpractice, omissions, lack of care, violations of court rules and fraud and conspiracy by the AG to deliberately and maliciously deny BRADSHAW his rights under the US Constitution. The actions and omissions of person(s) with the AG in 1997-2002 allow for fraud and conspiracy with BISOM.

136. Clearly, much of the AG malpractice and possible conspiracy and fraud must be placed on Asst AG L. DAVID SOSEBEE, the lead attorney on 96-1320 **who was in a position to do something about the confused mess and injustice being created in the CASTRO court.** But the problems evidently arose while defendant FORELLI was acting AG and while defendants **COTTON**, BUSH and CLAYTON also worked on the 96-1320 case.

137. The actions of the CNMI and its AG agents FORELLI, SOSEBEE, CLAYTON, **COTTON** and BUSH violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. The AG agents acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. BRADSHAW accordingly suffered much pain and distress

(mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury. The remedy is for the court to order restitution, removal of the illegally gained judgment and payment of damages to plaintiff.

**THIRD CLAIM--Civil Rights Violations (42 USC section 1983), AG Gross Incompetence and Malpractice and AG Obstruction of Justice and Actions to Hide and Cover-up Criminal Actions Manifested in the CNMI Courts**

138.   Plaintiff BRADSHAW herein by reference paragraph 1 to 137 hereinabove alleged as if set forth here in full.

139.   Upon learning of the default judgment against him in Apr 2004, plaintiff BRADSHAW undertook action during the summer of 2004; and unsuccessfully tried to find a lawyer (no Saipan attorneys were found who would take a case against judges because of economic prejudice. As one lawyer said--it would be devastating to his legal career to take a case against CNMI judges) but eventually learned of the alleged postal return receipts.

140.   On Sep. 12, 2004, BRADSHAW contacted the AG by phone and from then until Feb 2005 plaintiff made some 25 phone calls and wrote letters to have the fraudulent mailing documents investigated by US postal inspectors and the FBI. Reportedly AG PAMELA BROWN was fully informed on plaintiff's contacts and requests, but chose to essentially do nothing but lie, deceive, twist, distort, procrastinate, delay, stall, deny and obsfucate.

141.   Plaintiff's needs were simple with a request that the alleged fraudulent documents be **secured and** sent to US investigatory people; that BROWN'S office take steps to file a motion in the CNMI court under civil rule 60 to void the judgment against

40