BRADSHAW; and as an interim measure, that the CNMI pay the $139,000 judgment to BISOM.

142. If BROWN would have acted responsibly to resolve the issues before her with some action as the chief law enforcement officer of the CNMI, BRADSHAW's litigation before the US courts would have been unnecessary. Much of this case could have been easily handled by the CNMI without any particular expense or effort. As a minimum, BROWN could have written BRADSHAW explaining the alleged basis, legality and propriety of the default judgment. Yet, BROWN did nothing but acted to hide information from BRADSHAW and keep BRADSHAW in ignorance about what was in the case file and what the AG was doing on it.

143. As described herein plaintiff learned from the Clerk that the fraudulent mailing receipts in the CNMI case file were, all of a sudden, missing. Since these documents were in the possession of AG BROWN **(as BRADSHAW was so informed by personnel in the office of the AG),** the prima facie evidence is that defendant BROWN or persons under her supervision **or influence, to include possible** other CNMI employees **outside the AG's office**, have hidden or destroyed the receipts. **Regardless of whatever role BROWN had in the loss or hiding of those court documents, as a minimum, BROWN was grossly incompetent. Her office spent ten months investigating the alleged receipts. As a minimum, she would have had to have access to those documents to do any investigating. If the documents are now missing, it certainly shows that she is totally and maliciously irresponsible and incompetent beyond description. Being alerted in Sep 2004 that BISOM had committed fraud against the CNMI, Brown should have immediately acted to**

41

**secure the alleged fraudulent documents and have them properly investigated.**

144. This reality and the facts outlined above plainly suggest the obstruction of justice and hiding of criminal acts by defendant BROWN in cases which were before both the CNMI SC (96-1320) and the US District Court of Idaho (05-84).

145. As far as the alleged mailing envelopes from BISOM to BRADSHAW, reportedly in the 96-1320 file supposedly justifying the default judgment, BROWN must have known about these documents, yet never informed BRADSHAW, thus, necessitating much guesswork by BRADSHAW in early March 2005 on what happened.

146. Defendant BROWN appears to never put anything in writing, but rather to only commit to writing when it becomes absolutely necessary. Without written documents, any contact with the AG becomes difficult. Without things in writing, it is easy to lie, deceive, twist, distort, deny, obsfucate, stall and generally obstruct justice.

147. After many letters and phone calls over a period of five months from BRADSHAW to the AG requesting indemnification on the BISOM judgment, BROWN finally acknowledged BRADSHAW's many attempts to resolve that issue. On Feb. 23, 2005, BRADSHAW received the letter at Exhibit A from AG BROWN. Though characterized by at least one mistake, this letter denied BRADSHAW indemnification by essentially citing the Supreme Court decision.

148. On the mistake in this letter, the AG charged that since its April 2004 letter that "Almost six months later," BRADSHAW sent the AG a request for indemnification. This charge is not correct and it does matter if the present AG is attempting to prove that BRADSHAW neglected this case with any unnecessary time delays after his notification in April 2004. Actually, following the conversation with the AG on Sep. 12, 2004 (as elsewhere

described herein), BRADSHAW, faxed a letter requesting indemnification to the AG (on Sep 13, 2004 and copies of the material covered under the affidavits at Exhibits A to C**).**

149. Later, Ed Buckingham orally confirmed the receipt of these faxes in a telephone conversation. BRADSHAW next sent the AG registered mail with the Sep. 12, 2004 request for indemnification on Sep. 13, 2004. This registered letter was receipted by the AG on Sep. 28, 2004. Yet the AG's letter seems disingenuous in alleging that BRADSHAW's request was received "almost six months later" on Sep. 29, 2004, a day after it was actually received (implying that BRADSHAW took almost six months to contact the AG).

150. The initial notification letter from the AG, dated Apr. 6, 2004 (at Exhibit "A," which, per its mailing envelope, was mailed on Saipan on Apr. 7, 2004), was also received some fifteen days later by BRADSHAW about Apr. 22, 2004. This means that the actual elapse of time between the AG notification to BRADSHAW and his contact of the AG was over four months and not almost six months as alleged by the AG. This time was spent in pursuit of trying to find legal help and someone to actually check the 96-1320 file to determine what had happened.

151. Thus, PAMELA BROWN made it plain that the AG would do nothing for me beyond a short "limited" telephone call to a local attorney on my options, meaning that henceforth BRADSHAW was denied any legal assistance from the AG. Actually, it appears that AG discontinued legal assistance to BRADSHAW in early 2000 and has done nothing for BRADSHAW since then. This means that all of BRADSHAW's letters, phone calls and contacts have been a total waste of time as the AG did nothing and made no effort to apprise BRADSHAW of the status of case 96-1320.

152. So the official position of the CNMI government is that the decisions of the CNMI courts have ruled out any possibility of BRADSHAW receiving any form of reimbursement or restitution for the deliberate and malicious injustice, injury and damage put on BRADSHAW by BISOM, SORENSEN and the CNMI and its agents in the AG's office and courts in 1997-2005, beyond the option of a successful criminal action and/or this suit in Federal court.

153. Otherwise, it is to be noted that paragraphs two, three and four of the AG letter of Feb. 15, 2005 also clearly acknowledge that BRADSHAW was first given notice in April 2004 of the CNMI court actions that took place to damage and hurt him in 1997-2002.

154. Defendant BROWN'S actions (to obstruct justice and act to cover up criminal actions in the CNMI **and/or to be maliciously guilty of gross incompetence**) from Sep 2004 to date have been to violate BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property.

155. Defendant BROWN's actions were deliberate and malicious and were made in a possible conspiratorial mode to mislead the US and CNMI courts in cases before the courts; and thereby violate BRADSHAW's rights under the US Constitution. With such actions, BRADSHAW was denied due process.

156. Defendant BROWN's actions have been deliberately designed to keep BRADSHAW in a state of ignorance about what had happened on case 96-1320 and not allow BRADSHAW to obtain needed documents to prove the conspiracy and fraud perpetuated upon him by BISOM and the CNMI.

157. The actions of the CNMI and its agent BROWN violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. BROWN acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury. The remedy is for the court to order restitution, removal of the illegally gained CNMI judgment and payment of damages to BRADSHAW.

## FOURTH CLAIM--Civil Rights Violations (42 USC section 1981 and 1983), and Conspiracy and Fraud and Violations of CNMI Court Rules

158. Plaintiff BRADSHAW herein by reference paragraph 1-157 hereinabove alleged as if set forth here in full.

159. The trial of CNMI SC 96-1320 commenced about Feb 7, 2000. It was characterized by much confusion and contradictory paradoxes which defendant CASTRO allowed into evidence as well as BRADSHAW's letter of Jul 14, 1999 which he should have taken note of because of its relevance. Rather than obey CNMI rules/**laws**, CASTRO made his own rules and law as he went along to deprive BRADSHAW of his due process rights.

160. **Possibly,** BISOM offered to the court postal documents **during the trial** which allegedly showed that BISOM twice mailed his complaint to BRADSHAW in a certified

envelope showing the name and return address of "Jay H. Sorensen Esq." These mailings were allegedly returned as unclaimed. Contrariwise, BISOM **in his motion for default judgment** also offered evidence in the form of alleged certified mailings and return receipts that service was made on BRADSHAW with the acceptance of the mailings by a person allegedly named "Manny." BISOM also introduced into evidence documents showing that the AG accepted service for BRADSHAW. **These representations were made in BISOM's motion and declaration for a default judgment.**

161. Defendant CASTRO violated CNMI court rules/**laws** and allowed the conflicting, confusing and contradicting material from BISOM into evidence as truth with no effective opposition from the AG. Of course, it would be absolutely ludicrous to believe that BRADSHAW refused service all the while that BRADSHAW and his alleged AG lawyer also accepted service. Which way was it? Did BRADSHAW refuse service or did he accept service? Yet, defendant CASTRO allowed both options into evidence as true.

**162. BISOM's motion for a default judgment was predicated upon service being made upon both BRADSHAW and his AG attorney. Rather than ruling on this motion, CASTRO chose to approve the default judgment on the basis that BRADSHAW had avoided service. Thus, CASTRO made up his own rules/laws and contradicted the actual records filed by BISOM in the case and BISOM's request for a default judgment. CASTRO ignored CNMI rules/laws requiring service by publication or personal service if attempted service by certified mail failed.**

163. The AG apparently did introduce at some point in time BRADSHAW's letter of Jul 14, 1999 which categorically acknowledged two things. First two certified mail packets did come to BRADSHAW but without an identification as to the mailer. Though BRADSHAW did at first assume that the first one came from SORENSEN, the contents of those two packets, unclaimed by BRADSHAW, remain a mystery. No one, beyond the mailers, knows what was in the packets. Second, BRADSHAW's Jul 14 letter also declared that no personal service was ever made on BRADSHAW and if BISOM claimed it in court it would be fraud on his part.

164. Defendant CASTRO obviously read this letter and surely understood its message though he refused to allow it into evidence. This letter was written back in 1999 when the facts were close and first hand knowledge to BRADSHAW. It totally contradicted everything which BISOM submitted to the court on alleged evidence. Defendant CASTRO made no effort to resolve the total contradicting, confusing and impossible pieces of evidence before him from BRADSHAW and BISOM. Defendant CASTRO took the easy way out by ignoring the conflicts and accepting the evidence submitted by BISOM--though the BISOM evidence was likewise totally conflicting, confusing and contradicting and fraudulent per BRADSHAW.

165. Too the AG apparently maintained six days before the trial and during the trial that the AG did not represent BRADSHAW (as found by the CNMI Supreme Court); yet defendant CASTRO in his Feb 22, 2000 order actually found that the AG did represent BRADSHAW. Which way was it? Did BRADSHAW have AG representation or not?

166. Anyway CASTRO in his Feb 22 order declared that BRADSHAW **both was properly served and** avoided service and that BRADSHAW had legal representation in court. This order came out in the form of an order denying motion to remove case from trial

47

docket as made by the AG. The service remarks were incidental to the issue of removal. Though BISOM had filed a motion in mid Feb 2000 for a default judgment against BRADSHAW, it appears that CASTRO **ignored BISOM's return of service forms and alleged service on the AG and then** never issued any order on **BISOM's default** motion beyond his remarks on the AG motion to remove the case from trial.

167. Since the CNMI rules do not address the use of certified mail for service (unless 7 CMC was still in effect) and since the CNMI SC had never established personal jurisdiction over BRADSHAW in any previous legally authorized method of service, defendant CASTRO's decision that BRADSHAW avoided service was wrong and lacked legal justification. BRADSHAW was daily at a retail business in 1996-1998 and could have been easily served. He never avoided service as his letters to the AG substantiate that fact. **As a minimum, CASTRO should have obeyed 7 CMC, Div 1, and demanded that if BRADSHAW avoided service then the legal remedy for BISOM and the court was the process of service by publication and/or, per rule 4, by personal service (as BRADSHAW anticipated in his Jul 14, 1999 letter).**

168. As discussed previously herein, the CNMI civil procedures in 1997 specified "personal" service on defendants in the US and in a manner not prohibited by law, rules 4(e) and (k). Plainly, defendant CASTRO allowed documents into court which were illegal and contrary to the CNMI's own rules. As a minimum, judge CASTRO's actions violated Washington state's statutory laws and rules of civil procedure.

169. As outlined earlier herein, CNMI rule 4(m) on time limit for service was simply never obeyed by any of the parties in 96-1320. As a minimum, CASTRO was the presiding

judge and during the trial would have been fully exposed to the facts on the non-compliance with rule 4(m). Yet, CASTRO did nothing. As a minimum, judge CASTRO should have been familiar with his own court rules and procedures. Surely, he had a duty on April 5, 1997 (some 26 days before BISOM filed his first amended complaint on May 1, 1997) and again in Mar 1999 to dismiss the complaint against BRADSHAW under rule 4(m).

170. Too, the first cite of allegations of default apparently surfaced in the mid Feb 2000 motion by BISOM (either that or the AG was so incredibly incompetent to defy all reasonable explanations). If CASTRO was doing his job, 96-1320 should have been dismissed against BRADSHAW long before the trial date.

171. Thus, by the CNMI civil procedures, all actions taken by BISOM and the SC after April 5, 1997 were illegal and without force of law. The AG was duty bound to file for a dismissal on Apr 5, 1997. Failing that action from the AG, judge CASTRO was himself duty bound by rule 4(m) to initiate action on Apr 5, 1997 to dismiss the action against BRADSHAW unless BISOM showed good cause for the failure, and the court appropriately acted by court order to extend the time for service for a specified period of time as provided for in the rules. Manifestly CASTRO repeatedly denied BRADSHAW his due process rights under the US Constitution, starting in Apr 1997 and continuing until the trial in Feb 2000.

172. Defendant CASTRO's illegal, confusing, unclear and contradicting actions were certifiably reckless, deliberate, malicious and intentional with an objective to place injury and hurt on BRADSHAW. His actions could have been caused by gross incompetence, or possibly CASTRO was involved in the BISOM conspiracy and fraud against BRADSHAW, or possibly CASTRO exercised personal discrimination against BRADSHAW, a US state-sider

(in violation of 42 US 1981. Per an 10th Circuit Court of Appeals decision, 42 USC 1981 is not limited to the technical restrictive meaning of the word "race"). While the American BISOM was at issue, it was far more practical and easier for judge CASTRO to simply decide issues against BRADSHAW than against BISOM since BISOM's lawyer was in court demanding and arguing issues for BISOM.

173. BRADSHAW was not present and had no lawyer in court and without any notice of the action in progress in court. As a minimum, defendant CASTRO took the easy way out and found for BISOM and against the unrepresented BRADSHAW.

174. While defendant CASTRO declared in one order that BRADSHAW was represented by the AG, he otherwise knew and understood that the case was proceeding without any involvement from BRADSHAW or without BRADSHAW even having counsel present or of having notification from the AG or the court on the case.

175. BRADSHAW's Jul. 14, 1999 letter was presented to the court by his alleged former attorney, the AG--despite the AG's withdrawal from the case just before the trial started. Allegedly, the AG submitted to the court this Jul. 14, 1999 letter from BRADSHAW; not to help BRADSHAW, but rather to justify the actions of the AG in not properly representing BRADSHAW in SC 96-1320 and/or in collusion with defendants BISOM/SORENSEN and possibly defendant CASTRO in a conspiracy to defraud BRADSHAW and the CNMI.

176. This Jul. 14, 1999 letter seems to be the only evidence used in court to support the AG's allegation that BRADSHAW did not want AG representation or indemnification from the CNMI for any resulting judgment as argued by the AG and as found by the CNMI courts. But this letter, nor any other communications from BRADSHAW, allowed for those

conclusions. BRADSHAW always wanted AG representation and indemnification.

177. BRADSHAW's message to the AG was always that upon service, the AG would be contacted to file an answer and to represent BRADSHAW in court on the complaint, and with an implied request from BRADSHAW for indemnification upon service (since this letter was sent to the AG before the trial even took place and since the court found that service had occurred [with the court's acceptance of BISOM's documents used in his motion for a default judgment], the reality is that BRADSHAW did request both assistance and indemnification in the context of the alleged service stipulated by the court to enter the default judgment).

178. In the absence of service on 96-1320, there was no need for the AG to file an answer or to represent BRADSHAW--beyond going into court and having BRADSHAW's name stricken from the case, as the AG was supposed to do and as authorized by BRADSHAW in July 1999. Though BRADSHAW's communications were clear enough, the AG went on and accepted service (without the knowledge, consent or authorization of BRADSHAW) and then withdrew from the case just before the trial commenced (leaving BRADSHAW served in the case but without notice and without counsel in court).

179. Defendant CASTRO, as the presiding judge, must have understood what was happening in his own court room. He accepted the AG withdrawal and proceeded with the trial though BRADSHAW had no representation and was never given notice of the trial.

180. The only evidence in court from BRADSHAW to support the AG withdrawal and the AG's argument that BRADSHAW did not want indemnification was the Jul. 14, 1999 letter which defendant CASTRO read, considered and refused to admit into evidence.

51

181. Surely CASTRO grasped the content of the Jul. 14, 1999 letter which made it clear that the primary issue in the letter was service and not directly focusing on whether the AG should or should not be the attorney for BRADSHAW or whether the CNMI should or should not indemnify BRADSHAW upon a court judgment. With service, there is the obvious fact that BRADSHAW expected both AG representation and indemnification.

182. Defendant CASTRO must have been cognizant in court that something was wrong when a trial was proceeding and a default judgment of $139,000 was being entered against BRADSHAW with BRADSHAW not being present in court and BRADSHAW not having any legal representation present, and all in the context that BRADSHAW's alleged former counsel, the AG, had a written communication from BRADSHAW indicating that no service had ever taken place and that no constructive service was possible, and even that if BISOM tried to produce some such documentation, the documents would constitute fraud.

183. After receiving the default judgment of $139,000, BISOM asked the court to order its payment on the basis of the Indemnification Act. CASTRO refused to allow the payment on the premise that BRADSHAW had not asked for representation and indemnification.

184. Since BRADSHAW was given no notice from the CNMI; knew nothing about the trial and the alleged service; had assumed that the AG was his counsel; and the fact that BRADSHAW honesty believed that the AG had went into court and had his name removed from 96-1320; and that no answer in court had ever been forthcoming from BRADSHAW or his alleged AG counsel, defendant CASTRO refused to allow BRADSHAW indemnification.

185. Defendant CASTRO failed to exercise due care and responsibility as the trial judge by allowing the trial to proceed in the absence of BRADSHAW being present or having

counsel present or of being given notice of the trial; and in view of documentation held by the AG from BRADSHAW showing no service and not even constructive service.

186. The alleged postal receipts from an unknown party and the two unclaimed certified envelopes with SORENSEN's name of them, as submitted in the trial court, should have been sufficient for the trial judge to have immediate hard questions about the case and whether it should proceed or not and especially in view of the letter produced by the AG showing two mysterious certified letters with no name, and evidence of no service and conclusions of fraud for any alleged service which might be introduced by BISOM.

187. In the interest of justice, defendant CASTRO had a duty to exercise due care and concern over the interests and constitutional rights of BRADSHAW, who was not in court and who was not represented by his supposed legal and proper attorney, the AG.

188. Yet, CASTRO did little or nothing in the trial to establish justice and entered a default judgment against BRADSHAW when there was substantial evidence of fraud and conspiracy on the part of BISOM; and evidence of fraud, conspiracy, malfeasance, malpractice, inexcusable neglect and general incompetence on the part of the AG, who was supposed to be representing and defending BRADSHAW.

189. Though the evidence was plain enough of what was happening, defendant CASTRO denied BRADSHAW's basic rights under the US Constitution and proceeded to order a judgment of $139,000 individually against BRADSHAW and then refused to allow the imposition of the CNMI Indemnification Act to relieve the burden from BRADSHAW.

190. The charges made against BRADSHAW by BISOM were effectively declared true by the actions of CASTRO. BRADSHAW was found guilty of practicing discrimination against

53

BISOM and of discharging BISOM illegally/improperly. BRADSHAW never had his day in court to answer the charges--whether they be true or false.

191. CASTRO's decision to admit bogus documents into court and to refuse to grasp or apply BRADSHAW's communications with the AG resulted in the judgment of $139,000 against BRADSHAW and contributed to the payout of some $140,000 by the CNMI. BISOM did not earn these judgments in court; but rather, by a default judgment from CASTRO.

192. While defendant CASTRO may have had some possible basis to question the BRADSHAW letter in terms of admittance into evidence, he certainly knew or should have known that something was wrong with the proceedings going on in his court. He should have, as a minimum, issued a stay or delay in proceedings with an order to the AG to satisfactorily resolve the conflicting issues before the trial proceeded.

193. Clearly, defendant CASTRO violated CNMI court rules/**laws** and recklessly and maliciously misused and abused the power he possessed as the trial judge in 96-1320 to aid, abet, allow, promote, join-in and cover-up the commission of fraud and conspiracy in his court and deny plaintiff BRADSHAW of his rights, property and liberty under 42 USC 1983 and deny BRADSHAW his rights and benefits under the US Constitution.

194. The actions of judge CASTRO to accept the presentation of fraudulent postal documents from BISOM and the AG also raise the spectrum that the Judge's actions not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud imposed on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his rights by the AG and Judge.

195. Defendant CASTRO was charged with an affirmative duty to prevent the violation of US constitutional rights in his court. Defendant CASTRO maliciously and irresponsibly failed in this duty. He violated both the CNMI court rules and procedures and the US Constitution in his failures in court.

196. The actions of the CNMI and its agent judge CASTRO violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. Defendant CASTRO acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury. The remedy is for the court to order restitution, removal of the illegally gained CNMI judgment and payment of damages to the plaintiff.

**FIFTH CLAIM-- Violations of Civil Rights (42 USC 1983) and Court Rules/Laws and Possible Conspiracy and Fraud**

197. Plaintiff BRADSHAW herein by reference paragraph 1-196 hereinabove alleged as if set forth here in full.

198. Defendants MANGLONA and BELLAS (along with Judge Pro Tem Pedro M. Atalig, now deceased), in the Supreme Court review in Mar.-Sep. 2002, were all exposed to **CASTRO's** violations of court rules/laws, the basic trial results and also BRADSHAW's

letter of Jul. 14, 1999 all of which were clear enough that absolute confusion and pandemonium came out of the trial of 96-1320 in judge CASTRO's courtroom.

199. BRADSHAW was a defendant in the appeal of SC 96-1320 to the Supreme Court; yet BRADSHAW was never notified of the hearing by the AG or the court, was not present in court, had no attorney present (as the AG had withdrawn from representing BRADSHAW six days before the trial), and had no opportunity in court to defend himself; thus, violating BRADSHAW's civil rights under the US Constitution.

200. Despite having information from BRADSHAW (in BRADSHAW's letter of Jul. 14, 1999 which was before the court) and totally contradictory documents filed by BISOM, defendants MANGLONA and BELLAS upheld the trial court's actions and also found BRADSHAW guilty--thus denying BRADSHAW due process and his day in court.

201. Like CASTRO used certain remarks in the CNMI Indemnification Act, MANGLONA and BELLAS followed the established precedent to deny BRADSHAW any hope of obtaining redress/restitution for the fraud lodged against him in the CNMI courts.

202. The CNMI Supreme Court used provisions in the Indemnification Act to deny BRADSHAW any restitution on the basis that BRADSHAW failed to request legal assistance and indemnification "five days" before the answer on the complaint was filed in court (as cited in the Supreme Court decision and in AG BROWN's letter of Feb. 15, 2005, at Exhibit A). Since "no answer" was ever filed in court on SC 96-1320 by the AG or by BRADSHAW (thus, allowing the default judgment), this provision is totally irrelevant and immaterial.

203. In any case, it was the AG who had illegally and improperly accepted service on 96-1320 and went into court and allowed BISOM to introduce fraudulent documents into

court files. If there was a need for an answer to the complaint (per the Indemnification Act), the legal duty for filing that answer lay with the AG and not BRADSHAW (who knew nothing about what was happening in court and who relied upon the AG and courts for justice).

204. Along with the AG failure to properly notify/defend BRADSHAW in court, the judges in both the SC and the Supreme Court watched the whole proceedings with obvious knowledge and understanding of what was happening; yet did nothing to correct the injustice going on and lack of due process in their courtrooms. The AG and defendants CASTRO, MANGLONA and BELLAS all were participants in a de facto conspiratorial operation to deprive BRADSHAW his rights under the US Constitution.

205. Clearly defendants MANGLONA and BELLAS read and must have understood the contents of BRADSHAW's letter of Jul. 14, 1999, which was before the court. All of this indicates a furtherance of a conspiracy by the AG and defendant CASTRO to place the monetary losses in 96-1320 on BRADSHAW and to deprive him of his due process and his property and rights under the US Constitution.

206. Defendants MANGLONA and BELLAS, in their review, were in a position to see and understand completely what was happening. Instead of resolving the fraud and conspiracy before them, they joined in in a furtherance of the de facto conspiracy to forever prohibit BRADSHAW from having any restitution of his claims in the CNMI.

207. Though finding repeated illustrations of mistakes and mistaken actions, a conflict of interest between the AG and BRADSHAW, and possible violations of the Bar Association ethics rules by the AG, the Supreme Court judges in their decision found that no attorney-client relationship existed between the AG and BRADSHAW and that BRADSHAW was not

entitled to indemnification since no representation and/or indemnification was requested.

208. As was true in the SC case, the only AG evidence supporting its non representation and refusal to allow indemnification decisions was the Jul. 14, 1999 letter where the Supreme Court justices agreed with the trial court that it should not be admitted. In other words, the Supreme Court appears to have used the non-admitted Jul. 14, 1999 letter in its decision as it was the only evidence available.

209. The defendants MANGLONA and BELLAS likewise denied BRADSHAW an opportunity to be heard in court; denied BRADSHAW due process and equal protection of the law; injured plaintiff BRADSHAW; and violated BRADSHAW's basic civil rights under 42 USC 1983 and rights and benefits under the US Constitution.

210. Defendants MANGLONA and BELLAS' actions and omissions have involved discrimination against BRADSHAW (who was in the US and not domiciled or present in the CNMI to defend himself) and resulted in a defamation of BRADSHAW's character/reputation as their decision received wide publicity. Defendants MANGLONA and BELLAS were charged with an affirmative duty to prevent the violation of US constitutional rights in their court. Defendants MANGLONA and BELLAS maliciously and irresponsibly failed in this duty.

211. Thus, defendants MANGLONA and BELLAS acted in a de facto conspiracy with defendant CASTRO and a person(s) in the AG's office to deliberately and maliciously violate BRADSHAW's rights under the US Constitution and to defraud BRADSHAW and deny him of any opportunity to be reimbursed or protected by the Indemnification Act.

212. The actions of the CNMI Supreme Court judges seem to have involved a conspiratorial action involving intentional concealment of the fraud imposed on BRADSHAW

to keep BRADSHAW ignorant of the proceedings in court and the violation of his rights by the AG and Judges. The issue of concealment of fraud seems to have prompted MANGLONA and BELLAS to take no action to notify BRADSHAW of the hearing in their court.

213. Defendants MANGLONA and BELLAS misused and abused their Supreme Court power in the 96-1320 appeal to aid, abet, allow, promote, join-in and cover-up the commission of fraud and conspiracy in the CNMI courts and deny plaintiff BRADSHAW of his rights, property and liberty under 42 USC 1983 and the US Constitution.

214. The actions of the CNMI and its agent judges MANGLONA and BELLAS violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. The defendants acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury. The remedy is for the court to order restitution, removal of the illegally gained judgment and payment of damages to plaintiff.

### SIXTH CLAIM--Civil Rights Violations
### (Civil Rights Violations of the Civil Rights Act of 1870)

215. Plaintiff BRADSHAW herein by reference paragraph 1-214 hereinabove alleged as if set forth here in full.

216. Defendant CNMI and its agents FORELLI, BUSH, **COTTON,** CLAYTON, SOSEBEE, BROWN, CASTRO, MANGLONA and BELLAS each and collectively failed to afford BRADSHAW equal rights under the law in their actions to impose an illegal judgment of $139,000 on BRADSHAW without any recourse for reimbursement or restitution from the CNMI government. The actions of the defendant CNMI and its agents denied BRADSHAW equal rights under the law and clearly violated the Civil Rights Act of 1870.

217. The actions of defendants in violating the Civil Rights Act of 1870 produced a cause of action, pursuant to which both legal and equitable remedies may be had, including compensatory and under certain circumstances, punitive damages (14A C.J.S. Section 226). This remedy is separate, distinct and independent from other civil rights remedies (ibid.).

218. The actions of the CNMI and its agents FORELLI, BUSH, **COTTON,** CLAYTON, SOSEBEE, BROWN, CASTRO, MANGLONA and BELLAS violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws (under the 5th, 9th and 14th amendments)--thereby depriving BRADSHAW of life, liberty and property. The defendants acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, credit rating, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants. BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury. The remedy is for the court to order restitution, removal of the illegally gained CNMI judgment and payment of damages to the plaintiff.