happened- my last action "to" Bisom was in December 1993 and late Dec on his termination as I best recall).

In looking over this 96-1320 complaint (which was possibly filed after the statute of limitations expired), its quite evident that Bison/Sorenson is broaching new complaints never filed against me which certainly had no life or basis from the federal action filed in 1995. In other words, they had no life for a carryover.

For example, the claims and complaints concerned my alleged violations of Commonwealth law (but I don't understand the Civil rights ones citing 42 USC 1983) and filed in Superior Ct based on Commonwealth law and jurisdiction. These claims had no life or basis in the 1995 federal lawsuit (unless it be the civil rights ones which I don't understand). The statute of limitations has long since expired and now they are placing them in court. I have real problems with this from the standpoint of justice.

Too, there are the issues you raised in your letter to Sorenson on Dec 1996. Please let me know about this. I will do the best I can when I am served. I will notify you immediately (I will call you collect). I am retired living on Social Security. I have no funds for telephone calls and fax charges. Again, I will not relinquish my claims for costs (around $130 or so - $50 additional plus the $80 I did not receive from the deposition). Best wishes. Please advise me of any questions.

*Bob*
Bob Bradshaw
40203 N. Newport Hwy
Elk, WA 99009

July 14, 1999

CNMI Attorney General, ATTN. William C Bush
Saipan, CM 96950

Dear Mr Bush;

Thank you for your letter of Jun 30, 1999, just recently received by me. In 1995, I was a party to the US District Court Case 95-0042, after service. I made an answer to this complaint in 1995 and gave it to the CNMI AG. I was never furnished a copy of what answer was filed but I assume that whoever made the answer filed what I sent Saipan. In the answer I said that I never knew that Bisom was a Jew before the complaint. Recently, I have learned that the US District Court decision was upheld by the Appeals Court in a 1998 decision (according to the local Clerk of Court of the District Court in Saipan).

Regarding CNMI SC 96-1320 and all subsequent complaints, I have never been served on any of these complaints. I have never authorized the AG to accept service for me. As far as I am concerned those cases are all mute and non-existent. To repeat, I don't want the AG to accept service for me on anything. If Bisom wishes to sue me, he must serve me (actually with a process server).

Some two certified mail packets from an unidentified party came to me from Saipan in 1996 and 1997. I refused to accept either of them and they were returned by the Post Office undelivered. Possibly these mailings were an attempt to accomplish service although I cannot be sure what were in the packets and the sender's name was not identified (beyond a return address post office box). Again, if Bisom wants an answer from me he will have to hire a process server. As I said to Doug Cotton, if I am served I will contact the AG to make the answer. Otherwise, I have not authorized the AG to make any answers for me on anything in the CNMI cases. And I have never been served!

As for as constructive service, I have no knowledge of any attempts by anyone to serve papers on me. I live by myself and there is no one at my house except me. I have no employees or anyone else present who could accept service on my behalf. I don't have any reason to believe that Bisom can come up with any basis of service. If he attempts it, surely it would constitute some type of a fraud. If he produces a signature, it is not mine.

I assume that the CNMI has a cut off date for service like the 180 days or so for the feds. Surely, we are long past that date whatever it is. Couple that with the statute of limitations and I see no way that I am a part of the CNMI case. Should you file a motion to strike my name individually from the suit? Since you have

suggested it, it seems like a good idea although I don't know that it is necessary (other than if this thing goes to trial and Bisom tries to later claim service on me; thus, a pre-trial motion as you suggest would flush out whatever case he might try to make).

Accordingly, if you wish to file a motion to have me removed individually from the CNMI case, you have my permission and agreement. If you don't feel that such a motion will benefit your case, fine and I understand. There is a possibility that Bisom's lawyer may have "mistakenly" thought he made service on this and has neglected to verify the fact. He may not really know about the lack of service. I suppose for this reason, I have never been anxious to bring the matter up (thus letting him stay in the dark).

As for as me cooperating with you, I feel that I have went the extra mile to cooperate with the AG on this case. If you have knowledge otherwise, please advise me as I would like to hear about it.

Since the Fed case is now history, I don't see that I have any role in anything further. However, I am anxious to help you and the CNMI case in any way possible. In that sense, I will supply whatever information I can. If the case goes to trial and you wish me to come to Saipan, I would consider it. In saying this I would want something more firm on my expenses than how Cotton handled the situation for me for the Spokane deposition some years ago. I lived in Idaho, several hundred miles from Spokane. I agreed to come to Spokane or Boise if Bisom would pay my expenses. Cotton (without consulting me) agreed with Bisom on this deposition with a $25 a day or so motel bill limit (I now have forgotten the amount but it was not enough) which was ridiculous so I ended up never even being completely reimbursed by Bisom for my expenses. I sent Doug a bill to include the unreimbursed costs in the 95-0042 case (which Bisom is supposed to pay).

Should you represent me further? Again, I don't think I am a party to that CNMI case and if that is true, the answer is no (if the answer is yes then of course I would need representation; although I cannot perceive how it could be yes). I suppose if Bisom appealed the Circuit Court decision to the Supreme Court, I will continue to need help on the 95-0042 case. As for as the CNMI SC, your office has never and should never have represented me on this at all that I am aware of. As I was never served, I never asked for any assistance and the CNMI SC never should have been told that the AG represents me. Hence, why is there now a need to contact them to have the AG withdrawn as my attorney?

The Jew question - I know some very good Jews and indeed some very bad Jews (like Bisom if he is a Jew and I still don't know that fact). There was never any

reason for me to know that Bisom was a Jew since he never said that to me. And certainly he is not a religious Jew (religious Jews wear breads and he always was clean shaven). Otherwise, he looked like a majority type white and his name was no clue for anything.

In Bisom's deposition, he claims that he deceptively entered into Guy Gabaldon's confidence and found out that I sent Guy some alleged "anti-Semitic" literature from the US and that I fired Bisom because he was a Jew. All of this probably didn't come from Gabaldon although I allow that Bisom fraudulently and deceptively tried to manipulate something out of Gabaldon to claim that I am anti-Semitic to justify his lawsuit.

Gabaldon and I have been friends for 20 years. It is true that Guy has had some bad experiences with some Saipan Jews (particularly a liberal reporter who was very hostile to Gabaldon). After I came back to the states in 1994, I mailed some copies of a newsletter complaining about the Jewish lobby and how they are able to walk into Washington and get anything they want free for the state of Israel.

The newsletter was put out from Washington DC by Victor Marchetti, a former official with the CIA in the Director's office. Marchetti is a well known personality, having been on TV several times on discussions about the CIA. He put out this newsletter as a Washington watch and I have forgotten what the name is. Perhaps his letter was a little pro-Arab although I am not sure. In any case, he did do a good job of reporting on the flow of money ($5 billion annually), airplanes, technology, wealth and you name it to Israel - sometimes illegally and without Congressional authorization.

Frankly, I practice Judaism and am more anxious to see Israel built up (even at the expense of the stupid US taxpayers) as much as probably anyone in America. I did send some of this stuff from Marchetti to Gabaldon but none of it was Jew hatred stuff. It was only a complaint about the incompetence and stupidity of American officials that have given the wealth of this nation away all over the world. I learned long ago that this stupidity was not about to end because it has happened all over the world in the last 50 years.

In any case, this seems to be the basis for Bisom to bring his lawsuit and charge discrimination because he is allegedly a Jew. But all Jewish authorities (and I have had some three different Jewish Encyclopedias plus access to other authoritative sources) agree that there is no Jewish race. I agree with this. There is a Jewish religion which I willingly try to practice. But again, Bisom is certainly no religious Jew as is plainly evident when looking at him. In order to determine how deceptive Bisom was with Gabaldon, you will have to call Gabaldon and talk with him. He is well known and respected by many on Saipan. As for as I know,

he has never been deposed so Bisom must realize that he is on thin ice with lying about Gabaldon.

Reaching me? I live in the backwoods and at the moment it is impossible beyond this post office address. I might perhaps get you a fax number of a neighbour if it is needed. You should know that once your office (the AG) has my address, phone number or whatever, Bisom's lawyer also has it if he wants it. Local secretaries do trade information between each other. For example, I moved in 96 and was sure Bisom didn't have my new address (to serve me if he chose). Sure enough, he (or his secretary) seems to have gotten it - evidently from the AG's office (although he did not serve me). So if you need a fax number, I will request that only you have it.

Last, I am not trying to tell or suggest anything to you or your office on this case beyond my deposition, the above remarks and previous correspondence. However, my gut feeling is that Bisom wants to settle this thing short of a trial. He has requested a jury trial which my guess is would be disastrous for him. Bisom has no friends that I know of on Saipan. None of the political factions like him so when he went before the jury, he would largely face enemies.

Ray Guerreo is a local politician with pull with Teno. Ray really hates Bisom. SO if you want an ally to try to find out Bisom's problems and skullduggery, call Ray. He likely would help you in anyway possible and it is plausible that Ray may know something that would be detrimental to Bisom. You can read my files and see where Bisom crossed Ray by going on TV to make charges that were improper from the Auditor's office.

Finally, in closing, may I point out that I have essentially never been furnished by the AG any of these CNMI motions, filings, etc, etc. I did receive copies of the first two or so in 1996 but none of the more recent ones were sent me - perhaps because I was not served and was not a party to them. I do know that Bisom changed some of the complaints between 95-0042 and the few later ones which I saw. For example, he deleted the reference to the Jewish religion and substituted Jewish race (which as I said, does not exist in fact). I have assumed that Cotton or someone in the AG's office would carefully go over each petition to note any discrepancies from former petitions. Please let me know if I can help you further and the final results of this case.

Yours very truly,

*[signature]*

Robert D. Bradshaw, Box 3590, Oldtown, ID 83822

CNMI Attorney General, ATTN.: William C. Bush
Saipan, CM 96950

Dear Mr Bush.

Doug Cotton was able top piece together the events of 1993 which precipitated the Bisom lawsuit. Possibly you too have time to go through the thousands of pages of documents, depositions, etc and have attained some perspective of what happened. Anyway, I have prepared a synopsis of what happened to assist you.

In 1993, Larry Guerrero was the Republican Governor running for re-election. he was opposed by Democrat Froylan Tenorio. The campaign was bitter and hard. Scott Tan was Public Auditor but his tenure was up around Nov 21st, 1993. Bisom was hired by Tan as the legal counsel for the Public Auditor. Ray Guerrero was one of Larry's principle political allies and Director of CUC. I was a minor employee of the Dept of Finance.

Scott had not gotten along with Larry's administration and rumors abounded that the republicans would not reappoint him Public Auditor. However, at some point of time, Scott was led to believe (as he later orally confirmed with me) that Froylan would reappoint him if he won.

Froylan made Ray Guerrero his principle target - claiming that Ray was a crook and violating numerous CNMI laws. Just before the election, Scott and Bisom came on Saipan TV to confirm that Ray indeed was guilty of the allegations made by Froylan. For whatever reason, Bisom did most of the talking on TV.

In any case, this act violated the PA's law and made all of the Republicans furious. No way would they allow Scott to be reappointed. According to Scott (in later remarks to me), Froylan said that he would appoint Scott using temporary appointments. In the meantime, Scott laid on and arranged for the annual commonwealth audit in late Nov 1993, using the CPA firm of Delotte and Touche.

In early Nov, Larry lost and Froylan was the Governor elect. He promptly established a transition committee to plan on who would get what jobs in his new administration in Jan 1994. Around the middle of Nov, Froylan and Scott left together for a trip to Hong Kong, ostensibly on Commonwealth business. However, for this trip, Scott must have forgotten that his term would be up around Nov 21.

So, Scott's term was up and Governor Guerrero appointed me temporary Public Auditor. I was never a candidate for the permanent job and understood from Scott that Froylan would appoint him in Jan  Scott and I were then friends.

My appointment letter was on a Friday and I first came to the office the next Monday. Larry made a press release on it at once so Bisom (who Scott had left in charge of the office) learned that Friday that Scott's term was up and I was the temporary auditor. Bisom immediately called Scott in Hong Kong to brief him on what had happened. Scott consulted with Froylan and they decided that they did not want the CNMI audit scheduled in late Nov to take place. Actually, they wanted to delay it until Jan so that Scott could supervise it after he was reappointed.

In that telephone conversation or another one that weekend, Bisom was instructed to stop the audit at all costs and to go to Froylan's transition committee and coordinate his actions with them. In Bisom's complaint, he confirms the telephone calls and his meetings with the transition committee. He claims that they said that if he was fired for interfering in my work, he would be rehired in Jan when Froylan and Scott came on board.

Unbeknown to me, I came to work that Monday morning not understanding that Bisom (who I thought was my legal counsel) was involved in a conspiracy with Scott, Froylan and the transition committee to sabotage, undercut and hurt my work as public auditor. That Monday, I decided on proceeding with the audit as scheduled by Scott. I detected that Bisom was angry and tried in some ways to interfere in my decision. At that time, I never connected Bisom's opposition to me back to Scott and Froylan - although I became aware of it in a few days.

In the meantime, I, assuming that Bisom was now my "loyal" and trustworthy employee, talked to him privately and outlined a legal problem which I believed needed some attention from the AG. I ordered him to contact the AG and discuss my problem. Well, he never contacted the AG, instead, he contacted Stanley Torres, an opponent of Larry, at the Legislature and briefed him on my privileged conversation in the auditor's office (as he confirmed at his deposition with Cotton). Either he or Torres went to the paper with my legal problem. I knew at once that it came from Bisom because no one else knew of it.

I was only in Bisom's presence a few hours the first day I was in the office. the next day, he was gone most of the time (revealing public auditor information and my privileged conversation) at the legislature, possibly with the media and involved in strategy meetings with Froylan's transition committee on how he was going to stop and disrupt my work at the auditor's office.

All of these Bisom meetings were secret and clandestine and without my knowledge or authorization. After these secret meetings to conspire against me, I never saw Bisom again. He never returned to the office. He did bring a car by

and turned it in one day at noon but I was at lunch. I considered his action an abandonment of his job.

Within two days, I realized that I had a problem with Bisom - that he was disloyal, that he was violating PA rules and laws, that he was secretly working against me. I immediately gave him a 30 day notice of termination (which would be effective in early Jan 1994) without cause as allowed in his contract.

In the meantime, I discovered that Scott had a secret slush fund in his office which I thought was illegal. I closed it and turned the money into the CNMI treasurer and notified the Federal Comptroller if they wanted to audit it. Later, Scott and Froylan returned to Saipan. Whereas Scott and I had been friends, he became my enemy when he learned of my actions on the illegal slush fund.

During the month of Dec, Froylan, Scott and Bisom all three went to the media and constantly attacked me for doing the annual audit which I had proceeded with. I built a paperwork case for the termination of Bisom for cause which I did in late Dec giving him a 7 day notice. If the court should find that this termination was wrong, then surely it must be acknowledged that my earlier 30 day termination without cause would have taken effect. In either case, Bisom was gone!

Naturally, I filed a series of ethics complaints with the local Bar Association on Bisom's many actions. This group is a total joke on Saipan. And I suppose I knew that they would do nothing (they never have except in one rare case where a local lawyer was caught outright in a felony).

In Jan, my temporary appointment was up around the 20th. Froylan was sworn in I think on the 10th. I had to have an emergency operation (which I had in Eugene, OR) so I left in early Jan on sick leave (leaving the senior auditor in charge of the office). Once Froylan was Governor, Scott came to the office and took over (frankly, I believe illegally since I was still technically the temporary Public Auditor). Scott quickly brought Bisom back on board - apparently as he had promised Bisom (per Bisom's allegation).

Whether Froylan ever intended on hiring Bisom back or not, I cannot say. Possibly he planned on double crossing Bisom from day one. Or maybe he did plan on hiring Bisom back or giving him another job (like maybe being the CNMI AG or deputy AG). After his work for Froylan, Bisom perhaps expected a payback in some fashion in the context of a future, well paying, do-nothing job.

But Bisom had made many, many enemies among local people (actually of all political factions). Most people thought he was a bum or had problems of some sort. For certain, Froylan and his administration decided in early Jan that they

didn't want Bisom under any condition. So Bisom was not hired. And since he, as a lawyer, knew and understood that job promises mean little or nothing until the contract is finalized and signed by all parties, there was no reason for him to believe he had anything firm.

Scott soon got into trouble with Froylan's administration when he allegedly allowed a Chinese friend to have one of the public auditor's cars. The police found out and he was charged with a criminal act. Froylan then removed him and hired another auditor. The legal counsel position was filled with someone else.

Apparently in 1994, Bisom realized that he had been fired from a $45,000 a year job (where he apparently had little to do but show up daily) and instead of being appropriately rewarded, he got nothing. SO he proceeded with his lawsuit. And I applaud him for laying out his secret conspiracy with Scott, Froylan and the transition committee to undercut, sabotage and hurt me. I knew this stuff was going on but it's hard to prove secret clandestine meetings and agreements. Bisom has laid it out in his complaint.

Sometime in 94-95, Bisom went to Gabaldon. In a clandestine and deceptive act (without revealing who he was and what he was after), he told Gabaldon some things to make Guy take him into some confidence. Apparently, in their conversations, Gabaldon mentioned that I had mailed some of Victor Marchetti's newsletters (on the US money give away to Israel) to Gabaldon in 94, long after Bisom was fired. Bisom revealed this in his deposition, In any case, he used it as some alleged proof that I had discriminated against him for being a Jew.

The truth is that I didn't know he was a Jew in 93 and if I would have known, it would have made no difference whatsoever in my actions in firing him. The evidence seems to be that he is a liar, cheat, dishonest, disloyal bum and should be fired. I was only in his presence a few hours on the first day that I met him. Beyond what happened that day and the next one, I knew he was a problem.

A final note - I think my action and the action of the government in firing Bisom for cause was absolutely proper. I have real questions about the role of Scott, Bisom and Froylan in the conspiracy which he admits and outlines in his complaint. If the AG defends me and the government, is there any sense or conflict in also defending Scott and Froylan? Obviously, when Froylan was Governor, there was no need in asking that question. Best wishes,

Bob Bradshaw, Box 3590, Oldtown, ID 83822

July 20, 1999

CNMI Attorney General, ATTN.: William C. Bush
Saipan, CM 96950

Dear Mr Bush.

I sent you the essence of this letter a few days ago. Because mail does get lost to Saipan, I wished to send another copy. Also, may I suggest that by means you should read all the letters sent Bisom in connection with his dismissal and all the letters I filed with the local Bar Association on the ethics complaint. Not only did Bisom go out of his way to hurt my work and attack me, but he even telephoned Michael Johnson of Deloitte & Touche to threaten him over the audit he was doing.

The whole bit about discrimination is something for politically correct liberals to jump on in our modern warped society. Bisom was fired for the reasons outlined in the various communications to him. He was fired because I believed he was a dud and was absolutely no good as an employee. Obviously, in Jan 1994, the people in authority in the CNMI believed the same thing because they refused to hire him back.

The modern politically correct thing to do if one can claim discrimination is to never deal with the facts and truth of why the firing took place. instead, one can shift the argument and focus away from the true facts and focus an attack upon the party citing the facts. Slick Clinton is a master of deception and has followed this practice for years in his dealings with his opponents (as you may or may not agree). In other words, attack the attacker and never address the complaints and charges. Bisom did this. Rather than deal with what a dud he was and how sorry he was as an employee, he cooked up this anti-Jew stuff to charge me with discrimination.

And naturally, many gullible people will totally ignore the huge assortment of reasons on why he was fired and instead focus upon the alleged discrimination (I am still not convinced that he is a Jew because most Jews have got some brains and I wonder about Bisom and as I noted earlier, he clearly is not religious). Otherwise, the following letter is a duplicate of what I sent you two days ago. The following dates were recorded off the top of my head and are approximate only.

To repeat:

Doug Cotton was able top piece together the events of 1993 which precipitated the Bisom lawsuit. Possibly you too have time to go through the thousands of pages of documents, depositions, etc and have attained some perspective of what happened. Anyway, I have prepared a synopsis of what happened to assist you.

In 1993, Larry Guerrero was the Republican Governor running for re-election. he was opposed by Democrat Froylan Tenorio. The campaign was bitter and hard. Scott Tan was Public Auditor but his tenure was up around Nov 21st, 1993. Bisom was hired by Tan as the legal counsel for the Public Auditor. Ray Guerrero was one of Larry's principle political allies and Director of CUC. I was a minor employee of the Dept of Finance.

Scott had not gotten along with Larry's administration and rumors abounded that the republicans would not reappoint him Public Auditor. However, at some point of time, Scott was led to believe (as he later orally confirmed with me) that Froylan would reappoint him if he won.

Froylan made Ray Guerrero his principle target - claiming that Ray was a crook and violating numerous CNMI laws. Just before the election, Scott and Bisom came on Saipan TV to confirm that Ray indeed was guilty of the allegations made by Froylan. For whatever reason, Bisom did most of the talking on TV.

In any case, this act violated the PA's law and made all of the Republicans furious. No way would they allow Scott to be reappointed. According to Scott (in later remarks to me), Froylan said that he would appoint Scott using temporary appointments. In the meantime, Scott laid on and arranged for the annual commonwealth audit in late Nov 1993, using the CPA firm of Delotte and Touche.

In early Nov, Larry lost and Froylan was the Governor elect. He promptly established a transition committee to plan on who would get what jobs in his new administration in Jan 1994. Around the middle of Nov, Froylan and Scott left together for a trip to Hong Kong, ostensibly on Commonwealth business. However, for this trip, Scott must have forgotten that his term would be up around Nov 21.

So, Scott's term was up and Governor Guerrero appointed me temporary Public Auditor. I was never a candidate for the permanent job and understood from Scott that Froylan would appoint him in Jan Scott and I were then friends.

My appointment letter was on a Friday and I first came to the office the next Monday. Larry made a press release on it at once so Bisom (who Scott had left in charge of the office) learned that Friday that Scott's term was up and I was the temporary auditor. Bisom immediately called Scott in Hong Kong to brief him on what had happened. Scott consulted with Froylan and they decided that they did not want the CNMI audit scheduled in late Nov to take place. Actually, they wanted to delay it until Jan so that Scott could supervise it after he was reappointed.

In that telephone conversation or another one that weekend, Bisom was instructed to stop the audit at all costs and to go to Froylan's transition committee and coordinate his actions with them. In Bisom's complaint, he confirms the telephone calls and his meetings with the transition committee. He claims that they said that if he was fired for interfering in my work, he would be rehired in Jan when Froylan and Scott came on board.

Unbeknown to me, I came to work that Monday morning not understanding that Bisom (who I thought was my legal counsel) was involved in a conspiracy with Scott, Froylan and the transition committee to sabotage, undercut and hurt my work as public auditor. That Monday, I decided on proceeding with the audit as scheduled by Scott. I detected that Bisom was angry and tried in some ways to interfere in my decision. At that time, I never connected Bisom's opposition to me back to Scott and Froylan - although I became aware of it in a few days.

In the meantime, I, assuming that Bisom was now my "loyal" and trustworthy employee, talked to him privately and outlined a legal problem which I believed needed some attention from the AG. I ordered him to contact the AG and discuss my problem. Well, he never contacted the AG, instead, he contacted Stanley Torres, an opponent of Larry, at the Legislature and briefed him on my privileged conversation in the auditor's office (as he confirmed at his deposition with Cotton). Either he or Torres went to the paper with my legal problem. I knew at once that it came from Bisom because no one else knew of it.

I was only in Bisom's presence a few hours the first day I was in the office. the next day, he was gone most of the time (revealing public auditor information and my privileged conversation) at the legislature, possibly with the media and involved in strategy meetings with Froylan's transition committee on how he was going to stop and disrupt my work at the auditor's office.

All of these Bisom meetings were secret and clandestine and without my knowledge or authorization. After these secret meetings to conspire against me, I never saw Bisom again. He never returned to the office. He did bring a car by and turned it in one day at noon but I was at lunch. I considered his action an abandonment of his job.

Within two days, I realized that I had a problem with Bisom - that he was disloyal, that he was violating PA rules and laws, that he was secretly working against me. I immediately gave him a 30 day notice of termination (which would be effective in early Jan 1994) without cause as allowed in his contract.

In the meantime, I discovered that Scott had a secret slush fund in his office which I thought was illegal. I closed it and turned the money into the CNMI treasurer and notified the Federal Comptroller if they wanted to audit it. Later, Scott and Froylan returned to Saipan. Whereas Scott and I had been friends, he became my enemy when he learned of my actions on the illegal slush fund.

During the month of Dec, Froylan, Scott and Bisom all three went to the media and constantly attacked me for doing the annual audit which I had proceeded with. I built a paperwork case for the termination of

Bisom for cause which I did in late Dec giving him a 7 day notice. If the court should find that this termination was wrong, then surely it must be acknowledged that my earlier 30 day termination without cause would have taken effect. In either case, Bisom was gone!

Naturally, I filed a series of ethics complaints with the local Bar Association on Bisom's many actions. This group is a total joke on Saipan. And I suppose I knew that they would do nothing (they never have except in one rare case where a local lawyer was caught outright in a felony).

In Jan, my temporary appointment was up around the 20th. Froylan was sworn in I think on the 10th. I had to have an emergency operation (which I had in Eugene, OR) so I left in early Jan on sick leave (leaving the senior auditor in charge of the office). Once Froylan was Governor, Scott came to the office and took over (frankly, I believe illegally since I was still technically the temporary Public Auditor). Scott quickly brought Bisom back on board - apparently as he had promised Bisom (per Bisom's allegation).

Whether Froylan ever intended on hiring Bisom back or not, I cannot say. Possibly he planned on double crossing Bisom from day one. Or maybe he did plan on hiring Bisom back or giving him another job (like maybe being the CNMI AG or deputy AG). After his work for Froylan, Bisom perhaps expected a payback in some fashion in the context of a future, well paying, do-nothing job.

But Bisom had made many, many enemies among local people (actually of all political factions). Most people thought he was a bum or had problems of some sort. For certain, Froylan and his administration decided in early Jan that they didn't want Bisom under any condition. So Bisom was not hired. And since he, as a lawyer, knew and understood that job promises mean little or nothing until the contract is finalized and signed by all parties, there was no reason for him to believe he had anything firm.

Scott soon got into trouble with Froylan's administration when he allegedly allowed a Chinese friend to have one of the public auditor's cars. The police found out and he was charged with a criminal act. Froylan then removed him and hired another auditor. The legal counsel position was filled with someone else.

Apparently in 1994, Bisom realized that he had been fired from a $45,000 a year job (where he apparently had little to do but show up daily) and instead of being appropriately rewarded, he got nothing. SO he proceeded with his lawsuit. And I applaud him for laying out his secret conspiracy with Scott, Froylan and the transition committee to undercut, sabotage and hurt me. I knew this stuff was going on but it's hard to prove secret clandestine meetings and agreements. Bisom has laid it out in his complaint.

Sometime in 94-95, Bisom went to Gabaldon. In a clandestine and deceptive act (without revealing who he was and what he was after), he told Gabaldon some things to make Guy take him into some confidence. Apparently, in their conversations, Gabaldon mentioned that I had mailed some of Victor Marchetti's newsletters (on the US money give away to Israel) to Gabaldon in 94, long after Bisom was fired. Bisom revealed this in his deposition, In any case, he used it as some alleged proof that I had discriminated against him for being a Jew.

The truth is that I didn't know he was a Jew in 93 and if I would have known, it would have made no difference whatsoever in my actions in firing him. The evidence seems to be that he is a liar, cheat, dishonest, disloyal bum and should be fired. I was only in his presence a few hours on the first day that I met him. Beyond what happened that day and the next one, I knew he was a problem.

A final note - I think my action and the action of the government in firing Bisom for cause was absolutely proper. I have real questions about the role of Scott, Bisom and Froylan in the conspiracy which he admits and outlines in his complaint. If the AG defends me and the government, is there any sense or conflict in also defending Scott and Froylan? Obviously, when Froylan was Governor, there was no need in asking that question. Best wishes, *Bob Bradshaw*

Bob Bradshaw, Box 3590, Oldtown, ID 83822

July 15, 2000


CNMI Attorney General
Saipan, CM 96950

Gentlemen:

Over a year ago, William C. Bush of your office and I exchanged letters on the CNMI Superior Court Case 96-1320. Mr Bush suggested that he might go into Superior Court and have my name removed from 96-1320 because I was never served with the lawsuit.

I indicated that I was not served and that I knew of no reason at all which would allow any alleged constructive service (I have no employees or family members who could have accepted service). Furthermore, I have authorized no one on Saipan to accept service for me. This includes the AG's office as I had told Doug Cotton that neither he or anyone else there could accept service for me. Bisom must serve me personally if he wants to pursue this case with me!

Since I was not served, I agreed with Mr Bush that it would be well to go into court and have my name stricken. Frankly, I thought he would do that. But now over a year has passed and I have had no further communication from Mr Bush. Perhaps he is no longer with your office.

In any case, I am wondering what the status of 96-1320 is and did Mr Bush go into court and follow his suggestion to me on removing my name from the suit? Your help will be appreciated.

Yours very truly,

Robert D. Bradshaw
PO Box 3590
Oldtown, ID 83822

AFFIDAVIT

The undersigned, Robert D. Bradshaw, hereby certifies and affirms that before trial in Superior Court Civil Case 96-1930, the last communication received by me from the CNMI Attorney General occurred around Jun 30, 1999 from Asst AG William C. Bush, as prompted upon my initiation. No further communications, messages, letters, faxes, phone calls, etc were received by my on this case or its appeal, 2000-016 and 2000-023, until April 2004 when I received a letter from the AG, as initiated by my phone call to Mr Sachs of the AG office. On Jul 15, 2000, I wrote the AG on this matter but my letter was not answered.

In terms of communications from Mr Bisom and/or his attorney Jay H. Sorenson, I have never had any communications from them whatsoever in any form in this Case or its appeal. In about early 1997, I did receive two packages which were unidentified as to senders. They came via certified mail without any identification as to who their mailers were--although they did have a return post office box address. These two packages or mailings were returned to their senders by the post office.

In terms of possible "constructive service" from Mr. Bisom or his attorney or the AG on Civil Case 96-1320 or its appeal on Supreme Court case 2000-016 and 2000-023, I live alone and I have no other persons in my household or on my property who would accept mail or any form of service from anyone. I have no wife, no children, no employees, no friends, no colleagues, no acquaintances, etc who have or would accept mail or personal legal services on my behalf. All mail addressed to me in the US since 1994 would come only to me and no one else. I have known no one or had anyone on my property named Manny or anything close to that in the US since 1994. These facts are uncontroverted.

Dated at St. Maries, Idaho, this _____ day of _August_ 2005

_____
Robert D. Bradshaw

1

STATE OF IDAHO
COUNTY OF BENEWAH

I, ____Jerry Lee Nelson_____, Notary in and for the State of Idaho, residing at___St. Maries, Idaho_____ do hereby certify that on this _____9_____ day of _____August_____ 2005, personally appeared before me Robert D. Bradshaw, to me known to be the individual described in and who executed the within instrument for the uses and purposes herein mentioned.

Given Under My hand and Official Seal; this ___9_____ day of __August____2005.

_____
NOTARY PUBLIC IN AND FOR THE STATE OF IDAHO

JERRY LEE NELSON
Notary Public
State of Idaho

MY APPOINTMENT EXPIRES

___11/15/07_____

2

# AFFIDAVIT

The undersigned, David Vanderholm, hereby certifies and affirms the following:

I have been the rural mail carrier along the North Newport Highway in Elk, Washington from 1987 to the present. In 1996-1998, I delivered mail to Robert D. Bradshaw who operated a video store at 40203 N. Newport Hwy. As a part of my duties, when present on my working days, all mail coming to Mr Bradshaw on my route would have come into my hands and/or my attention--certainly in 1996-1998 when Bradshaw lived in Elk and even somewhat in 1999-2000 after Mr Bradshaw moved and his mail was being forwarded or returned from Elk. After Mr Bradshaw moved in late 1998, I delivered no more mail as addressed to him in Elk. It was forwarded to his new address and/or eventually returned.

A question has come to my attention over certified mail from Saipan, MP 96950 to Mr Bradshaw. Reportedly, two certified mail packets came in letter sized brown envelopes in late 1996 and/or 1997 from an unidentified sender but with a Saipan Post Office box. Reportedly, these were returned by the Elk Post Office as Mr Bradshaw refused to accept them.

Otherwise, it has been brought to my attention that some four or so more certified mail packets allegedly came to Mr Bradshaw in Elk from Saipan, MP 96950 in about 1998-1999 and that they were receipted by a third party in Elk, possibly named "Manny" or something similar. I recall no instance when I had a certified mailing for Mr Bradshaw which was delivered to a third party. Postal regulations require the delivery of certified mail to persons 18 years old or older at the address so stated and persons known to the carrier. For sure, I would have remembered four of these mailings. If the mailings were in letter sized brown envelopes without a named mailer, they would have really stuck out. Finally, I have never known a person named Manny (evidently a Hispanic derived name) or anything similar on my route.

Dated at Deer Park, Washington this __10__ day of __May__ 2005

_____
David Vanderholm
US Post Office, 9409 Bridges Road, Elk, WA
Phone 509-292-2750

STATE OF WASHINGTON
COUNTY OF SPOKANE

I, __Jeanetta R. Taylor__, Notary in and for the State of Washington, residing at __Newport, WA__ do hereby certify that on this __10th__ day of __May__ 2005, personally appeared before me David Vanderholm, to me known to be the individual described in and who executed the within instrument for the uses and purposes herein mentioned.

Given Under My hand and Official Seal; this __10th__ day of __May__, 2005.

_____
NOTARY PUBLIC IN AND FOR THE STATE OF WASHINGTON

MY APPOINTMENT EXPIRES __Feb. 16, 2008__

The following is transmitted by both FAX and US mail:

Jan 25, 2005

AG, Commonwealth of the Northern Mariana Islands
Caller Box 10007, Capitol Hill
Saipan, MP 96950

Gentlemen:

Reference is made to CNMI Superior Court Case No 96-1320 (in which the case file shows post office receipts allegedly from me showing that I received service on the complaint and its amendments by certified mail), my written and telephone communications on this matter to your office from Sep 12, 2004 on to this date, my attached memo for record (enclosures C and D), and my request from me to file a criminal complaint against the person or persons whom had prepared the receipts, all of which I deem to be forgeries and involving fraud to prompt a $139,000 default judgment against me in the Superior Court case.

It is my understanding that your office has undertaken an investigation commenced on or about Sep 12, 2004 on my request to file criminal charges against the party or parties producing the alleged mail receipts. In my conversation with Mr Buckingham of your office, I noted the possibility that the alleged mail receipts involved could become lost or damaged in the course of your investigation. I strongly recommended that your office make xerox copies of the original receipts and have a notary certify them as certified true copies of an original. These copies can be used in your investigation while the actual receipts can be safeguarded and secured to prevent loss or damage. I hope that this security process was implemented.

I also suggested to Mr Buckingham that Postal inspectors are available in the US to precisely investigate matters such as my complaint. This process could be done fairly quickly and involve little expense to the CNMI (although each passing day since Sep 12, 2004 goes to make it more possible that the Postal records or people will be unable to determine what happened). Finally, I suggested that this whole thing can be referred to the FBI as it involves interstate fraud and possible conspiracy to defraud both me and the CNMI (I note that the CNMI has already paid out over $100,000 in this matter plus the judgment of $139,000 against me).

In the Supreme court decision on this case, it appears that plaintiff argued that under the CNMI indemnification act, the CNMI should pay the $139,000. The court said that since I allegedly had not asked for any indemnification, none is due (apparently, the court said that if I had asked for indemnification, the plaintiff would have been paid the $139,000 judgment). Of course, it is totally wrong (and I would suggest that it is absurd and virtually impossible to believe) that "I had not asked for indemnification." The truth is that my attorney, the AG, had not informed me on what had happened or was happening on this case, despite my many contacts and persistence with the AG on this matter.

In any case, in accordance with the Supreme Court decision, I sent your office the attached letter (enclosure A) on Sep 12, 2004 by both fax and mail requesting indemnification. Mr Buckingham confirmed by telephone conversation that he had seen my fax. As I desired something in writing on this matter, I wrote the attached letter (enclosure B) on Nov 26, 2004 asking for a formal confirmation. I never received a reply.

Again, I ask for a formal confirmation on this request from me for indemnification of $139,130 and what your response is to my request. I will only note here that if this request is not honored promptly, I am continuing to incur expenses for phone calls, postage, etc, plus much pain and suffering. I hope that your office with address these needs promptly. Thanking you, I am,

Your very truly,

Robert D. Bradshaw
PO Box 473, Calder, ID 83808, Phone 208-245-1691

This letter is being transmitted by both fax 670-664-2349 and US mail.

Feb 7, 2005

Attorney General, CNMI
Caller Box 10007, Capitol Hill
Saipan, MP 96950

Gentlemen:

The purpose of this letter is to once more ask for AG representation, assistance and indemnification on Civil Case 96-1320.

On Sep 12, 2004 and thereafter I furnished your office affidavits of 23 Aug 2004 from me on all correspondence from your office to me and my correspondence to you on the question of service. Beyond these letters from me, my files show at least one more letter, copy attached, which discussed the case but did not comment on service (hence I did not send it to you earlier in 2004).

On the question of indemnification, page 18 of the Supreme Court decision indicates that indemnification is contingent upon the employee requesting government defense in the court action five days before the answer is filed on the complaint. My letter of Jul 14, 1999 did request defense if service was effected (though the alleged service was unbeknown to me, the court decided that service was made). Therefore this request date of five days before an answer was made was met or was otherwise inapplicable, irrelevant and/or impossible (for many reasons including the reality that no answer was ever made in court).

Too, in my conversation with Mr Buckingham on Sep 12, 2004 I brought up the matter of me filing criminal charges and asked him to represent me and to follow up in Superior Court to have that $139,000 judgment stricken from the record on the basis of fraud. Several times, I noted to Mr Buckingham that he was supposed to be my attorney, per my view. Mr Buckingham and I also briefly noted the situation with the statutes of limitations.

Of course, all along, I have wanted your office to make a prompt investigation of this matter and go into the CNMI Superior Court and have the judgment against me completely stricken. Also I made request on Sep 12, 2004 for your office to take immediate action on the question of the CNMI indemnification act. If the CNMI paid the $139,000 in Sep 2004, the question of the striking the judgment from the record because of fraud could have been delayed a few days or weeks after Sep 12, 2004.



On indemnification, page 10 of the Supreme Court decision notes the trial court's decision to refuse indemnification to Bradshaw for the $139,000 default judgment because "there was no request by defendant Bradshaw" for indemnification under Section 2304(a). But the court decision was made even after there was a recognition that there was a conflict of interest on the question of indemnification between Bradshaw and the CNMI government (p. 12 of the decision).

By copy of the attached letters, I have requested indemnification from the CNMI via letters to the Public Auditor and the AG (copies attached). Once again, I recommend that the CNMI take immediate action to indemnify me for the previously cited $139,130 plus the new expenses incurred by me on 96-1930 (approximately $100 in telephone calls, fax charges, postage, paper and copies, car expenses, notary charges, etc).

Finally, I note that I have filed criminal complaints with your office against the party or parties responsible for representations made to the CNMI courts about alleged certified letters being sent to me. As I noted in my Jul 14, 1999 letter to the AG, any such allegations are fraudulent. Because the statutes of limitations dates are in jeopardy, I urge the CNMI to take immediate action on this letter. Thanking you, I am,

Yours very truly,

*Robert D. Bradshaw*
Robert D. Bradshaw
PO Box 473
Calder, ID 83808
Phone  208-245-1691

E

LAW OFFICE
# HALL, FARLEY, OBERRECHT & BLANTON, P.A.

702 WEST IDAHO STREET, SUITE 700
KEY FINANCIAL CENTER
BOISE, IDAHO 83702

POST OFFICE BOX 1271
BOISE, IDAHO 83701

TELEPHONE (208) 395-8500
FACSIMILE (208) 395-8585
V:\Forms_Word\BOILERPLATE\Letterhead.doc

E-MAIL: contact@hallfarley.com
WEB PAGE: www.hallfarley.com

RICHARD E. HALL
DONALD J. FARLEY
PHILLIP S. OBERRECHT
J. CHARLES BLANTON
RAYMOND D. POWERS
CANDY WAGAHOFF DALE
J. KEVIN WEST
BART W. HARWOOD
JOHN J. BURKE
KEVIN J. SCANLAN
TAMSEN L. LEACHMAN

KEELY E. DUKE
JAMES S. THOMSON, II
SCOTT R. LEARNED
BRYAN A. NICKELS
MATTHEW J. RYDEN
BRENT T. WILSON
CHRIS D. COMSTOCK
JILL M. TWEDT
JENNIFER A. SWARTZ
KARIN DWELLE

*With Attorneys Admitted to Practice Law in
Idaho, Oregon, Washington and Utah*

July 13, 2005

Robert D. Bradshaw
P.O. Box 473
1530 W. Trout Creek Road
Calder, ID 83808

    Re:    *Bradshaw v. CNMI, et al.*
           HFOB File No. 3-635

Dear Mr. Bradshaw:

    This letter is written in response to your letter dated June 20, 2005.

    Representatives of the CNMI Office of the Attorney General ("CNMI AG") did not access, let alone "take possession" of, the CNMI Superior Court's file regarding Case No. 96-1320 on September 12, 2004, or on any other date. Moreover, Ms. Sablan has confirmed that the Superior Court of the CNMI does not check out or otherwise permit lawyers or other persons to take possession of its files. By contrast, the Court permits inspection of its files only at the clerk's window in the presence of the clerk. Thus, even if CNMI AG representatives endeavored to review the court's file, which they did not, they could not have "taken possession" of the same.

    The CNMI AG strenuously denies that it altered, removed or tampered with any of the CNMI Superior Court's records concerning Case No. 96-1320 or any other case.

                                      Very truly yours,

                                      Matthew J. Ryden

MJR:ccv
cc:    clients