indemnification (if BRADSHAW was served).

## US Postal Fraud

74. Unbeknown to BRADSHAW, BISOM/SORENSEN or person(s) under their misappropriated some certified mail/return receipt forms from the US Post Office possibly in 1997 and certainly by Aug 1999.

75. BISOM/SORENSEN used these forms to prepare fraudulent postal return receipts showing service of process on BRADSHAW by certified mail in Jun and Jul 1997 for the first two amended complaints. They submitted these fraudulent receipt records to the CNMI SC.

76. It is unclear when the AG first learned of these fraudulent documents in the 96-1320 file. But Asst AG SOSEBEE knew by Aug 27, 1999 when he received a letter from SORENSEN stating "service by certified mail on (Bradshaw) on two occasions. We also have the return receipt cards." Per the CNMI SC Order to Void on Dec 29, 2005, these receipts are identified as Z 142 485 879, dated Jun 4, 1997 and Z 142 485 883, dated Jul 2, 1997. They both bore the signature of "Manny" (the last name was possibly Mongohia).

77. Exhibit "D" has an affidavit of David Vanderholm, the postal carrier in Elk WA. The original of his affidavit is filed in BRADSHAW's Amended Motion to Void/Vacate Judgment in the CNMI SC 96-1320 file. Vanderholm categorically declares that the name Manny is unknown on his mail route.

78. On Sep 3, 1999, BISOM's "Reply to Opposition to Motion for Partial Summary Judgment" said that proofs of service on BRADSHAW was filed in 1997 and that these proofs were provided to the AG.

16

Received  Mar-30-2006 08:57       From-        To-US DISTRICT COURT, N      Page 008

79. From Aug 27, 1999 to early Feb 2000, the AG evidently did nothing of substance on case 96-1320, per the case file. The AG made no contact with BRADSHAW to advise him of the trial, of the alleged service made by HISOM or the conflict in the various documents in possession of the AG

### Judge CASTRO's Gross Incompetence

80. The AG's "Motion to Remove Case from Jury Trial Docket," filed on Feb 1, 2000, said: "plaintiff purports to have sent the Amended Summons and Complaint to defendant, Robert D. Bradshaw, 40203 N. Newport Hwy., Elk, WA 99009, on May 5, 1997. Exhibit A. Plaintiff also purports to have sent a Second Complaint and Amended Summons to defendant Bradshaw at the same address, on June 3, 1997. Exhibit B. Plaintiff has previously supplied copies of two United States Mail Domestic Return Receipt cards, neither of which bear the signature of defendant, Robert D. Bradshaw. Exhibit C. Defendant Bradshaw has not authorized anyone to accept service for him and has not been served with the any of the complaints in this case. Exhibit D, July 14, 1999 letter from Bradshaw to the Office of the Attorney General."

81. This AG motion included a copy of BRADSHAW's privileged letter of Jul 14, 1999, as evidence that BRADSHAW had not been served. Per the later Supreme Court decision, the AG notified the Court and SORENSEN that the AG withdrew that date as BRADSHAW's attorney. BRADSHAW was never noticed of this withdrawal, of the trial, or of the documents in court alleging service on BRADSHAW. This involved AG malpractice/lack of due diligence.

82. The trial was scheduled for Feb 7th. The various court filings, fraudulent receipts, and documents were all submitted to Judge CASTRO. CASTRO was thoroughly informed

17

about all aspects of case 96-1320 by Feb 7, 2000.

83. The trial of CNMI SC 96-1320 commenced under CASTRO. It was characterized by much confusion and contradictory paradoxes. Defendant CASTRO allowed the mess into evidence. But he did not allow BRADSHAW's letter of Jul 14, 1999 into evidence.

84. Defendant CASTRO obviously read BRADSHAW's letter of Jul 14, 1999. Surely he understood its message. Or did he? Anyway, it totally contradicted everything which BISOM submitted to the court on alleged evidence.

85. Judge CASTRO made no effort to resolve the total contradicting, confusing and impossible pieces of evidence before him from BRADSHAW and BISOM. A later Dec 29, 2005 void order from the SC proved the gross incompetence of CASTRO and his court

86. Defendant CASTRO took the way out by ignoring the conflicts in his court. He accepted the evidence submitted by BISOM. But per BRADSHAW's letter, the BISOM evidence was totally conflicting, confusing, contradicting and fraudulent. This paradox indicates a de facto conspiracy

87. Defendant CASTRO violated CNMI court rules/laws and allowed the conflicting, confusing, contradicting and fraudulent material from BISOM into evidence as truth with no effective opposition from the AG.

88. Rather than obey CNMI rules/laws, CASTRO made his own rules and law as he went along to deprive BRADSHAW of his constitutional and due process rights.

89. On Feb 14, 2000, BISOM entered a motion for default judgment against BRADSHAW. It was supported on Feb 16, 2000 by a declaration to the Court in the request of entry of default.

Received    Mar-30-2006 10:41    From-    To-US DISTRICT COURT, N    Page 001

90    The Clerk of Court entered this default in the official CNMI SC records on 2-14-00. The justification from BISOM for the default was "return of service" forms filed with the court showing service on BRADSHAW on the first and second amended complaints and service was made on Asst AG COTTON on the fourth amended complaint.

91.    BISOM's request for default judgment stated that service was made and that BRADSHAW did not answer the served complaints. The AG filed no answer on the fourth complaint allegedly served on Mr COTTON.

92.    In BISOM's Jul 2005 "Opposition to Motion to Void/Vacate Judgment" (p. 4), filed in 96-1320, BISOM/SORENSEN referred to the postal receipts and acknowledged that BISOM had "represented to the court that he had served defendant (in reference to BRADSHAW) by certified mail and defendant had signed the receipt... There is nothing to indicate that plaintiff (in reference to BISOM) had any way to know or even suspect that the postal receipt that was returned did not bear the signature of the person it was addressed to."

93.    From a Feb 22, 2000 "Order Denying Motion to Remove Case From Trial Docket," as signed by judge CASTRO, the CNMI's motion on Feb 1, 2000 to have 96-1320 removed from the trial docket was heard on Feb 7, 2000. This order on Feb 22, 2000 appears to confirm his decision to proceed with the trial.

94.    In denying removing the case from the trial docket, CASTRO said: "1. The motion relies on facts set forth in a form that fails to comply with the requirements of a supporting affidavit or declaration. 2. Defendant Robert D. Bradshaw was properly served by mail, return receipt requested but purposely avoided service. 3. The Office of the Attorney General has appeared on behalf of Robert D. Bradshaw as his attorney of record. 4. Defendant Robert D.

19

Received  Mar-30-2006 10:03       From-       To-US DISTRICT COURT, N    Page 001

Bradshaw, has waived any potential challenge to insufficiency of service of process by his previously bringing a motion to dismiss without joining such motion..."

95. It was strange that Judge CASTRO issued this order claiming that proper service was made and that BRADSHAW avoided service all the while that BISOM's motion for a default judgment was predicated upon allegations that BRADSHAW was served (both by certified mail and with service on the AG) and had failed to answer that service

96. If "proper service was made," as stated by CASTRO, why is that CASTRO added that BRADSHAW "avoided service"? The later SC order to void on Dec 29, 2005 found that CASTRO's decision completely lacked any basis in facts or in law. Thus, they were voided.

97. It is unclear what basis CASTRO used for this order since there was no evidence in court to substantiate the allegation of avoiding service except for BRADSHAW's Jul 14, 1999 letter and its remarks about the two unidentified certified letters from unidentified mailers not claimed by BRADSHAW.

98. This privileged letter to the AG was the only document in court which could have influenced CASTRO's decision. But the evidence also indicates that CASTRO's decision was made on the basis of a conspiracy with BISOM/SORENSEN.

99. BRADSHAW's Jul. 14, 1999 privileged letter was presented to the court by his alleged former attorney, the AG, despite the AG's withdrawal from the case about Feb 1, 2000, six days before the trial started.

100. Allegedly, the AG submitted this Jul. 14, 1999 letter from BRADSHAW to the court; not to help BRADSHAW, but rather to justify the actions of the AG. There is clear evidence of AG collusion with defendants BISOM/SORENSEN and defendant CASTRO in a

20

Received Mar-30-2006 10:03        From-        To-US DISTRICT COURT, N        Page 002

conspiracy to defraud BRADSHAW.

101. BISOM's motion for a default judgment was predicated upon service being made upon both BRADSHAW and the AG. Rather than ruling on this motion, CASTRO chose to approve the default judgment on the basis that BRADSHAW had avoided service.

102. Thus, CASTRO made up his own rules/laws and contradicted the actual records filed by BISOM in the case. CASTRO ignored Washington state laws on service. He also ignored CNMI rules/laws requiring service by publication or personal service if attempted service by certified mail failed.

103. Since the CNMI rules do not address the use of certified mail for service (except by 7 CMC which provides for publication as the remedy) and since the CNMI SC had never established personal jurisdiction over BRADSHAW in any legally authorized method of service, defendant CASTRO's decision that BRADSHAW avoided service was wrong and lacked legal justification. The later SC void order of Dec 29, 2005 proved this condition.

104. Of course, it would be absolutely ludicrous to believe that BRADSHAW refused service all the while that BRADSHAW and his alleged AG lawyer also accepted service. Which way was it? Did BRADSHAW refuse service or did he accept service? Yet, defendant CASTRO allowed both options into evidence as true.

105. Too the AG maintained six days before the trial and during the trial that the AG did not represent BRADSHAW (per the Supreme Court's decision, p. 21). Yet defendant CASTRO in his Feb 22, 2000 order actually found that the AG did represent BRADSHAW. Which way was it? Did BRADSHAW have AG representation or not? This is more prima facie evidence of conspiracy between BISOM/SORENSEN, CASTRO and SOSEBEE.

21

106. Defendant CASTRO's illegal, confusing, unclear and contradicting actions were certifiably reckless, deliberate, malicious and intentional with an objective to place injury and hurt on BRADSHAW

107. BRADSHAW was not present and had no lawyer in court and without any notice of the action in progress in court. As a minimum, defendant CASTRO took the way out and found for BISOM and against the unrepresented BRADSHAW.

108. Defendant CASTRO, as the presiding judge, must have understood what was happening in his own court room  He accepted the AG withdrawal and proceeded with the trial though BRADSHAW had no representation and was never given notice of the trial.

109. Not only did CASTRO lack personal jurisdiction over BRADSHAW, but the facts of the case disclose that he also lacked subject matter jurisdiction. In BRADSHAW's letters at Exhibit B, numerous issues involving subject matter jurisdiction are broached. Many of them were covered in BRADSHAW's letter of Jul 14, 1999.

110. For example, the Jul 14 letter mentioned the question over the statute of limitations which is clearly a subject matter issue. BRADSHAW also mentioned BISOM's complaint that BRADSHAW discriminated against him because of his Jewish "race." According to Jewish encyclopedias (like Encylopaedia Judaica, Universal Jewish Encyclopedia, etc), there is no Jewish race. BRADSHAW can find no legal basis in Civil Rights laws or court cases allowing a discrimination lawsuit over an alleged Jewish race which does not exist.

111. By Judge CASTRO's actions, he completely closed the door for BRADSHAW to have any opportunity to question subject matter jurisdiction. Besides the questions just

22

noted, there were other questions over subject matter jurisdiction which BRADSHAW would have raised if given a chance.

112. For instance, the CNMI is quick to claim qualified immunity for her officials which certainly concerns subject matter. Given a chance, BRADSHAW would have proven his possession of qualified immunity. He could show that he acted reasonably, carried out applicable statutes and regulations in every respect and complied with BISOM's due process rights.

113. BISOM's own actions were both illegal per his oath of office to obey CNMI laws and his own contract. Former CNMI public Auditor Scott Tan and Governor-elect Tenorio neither held a position in the CNMI government in late Nov and Dec 1993.

114. BISOM had no authority to negotiate with them on OPA. BRADSHAW was the Public Auditor and had legal authority for the office and its audits. BISOM's illegal acts are spelled out in his complaints in cases 95-0042 and 96-1320.

115. When BISOM was fired for cause in 1993, BRADSHAW's actions were completely coordinated with both the AG and Civil Service Commission. In no instance did BRADSHAW deviate from their procedural instructions.

116. The original complaint and the first and second amended complaints in 96-1320 were all filed in BRADSHAW's official capacity as well as his individual capacity. Per CNMI SC rule 4(I), the CNMI AG should have been served for the official capacity complaints. BISOM did not do this.

117. Defendant CASTRO failed to exercise due care and responsibility as the trial judge by allowing the trial to proceed in the absence of BRADSHAW being present or having

23

Received  Mar-30-2006 10:03       From-       To-US DISTRICT COURT, N       Page 006

counsel present or of being given notice of the trial.

118  In the interest of justice, defendant CASTRO had a duty to exercise due care and concern over the interests and constitutional rights of BRADSHAW, who was not in court and who was not represented by his supposed legal and proper attorney, the AG.

119. Yet, CASTRO did little or nothing in the trial to establish justice. He entered a default judgment against BRADSHAW when there was substantial evidence of fraud and conspiracy on the part of BISOM; and evidence of fraud, conspiracy, malfeasance, malpractice, inexcusable neglect and general incompetence on the part of the AG, who was supposed to be representing and defending BRADSHAW.

120. Though the evidence was plain enough of what was happening, defendant CASTRO denied BRADSHAW's basic rights under the US Constitution. He proceeded to order a judgment of $139,000 individually against BRADSHAW and then refused to allow the imposition of the CNMI Indemnification Act to relieve the burden from BRADSHAW.

121. The charges made against BRADSHAW by BISOM were effectively declared true by the actions of CASTRO. BRADSHAW was found guilty of practicing discrimination against BISOM; of making alleged statements that his appointment was political, and of discharging BISOM illegally/improperly. BRADSHAW never had his day in court to answer the charges--whether they be true or false.

122. As a minimum, the case file 96-1320 is clear enough that Justice CASTRO is totally and grossly incompetent and not qualified to be on the bench deciding cases

123. It is also clear that CASTRO exercised 42 USC 1981 discrimination against BRADSHAW on the basis of BRADSHAW's citizenship, national origin and domicile (a US

24

state sider). Since BRADSHAW was not present and had no attorney, it was easy for CASTRO to violate BRADSHAW's rights.

124. Per US law, 42 USC 1981 is not limited to the technical restrictive meaning of the word "race." While the American BISOM was at issue, it was far more practical and easier for judge CASTRO to simply decide issues against BRADSHAW than against BISOM since BISOM's lawyer was in court demanding and arguing issues for BISOM.

125. There are also issues about Justice CASTRO's involvement of corruption and conspiracy with BISOM while on the bench.

126. For years, some of the CNMI courts and judges have been accused of corruption and racketeering in their actions. Judge CASTRO as a probate judge in 2000 arranged for his colleague Pedro Atalig (who was one of the Supreme Court justices who heard the 96-1320 appeal) to receive large sums of money in cases before CASTRO.

127 Allegedly, these CASTRO directed payments were improper. Allegedly, CASTRO shared in this money plunder funneled through Pedro Atalig.

### The Trial

128. When the 96-1320 case went to trial, the AG made no contact with BRADSHAW or proper preparations for the trial. In the Feb-Mar 2000 trial in SC, the CNMI was represented by Asst AG SOSEBEE as lead attorney.

129. On Feb 3, 2000, BISOM/SORENSEN submitted a "Opposition to Motion to Remove Case From Trial Docket." This motion cited BRADSHAW's letter of Jul 14, 1999 by saying: Mr. Bradshaw received two certified mail packets from Saipan in 1996 and 1997. Plaintiff, in fact, sent two such envelopes with summons and complaint, true copies of which

25

are attached. They were returned unopened."

130. The return receipts on the envelopes submitted as evidence for this BISOM opposition carries the precise same numbers as found on the return receipts supposedly signed by "Manny." Judge CASTRO accepted both sets of documents as true and allowed them into evidence.

131. BRADSHAW has no knowledge/remembrance of the two envelopes submitted in court by BISOM. The envelopes entered by BISOM in 96-1320 allegedly had the mailer(s) identified as "Jay H. Sorensen, Esq."

132. BRADSHAW had no knowledge of these two envelopes until they were brought to his attention in the summer of 2005 when BISOM filed an answer to BRADSHAW's motion to void/vacate judgment in 96-1320. This answer included two Xerox copies of two alleged envelopes sent BRADSHAW by certified mail in 1997.

133. In 1999, BRADSHAW acknowledged two certified mailings from "unidentified" mailers which had a Saipan post office box for a return address. This Jul 14 letter was written back in 1999 when the facts were close and first hand knowledge to BRADSHAW.

134. To this day in 2006, BRADSHAW's memory distinctively recalls these two envelopes with unidentified mailers.

135. BRADSHAW remembers visually looking at least one of the unidentified certified letters in 1996/1997 and noting its similarity to the one sent him in 1995 from lawyer SORENSEN (copy of which is at Exhibit "E"). BRADSHAW did not note the post office box numbers on the ones in 1996/1997 to be sure that they were the same as the one in 1995. But they looked similar.

26

136. In 1997, BRADSHAW did assume in 1997 that the unidentified envelopes in 1996/1997 were from SORENSEN. But since BRADSHAW was not thereafter served, by 1999, BRADSHAW became unsure who the envelopes were from in 1996/1997.

137. Based on the 1995 mailing from SORENSEN, it appears that lawyer SORENSEN follows the practice of mailing summons in envelopes without his name on them. This seems to be his MO or modus operandi.

138. Regardless, the presence of one of them was reported at once to the AG. The AG was notified based on BRADSHAW's assumption that the envelope was from SORENSEN. If these envelopes constituted service, then the AG was notified of that service.

139. When a court is dealing with crooks who have and will enter fraudulent documents in court in order to obtain a default judgment, alleged mailings like these two certified mail letters prove nothing simply because it is such a simple task to fraudulently prepare envelopes like these two were prepared. Admittedly, with the new post office tracking capability since 2004, certified documents are easier to now validate, But in 1997, this was out of the question. Thus, it is easy to have fraudulent rubber post office stamps made to stamp any document. For that matter, on Saipan, it would be easy to pay a bribe to a Saipan postal employee and have documents date stamped however desired.

140. In any case, the certified numbers on these two documents were only three numbers apart which seems awful strange that only three certified letters left the Saipan post office in a 30 day period. Too, the certified mail numbers were precisely the same ones which were submitted to the court showing acceptance of service of the complaints by the fictitious Manny. It is clear that the two sets of postal documents cannot be true.

141. BRADSHAW's privileged letter of Jul 14, 1999 was brought to the attention of Judge CASTRO as it totally conflicted with everything happening in his court. Judge CASTRO refused to allow BRADSHAW's letter into evidence. Yet, he allowed in the documents submitted by BISOM both on alleged service and non-service.

142. CASTRO then proceeded to enter a default judgment and so instructed the jury. With the default judgment, BISOM ultimately received $140,000 from the CNMI and a judgment against BRADSHAW for $139,000. BISOM asked the court to have the CNMI pay the $139,000 judgment on the basis of the Indemnification Act. The SC denied this request.

143. Both the default judgment of $139,000 against BRADSHAW and the ultimate pay out of $140,000 in 2003 damaged the reputation, name and professional conduct of BRADSHAW. Both of these judgments were predicated on BRADSHAW's actions per the illegal default judgment entered by CASTRO.

### The Supreme Court Appeal

144. The CNMI appealed the SC decision but later dropped its appeal. BISOM also appealed because the trial court excluded certain evidence and denied plaintiff's request for indemnification for BRADSHAW.

145. In the Supreme Court appeal in Mar-Sep 2002, the CNMI was represented by Asst AG CLAYTON. On the appeal, the Supreme Court upheld the trial court. But importantly, just as the trial court had BRADSHAW's letter of Jul 14, 1999, the Supreme Court also had it and quoted part of it in its decision.

146. Whereas defendant CASTRO found that the AG supposedly was BRADSHAW's attorney and supposedly represented BRADSHAW at the trial (per the CASTRO order of Feb

28

Received  Mar-30-2006 10:41       From-       To-US DISTRICT COURT, N   Page 002

22, 2000). the Supreme Court (in its Sep 13, 2002 decision) said that the AG was not BRADSHAW's attorney. The court added that BISOM had been so informed by the AG at least six days prior to trial (p. 12 of the Supreme Court's decision) and that the trial court was so informed at the oral arguments presented by the AG (p. 21 of the decision).

147. The Supreme Court also found that "before the trial court... the Attorney General's Office allowed a default judgment to be taken against Bradshaw. This fact alone permits an equally persuasive inference that Bradshaw had not, in fact, requested a defense. The trial court's determination that Bradshaw did not request a defense was not clearly erroneous" (p. 21 of the decision) The court also found "As there has been no showing that BRADSHAW requested a defense or indemnification, it can not be said that BRADSHAW wants indemnification."

148. In both the CNMI SC and Supreme Court cases, the report that the AG was not representing BRADSHAW was apparently predicated upon BRADSHAW's Jul 14, 1999 letter. Despite not allowing this letter into evidence, this letter was the only evidence available which the AG had to support its contention that the AG had withdrawn from the case at BRADSHAW's request.

149. Judges MANGLONA and BELLAS (along with Judge Pro Tem Pedro M. Atalig, now deceased), in the Supreme Court review in Mar.-Sep. 2002, were all exposed to CASTRO's violations of court rules/laws, the basic trial results and BRADSHAW's letter of Jul 14, 1999. They saw the absolute confusion and pandemonium from the trial of 96-1320. Yet, they did nothing to resolve the mess. They supported CASTRO's decision.

150. While the Supreme Court justices were also guilty of misconduct in the way they handled case 96-1320, plaintiff BRADSHAW is not making a claim against them in this 2d amended complaint. Because of judicial immunity and questions of jurisdiction, these justices would probably escape any liability for their wrong/illegal actions.

151. BRADSHAW was a defendant in the appeal of SC 96-1320 to the Supreme Court. Yet BRADSHAW was never notified of the hearing by the AG or the court, was not present in court, had no attorney present (as the AG had withdrawn from representing BRADSHAW six days before the trial), and had no opportunity in court to defend himself.

### The Post Trial

152. Although the AG sent no further communications to BRADSHAW, after Jun 1999 until 2004, the 96-1320 case file did have some more US post office return receipts in it from the AG, as allegedly signed by "Manny" for BRADSHAW. As a minimum, these receipts show collusion and conspiracy to defraud between BISOM/SORENSEN and some other person(s) in the CNMI.

153. While BRADSHAW and his supposed AG attorney had contact up until July 1999, the AG discontinued contact with BRADSHAW after Jun 1999. BRADSHAW wrote the AG after the Jul 14, 1999 letter and again in 2000 but his letters were never acknowledged or answered.

154. During all of this interchange between SORENSEN and the AG, none of this was ever brought to the attention of BRADSHAW. BRADSHAW knew nothing about this interplay. BRADSHAW had no knowledge at all that the trial was underway and that BRADSHAW was a defendant in the trial or its appeal. All along, BRADSHAW believed that the AG was indeed

30