his attorney and that the AG had went into court and had BRADSHAW's name removed.

155. While the AG acted to keep BRADSHAW informed in 1996-1998 on some events on Saipan relative to BRADSHAW, the AG entered into a process of silence in 1999 which eventually turned into an hostile adversarial relationship at least six days before the trial of 96-1320. In April 2004, at BRADSHAW's initiation, the AG notified BRADSHAW of the outcome of 96-1320 in 2000 and its appeal in 2002.

156. The CNMI Supreme Court's decision, appeal nos. 00-0016 & 0023-GA, consolidated (on pages 12, 13, and 22), cited repeated cases of mistakes and mistaken actions (plural) by the AG. On page 22, the Supreme Court decision opened the possibility that an attorney or attorneys in the Office of the AG had violated the Bar Association ethics rules. The Supreme Court did not establish which person or persons individually were responsible for the malpractice, mistakes, and so forth. In its decision (page 12), the Supreme Court also allowed that in the AG appearance and presentation there was a conflict of interest between the CNMI and BRADSHAW.

157. All of this translated to Supreme Court decided gross incompetence and malpractice by the AG. It contributed to violations of BRADSHAW's rights to due process and equal protection of the laws under the US Constitution. The CNMI AG's actions were deliberate, malicious, intentional and extremely irresponsible in creating a total mess of case 96-1320 and great injury and damage being placed upon BRADSHAW and the CNMI.

158. As a minimum, if the certified letters sent by BISOM (unclaimed by BRADSHAW) communicated an avoidance of service, the AG was fully informed by BRADSHAW on these letters and should have done something about them. With the first one, whether identified or

31

not, the AG should have immediately contacted BRADSHAW about the consequences of the letters being unclaimed or filed an answer.

159. During the filings of the several actions by BISOM, the AG accepted service for BRADSHAW in his individual capacity on one or more of the complaints without BRADSHAW's knowledge, authorization and/or request. The AG made no answer in court on any of the summons it had accepted.

160. BRADSHAW was never informed on these acceptances of service by the AG. The AG did nothing about advising the court or BISOM of the insufficiency of service of process. The AG violated the CNMI court rules and failed in not discharging its duties and due diligence on this case.

161. Despite being frequently informed that no service on the BISOM complaint in 96-1320 had ever been made personally on BRADSHAW and that constructive service was impossible, the AG made no effective effort to go into court and have the question of service resolved on the basis that BISOM and/or his attorney was practicing deception and fraud upon the CNMI courts (in their presentation of alleged postal documents showing alleged service/refusal of service by BRADSHAW when no actual/constructive service existed).

162. In view of the BRADSHAW letter of Jul 14, 1999 notifying the AG of no service and no possibility for constructive service, all of these alleged postal documents should have been sufficient to alert members of the AG's office that they were openly suspicious and involved possible fraud and deception.

163. The AG should have been properly monitoring 96-1320 and promptly brought the discrepancies (between what BISOM was saying and BRADSHAW's letter to the AG on

Received   Mar-30-2006 10:12       From-        To-US DISTRICT COURT, N    Page 004

Jul 14, 1999) to the attention of the court.

164. Whenever the AG found out about the postal documents (which were a total complete contradiction to BRADSHAW's letter of Jul 14, 1999), the AG should have protested to the court and at least filed an appeal to the Supreme Court on the illegal postal documents filed by BISOM. Clearly, the AG was grossly incompetent, irresponsible and malpracticing in not addressing the fraudulent postal documents used by BISOM/SORENSEN.

165. The primary action of the AG was to allow the court to enter a default judgment on BRADSHAW (per the CNMI Supreme Court, p. 21) without any opposition and without exercising due care and recognizing the fiduciary responsibility which the AG had in its role of protecting and defending the CNMI and its officials, like BRADSHAW.

166. BRADSHAW was sued in the complaint and 1st and 2d amended complaints in his official capacity along with allegations involving his official duties in the OPA. In the 3d and 4th amended complaints, the title caption of the actors dropped BRADSHAW in his official capacity, but the allegations in the documents remained that BRADSHAW was being sued officially for his work.

167. The 1st and 2d Amended complaints were the ones allegedly served on BRADSHAW by the fraudulent receipts. They were also the ones where CASTRO declared that BRADSHAW avoided service. Certainly, the CNMI had a fiduciary duty to protect and indemnify BRADSHAW for his official duties.

168. BRADSHAW was never notified or informed at all on what was happening in court on this case or on the AG's withdrawal or of the entry of the default judgment on BRADSHAW as made without opposition from the AG. Thus, the AG sat back, did nothing

33

and allowed the default judgment to take place (per the Supreme Court).

169. At some point in time, the AG violated CNMI court rules/laws and also produced alleged postal receipts on supposed communications sent by the AG to BRADSHAW by certified mail None of these communications were received by BRADSHAW. But the postal receipts that were made out and submitted to the court by the AG showed receipt by allegedly the same unidentified and unknown Manny as the receipts which were presented by BISOM to the SC; thus presenting prima facie evidence of conspiracy between BISOM and some person(s) in the AG's office.

170. The AG's presentation of fraudulent postal receipts in connection with alleged communications to BRADSHAW raise the spectrum that the AG's action not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his constitutional rights. The US Supreme Court has ruled that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitations" (Supermarket of Marlinton v. Meadow Gold Dairies).

171. The actions and omissions of the AG during the years 1997-2002 were sufficient to establish that there was gross incompetence, malfeasance, malpractice, omissions, lack of care, violations of laws/rules and fraud and conspiracy by the AG. The AG persons deliberately and maliciously denied BRADSHAW his rights under the US Constitution.

172. At BRADSHAW's initiation, the AG on Apr 6, 2004 sent him a copy of the SC order on 96-1320 and the decision on the Supreme Court Appeal. A copy of the Apr. 6, 2004 transmittal letter is at Exhibit "A." This letter was a shock to BRADSHAW in that he had

previously believed and acted on the premise that the AG had went into court and had his name removed as a defendant from SC 96-1320. This increased the level of emotional duress and stress and loss of the enjoyment of life on BRADSHAW

173. In the summer of 2004, BRADSHAW began unsuccessful efforts to find a lawyer to undertake a case against the CNMI and to have someone on Saipan check the actual case file. BRADSHAW could not find a lawyer who would take the case because of economic prejudice and fear of retaliation from Judge CASTRO.

174. BRADSHAW did learn from Micronesian Legal Services that BISOM entered into evidence documents showing alleged service on both the AG for BRADSHAW and on BRADSHAW via alleged postal mail receipts which showed receipt of service on BRADSHAW by an unidentified/unknown third party (named Manny) who incontrovertibly does not exist.

### AG Brown Lies and Obstructs Justice

175. Though suspicious that person or persons in the AG office presently might be untrustworthy and unreliable and act to further damage BRADSHAW, plaintiff BRADSHAW, without funds to hire a counsel and unable to obtain help from Idaho Legal Services or Micronesian Legal Services, reluctantly did turn to the AG on Sep. 12, 2004 for relief. BRADSHAW talked by phone to Heather, Mr Lemon and Mr Buckingham. Buckingham later briefed AG BROWN and was given the go ahead to investigate BRADSHAW's complaints over 96-1320.

176. BRADSHAW requested that the fraudulent documents be sent to US Postal Inspectors/the FBI and that the AG go to court and have the $139,000 judgment against

35

Received Mar-30-2006 10:12      From-      To-US DISTRICT COURT, N     Page 007

BRADSHAW voided. One of BRADSHAW's letters is at Exhibit F.

177. After many phone calls and letters from BRADSHAW which were never answered by the AG, AG Brown did respond on Feb 15, 2005 (Exhibit A6). BROWN's letter notified BRADSHAW for the first time that the AG was not BRADSHAW's attorney.

178. It was then clear that the AG would provide no legal help to BRADSHAW and was in fact a hostile adversarial party. This effort before Feb 15, 2005 cost BRADSHAW over $100. The AG inaction further increased the level of emotional stress and loss of enjoying life on BRADSHAW.

179. If BROWN would have acted responsibly to resolve the issues before her with some action as the chief law enforcement officer of the CNMI, BRADSHAW's litigation before the US courts would have been unnecessary. Much of this case could have been easily handled by the CNMI without any particular expense or effort. As a minimum, BROWN could have written BRADSHAW explaining the alleged basis, legality and propriety of the default judgment

180. Yet, BROWN did nothing in 2003-2005, but acted to hide information from BRADSHAW and keep BRADSHAW in ignorance about what was in the case file and what the AG was doing on it.

181. In the summer of 2005, plaintiff learned from the SC Clerk that the fraudulent mailing receipts in the CNMI case file were, all of a sudden, missing. Since these documents were in the possession of AG BROWN (as BRADSHAW was so informed by personnel in the office of the AG), she was responsible for them.

Received Mar-30-2006 10:12 From- To-US DISTRICT COURT, N Page 008

182. Too, this BROWN influence also reached to other CNMI employees outside the AG's office. The result has been hidden or destroyed records from the 96-1320 case file.

183. Regardless of whatever role BROWN had in the loss or hiding of those court documents, as a minimum, BROWN was grossly and maliciously incompetent. Her office spent ten months investigating the alleged receipts. As a minimum, she would have had to have access to those documents to do any investigating. If the documents are now missing, it certainly shows that she is totally irresponsible and incompetent beyond description.

184. Being alerted in Sep 2004 that BISOM had committed fraud against the CNMI, Brown should have immediately acted to secure the alleged fraudulent documents and have them properly investigated by US authorities.

185. This reality and the facts outlined above plainly outline the obstruction of justice and hiding of criminal acts by defendant BROWN in cases which were before both the CNMI SC (96-1320) and the US District Court of Idaho (05-84).

186. As far as the alleged mailing envelopes from BISOM to BRADSHAW, now in the 96-1320 file supposedly justifying the default judgment, BROWN must have known about these documents. Yet she never informed BRADSHAW. This hiding of information from BRADSHAW has necessitated much guesswork in 2005 on what happened.

187. Defendant BROWN appears to never put anything in writing, but rather to only commit to writing when it becomes absolutely necessary. Without written documents, any contact with the AG becomes difficult. Without things in writing, it is easy for the AG to lie, deceive, twist, distort, deny, obsfucate, stall and generally obstruct justice.

Received  Mar-30-2006 10:12      From-      To-US DISTRICT COURT, N      Page 009

188. After many letters and phone calls over a period of five/six months from BRADSHAW to the AG requesting indemnification on the BISOM judgment, BROWN finally acknowledged BRADSHAW's many attempts to resolve that issue. On Feb. 23, 2005, BRADSHAW received the letter at Exhibit A from AG BROWN. Though characterized by at least one mistake, this letter denied BRADSHAW indemnification by essentially citing the Supreme Court decision.

189. On the mistake in this letter, the AG charged that since its April 2004 letter that "Almost six months later," BRADSHAW sent the AG a request for indemnification. This charge is not correct and it does matter if the present AG is attempting to prove that BRADSHAW neglected this case with any unnecessary time delays after his notification in April 2004. Actually, following the conversation with the AG on Sep. 12, 2004 (as elsewhere described herein), BRADSHAW, faxed a letter requesting indemnification to the AG (on Sep 13, 2004 and copies of the material covered under the affidavits at Exhibits A to C).

190. Later, Asst AG Ed Buckingham orally confirmed the receipt of these faxes in a telephone conversation. BRADSHAW next sent the AG registered mail with the Sep. 12, 2004 request for indemnification on Sep. 13, 2004. This registered letter was receipted by the AG on Sep. 28, 2004. Yet the AG's letter seems disingenuous in alleging that BRADSHAW's request was received "almost six months later" on Sep. 29, 2004, a day after it was actually received (implying that BRADSHAW took almost six months to contact the AG).

191. The Initial notification letter from the AG, dated Apr. 6, 2004 (at Exhibit "A," which, per its mailing envelope, was mailed on Saipan on Apr. 7, 2004), was also received some fifteen days later by BRADSHAW about Apr. 22, 2004. This means that the actual elapse of

38

time between the AG notification to BRADSHAW and his contact of the AG was over four months and not almost six months as alleged by the AG. This time was spent in pursuit of trying to find legal help and someone to actually check the 96-1320 file to determine what had happened.

192. Thus, Ms BROWN made it plain that the AG would do nothing for me beyond a short "limited" telephone call to a local attorney on my options. This meant that henceforth BRADSHAW was denied any legal assistance from the AG. Actually, it appears that AG discontinued legal assistance to BRADSHAW in 1999 and never told BRADSHAW about it.

193. The AG has done nothing for BRADSHAW since Jun 1999 beyond being an adversary and constantly working against BRADSHAW.

194. This means that all of BRADSHAW's letters, phone calls and contacts have been a total waste of time as the AG did nothing and made no effort to apprise BRADSHAW of the status of case 96-1320. If BRADSHAW had of been informed that the AG was his adversary, BRADSHAW could have saved much money, time and effort.

195. Otherwise, it is to be noted that paragraphs two, three and four of the AG letter of Feb. 15, 2005 also clearly acknowledge that BRADSHAW was first given notice in April 2004 of the CNMI court actions that took place to damage and hurt him in 1997-2002.

196. Defendant BROWN's actions have been deliberately designed to keep BRADSHAW in a state of ignorance about what had happened on case 96-1320 and not allow BRADSHAW to obtain needed documents to prove the conspiracy and fraud perpetuated upon him by BISOM and the CNMI.

### BRADSHAW Had to Take Legal Action in 2005

197. From Sep. 12, 2004 to date, BRADSHAW went to great effort and exhausted all remedies available to him in the CNMI to resolve this case and the dispute without further court actions/legal processes. BRADSHAW's efforts failed. The AG effectively did nothing.

198. The passage of a few days short of six months without resolution was sufficient to demand action on Mar 7, 2005. BRADSHAW, pro se and at his own expense, filed a petition in the SC asking the SC to void/vacate its judgment against BRADSHAW. This action costs BRADSHAW $4000. It was decided on Dec 29, 2005 when the SC issued an order to void the $139,000 judgment.

199. But this judgment did not address or alter the public slander, wrong, lack of due process and expense placed on BRADSHAW by the actions of the CNMI through its agents.

200. BRADSHAW simultaneously filed a suit similar to this one in the US District Court of Idaho (Case 05-0084). Because of Title 18 USC 4 and the need to report felonies as soon as possible to a US judge, it was essential that this case be filed in Idaho. In case 05-0084, BRADSHAW obeyed the law and reported the postal fraud felonies described herein with a citation of 18 USC 4.

201. Too, BRADSHAW was recruited to go to Saipan from Idaho. BRADSHAW suffered damage in Idaho. BRADSHAW expected to get copies of the fraudulent documents and get them to US Postal Inspectors in Idaho. Finally, with the documents, BRADSHAW expected to employ a Idaho handwriting expert to prove that the documents were not signed by BRADSHAW. This case cost BRADSHAW $4000. The Idaho case was dismissed without prejudice in Jul 2005 for lack of personal jurisdiction. It was refiled in the CNMI in Aug 2005.

202. Ever since trying to obtain some resolution on this case from the CNMI AG and courts (from Sep 2004 to date), the AG consistently has avoided writing letters to BRADSHAW or allowing BRADSHAW to have any knowledge of the facts in the case. Instead, the AG has generally acted to lie, deceive, twist, distort, stall, delay, obfuscate, hide and deny BRADSHAW any information which would help him learn the facts.

203. BRADSHAW tried to obtain copies of documents from the AG--both before filing US civil action 05-84 and afterwards in the form of two requests for documents under discovery (in May and June 2005). The AG simply refused to honor the requests. Since Jun 1999, the AG has consistently kept the facts of 96-1320 in secret from BRADSHAW.

204. Starting in Feb 2005, BRADSHAW made many phone calls and sent numerous letters to the SC Clerk of Court with checks enclosed for copies of documents. In Oct 2005, BRADSHAW wrote the Chief Judge about the matter. Starting in early Dec 2005, the clerk began filling some of these requests for documents from the 96-1320 case file.

205. But in a Jun 2005 telephone conversation, the Clerk said that the postal receipts in question are not now in the file.

206. In learning of the missing records, BRADSHAW contacted the CNMI lawyer, Hall Farley, who sent back the enclosed letter Exhibit "G."

207. In the Hall Farley letter, the CNMI AG denied ever seeing the alleged fraudulent postal receipts. The AG pretended to be in total ignorance about its contacts with BRADSHAW from Sep 2004 until Mar 2005. This AG alleged ignorance happened three months after the 05-84 suit was filed in the US Idaho court over this very question.

208. In a Jun 18, 2006 letter (Exhibit "H"), the Clerk further informed BRADSHAW that the attached exhibit/letter to the 02/03/00 "Opposition to Motion to Remove Case From Trial Docket" is now missing. This letter is important in establishing the fraud in 96-1320. It is clear that some person(s) have reviewed/rifled the 96-1320 court case file and removed and hid or destroyed a number of documents.

209. While the case file has been rifled and altered and documents hidden or destroyed, a copy of the fraudulent receipts from BISOM/SORENSEN remained. They are attached to the AG's motion of Feb 1, 2000 to take the case off of the calendar. Exhibit "I" a is copy of the fraudulent receipts entered by BISOM/SORENSEN.

210. BRADSHAW's contacts with the AG in 2004-2005 are spelled out in the affidavit at Exhibit "J" as filed in the CNMI SC case 96-1320 in the summer of 2005. Local newspaper reports of the trial finding BRADSHAW guilty of BISOM's allegations are at Exhibit "K."

### FIRST CLAIM--Civil Rights Violations (42 USC 1983)

211. Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

212. In 1996-2003 at the CNMI SC in case 96-1320 on Saipan, defendant ROBERT A. BISOM and his attorney defendant JAY H. SORENSEN violated plaintiff's due process, equal protection of the law and other rights under the US Constitution and the 5th, 9th and 14th amendments of the US Constitution and 42 USC 1983.

213. BISOM/SORENSEN engaged in malicious prosecution to bring on the injury to plaintiff. Three times the USDC NMI dismissed the BISOM claims. Among other things, BISOM never addressed the distinction between official and individual capacities and duties.

214. Yet. BISOM kept and maintained the essential same allegations against BRADSHAW in all six of his complaints in 95-0042 and 96-1320.

215. BISOM/SORENSEN knew that there was a bar against them to proceed with their litigation against BRADSHAW.

216. By the summer of 1999, BISOM/SORENSEN then misappropriated US postal forms for purposes of fraud. In 1999 and 2000, they entered fraudulent US mail postal receipts and submitted contradictory alleged mailing envelopes to BRADSHAW in case 96-1320 to obtain a default judgment against BRADSHAW in violation of 18 USC 241-242; 1341; 1342; 1349; 1707; and 39 USC 3005/4005.

217. BISOM/SORENSEN submitted two sets of postal documents to the court. In 1999, the set of fraudulent receipts were submitted. On Feb 3, 2000, BISOM/SORENSEN submitted two alleged mailing envelopes which involved the exact same certified numbers as for the two return receipts. The mailing envelopes showed them to be undelivered and returned to sender. The two sets of documents were contradictory and impossible.

218. In the 2005 Opposition to Motion to Void/Vacate Judgment in the CNMI case 96-1320, BISOM/SORENSEN admitted submitting both sets of contradicting documents to the SC. Obviously, one or both sets of postal documents were fraudulent.

219. BRADSHAW allows that both of them could be fraudulent. Certainly, the return postal receipts were fraudulent. Whether BISOM/SORENSEN ever mailed the envelopes submitted to the court remains a question mark.

220. BISOM/SORENSEN violated CNMI court rule 4 (d), (e), (l) and (m), 7 CMC Sections 1102 and 1104 and WA state laws and rules by not serving BRADSHAW in

43

Received   Mar-30-2006 10:19         From-                         To-US DISTRICT COURT, N    Page 005

accordance with the law  They denied BRADSHAW his day in court to answer their complaint.

221. In the BISOM complaints, BISOM admitted that he worked outside official government channels and without authority to block and oppose the audit work of BRADSHAW.

222. In a CNMI AG deposition with BISOM in 1996, he also admitted that in 1993 he went to the CNMI legislature and discussed confidential OPA information with certain legislatures. These facts prove that BISOM was properly fired by BRADSHAW for cause.

223. BISOM/SORENSEN obtained a judgment against BRADSHAW for $139,000. They also obtained a judgment and settlement of $140,000 in 2003 from the CNMI in part as a result of the illegal default judgment. BRADSHAW was due $130 from BISOM in case 95-0042. In the 2003 settlement of 96-1320, BRADSHAW lost this $130.

224. The illegal actions and improper judgments allowed by the defendants brought a loss of property (money) to plaintiff. BRADSHAW was also slandered and defamed in the CNMI media.

225. BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged. His professional status as a CPA was damaged in the media to affect his ability to earn a living when he resumes the practice of accounting.

226. These events further brought much emotional distress, pain and suffering to BRADSHAW. They also brought about a loss of enjoyment of life to BRADSHAW.

227. The actions of BISOM/SORENSEN were extreme and outrageous. They were done recklessly, maliciously and intentionally with a desire to inflict monetary, emotional and

Received Mar-30-2006 10:18      From-      To-US DISTRICT COURT, N      Page 006

other damage on BRADSHAW.

228. To address the illegal judgment, BRADSHAW brought action in the CNMI SC in 2005 to void the default judgment of $139,000. The SC granted this motion on Dec 29, 2005. This action costs BRADSHAW personally $4,000. The actions of BISOM/SORENSEN make BRADSHAW continue to incur expense in the courts to obtain relief from the injuries BISOM/SORENSEN caused.

229. BRADSHAW prays for relief from the actual damages of the $130 in case 95-0042, $4,000 in case 96-1320, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to BISOM/SORENSEN.

230. Since BISOM/SORENSEN collected $140,000 illegally from the CNMI because of the alleged actions of BRADSHAW and the default judgment, BRADSHAW asks that BISOM/SORENSEN be made to repay this $140,000 to the CNMI. BRADSHAW further requests that the CNMI Bar Assn and US authorities be advised of this case for further action.

231. Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $279,000 from BISOM and $279,000 from SORENSEN for emotional and mental distress and the loss of the enjoyment of life.

### SECOND CLAIM--Civil Rights Violations (42 USC 1983)

232. Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

233. In 1996-2003 in CNMI case 96-1320, AG defendants FORELLI, COTTON, BUSH, CLAYTON and SOSEBEE each individually and collectively acted to violate BRADSHAW's