territorial limits of the Commonwealth."  The Order construes the phrase "and not prohibited by law" as meaning that the law of the state of the nonresident defendant must specifically allow the kind of service used in order for such procedure to be lawful.  There are several problems with this construction of Rule 4(k).[4]

1. Legislative intent.

It is worth noting that no authority is cited in the SC order for this proposition.  It is likely that none exists, as there is no incentive for any jurisdiction to place such a limitation on their methods of bringing persons who are charged with civil wrongs before their tribunals.

When interpreting a statute a court's objective is to give effect to the intent of the legislature. *In re Estate of Rofag*, 2 N.M.I. 18, 29 (MP 1991).  The legislative purpose is expressed in the ordinary meaning of the words used.  *Commonwealth Ports Auth. v. Hakobotan Saipan Enter. Inc*, 2 N.M.I. 212, 222 (MP 1991).

The legislative purpose of the Commonwealth's long-arm statute is expressly stated in 7 CMC §1102(e): "The legislature intends that jurisdiction under this section shall be coextensive with the minimum standards of due process as determined in the United States federal courts."  Due to this language, it has been observed: "the very liberal language of Section 1102 clearly indicates that the intent of the statute was to expand the jurisdiction of the Commonwealth's courts to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Sirok*, 1 CR at 1075-1076.

Thus, since the stated purpose of the legislature was to maximize the reach of the long-arm statute, it would be antithetical to that end to suppose that the legislature wanted to

___

[4]  In footnote 2 of the SC order, it says that it appears that service would have been untimely, although dismissing the point as moot in light of the finding that that the mailings did not constitute service. [Order, p. 9, n.2; ER 107].  However, the Superior Court apparently overlooked the fact that when the second amended complaint was filed on May 30, 1997, an amended summons for Bradshaw was issued at the same time, making service in June, 1997 well within the 120 days allowed by Com.R.Civ.P. 4(m).  Moreover, the case was removed to federal court by defendants on December 31, 1996 and not remanded to superior court until March 27, 1997.  Since the superior court lost jurisdiction and its summons was no longer valid, that time is not be counted in the 120 days.  See, *Bruley v. Lincoln Property Co.*, 140 F.R.D. 452 (D.C. Colo. 1991).

22

16

EXH. A

limit so severely the methods allowed to bring those over whom the courts have jurisdiction before those courts. It is much more in keeping with that stated intent to interpret Rule 4(k) to mean that service may be effected so long as it does not offend constitutional prohibitions.

2. Plain meaning.

Rules of procedure should be given their plain meaning, and the Supreme Court has said when that meaning is plain from looking at the words of the rule, it will not construe it differently. *Tudela*, 1 N.M.I. at 185. For example, this rule of construction was employed in *Mafnas v. Commonwealth*, 1 N.M.I. 400 (MP 1990) and the Supreme Court, in interpreting a rule of appellate procedure that allows briefs to be deemed filed when mailed, refused to read in a requirement that the mailing must be postmarked, even though the court saw merit to such a requirement. Nevertheless, it pointed out: "Clearly the rule does not expressly impose such a requirement." *Id.* at 403

Likewise, here the wording "not prohibited by law" does not expressly mean that the nonresident defendant's state must specifically authorize the manner of service employed. The plain meaning is that this part of Rule 4(k) disallows a type of service of process only if the nonresident defendant's state has an express prohibition against any person within its borders being subjected to that kind of service. Although Washington may not authorize service of process by registered or certified mail for actions maintained within its borders, it has no "prohibition," as that word is used in the rule, against its use. In this instance, the Superior Court order interpreted Rule 4(k) as if it read: All process may be served anywhere within the Commonwealth, and, *when authorized by the other jurisdiction*, beyond the territorial limits of the Commonwealth.

Also, when one looks at the language in Rule 4(k) as a whole, it really addresses location—that is, the geographical reach of process; it does not really address the manner or method of service at all.

|23|

EXH. A

17

3. Analogous case law.

The Federal Rules of Civil Procedure has similar wording, including the phrase "unless prohibited by law," in its provisions governing service outside the country Fed.R.Civ.P. 4(f) provides for service on individuals outside the United States, which is incorporated into the rule for service on corporations. The pertinent sections read:

> (f) Unless otherwise provided by federal law, service...may be effected in a place not within any judicial district of the United States:
> ...
> (2) if there is no internationally agreed means of service...
>
> (C) unless prohibited by the law of the foreign country, by
> ...
> (ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served.

In the recent case of *Polargrid LLC v. Videsh Sanchar Nigan Ltd.*, 2006 U.S. Dist. LEXIS 17531 (S D N Y. April 7, 2006) this rule came under scrutiny when defendant, an Indian corporation, asserted that service by Federal Express courier on it was not effective because the law of India, which is not a signatory to any international agreement regarding service of process, does not recognize this method of service. It argued that this service was "prohibited" within the meaning of Rule 4(f)(2)(C) since what is not an allowed method of service is, by implication, prohibited. This argument was rejected by the court. "This interpretation of Rule 4(f)(2)(C)(ii) has been repeatedly rejected in favor of the view that the method of service specified in that rule is acceptable so long as such service does not actually violate the law of the country where service is attempted." *Polargrid LLC* , at p. 6, citing, *Resource Ventures, Inc. v. Resources Mgmt. Int'l., Inc.*, 42 F. Supp 2d 423, 430 (D. Del. 1999); *Dee-K Enterprises, Inc. v. Heveafil SDN.BHD*, 174 F.R.D. 376, 380 (E.D Va. 1997).



EXH. A

18

III. ~~THE FACT~~ THAT BRADSHAW PURPOSEFULLY AVOIDED MAIL
SERVICE IS RELEVANT AND SHOULD HAVE BEEN CONSIDERED

While Bradshaw maintains he was not served, he does not deny that he received certified mail that in fact contained summons and complaint. He says in his affidavit of March 2, 2005: "In 1996 and again in 1997, I did receive two packages which were unidentified as to senders. They came via certified mail without any identification as to who their mailers were—although they did have a return post office box address. These two packages or mailings were returned to their senders by the post office as I will not willingly accept unidentified mailings from unknown party or parties." [ER 89]. Additionally, the affidavit of David Vanderholm, Bradshaw's previous postman, submitted as Exhibit "E" in support of the amended motion, says in its second paragraph that two brown envelopes from Saipan "were returned by the Elk Post Office as Mr. Bradshaw refused to accept them." [ER 97].

Plaintiff, in fact, sent two such envelopes with summons and complaint during May and June, 1997 to defendant at his address in Elk, Washington by certified mail, true copies of which were attached to Bisom's memorandum in opposition to the motion. They were returned unopened, stamped by the postal service as unclaimed. [ER 35 38].

The SC order found as fact that "Bradshaw clearly was avoiding service." [Order, p. 10; ER 108]. But the order concludes that because the manner of service was impermissible under CNMI and Washington law, it did not matter. As demonstrated above in section II, this is incorrect, as CNMI's long-arm statute specifically does allow for service by registered or certified mail, and whether Washington's law does or does not should not be determinative of effective service.

Several courts have addressed this issue and uniformly reject the argument that service can be avoided by simply refusing to accept one's mail, as Bradshaw did.

[25]

*EXH. A*

In *Merriott v. Whitsell*, 476 S.W.2d 230 (Ark. 1972), a non-resident defendant refused

to accept a Summons and Complaint sent by certified mail. The court said:

> We agree with appellant that one who is subject to the
> jurisdiction of the courts of this state under the act, cannot
> defeat the jurisdiction by the simple expedient of refusing to
> accept a registered letter. The avoidance of authorized service
> of proper process by a willful act or refusal to act on the part
> of the defendant would create an intolerable situation and
> should not be permitted.

*Id.* at 232.

In *Creadick v. Keller*, 160 A. 909 (Del. 1932), the court said:

> It is clear from the record that the plaintiff's failure to fully
> comply with the requirements of the statute was caused by the
> defendant's refusal to receive the letters and sign the receipt.
> Such refusal made it impossible for the plaintiff to file the
> return receipt with his declaration. It would create an
> intolerable situation if the defendant could, by his own willful
> act, or refusal to act, prevent the plaintiff from maintaining his
> action. It is a situation the Court cannot recognize.

In *Patel v. Southern Brokers, Ltd.*, 289 S.E.2d 642, 643 (S.C. 1982): "[W]e

think it can hardly be logically argued that one may avoid the process of the court by

merely refusing to accept a letter known to contain Summons and Complaint."; and

see, *Cherry v. Hefferman*, 182 So. 477, 429 (Fla. 1938) ("If defendant chooses to flout

the notice and refuse to accept it, he will not be permitted to say in the next breath that

he has not been served.")

While the Superior Court order does not deal directly with the overwhelming

weight of authority that holds that one can not choose not to be served by

registered/certified mail, it does say that even if he had been served by mail, federal

courts would not consider it completed service, citing cases dealing with service by

mail under the Federal Rules of Civil Procedure. [Order p. pp. 10-11, ER 108-109].

Here again, the SC order is on the wrong page. It refers to the "waiver of

service" provisions of Rule 4, which are also found in our Commonwealth Rules of

*Exh. A*

〔26〕

Civil Procedure, corresponding to the same federal rule. Com.R.Civ.P. 4(d).[5] This procedure is different in kind and intent from the service provisions in the long-arm statute. Under Rule 4(d) service need only "be dispatched through first-class mail or other reliable means." Rule 4(d)(2)(B). By contrast, when the mails are employed for service under the long-arm statute, it requires registered or certified mail, return receipt requested, with the filing of an affidavit attaching the signed return receipt plus service of a certified copy of summons and complaint with the Attorney General. 7 CMC § 1104

Most importantly, the waiver of service provisions are voluntary as far as a defendant is concerned, calling for the cooperation of the defendant to effect service. This is made clear in the 1993 Advisory Committee Notes:

> . . . . . . . . . .
> This practice was introduced to the rule in 1983 by an act of congress authorizing "service-by-mail," a procedure that effects economic service with cooperation of the defendant.
> . . . . . .
> The former text described this process as service-by-mail. This language misled some plaintiffs into thinking that service could be effected by mail without the affirmative cooperation of the defendant. [citation] It is more accurate to describe the communication sent to the defendant as a request for a waiver of formal service.
> . . . . . . . . . .
> ...Unless the addressee consents, receipt of the request under the revised rule does not give rise to any obligation to answer the lawsuit.[and] does not provide a basis for default judgment .

---

[5]    The Order references Rule 4(c)(2)(C)(ii). [Order, p. 11; ER 109]. However, the 1993 amendments to Fed.R.Civ.P. 4 changed the subsections of the rule so that the substance of subdivision 4(c)(2)(C) and (D) were included in the revised subdivision 4(d). See, 1993 Advisory Committee Notes to Fed.R.Civ.P. 4.

_EXH. A_

[27]

The cases cited and discusses in the SC order at footnote 5 are all cases that deal with Rule 4(d), formerly Rule 4(c)(2)((:),[6] and not with forms of service that do not depend on the voluntary cooperation of the person served, such as 7 CMC §1104

There is, however, one federal case worth noting that is very close to this one on its facts. *Nikwei v. Ross School of Aviation, Inc.*, 822 F.2d 939 (10th Cir. 1987) was an appeal from a denial of a motion under Rule 60(b) to set aside a default judgment on grounds that the defendant had not been properly served. Service on the individual defendant, Babcock, had been done pursuant to Oklahoma's statute allowing service by certified mail with a request for a return receipt. However, the return receipt came back unsigned and marked "refused." After evidentiary hearings with witnesses, including Babcock's postal carrier, the district court found that either Babcock or his wife had refused the certified package delivered to their house. There was also evidence that "put Babcock on notice of the pending action, thereby making him inclined to refuse personal service of process." *Nikwei*, 822 F.2d at 943. In affirming, the circuit court cites and discusses several cases from around the country dealing with the refusal to accept certified or registered mail service. It notes that where delivery by mail has been refused by the addressee then returned to sender with that notation, "the almost unanimous line of authorities indicates that due process has been satisfied and the court has acquired personal jurisdiction of the defendant." *Id.* at 944-945, quoting Note, *Constitutional Law: The Validity of Service of Process by Mail When There Is No Return Receipt: The Outer Limits of Due Process*, 25 Okla. L. Rev. 566, 567 (1972). "Thus, the courts view service by registered or certified mail as being complete when such is refused though the act of the defendant." *Nikwei*, 822

---

[6] The two cases from the Ninth Circuit cited in footnote 5 give table case citations, as both are unpublished opinions, not to be cited to or by courts of the circuit. Ninth Circuit Rule 39-3.

 EXH. A.

22

F.2d at 945. The opinion quotes with approval this language from *Wax v. Van Marter*,
189 A. 537, 539 (Pa Super. 1936):

> Such willful, artificial conduct...ought not to be rewarded
> with success. Fortunately, a good service does not depend on
> whether the signature of the defendant is on the return receipt,
> but rather on the reasonable probability that the notice reached
> him. Statutes are to be construed so as may best effectuate the
> intentions of the makers.

The same should be said here. The envelopes that Bradshaw returned
unopened are clearly identified as being from plaintiff's attorney, and he knew what
they contained. At this point in the litigation, he was well aware that the federal
claims had been dismissed and that plaintiff had refiled the case in Superior Court.
He should not be allowed to choose whether he is served or not when summons and
complaint had been properly sent by certified mail as authorized by statute.

### IV. DEFENDANT WAIVED ANY DEFECT OF SERVICE BY APPEARING THROUGH COUNSEL AND BY FAILING TO CHALLENGE SUFFICIENCY OF PROCESS

The Attorney General purported to act on behalf of Bradshaw as a defendant
on several occasions in this case. Thus, defendant appeared generally through counsel
in the following instances:

December 31, 1996 - Removal of case to Federal Court

June 26, 1997 - Motion for More Definite Statement, Motion to Require Bond
and Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim and
Insufficiency of Process. [7]

July 23, 1997 - Motion to Dismiss for Lack of Personal Jurisdiction and
Failure to State a Claim

---

[7] The insufficiency of process argument was as to defendants Tan and CNMI only, not as to
Bradshaw.

*[29]*

23

*Exh. A*

December 16, 1997 - Notice of Substitution of Party Defendant (This substituted LaMotte for Bradshaw and Tan in their official capacities)

January 23, 1998 - Removal to Federal Court

June 3, 1998 - Appearance for Trial Setting

November 27, 1998 - Stipulation to extend time to Answer Complaint

In none of these appearances did the Attorney General ever indicate that Bradshaw was not represented by that office nor that service was defective. In fact, in the motion to dismiss, two of the claims that were challenged, the Sixth and Eight causes of action, were brought solely against Bradshaw in his individual capacity. In these the AG was clearly acting on behalf of Bradshaw personally.

The Superior Court's order concludes that these appearances did not constitute a waiver of objection to service of process despite expressly acknowledging that the AG filed motions under Com.R.Civ.P. 12(h) on Bradshaw's behalf but did not raise any objection to service of process, and noting that under Com.R.Civ.P. 12(h)(1) objection was required to be raised in order to avoid waiver. [Order, p. 12, n.6; ER 110]. It does this by examining the correspondence submitted by Bradshaw, noting the confusion it exhibits about whether he had been served or not and what to do about it, noting also that the AG failed to keep Bradshaw properly informed, then later withdrew as counsel, and it finds some support in the fact that the court later ruled that Bradshaw made no request for indemnity. Besides ignoring the plain meaning of Rule 12(h)(1) and disregarding it, there are some fallacies of fact and law in this reasoning.

Factually, although the Superior Court's order recites it [Order, p.14; ER 112], the record does not show that the AG ever withdrew as Bradshaw's counsel. It is correct that the AG, having taken the position that Bradshaw had not been served, did not file an answer on his behalf. In fact, the AG maintained that position even after

*Exh. A*

24

the trial judge ruled otherwise on February 7, 2000, still not filing an answer for Bradshaw, thereby allowing Bisom to request his default on February 14, 2000.

Despite this, in fact, the AG defended Bradshaw in the trial and afterwards. In part this is due to the fact that the AG represented the CNMI government and liability of the government on claims of breach of contract and wrongful termination were based on the acts of Bradshaw in firing Bisom. Thus, the AG's defense of the government was congruent with the interests of Bradshaw. And, because there was no way to separate out the facts of the other claims against Bradshaw as the evidence came in at trial, the AG, as a practical matter, defended him on those claims as well.

But the AG's efforts on Bradshaw's behalf even went further than that. After the verdict and entry of judgment, Bisom sought attorney's fees under 1 CMC §8153, a provision in the Political Coercion Statute. As noted in the order granting a portion of the fees requested, "only Bradshaw, in his individual capacity, was sued and found liable for political coercion." [Decision and Order filed June 7, 2000, p. 7; ER 57]. Yet, even though the C.N.M.I. government had no responsibility nor any exposure for paying any attorney's fee award, the AG challenged the application for attorney's fees on Bradshaw's behalf. [Decision and Order filed June 7 at pages 2, 4; ER 52,54]. These objections resulted in the fee award being reduced from the $83,020 requested to $33,078.28.

In terms of legal analysis, the SC order misses the mark by focusing on the actual authority of the AG vis-à-vis Bradshaw, when it is the apparent authority that really matters. After all, all of the correspondence that the SC order relies on to document the ambiguities of the relationship was between the AG and Bradshaw, and neither Bisom nor the trial judge was privy to them. It was the impression The AG and Bradshaw created rather than the dynamics between them that is important.

*EXH. A*

[31]

25

The scope of apparent authority of an attorney as to procedural matters is quite broad.

> The general employment of an attorney to prosecute or defend a cause or proceeding ordinarily vests in a plaintiff's attorney the implied authority to take all steps or do all acts necessary or incidental to the regular and orderly prosecution or management of the suit, and in a defendant's attorney the power to take such steps as he deems necessary to defend the suit and protect the interests of defendant, in so far as they affect only the remedy. By virtue of such employment the attorney also acquires, as to the courts and other parties or their counsel, the apparent authority to bind the client by taking all steps or exercising all powers that are ordinarily taken by, or conferred upon, attorneys in similar actions or causes. In proceedings before a court of record this apparent authority of an attorney is so broad, so far as the court and opposing parties are concerned, as to have been characterized as plenary in nature; and, in the absence of fraud and collusion, almost any act or omission in litigation which affects only the remedy or procedure will be treated as coming within his authority to bind his client, for the courts must deal with the parties as though they were actually present and acting in the persons of their attorneys. Otherwise stated, the authority of an attorney extends to the management of the case in all the exigencies which arise during its progress, and his broad authority in this connection cannot be questioned by the client because of the want of specific authority to do the act done or consented to, or because the attorney has in fact exceeded or violated instructions or limitations not communicated to the court or opposing parties or their counsel.

*Gasior v. Wentz*, 89 N.W.2d 886, 889 (N.D. 1958), quoting 7 C.J.S., Attorney and Client, § 80, pp. 898-899.

"The appearance of an attorney is prima facie evidence of his authority to appear in the cause, and his appearance for any purpose other than to specially attack jurisdiction waives service of process, and constitutes a general appearance…" *In re Grant*, 52 F.2d 223, 224-25 (M.D.N.C. 1931). "A general appearance or responsive pleading by a defendant that fails to dispute personal jurisdiction will waive any defect in service or personal jurisdiction." *Benny v. Piper*, 799 F.2d 489, 492 (9th Cir. 1986). The aforementioned procedures undertaken on behalf of and for the benefit

32

*Exh. A*

26

of defendant Bradshaw effected a waiver of any defects there might have been in
serving him, if any there were.

## V. THESE ISSUES HAVING ALREADY BEEN HEARD AND DETERMINED, THE LAW OF THE CASE DOCTRINE APPLIES TO PREVENT GRANTING THIS MOTION

Before the jury trial began defendants filed their Motion to Remove Case from
Trial Docket. That motion was essentially based on the argument that Bradshaw had
not been served, and since he was central to the case, the matter should not go to trial,
but should go off calendar. Opposition was submitted and the motion was heard
before the trial was begun. The result was the Order Denying Motion to Remove
Case from Trial Docket filed February 22, 2000.[ER 42]. That order made specific
findings, including: that defendant Robert D. Bradshaw was properly served but
purposefully avoided service, that the Attorney General's office had appeared on his
behalf, and that he had previously waived any challenge to insufficiency of process.
[ER 43].

Courts are generally required to follow legal decisions of the same or a higher
court in the same case; this is the law of the case doctrine. *Wobol v. Villacrusis*, 4
N.M.I. 314, 318 (MP 1995), quoting *Camacho v. J.C. Tenorio Enters., Inc.*, 2 N.M.I.
407, 413-14 (MP 1992) (" Law of the case principles…are a matter of practice that
rests on good sense and the desire to protect both court and parties against the burdens
of repeated reargument by indefatigable diehards.")

The Superior Court order discusses Judge Castro's order of February 22, 2000
a couple of times [Order, p. 10, 11; ER 108,109], but disregards any "law of the case"
implications. This despite the fact that the issue was presented and briefed in Bisom's
opposition, including attaching a copy of the order to the opposition with a request to
take judicial notice of it pursuant to Com. R Evid. 201.

*EXH. A*

33

27

> Under the "law of the case" doctrine, "a court is generally
> precluded from reconsidering an issue that has already been
> decided by the same court, or a higher court in the identical
> case." [citation]The doctrine is not a limitation on a tribunal's
> power, but rather a guide to discretion. [citation] A court may
> have discretion to depart from the law of the case where: 1)
> the first decision was clearly erroneous; 2) an intervening
> change of the law has occurred; 3) the evidence on remand is
> substantially different; 4) other changed circumstances exist;
> or 5) a manifest injustice would otherwise result. *Failure to*
> *apply the doctrine of the law of the case absent one of the*
> *requisite conditions constitutes an abuse of discretion.*

*United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (citations

omitted)(emphasis added)

Judge Castro's February 22, 2000 order was not erroneous at all, and the SC

order does not attempt to make a case that it was.  There was neither any intervening

change of law, nor other changed circumstances between 2000 and 2005.  The

material evidence was the same, as Bradshaw's letter of July14, 1999 was presented

as part of the AG's motion to remove the case from the trial docket [ER 29-34].  Both

judges came to the same conclusion, namely, that Bradshaw had been served by

certified mail, but had purposefully avoided accepting it. [Order, p.10; ER 108; Order

Denying Motion to Remove Trial from Trial Docket filed Feb. 22, 2000, ¶ 2; ER 43].

Perhaps the Superior Court felt that it would be unjust for Bradshaw to bear the

responsibility; but as can be seen, the Superior Court viewed the case through a prism

of distorted and misapplied law.  In any event, the Superior Court's order fails to

explain its reason for overruling the prior findings.  This failure is another abuse of

discretion.

## CONCLUSION

> "A basic tenet of statutory construction, …, is that a statute
> should be construed so that effect is given to all its provisions,
> so that no part will be inoperative or superfluous." If courts
> were free to pick to pick and choose what part of a statute
> or…regulation to rely on and what part to ignore, then the

*EXH. A*

/34/

courts—and not Congress …—would, in effect, draft the law
as well as construe its meaning.

*Florez ex rel Wallace v. Callahan*, 156 F.3d 438, 443 (2nd Cir 1998), quoting

*Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 31 (3rd Cir. 1995).

By ignoring the need for an independent action required by Rule 60(b) and by
ignoring the provisions of the long-arm statute, the Superior Court's order applied law
quite different from what the legislature intended and the plain meaning directs to
reach the conclusion that defendant is entitled to relief from the judgment against him.
Likewise, the Superior Court order notes and acknowledges that by counsel making
motions under Rule 12 without challenging service of process of Bradshaw there is a
waiver of the defense of insufficiency of process, but then simply disregards the
waiver here. The order finds as fact that Bradshaw clearly avoided the attempts to
serve him by certified mail, but excuses Bradshaw from that conduct, saying that it
did not matter, based on its incorrect assessment that service by certified mail was
prohibited. Lastly, the order fails to give any deference to the prior rulings by the trial
judge, who surely was more intimately involved and familiar with the case. Thus, in
several respects the SC order constitutes an abuse of discretion. The Superior Court's
order vacating judgment against Robert D. Bradshaw must be reversed and the
judgment reinstated.

Respectfully submitted,

Jay H. Sorensen
(CNMI Bar No. F0127)
Attorney for Appellant

*Exh. A*

35

20

**JAY H. SORENSEN**
**Attorney at Law**
**c/o Shanghai**
**P.O. Box 9022**
**Warren, MI 48090-9022**
**Phone (Shanghai,China): 86-21-5083-8542**

**MARK B. HANSON**
**First Floor, Macaranas Bldg.**
**Beach Road, Garapan**
**PMB 738, P.O. Box 10,000**
**Saipan, MP 96950**
**Phone: (670) 233-8600**
**Facsimile: (670) 233-5262**

Attorneys for Appellant

## IN THE SUPREME COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

ROBERT A. BISOM,                )    APPEAL NO. 06-0006 GA
                                )
    Appellant,                  )
                                )    **STATEMENT AS TO**
    v.                          )    **INTERESTED PARTIES**
                                )
COMMONWEALTH OF THE NORTHERN    )
MARIANA ISLANDS,  ROBERT D.     )
BRADSHAW, former Temporary Public )
Auditor, in his individual capacity, et al. )
                                )
    Appellee.                   )
                                )
———————————————————)

In accordance with Rule 28(k), the undersigned, counsel of record for

Appellant, Robert A. Bisom, certifies that the parties that have an interest in the

outcome of this case are limited to those parties listed in the caption.


JAY H. SORENSEN
(CNMI Bar No.F0127).
Attorney for Appellant

[36]

*Exh. A*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 24, 2006 a copy of Appellant's OPENING

BRIEF and a copy of the EXCERPTS OF RECORD were deposited in the U.S. Post Office, first

class mail, postage prepaid, addressed as set forth below:

> Robert D. Bradshaw
> P.O. Box 473
> 1530 W. Trout Creek Road
> Calder, Idaho 83808

> Office of the Attorney General
> Civil Division—Capitol Hill
> Second Floor, Juan A. Sablan Memorial Bldg.
> Caller Box 10007
> Saipan, MP 96950

ROWENA DE VERA

Exh. A

Northern Mariana Islands
Commonwealth Rules of Civil Procedure

(c) TIME FOR SERVING AFFIDAVITS. When a motion for new trial is based upon affidavits they shall be served with the motion. The opposing party has 10 days after such service within which to serve opposing affidavits, which period may be extended for an additional period not exceeding 20 days either by the court for good cause shown or by the parties by written stipulation. The court may permit reply affidavits.

(d) ON INITIATIVE OF COURT. Not later than 10 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party. After giving the parties notice and an opportunity to be heard on the matter, the court may grant a motion for a new trial, timely served, for a reason not stated in the motion. In either case, the court shall specify in the order the grounds therefor.

(e) MOTION TO ALTER OR AMEND A JUDGMENT. A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

**Rule 60.  Relief From Judgment or Order.**

(a) CLERICAL MISTAKES. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court.

(b) MISTAKES; INADVERTENCE; EXCUSABLE NEGLECT; NEWLY DISCOV-ERED EVIDENCE; FRAUD, ETC. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresenta-tion, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application: or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided by law, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audit querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

**Rule 61.  Harmless Error.**

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

*EXH. A*

7/96   **38**                                         62

*2006 U.S. Dist. LEXIS 17531, \**

POLARGRID LLC, Plaintiff, - against - VIDESH SANCHAR NIGAM LIMITED, Defendant.

04 CV 9578 (TPG)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 17531

April 6, 2006, Decided
April 7, 2006, Filed

**CORE TERMS:** promissory estoppel, effected, service of process, unconscionable, auction, clerk, specific performance, network, acquisition, fiber-optic, bandwidth, acquiring, enforceable contract, judicial district, written contract, vague, mail, cable system, construct, bandwith, definite, bidding, invest, plead, won

**COUNSEL:** [\*1] For Polargrid LLC, Plaintiff: Mark Steven Baldwin, Peter Adelman, Brown Rudnick Berlack Israels, LLP, New York, NY.

For Videsh Sanchar Nigam Limited, Defendant: William R. Golden, Jr, Kelley Drye & Warren, LLP, New York, NY.

**JUDGES:** Thomas P. Griesa, U.S.D.J.

**OPINIONBY:** Thomas P. Griesa

**OPINION:** Plaintiff Polargrid LLC has commenced this action against defendant Videsh Sanchar Nigam Limited ("VSNL") for VSNL's alleged breach of contract. Polargrid seeks a declaratory judgment of its rights under the alleged contract and an order compelling specific performance of the contract. Alternatively, if specific performance is denied, plaintiff seeks monetary damages and an order enjoining VSNL from acquiring certain assets it is in a position to acquire as a result of its alleged breach. Polargrid also asserts a claim for promissory estoppel.

VSNL has moved to dismiss the case for insufficient service of process. VSNL has also moved to dismiss the case for failure to plead sufficient specifics or, in the alternative, to obtain a more definite statement. Finally, there is an application to dismiss the promissory estoppel cause of action for failure to state a claim.

The motion is denied in all respects. [\*2]

THE COMPLAINT

The following is a summary of the allegations in the complaint.

Polargrid and VSNL are providers of telecommunication and Internet services. VSNL is based in India.

In 2002, Polargrid began preparing to construct an international fiber-optic cable system across the Arctic Ocean that would offer connectivity to Europe, Asia and the United States. In pursuit of this goal, Polargrid negotiated, but did not formally enter into, an agreement with Tyco Telecommunications Inc. ("TycoTel"), under which TycoTel would plan and construct the fiber-optic cable system for a price of approximately $ 800 million. There was a draft contract for the arrangement, which was apparently referred to as the prospective "Polarnet Contract." It was not consummated.

Essential to Polargrid's plan was access to the Tyco Global Network (TGN), an existing global network of undersea and terrestrial fiber-optic capacity, facilities, and usage rights, and the employees, contracts, and obligations associated therewith. The proposed Polarnet Contract included access to TGN. TGN is owned by Tyco International, Ltd ("Tyco"), an affiliate of TycoTel.

In late 2003, Tyco retained Goldman Sachs & Co. **[*3]** to conduct an auction for the sale of TGN. Polargrid was intent on winning this auction due to the vital importance of TGN to the Polargrid plan. VSNL was also interested in acquiring TGN. Polargrid and VSNL recognized each other as potential competitors in the auction.

At the suggestion of TycoTel, Polargrid representatives met with VSNL representatives in May 2004. This meeting led to the execution, on June 28, 2004, of a Memorandum of Understanding ("MOU") between the two parties. Under the MOU, Polargrid agreed to withdraw from the bidding for TGN, to desist from any communications with Tyco or any bidder for TGN concerning a potential acquisition of TGN, and to assist VSNL exclusively in its bid for TGN.

In consideration for Polargrid's agreement not to compete with VSNL, VSNL agreed to (1) invest $ 35 million in Polargrid by purchasing a convertible debenture simultaneous with its closing of the TGN acquisition; and (2) sell or lease to Polargrid, at prices specified in the MOU, certain agreed amounts of bandwith capacity on the TGN network, together with other specified related rights.

On June 28, 2004, immediately after the MOU was executed, Polargrid sent a letter to Goldman **[*4]** Sachs in which it stated that it did not intend to accept the invitation it had received to submit an offer for TGN, and was withdrawing its previously submitted indication of interest in acquiring TGN. Polargrid also communicated with VSNL several times to offer its assistance with VSNL's acquisition efforts.

On November 1, 2004 VSNL and Tyco announced that VSNL had won the auction. Tyco accepted $ 130 million for TGN, a price much lower than either party had expected.

The complaint alleges that shortly after announcing that it won the bidding for TGN, VSNL expressly repudiated its obligations to Polargrid under the MOU. In particular, VSNL stated to Polargrid that it would neither invest $ 35 million in Polargrid, nor would it provide Polargrid with the promised TGN bandwith.

The complaint alleges that specific performance is the required remedy because there is no adequate bandwidth currently available on the market to replace the TGN network. The complaint asserts that, in the remote event that Polargrid can find the required bandwidth, the cost of such bandwidth is likely to exceed $ 1.5 billion.

## DISCUSSION

### Service of Process

Initially, VSNL moved to dismiss **[*5]** the complaint pursuant to Rule 12(b)(5) claiming that Polargrid's service of process, namely the mailing by Polargrid of the summons and complaint to VSNL's Mumbai, India office via Federal Express, was insufficient. The court need not consider the adequacy of such service since Polargrid has subsequently effected service by a method that is undoubtedly sufficient, by having the Clerk of Court mail process to VSNL via Federal Express. Actually, VSNL received both Federal Express deliveries.

Under Rule 4(h)(2) service upon corporations not within any judicial district of the United States is to be effected "in any manner prescribed for individuals by subdivision (f)." Subsection (2)(C)(ii) of Rule 4(f) provides:

> (f) Unless otherwise provided by federal law, service . . . may be effected in a place not within any judicial district of the United States:

*EXH. 14*

46

. . .

(2) if there is no internationally agreed means of service . . .

. . .

(C) unless prohibited by the law of the foreign country, by

. . .

(ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served

It is undisputed that India is **[*6]** not a signatory of any international agreement regarding service of process.

VSNL asserts that service by the Clerk of Court via Federal Express is a "prohibited" means of service in India. VSNL does not allege that Indian law literally prohibits service by Federal Express. Rather, VSNL states that service by Federal Express is not one of the methods of service recognized by Indian law and that "what is not an allowed method for service of process is, by implication, prohibited." This interpretation of Rule 4(f)(2)(C)(ii) has been repeatedly rejected in favor of the view that the method of service specified in that rule is acceptable so long as such service does not actually violate the law of the country where service is attempted. Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc., 42 F. Supp. 2d 423, 430 (D. Del. 1999); Dee-K Enterprises, Inc. v. Heveafil SDN.BHD, 174 F.R.D. 376, 380 (E.D. Va. 1997).

The court finds that service has been properly effected pursuant to Rule 4(f)(2)(C)(ii).

**Sufficiency of Polargrid's Pleading**

VSNL contends that the complaint must be dismissed for failure to comply with the requirements of pleading **[*7]** set forth in Fed. R. Civ. P. 8(a). VSNL points out that Polargrid did not annex the MOU to its complaint or quote the MOU verbatim within its complaint. VSNL asserts that, even at this early stage, it must be able to "confirm the exact and total language of the contract Polargrid purports to have been breached." VSNL states that the complaint's recitation of the provisions of the MOU is so vague as to make impossible for VSNL to answer and adequately prepare for trial.

The court finds that Polargrid has satisfied the requirement of Rule 8(a) by alleging, in general terms, the conditions and obligations set forth in the MOU, and that it performed its obligations under that agreement while VSNL failed to do so.

In any event, in response to VSNL's motion, Polargrid has now submitted a copy of the MOU. VSNL's response is that it must also be given the draft Polarnet Contract that is referred to in the MOU. Such a demand goes beyond the pleading requirements set forth in Rule 8(a).

VSNL has also moved to require Polargrid to make a more definite statement of its claims pursuant to Rule 12(e). As discussed above, Polargrid's complaint is not so "vague **[*8]** or ambiguous" such that VSNL cannot reasonably be required to frame a responsive pleading. Accordingly, VSNL's motion pursuant to Rule 12(e) is denied.

VSNL also moves for dismissal of Polargrid's promissory estoppel claim pursuant to Rule 12(b)(6). VSNL argues that the complaint fails to state a claim for promissory estoppel because that theory only applies in the absence of a written contract whereas, in the present case, Polargrid alleges that the existence of a written contract, namely the MOU.

*Exh A*

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17531                                    Page 4 of 6

This argument lacks merit because VSNL has denied that the MOU is a valid enforceable contract. Polargrid is entitled to plead the alternative theory of promissory estoppel in the event it is later determined there is no enforceable contract. Dagen v. Cfc Group Holdings, 00-CV-5682, 2002 U.S. Dist. LEXIS 25767 at *75 n.20 (S.D.N.Y. 2002)

VSNL also argues that Polargrid has failed to state a claim for promissory estoppel because it has not alleged that the injury it sustained was so significant that denying it relief would be unconscionable.

In New York promissory estoppel has three elements: (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance [*9] by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of its reliance. Zucker v. Katz, 708 F. Supp. 525, 532-33 (S.D.N.Y. 1989).

New York courts have sometimes required the additional element of unconscionable injury. See Sea Trade Co. v. FleetBoston Fin. Corp., 03-CV-10254, 2004 U.S. Dist. LEXIS 18140 at *16-17 (S.D.N.Y. 2004). However, unconscionable injury has only been required when the theory of promissory estoppel is invoked to avoid the statute of frauds. Jacobs v. Carsey-Werner Distribution, Inc., 93-CV-6825, 1994 U.S. Dist. LEXIS 3746 at *13 (S.D.N.Y. Mar. 30, 1994) (unconscionability required only when promissory estoppel asserted to contravene effect of Statute of Frauds); Rosenthal v. Kingsley, 674 F. Supp. 1113, 1125 (S.D.N.Y. 1987). See also Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir. 1977). The statute of frauds is not at issue in this case; accordingly, the element of unconscionable injury need not be alleged.

CONCLUSION

The motion to dismiss is denied.

SO ORDERED

Dated: New York, New York

April 6, 2006 [*10]

Thomas P. Griesa

U.S.D.J.

[42]                                                                                         Ex. A

http://www.lexis.com/research/retrieve?_m=05ec1aeef9a6c9849d90f2f742ee29a3&csvc=le&cform=b...    5/16/2006