```
                                              F I L E D
                                                 Clerk
                                              District Court

                                              JUN 2 9 2006

                                           For The Northern Mariana Islands
                                           By_____
                                                      (Deputy Clerk)
```

Robert D. Bradshaw
PO Box 473
1530 W. Trout Creek Road
Calder, Idaho 83808
Phone 208-245-1691

Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT D. BRADSHAW ) | Civil Action No. 05-0027 |
| Plaintiff ) | |
| v. ) | |
| COMMONWEALTH OF THE NORTHERN ) | PLAINTIFF'S PETITION FOR |
| MARIANA ISLANDS (hereafter referred to ) | DECLARATORY JUDGMENT |
| as the CNMI); et. al. ) | |
| Defendants ) | |

### Introduction

1. Comes now plaintiff to petition the court per 28 USC 2201-2202 and Federal Rules Civil Procedure (FRCP) 56 and 57 to enter declaratory judgments relative to plaintiff's second amended complaint in that certain clear controversies exists between plaintiff and the CNMI defendants which are of a justiciable nature and can be settled easily and quickly by the Court at this time without further litigation, delay or expense.

2. These judgments recognize and authenticate the provisions of declaratory judgment procedures to terminate or diminish some of the uncertainty and/or controversy in the complaint's allegations respecting US laws on discrimination and immigration.

1

3. Declaratory judgment by the Court may now be granted by the Court whether or not further relief is sought. It is alternative or cumulative in the present instance and not exclusive or extraordinary. As a minimum, these judgments will serve a useful purpose in clarifying and settling legal issues at hand and whether or not other remedies are more effective or efficient. The pendency of the remaining actions and issues in this case with the same set of facts will not bar declaratory judgment in this instance. Declaratory judgment at this time will only go to facilitate and revolve conflicts between the parties.

4. A decision on these issues will resolve certain critical issues between the plaintiff and defendants and help to resolve other questions in the case. The interests of justice will be advanced if the Court by discretion addresses these issues and renders a judgment. There is also a public importance in deciding these issues in US Court. This motion is predicated upon the need for a judicial determination of the law and resulting liability in general without a determination of damages, per FRCP 56-57.

**Facts**

5. Per plaintiff's Second Amended complaint, paragraphs 123-124; Sixth (pages 56-58), Tenth (pages 64-65), Eleventh (pages 65-66), and Twelfth (pages 66-68) claims; and per defendant Castro's Motion to Dismiss now before the Court; there are controversies between the CNMI, its agents and plaintiff much of which can easily be settled by this declaratory judgment.

6. Articles XI and XII of the NMI Constitution cites alienation of land restrictions in that only persons of "Northern Marianas descent" may own land in the NMI. Section 4 of article XII defines a person of Northern Mariana Islands (NMI) descent in terms of blood and race.

2

7. Since the 1950s, the US Supreme Court and US law in general have declared discrimination based on race, ancestry or national origin illegal per the US Constitution.

8. In Rice v. Cayetano, (98 818) 528 US 495 (2000), the Supreme Court found that the state of Hawaii could not deny or abridge the right to vote on account of race and that "ancestry can be a proxy for race."

9. This Supreme Court decision thus defined categorized Native Hawaiians as a race rather than an indigenous people. The Court further found that racial discrimination is that which singles out "identifiable class of persons." While the state used a defense the analogy of how American Indian tribes are treated in the US, the Court did not accept that argument.

10. In Doe v. Kamehameha Schools, 416 F. 3d 1025 (9th Cir) 2005, the Court found that the privately founded Kamehameha Schools could not discriminate in its admissions on the basis of race or ancestry in that it restricted admissions to persons of native Hawaiian ancestry. The Schools had argued that native Hawaiians were exempt from US civil rights laws and that the policies served as a remedial function aimed at righting wrongs of the past. The Court found that race was the deciding factor in the schools admission policies and that US civil rights laws did apply.

11. In June 2006, the US Senate defeated Senate bill S-147, the Native Hawaiian Government Reorganization Act. This was a measure promoted for the last seven years by Hawaiian Senator Daniel Akaka to grant native Hawaiians the right to create a native Hawaiian government, composed of only redefined indigenous natives and whose members could be only voted in by native Hawaiians. This native government would have gained control over certain natural resources, lands and assets.

12. Congressional opponents of S-147 had argued that it would establish a sovereign race based government and race-based privileges which would divide the people according to race. Proponents of the measure granting special rights and benefits to native indigenous Hawaiians in the above issues argued that the special benefits and privileges were needed to redress wrongs that have allegedly persisted since the US backed overthrow of the kingdom of Hawaii in 1893.

13. Except for the CNMI, there are no land restriction laws in the state of Hawaii or in the US territories, like Guam, etc--unless covered by treaty. The same situation generally prevails on Indian reservations in the US where title to land is transferred by fee simply to anyone with the money. Depending on the treaties involved and their status today, and omitting certain tribal lands held in trust by tribes, by the state involved, or the US government (per 24 CFR 131.1 and 24 CFR 805.218(a)(2)), there is no discrimination over land ownership on Indian reservations, in that non-native Americans can own land on the reservations the same way as members of the involved particular tribe of native Americans.

14. In United Steelworkers of America v. Weber, 443 US 193 (1979), the Supreme Court found that under 42 USC 1981, for an affirmative action policy to be legal, it must: "(1) respond to a manifest imbalance in its work force; (2) not 'create... an absolute bar to the...advancement of the non-preferred race or 'unnecessarily trammel' their rights; and (3) do no more than is necessary to achieve a balance."

15. Qualified persons of the NMI were granted full US citizenship and afforded the rights, privileges and benefits of other US citizens on Nov 4, 1986. By extension, the rights of

4

US citizenship for the people of the NMI entail the same restrictions and limitations as found present among other US citizens.

16. In the old Trust Territory (TT) of the Pacific government entity, the local TT indigenous citizens were granted employment preference rights (in that jobs had to be filled locally if local indigenous qualified people were available). These restrictions in employment have continued with the NMI. Local indigenous citizens are automatically given job preference rights. Off island (foreign) businesses must employ 20% of their work forces by local citizens. This is another sample of preferences given to local citizens in employment.

17. In court trials in the US District Court of local indigenous citizens, the court has had to on occasion station US marshals in court to protect witnesses and jurors from court room intimidation made by local citizens when their relatives or friends are on trial in the US court. The locals are known to use evil eye, gestures or other forms of intimidation to keep witnesses and jurors from telling the truth.

18. In the summer of 2002, the NMI legislature introduced a bill to amend the NMI Constitution to prohibit anyone other than persons of Northern Marianas descent from running for public office. This bill was defeated, but it shows the attitude of local indigenous citizens to discriminate against outsiders.

19. In June 2006, the NMI legislature passed Senate Bill 15-46 which provided that foreigners (which by definition per the law included US citizens of non-NMI descent) could obtain limited ownership interests in condominium apartments above the ground floors. US citizens are the only persons who have citizenship and theoretically the only people who could live on Saipan in a permanent relationship to buy these residential apartments. Thus,

5

foreigners in this bill effectively addressed only US citizens of non-NMI descent. US citizens from mainland America are considered foreigners in the eyes of the NMI people

20. The racial, ancestry and national origin discrimination in favor of local people of NMI racial descent, who are US citizens, and other US citizens, who are not of NMI descent, means that there are two distinctively different classes of US citizens in terms of the NMI, based on racial, ancestry or national origin factors. The US Constitution does not provide for two classes of US citizens. There is only one class per the Constitution.

21 The US and the NMI entered into an Covenant agreement in 1975 which was solemnized by the US in PL 94-241 (90 Stat. 263). The US agreement on the Covenant was made by US statutory law and not by treaty.

22. Section 105 of the Covenant allowed the US to enact legislation applicable to the NMI. But if such legislation cannot also be made applicable to the several states then the NMI must be specifically named therein for the legislation to become effective in the NMI. Fundamental provisions of the Covenant in Articles I, II and III and in Sections 501 and 805 can only be modified by US legislation with the consent of both the US and the NMI.

23. The limitations in amending the fundamental provisions of the covenant, as cited in Section 105 for Articles I, II and III and Sections 501 and 805 specifically address legislative acts of the US Congress and not US Court decisions. The US Courts may address these provisions which are otherwise restricted by legislation.

24. The provisions of Section 105 did not address or limit the provisions of section 503 on immigration.

25. Section 805 of the Covenant recognized and allowed the NMI restrictions on the ownership of land.

26. Section 501 of the Covenant provides that the 14th amendment, section 1, applies in the NMI. The 14th amendment and US supreme court decisions and laws since the 1950s have declared discrimination on the basis of race, ancestry or national origin in any form illegal and unconstitutional in the United States and in its political sub-divisions.

27. In Wabol v. Villacrusis 898 F 2d 1381 (9th Cir 1990), the court said that there is a distinction between the right claimed under the equal protection clause and the right to equal protection itself; that not every right subsumed within the due process clause can ride the fundamental coattails of due process within the territories and thus the same must be true of the equal protection clause; and that it is the specific right of equality that must be considered for purposes of territorial incorporation, rather then the broad general guarantee of equal protection.

28. In JS App. 10a-17a, 1999, the USDC of the NMI, sitting as a three judge panel under 28 USC 2284, found that the Equal Protection Clause of the 14th amendment is subject to the distinction in Insular Cases which distinguish incorporated US territories which are destined for statehood from unincorporated US territories which are not destined for statehood (like the CNMI). In the CNMI, the US Constitution does not apply automatically, but imposes only "those fundamental limitations in favor of personal rights [that are] the basis of all free government"--Dorr v. United States 195 US 138, 146-147 (1904) (quoting Downes, 182 US at 291). Thus, fundamental personal rights under the US Constitution are

7

guaranteed to inhabitants of unincorporated territories--Corporation of the Presiding Biship v. Hodel, 830 F2d 374, 385 (D.C. Cir. 1987) (applying Dorr standard).

29. Section 805 of the Covenant and articles XI and XII of the NMI Constitution violate fundamental and personal rights that are the basis of all free government. Thus, these provisions are unconstitutional.

30. Section 502 of the Covenant provides that private civil rights actions are allowed in the NMI as applicable in the US states.

31. Section 503 of the Covenant states: "The following laws of the United States, presently inapplicable to the Trust Territory of the Pacific Islands, will not apply to the Northern Mariana Islands except in the manner and to the extent made applicable to them by the Congress by law after termination of the Trusteeship Agreement. (a) except as provided in Section 506, the immigration and naturalization laws of the United States..." This provision has been assumed by the CNMI to mean that the CNMI has control over all aspects of its "local immigration."

32. On Jun 27, 2000, the US Cir Ct for the DC Circuit found that "'immigration and naturalization laws of the United States' generally do not apply in the CNMI" (Pacific Micronesia Corp, Petitioner, v. National Labor Relations Board, Respondent, case No 99-1078). The word general is not totally or necessarily all inclusive (p. 581, "Webster's New World Dictionary," 2d College Edition).

33. By Proclamation (#5564) on Nov 3, 1986, President Reagon terminated the US administration of the UN trusteeship over the NMI (51 Fed. Reg. 40,399). The Covenant was then fully implemented.

8

34. Sections 105 and 503 of the Covenant means that the US can legislate questions of immigration in the NMI after the US terminated its UN trusteeship agreement on Nov 3, 1986.

35. The Immigration Reform and Control Act (IRCA) 1986 became public law 99-603 on Nov 6, 1986. Nothing in the act limits or restricts its applicability to the NMI. Since the IRCA applied to the several US states, it therefore applied to the CNMI without necessitating any specific mentioning of the CNMI.

36. Section 102 of the IRCA amends title 8 of the US Code to add a section 274B (8 USC 1324b) which specifically prohibits discrimination in employment on national origin or citizenship status. This section prevents discrimination against US citizens in employment without distinction as to the two types of US citizens as found in the CNMI.

37. Section 102 of the IRCA did not just alter the wording of the US Immigration and Nationality Act; but rather, it constituted an insertion/addition of a completely new section which had not previously exited in the Immigration and Nationality Act before Nov 6, 1986.

## Discussion

38. While many of the US sponsored programs of affirmative action and the issues over special rights and benefits to native Hawaiians have come into being on the promise of righting many of the alleged wrongs of the past, this argument cannot be made with the US administration of the Northern Mariana Islands. Since 1944, the US government has went out of its way to shower benefits, blessings, education, citizenship and huge sums of money on the people of the NMI. There is no way that an argument can now be advanced that the US has not been more than gracious to the people of the NMI for the last 62 years.

9

39. The very mention of the definition of the people of the Northern Mariana islands according to blood (Section 4, Article XII, NMI Constitution) precisely raises the issue to one of a racial definition. There is no other way to address the word blood.

40. The NMI land restrictions constitute discrimination actions on the basis of race, ancestry or national origin as prohibited by the US Constitution and law.

41. The local indigenous people of NMI descent have US passports and are full US citizens. As many of them have become quite wealthy under the US money grants and other benefits, they have bought land in the US. This means that they can and do own US land but US citizens of non-NMI descent cannot own NMI land. This is blatant racial, ancestry or national origin discrimination.

42. While the above cited Wabol case generally upheld the NMI land restrictions in terms of a legislative act on leasehold contracts to non-US citizens, this case clearly defined the issue as race based restrictions. Too, it cited the US Trusteeship agreement with the UN to protect the local people "against the loss of their lands." While this objective may have sounded good in having someone "protect" the local people in the old TT system, there are few local NMI persons today who would say that they need protection by a big brother state. In any case, this protection is not being done by treaty. In terms of the US, it is being done in the vein of a US legislative act of Congress

43. While the case could be made that the US by treaty possibly could enter into an agreement to allow racial, ancestry or national origin discrimination, it would be impossible that the US by statutory law in PL 94-241 could solemnize, authorize and/or allow racial, ancestry or national origin discrimination among its US citizens in the same geographical

10

area under control of the US. This allowance would create two classes or kinds of US citizens. One would be allowed government benefits while the other would not be allowed the same benefits. This is unconstitutional per the Constitutional equal protection of the law.

44. Also, per Wabol, cited above, it is the specific right of equality that must be considered for purposes of territorial incorporation, rather then the broad general guarantee of equal protection. Two different classes of US citizens with two different sets of rights, and benefits cannot possibly be the specific right of equality.

45. In JS App. 10a-17a, as cited above, in 1999, the USDC found that the Constitutional provisions in favor of personal rights are the basis of all free government. These rights are guaranteed to the inhabitants of the CNMI under the US Constitution.

46. The land restrictions effectively mean that the government is almost totally controlled by local people of NMI descent. Since non-local people cannot own land, they are limited in their ability to elect government leaders. Thus, the NMI government is almost totally in the hands of local indigenous NMI people.

47. This local control of the NMI government has translated to a situation whereby local preferences prevail in almost all personnel functions in terms of employment. Here local means the local people of NMI descent and not necessarily other US citizens simply because the local government is totally controlled by the local people of NMI descent.

48. The land restriction laws and preferences to local citizens in employment means that the NMI has a government policy supporting racial, ancestry or national origin discrimination against outsiders or people of non-NMI descent.

Received   Jun-29-2006   08:05      From-                    To-US DISTRICT COURT, N    Page 002

49. This blatant discrimination quickly reached the point that mainland US citizens are often looked upon with disdain and contempt and are scornfully called "haoles" and "g-ddam Americans" by many of the local citizens of NMI descent. This shows the locals' appreciation for their US passports and the some $2 to $3 billion the US has given them over the last several decades since WWII.

50. The Covenant and US PL 94-241 did not give the CNMI plenary authority over all immigration. The NMI power over immigration was expressly limited to those US immigration laws in effect in the Trust Territory when the US ended its administration of the UN trusteeship over the NMI on Nov 3, 1986. As the DC Cir Ct found, the NMI control over its local immigration was general only and not total and all inclusive.

51. PL 99-603 took effect on Nov 6, 1986. This law was not addressed in the Covenant section 503 which focused on laws in effect on Nov 3, 1986. Since 99-603 applied to the US states, it applied to the NMI unless specifically exempted. There appears to be no exemptions or restrictions in PL 99-603 in terms of the NMI.

52. The new Section 102 insertion in PL 99-603 was not and could not have been a part of the immigration laws of the US which were addressed in Section 503 of the Covenant. Clearly, this new insertion into the law happened after President Reagan terminated the US administration of the UN Trusteeship for the NMI on Nov 3, 1986.

53. As a minimum, Section 102 of PL 99-603 prohibiting discrimination against US citizens in employment could not be made ineffective in the NMI in any sense to violate the US constitution and law.

12

## Conclusions

54. The NMI laws on land restrictions and preferences in employment has created an environment where there is prevailing racial, ancestry or national origin discrimination against outsiders, to include US citizens who are not of NMI racial descent. This prevailing situation constitutes NMI government policy.

55. The NMI land restrictions and employment preferences result in a NMI government discrimination policy against US citizens of non-NMI descent which is predicated on the basis of racial, ancestry or national origin factors and are illegal by the US Constitution and law

56. The CNMI discrimination policies means that there are two classes of US citizens in the NMI based on race, ancestry and/or national origin. This two class system is unconstitutional per the US Constitution and especially the 14th amendment on equal protection of the law.

56. PL 99-603 applied to the NMI on Nov 6, 1986. It was in effect in 1990-1994.

## Petition to the Court

WHEREFORE, plaintiff requests judgment and relief as follows:

1. That the court declare the land restriction laws in the NMI illegal by the US Constitution and law.

2. That the Court find that the NMI has a government policy of racial, ancestry and/or national origin discrimination against US citizens of non-NMI racial descent.

3. That the Court find that the CNMI practices racial, ancestry and/or national origin discrimination against US citizens of non-NMI racial descent.

13

4. That the Court find that it is unconstitutional to have two classes or kinds of US citizens in the Northern Mariana Islands.

5. That the Court find that the CNMI government policy of racial, ancestry and/or national origin discrimination against US citizens of non-NMI descent is illegal by the US Constitution and law.

6. That the Court find that PL 99-603 "generally" applies to the NMI.

7. That the Court find that Section 102 of PL 99-603 specifically applied in the NMI in 1990-1994.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Dated this 28th day of June 2006 at Calder, Idaho.

_____
Robert D. Bradshaw, Plaintiff, Pro Se

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 28th day of June 2006, I caused to be served a true copy of the foregoing document by US Mail Postage Paid to each of the following:

Jay H. Sorensen, c/o Shanghai, PO Box 9022, Warren, MI 48090-9022
Kristin St Peter, Asst Attorney General, Caller Box 10007, Capitol Hill, Saipan, MP 96950
Patrick Civille, Civille & Tang, PLLC, PMB 86, PO Box 10003, Saipan, MP 96950

_____
Robert D. Bradshaw, Plaintiff, Pro Se