Robert D. Bradshaw
PO Box 473
1530 W. Trout Creek Road
Calder, Idaho 83808
Phone 208-245-1691

Plaintiff, Pro Se

F I L E D
Clerk
District Court

SEP 1 4 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT D. BRADSHAW<br><br>    Plaintiff<br><br>v.<br><br>COMMONWEALTH OF THE NORTHERN<br>MARIANA ISLANDS (hereafter referred to<br>as the CNMI); et. al.<br>    Defendants | ) Case No. CV 05-0027<br>)<br>)<br>)<br>)<br>) **AFFIDAVIT OF ROBERT D.**<br>) **BRADSHAW IN SUPPORT OF**<br>) **PLAINTIFF'S MOTION FOR**<br>) **PARTIAL SUMMARY JUDGMENT**<br>) |

I, ROBERT D. BRADSHAW, hereby affirm:

    1. I am the plaintiff in the above captioned case. I submit this affidavit in support of Plaintiff's Motion for Partial Summary Judgment. I have personal knowledge of the information set forth herein, and if called upon to testify, I would and could competently testify thereto.

    2. Attached hereto are true and accurate copies of the following exhibits in support of the Motion for Partial Summary Judgment.

        Exhibit A:  Chronology of Events in CNMI Case 96-1320.

        Exhibit B:  Docket--Certificate of Record by Clerk, Case 96-1320

        Exhibit C:  Bisom's original Complaint, Case 96-1320

1

Exhibit D:  First Amended Complaint, Case 96-1320

Exhibit E:  Second Amended Complaint, Case 96-1320

Exhibit F:  Third Amended Complaint, Case 96-1320

Exhibit G:  Fourth Amended Complaint, Case 96-1320

Exhibit H:  Stipulation of 5-20-97 Re Motions:  Order Thereon.

Exhibit I:  Castro's Order of Nov 6, 1998

Exhibit J:  Lizama's Dec 29, 2005 Order Granting Robert Bradshaw's Motion to Vacate Judgment

Exhibit K:  Sorensen's Sep 3, 1999 Reply to Opposition to Motion for Partial Summary Judgment

Exhibit L:  Sosebee's Feb 1, 2000 Motion to Remove Case From Jury Trial Docket

Exhibit M:  Return of Service Form used by the CNMI Superior Court (Sample)

Exhibit N:  Sorensen's Feb 3, 2000 Opposition to Motion to Remove Case from Trial Docket

Exhibit O:  Sorensen's Feb 16, 2000 Supplemental Declaration in Support of Request for Entry of Default

Exhibit P:  Sorensen's Feb 14, 2000 Request for Entry of Default; Declaration of Jay H. Sorensen; Entry of Default

Exhibit Q:  Bradshaw's May 23, 2005 Amended Motion to Void/Vacate Judgment

Exhibit R:  Sorensen's Jul 15, 2005 Opposition to Motion to Void/Vacate Judgment

Exhibit S: Bisom's May 24, 2006 Opening Brief in his appeal to NMI Supreme Court, Appeal 06-0005 GA.

Exhibit T: Bisom's Jul 5, 2006 Reply Brief of appeal to NMI Supreme Court,

Appeal 06-0005 GA

    Exhibit U: Bradshaw's Dec 28, 1993 termination letter to Bisom

    Exhibit V:  Bisom's Aug 5, 1999 Affidavit of Plaintiff in Support of Motion for Partial Summary Judgment

    Exhibit W: Answer of Mar 30, 1999 of CNMI and Tan.

    Exhibit X:  Castro's Feb 22, 2000 Order Denying Motion to Remove Case From Trial Docket

    Exhibit Y:  Sosebee's Feb 1, 2000 Declaration

    Exhibit Z:  NMI Supreme Court Opinion and Order of 13 Sep 2002 on Appeal Nos 2000-016 and 2000-023 GA.

    Exhibit AA: Bradshaw's Jun 20, 2006 Brief on the Bisom Appeal 06-0005 GA

    Exhibit BB:  Bradshaw's Letter of Apr 14, 2006 Asking for AG assistance and indemnification.

    Exhibit CC:  Acting AG Baka's Letter of Apr 26, 2006 saying no AG assistance.

    Exhibit DD:  Asst AG St Peter's Letter of Jul 17, 2006 saying that the AG's office does not represent Bradshaw and is under no obligation to do so.

    Exhibit EE:  Jury's General Verdict with Special Findings of Feb 25, 2000 Re Defendant CNMI Government

    Exhibit FF:  Castro's Decision and Order of Jun 7, 2000

    Exhibit GG: Sorensen's Mar 1, 2000 Application for Attorney Fees;  Declarations in Support.

    Exhibit HH: April 5, 2005 Letter of Bradshaw to CNMI Superior Court trying to get copies of the fraudulent postal receipts filed by Bisom/Sorensen in the case file of 96-1320.

    Exhibit I I: Jun 20, 2005 Letter of Bradshaw to Matthew Ryden, CNMI attorney in Boise, Idaho, to note that the SC Clerk had informed him that the original fake postal receipts in the 96-1320 case file are now missing.

Exhibit JJ:  Bisom's Aug 5, 1999 Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment.

3. I furthermore declare the following for CNMI case 96-1320:

a. I have made a review of the entire docket and the case files up to Apr 5, 1997 and I find no court orders for an extension of time to increase the 120 days deadline under CNMI Civil Procedures rule 4(m); nor do I find any record of an order dismissing the action. After Apr 5, 1997, I find nothing in the docket which would allow that any order was ever issued for an extension of time or for a dismissal of the complaint.

b. The record does not disclose any service or attempted service of Bisom's 1st amended complaint on Bradshaw by May 20, 1997 and/or of the service or attempted service of the 2d amended complaint on Bradshaw by May 30, 1997.  These documents became dead by law on those dates and could not be legally served or attempted after those dates.

c. From Dec 1996 to Aug 1999, the docket shows no record of the filing of return of service forms for service on Bradshaw. The docket on 6/5/97 shows the filing of a certificate of service on Bradshaw.

4. In the second amended complaint (para 223, 230), Bradshaw alleges that the $140,000 judgment against and pay out by the CNMI to Bisom happened because of the activities of Bradshaw and the default judgment entered on him by the CNMI SC. In terms of Bradshaw's Complaint itself, the role of Castro is not totally defined by all of the relevant facts to stipulate to what extent that the $140,000 payout is due precisely to the default judgment. Subsequent developments have now made this issue clear and suitable for summary judgment.

a. The General Verdict with Special Findings Re Defendant CNMI Government (see Exhibit EE herein) finds for Bisom for Breach of Contract ($100,000) and for Wrongful Termination ($10,300). In the Complaint and amendments and the Decision and Order of Jun 7, 2000 (p. 7 of Exhibit FF attached hereto), these issues are defined as a result of the activities of Bradshaw. In the default, the legal conclusion was that Bradshaw admitted all of Bisom's allegations against him. Therefore, the judgment against the CNMI precisely arose because of the default judgment against Bradshaw. Without the default, there is no way that these judgments would have arisen against the CNMI.

b. Attorney fees of some $33,000 was awarded to Bisom as a result of the Castro Decision and Order of Jun 7, 2000 (Exhibit FF). This decision was predicated upon the activities of Bradshaw and the level of success which Bisom achieved against Bradshaw (p. 7-9, Exhibit FF).

c. Bisom, through his attorney, filed his appeal brief on May 24, 2006 (Exhibit S). Therein (p. 7) he notes that "On February 14, 2000 at the request of the plaintiff default was entered as to defendant Robert D. Bradshaw..." In this same appeal, Bisom (p. 8) added: "By Decision and Order entered June 7, 2000 attorney's fees in the amount of $33,078.28 were awarded against Bradshaw..." This brief is conclusive that the judgment against the CNMI and the attorney's fees all arose from the default judgment entered by Bisom on Feb 14, 2000.

5. From plaintiff personal knowledge of the economic situation in the NMI, plaintiff offers the following evidence that the CNMI and its government is heavily involved in commercial activities to the extent that it must be defined as a enterprise per the RICO

definitions of 18 USC 1961-1965:

    a. The CNMI is allowed to collect an import tax or duty on all products entering the CNMI. The CNMI collects this tax on all goods shipped to the CNMI from the US as well as other outsiders. Yet, goods going from the CNMI into the USA goes in duty free without US tariffs. Such CNMI goods are also allowed to be labeled as "Made in the USA."

    b. For years, Asian made automobiles were shipped by the thousands to the CNMI to be unloaded and then reloaded for re-shipment to the USA to beat US tariffs or US import limits on Asian cars. Plaintiff Bradshaw in 1979-1980 has seen these new automobiles by the hundreds/thousands parked at lower base in Saipan, ready to be reloaded on ships and sent to the US.

    c. This strange tax relationship has spawned a garment industry on Saipan where a number of Asian producers establish factories on Saipan and bring in Asian workers to make clothing and consumer goods to be shipped duty free to the US. In a 2000 report, the auditing firm of Burger and Comer of Guam said that the garment industry in FY 1999 paid $73 million dollars to the CNMI government for taxes and for other benefits to the producers and their employees  Besides US gifts and grants, the garment industry is a second major source of funding to the CNMI government.

    d. But the operations of the garment manufactures has invited much abuse of these thousands of alien people brought in to do the work. The abuse and working conditions at the garment factories have promoted a number of high profile class action lawsuits-- including one in the Superior Court of California and at least two in federal court (including one resulting in a $20 million payout by defendants).

e. There is some incoming money from tourism and now there is a growing gambling (legal in the CNMI) and prostitution (mainly from imported prostitutes) operations. But while this does involve large sums of money, much of it goes into the pockets of government officials and private persons who receive bribes, payoffs and kickbacks for the operations. The tax revenues to the CNMI is not great from these activities, in contrast to the US funding and garment manufacturers.

f. There is still one more source of revenue in the NMI. The NMI borrows money illegally (the CNMI Constitution prohibits indebtedness to pay for government operations) annually to pay some part of the $200 million operating budget. This NMI debt is now in excess of $175 million and growing. Most of these loans come from the NMI retirement fund (plus another $522 million in unfunded liabilities to the fund). Also, the NMI faces periodic power outages/threats because of unpaid bills to its fuel oil supplier. The money problem is a ticking time bomb which violates laws and will have an enormous impact on the USA when its impact eventually materializes. The CNMI has already looked to the USA for a bailout.

g. Despite receiving benefits of US programs and the importation of thousands of alien workers, the CNMI unemployment rate hovers around 14-15%. Many of these unemployed local people are on some US welfare program, like food stamps and/or USDA food grants. Despite being on US welfare, some of the welfare recipients have found money in past years to bring in and hire alien employees as domestics. This paradox has created some media complaint and recognition in the CNMI.

h. So while local people may be unemployed, many of them have money because of the huge possibilities arising from the local corruption, graft and other illegal

operations and/or from the restrictions in land ownership. Since the local people own the lands, they are able to rent and lease them out to outsiders and receive much personal funding which is almost untaxed in the CNMI. In 1990, there were over 100 local millionaires in the CNMI--who paid very little in the way of taxes.

i. As noted heretofore, corruption is very prevalent and widespread in the CNMI. This fact supports the complaint of BRADSHAW herein that 18 U.S.C. 1961-1965 (the RICO) act was violated by defendants in the CNMI and the fact that it is impossible to obtain local witnesses who will testify in court on the CNMI problems.

j. The widespread corruption, gambling and prostitution; the importation of thousands of aliens from Asia (often young, vulnerable women/girls); and the control of the local government exclusively in the hands of the local indigenous people has combined to create enormous discrimination against outsiders. Of course, Asian workers are the most affected. But Americans from the USA also are subject to discrimination. This realty combines to support the claims for discrimination in plaintiff's complaint.

k. From 1976 to date, the local CNMI government has had exclusive control over immigration into the CNMI. This reality has created a situation where much abuse and corruption has surfaced to bring questions to the attention of federal overseers.

l. In the late 1980s and early 1990s, thousands of Chinese on Mainland China began to have some freedom to leave China with a Chinese passport if they could obtain a visa in advance. This condition opened up enormous opportunities for fraud in the CNMI.

m. While in the CNMI in 1990-1991, plaintiff learned of how this scam worked. A Chinese man named Chen had some agents in China who would sell CNMI visas to Chinese

for $5,000 each. The retail sellers in China would get a commission. The head man Chen would get a slice of the money and a local Marianas Visitor Bureau official would get the last of the pie (some $2,000 for each applicant) which he kept himself and/or paid off to other involved CNMI officials for their help.

n. While plaintiff Bradshaw herein is not attempting to ask the US courts to investigate this fraud and corruption going on in the CNMI, per se, the facts of this corruption is relevant to what happened to Bradshaw in the CNMI courts and to Bradshaw's RICO claims in the 2AC. Corruption is common in the CNMI and surely influenced the fraud and conspiracy placed on Bradshaw.

o. According to a story in the Saipan Tribune of Aug 11, 2006, the CNMI House of Representatives has passed on first reading House Bill 15-146 which proposes to form a Second Marianas Political Status Commission "to revisit the provisions of the Covenant (with the US) and U.S. government's actions in interpreting and implementing the Covenant, and examine alternative political and economic status options for the Northern Marianas." The bill states "the people (of the CNMI) desire to reexamine whether continuing in a 'commonwealth' relationship with the United States pursuant to the terms of the Covenant is in their best interest, or whether some other political status will better enable them to fulfill their aspirations of full and meaningful self-government."

p. Anyone familiar with the CNMI and how it operates can readily see that the above new effort to revisit the covenant with the US is a matter of economics and dollars. The CNMI relationship with the US hangs on money. Without a sufficient inflow of US dollars, the present relationship will undoubtedly fall apart.

q. The conclusion has to be that the CNMI and its government is an enterprise involved in commercialism between foreign states and the US. The revenues, both legal tax revenues and/or graft and payoffs in the pockets of government officials, comes primarily from commercialism and from US grants, gifts, etc.

6. Besides numerous false charges and statements in Bisom's complaints and various filings (particularly in his Aug 5, 1999 Affidavit of Plaintiff in Support of Motion for Partial Summary Judgment--Exhibit V), which were never proven in court or in any record of evidence, his complaints (Exhibit C-G) and his affidavit for partial summary judgment (p 4, Ex. V herein) alleged that Bradshaw supplied written press statements to the Pacific Star paper on the performance of Bisom. Bradshaw categorically denies this allegation. Bradshaw made no press statements or press releases to the media on Bisom. Instead it was Bisom who regularly went to the media to attack Bradshaw, OPA, and the Deloitte & Touche audit.

7. On Saipan, internal government documents often get leaked or bootlegged to the media. Representative Torres allegedly supplied items in the Bisom case to the media (to include a memorandum of record prepared by Bradshaw for internal use in the government; but leaked to the Star). And as reported by the Star (p. 2, Ex. F of Bisom's Affidavit in support of motion for partial summary judgment), Bisom himself leaked documents to the newspapers for his own purposes. None of this media material in Bisom's Affidavit in Support of Motion for Partial Summary Judgment came from Bradshaw. It apparently came from Torres and Bisom.

Dated this 25th day of August 2006 at Coeur d'Alene, Idaho

_Robert D. Bradshaw_
Robert D. Bradshaw, Plaintiff Pro Se

STATE OF __Idaho__

COUNTY OF __Kootenai__

I, __* * * * * * *Peggy Hord* * * * * * * * * *__, Notary in and for the State of __Idaho__, residing at __Coeur d'Alene, Idaho * * * * * *__ do hereby certify that on this __25th__ day of __August__ 2006, personally appeared before me Robert D. Bradshaw, to me known to be the individual described in and who executed the within instrument for the uses and purposes herein mentioned.

Given Under My hand and Official Seal this __25th__ day of __August__ 2006.

NOTARY PUBLIC IN AND FOR THE STATE OF __Idaho__

MY APPOINTMENT EXPIRES

__12-08-09__

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the __4th__ day of __Sep__ 2006, I caused to be served a true copy of the foregoing document by US Mail Postage Paid to each of the following:

Jay H. Sorensen, c/o Shanghai, PO Box 9022, Warren, MI 48090-9022
Kristin St Peter, Asst Attorney General, Caller Box 10007, Capitol Hill, Saipan, MP 96950
Mark B. Hanson, PMB 738, PO Box 10,000, Saipan, MP 96950.

Robert D. Bradshaw, Plaintiff, Pro Se

11