APPEAL NO. 06-0006 GA

**IN THE SUPREME COURT**
**FOR THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | | |
|---|---|---|
| ROBERT A. BISOM, | ) | APPEAL NO. 06-0006 GA |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| COMMONWEALTH OF THE NORTHERN | ) | |
| MARIANA ISLANDS, ROBERT D. | ) | |
| BRADSHAW, former Temporary Public | ) | |
| Auditor, in his individual capacity, etc. | ) | |
| | ) | |
| | ) | |
| Appellee. | ) | |

**APPEAL FROM THE SUPERIOR COURT**
**OF THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

Juan T. Lizama, Associate Judge

---

**APPELLANT'S OPENING BRIEF**

---

**JAY H. SORENSEN, ESQ.**
c/o Shanghai, P.O. Box 9022
Warren, MI 48090-9022
Phone: 86-21-50838542
Facsimile: 86-21-50838542

**MARK B. HANSON**
First Floor, Macaranas Bldg.
Beach Road, Garapan
PMB 738, P.O. Box 10,000
Saipan, MP 96950
Phone: (670) 233-8600
Facsimile: (670) 233-5262

EXHIBIT 5

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES................................................. iii-iv

ISSUES PRESENTED........................................................ 1

STATEMENT OF JURISDICTION........................................... 1

STANDARDS OF REVIEW................................................... 1

STATEMENT OF THE CASE................................................ 2

STATEMENT OF FACTS..................................................... 4

ARGUMENT..................................................................... 8

   I. RULE 60 (b) DOES NOT AUTHORIZE
   VACATING THIS JUDGMENT BY MOTION
   BROUGHT MORE THAN ONE YEAR AFTER
   ENTRY..................................................... 8

    A. The requirement for an independent action was
      ignored................................................
    B. The correct standard to determine whether to grant
      relief under the independent action clause of Rule
      60(b) was not employed................................. 11
    C. The erroneous application of Rule 60(b) was prejudicial 13

   II. THE TRIAL COURT'S CONCLUSION THAT
   BRADSHAW WAS NOT PROPERLY SERVED IS
   BASED ON A MISINTRPRETATION OF COM.R.CIV.P 4    14

    A. The trial court ignored several applicable sections
      dealing with service of process of out-of-state
      defendants............................................... 14
    B. CNMI law regarding service on nonresident defendants
      does not require compliance with the service provisions
      of the statutes and rules of the state where the defendant
      is residing............................................... 15

    1. Legislative intent..................................... 16
    2. Plain meaning......................................... 17
    3. Analogous case law.................................... 18



*Exh. # 5*

III. THE FACT THAT BRADSHAW PURPOSEFULLY
AVOIDED MAIL SERVICE IS RELEVANT AND
SHOULD HAVE BEEN CONSIDERED....................    19


IV. DEFENDANT WAIVED ANY DEFECT OF
SERVICE BY APPEARING THROUGH COUNSEL
AND BY FAILING TO CHALLENGE SUFFICIENCY OF
PROCESS .......................................................    23

V. THESE ISSUES HAVING ALREADY BEEN
HEARD AND DETERMINED, THE LAW OF THE
CASE DOCTRINE APPLIES TO PREVENT
GRANTING THIS MOTION....................................    26

CONCLUSION..............................................    28

ADDENDUM

Rule 60, Commonwealth Rules of Civil Procedure

Polargrid LLC v. Videsh Sanchar Nigam Limited,
2006 U.S. Dist. LEXIS 17531 (D.C. S.D.N.Y April 7, 2006)





ii

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*American Bankers Ins. Co of Fla. v. Northwestern Nat. Ins. Co.*,
198 F.2d 1332 (11th Cir. 1999) ……………………………………………………..   1

*Bankers Mtg. Co. v. U.S.*, 423 F.2d 73 (5th Cir. 1970)…………………………………….   10, 12

*Benny v. Piper*, 799 F.2d 489 (9th Cir. 1986) …………………………………………   26

*Bruley v. Lincoln Property Co.*, 140 F.R.D. 452 (D.C. Colo. 1991)…………………………   16

*Camacho v. J.C. Tenorio Enters., Inc.*, 2 N.M.I. 407 (MP 1992) ………………………….   27

*Carteret Sav. & Loan Asso., F.A. v. Jackson*, 812 F.2d 36 (1st Cir. 1987) ………………..   12

*Cherry v. Hefferman*, 182 So. 427 (Fla. 1938) ……………………………………………   20

*Commonwealth Ports Auth. v. Hakobotan Saipan Enter. Inc*, 2 N.M.I. 212 (MP 1991)….   16

*Corn V. Guam Coral Co.*, 318 F.2d 622 (9th Cir. 1963)…………………………………….   9

*Creadick v. Keller*, 160 A. 909 (Del. 1932) ……………………………………………….   20

*Dee-K Enterprises, Inc. v. Heveafil SDN.BHD*, 174 F.R.D. 376 (E.D. Va. 1997) ……….   18

*Export Group v. Reef Indus., Inc.*, 54 F.3d 1466 (9th Cir. 1995) …………………………..   1

*Florez ex rel Wallace v. Callahan*, 156 F.3d 438 (2nd Cir 1998) …………………………..   29

*Gasior v. Wentz*, 89 N.W.2d 886 (N.D. 1958) ……………………………………………..   25, 26

*Giles v. Giles*, 37 P.3d 589 (Haw. App. 2001)……………………………………………..   10

*In re Grant*, 52 F.2d 223 (M.D.N.C. 1931)……………………………………………………   26

*Griffin v. Fed. Deposit Ins. Corp.*, 831 F.2d 799 (8th Cir. 1987)……………………………   12

*Humanetics, Inc. v. Kerwit Medical Products, Inc*. 709 F.2d 942 (5th Cir. 1983) ………..   12

*Levinsky v. State*, 503 A.2d 534 (Vt. 1985) ………………………………………………..   11, 12

*Lockwood v. Bowles*, 46 F.R.D. 625 (D.C. D.C. 1969)………………………………………   13

*Mafnas v. Commonwealth*, 1 N.M.I. 400 (MP 1990) ……………………………………….   17

*Merriott v. Whitsell*, 476 S.W.2d 230 (Ark. 1972) ……………………………………….   20



Exh. 5
S

*Middleton v. McDonald*, 388 F.3d 614 (8th Cir. 2004) ............................................. 12

*N.C. v. W.R.C.*, 317 S.E.2d 793 (W. Va. App. 1984) ............................................. 12

*National Surety Co. v. State Bank, 120* F 593 (8th Cir.1903) ..................................... 12

*Nikwei v. Ross School of Aviation, Inc.*, 822 F.2d 939 (10th Cir. 1987)....................... 22

*Pangelinan v. Itaman*, 4 N.M.I. 114 (MP1994) .................................................... 11

*Patel v. Southern Brokers, Ltd.*, 289 S.E.2d 642 (S.C. 1982) .................................... 20

*Polargrid LLC v. Videsh Sanchar Nigan Ltd.*, 2006 U.S. Dist. LEXIS 17531
(S.D.N.Y. April 7, 2006)............................................................................. 18

*Resource Ventures, Inc. v. Resources Mgmt. Int'l., Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999) ... 18

*In re Estate of Rofag*, 2 N.M.I. 18 (MP 1991)..................................................... 16

*Sablan v. Cabrera*, 4 N.M.I. 133 (MP 1994) ...................................................... 1

*Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28 (3rd Cir. 1995) .............. 29

*Sirok v. Rotec Engineering*, 1 CR 1065 (D.C. N.M.I. 1984).................................... 15

*State v. Raper*, 736 P.2d 680 (Wash. App. 1987) ................................................ 10

*Sullivan v. Tarope*, 2006 MP 11 P33 ............................................................. 12, 13

*In re Estate of Tudela*, 4 N.M.I. 1 (MP 1993), *appeal dis.*, 43 F.3d 1479 (9th Cir. 1994)..... 1

*Tudela v. Marinas Pub. Land Corp.*, 1 N.M.I. 179,184 (MP1990) ............................ 10, 17

*Untied States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) ....................................... 27, 28

*United States v. Beggerly*, 524 U.S. 38, 141 L.Ed.2d 32, 118 S.Ct. 1862 (1998) ............. 11

*U.S.A. v. Pauly*, 321 F.3d 578 (6th Cir. 2003) .................................................. 1

*Wax v. Van Marter*, 189 A. 537 (Pa. Super. 1936) ............................................. 22

*Wobol v. Villacruisis*, 4 N.M.I. 314 (MP 1995) ................................................. 27





STATUTES AND RULES

1 Commonwealth Code
      Section 3201 ................................................................. 1
      Section 3202 ................................................................. 1
      Section 8153 ................................................................. 25

7 Commonwealth Code
      Section 1102 ................................................................. 15, 16
      Section 1104 ................................................................. 15, 21

Commonwealth Rules of Civil Procedure
      Rule 4(d) ..................................................................... 21
      Rule 4(e) ..................................................................... 14
      Rule 4(k) ..................................................................... 16-18
      Rule 4(m) .................................................................... 16
      Rule 12(h)(1) ............................................................... 24
      Rule 60(b) ................................................................... 8-12

Commonwealth Rules of Evidence
      Rule 201 ..................................................................... 27

Federal Rules of Civil Procedure
      Rule 4(f) ..................................................................... 18

Rules of the Ninth Circuit Court of Appeals
      Rule 39-3 .................................................................... 21

OTHER AUTHORITIES

Advisory Committee Notes, 1993 Amendments to the Federal Rules of Civil Procedure ...... 9, 21

7 C.J.S., Attorney and Client, § 80.................................................... 26

7 J. Moore's Federal Practice, ¶60.30[3] ............................................. 1

11 Wright and Miller, Federal Practice and Procedure §2868 (1973)........................... 12

Note, *Constitutional Law: The Validity of Service of Process by Mail When There is
No Return Receipt: The Outer Limits of Due Process*, 25 Okla. L. Rev. 566 (1972) ........... 22



Exh.
5

## ISSUE PRESENTED

Whether the Superior Court properly granted the motion to vacate the judgment entered on March 10, 2000 against defendant, Robert D. Bradshaw.

## STANDARDS OF REVIEW

Orders granting relief under Rule 60(b) are reviewed for abuse of discretion; however, to the extent the decision to grant or deny the motion is based on questions of law, they are reviewed de novo. *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1469 (9th Cir. 1995); *U.S.A. v. Pauly*, 321 F.3d 578 (6th Cir. 2003).

Issues involving construction and application of a statute are reviewed de novo on appeal. *In re Estate of Tudela*, 4 N.M.I. 1 (MP 1993), *appeal dismissed*, 43 F.3d 1479 (9th Cir. 1994).

To the extent the issues present application of fact findings to statutes they are mixed questions of law and fact and are reviewable de novo on appeal. *Sablan v. Cabrera*, 4 N.M.I. 133 (MP 1994).

## STATEMENT OF JURISDICTION

A. Jurisdiction of the Superior Court is authorized by 1 CMC Section 3202.

B. Jurisdiction of the Supreme Court is founded upon 1 CMC Section 3102. Appeal is from an order granting a motion to vacate a judgment under Rule 60 (b), Commonwealth Rules of Civil Procedure. An order granting or denying relief under Rule 60(b) is final and appealable. *American Bankers Ins. Co of Fla. v. Northwestern Nat. Ins. Co.*, 198 F.2d 1332, 1338 (11th Cir. 1999), citing, 7 J. Moore's Federal Practice, ¶60.30[3] at 60-343.

C. The Order Granting Robert Bradshaw's Motion to Vacate Judgment was entered on December 29, 2005. Notice of Appeal was timely filed on January 30, 2006.

7



### STATEMENT OF THE CASE

Bisom first filed this case in the United States District Court for the Northern Mariana Islands on November 14, 1995 against the Commonwealth of the Northern Marian Islands, Robert D. Bradshaw, former Temporary Public Auditor, and Scott Tan, former Public Auditor.

On November 6, 1996 on motion of defendants, the district court entered Order Granting Defendants' Motion for Judgment on the Pleadings and Dismissing Remaining Claims for Lack of Jurisdiction. During the time the case was pending in federal court plaintiff took the deposition of Bradshaw over two days in September, 1996 in the city of Spokane, Washington.

The case having been dismissed for lack of jurisdiction from federal court, Bisom filed the case in CNMI Superior Court on December 5, 1996.

The case then went through three years of pretrial motions and maneuvers, including twice being removed to U.S. District Court by the Attorney General, on behalf of all defendants. Both times the case was remanded back to Superior Court. Defendants also filed a motion to dismiss, resulting in the Decision and Order on Defendants' Motion for Lack of Personal Jurisdiction and Failure to State a Claim and on Defendants' Motion for a More Definite Statement filed November 6, 1998. Bisom's fourth and final amended complaint was filed on November 18, 1998. [ER 1][1]

The case came on for jury trial on February 7, 2000. The first matter taken up was defendants' Motion to Remove Case from Trial Docket, arguing that because defendant Bradshaw had not yet been served, the case should go off calendar. [ER 29-34]. Order Denying Motion to Remove Case from Trial Docket was filed on February 22, 2000, effective nunc pro tunc to February 7, 2000. [ER 42]. On February 14, 2000 at the request of plaintiff default was entered as to defendant Robert D. Bradshaw. [ER 39-41].

---

[1] Items marked "ER" are referenced to the Excerpts of Record.





EXH. A

2

The jury returned its general verdict on special findings on February 25, 2000 in favor of plaintiff as to defendants Robert D. Bradshaw and the CNMI, and in favor of defendant Scott Tan. [ER 45-48]. Order and Judgment was entered on March 10, 2000 for $139,000 against Robert D. Bradshaw and for $110,300 against the CNMI. [ER 49]. By Decision and Order entered June 7, 2000 attorney's fees in the amount of $33,078.28 were awarded against Bradshaw and Bisom's request for findings of indemnity were denied. [ER 51].

Appeals by plaintiff on issues of damages and indemnification were unsuccessful. *Bisom v. Commonwealth*, 2000 MP 19. Cross-appeal by defendants was filed and later abandoned. Acknowledgment of Full Satisfaction of Judgment as to defendants CNMI and Leo LaMotte, Public Auditor, in his official capacity was filed on March 14, 2003.

Bisom also appealed the dismissal of the federal claims by the district court to the Ninth Circuit Court of Appeals. *Bisom v. C.N.M.I. et al.*, Ninth Circuit Appeal No. 96-17369. That appeal resulted in the dismissals being sustained by unpublished memorandum filed September 9, 1998. It should be noted that at the times pertinent to the issues brought by this motion, the Attorney General was the attorney of record for defendant Bradshaw in that appeal and was actively representing him in the federal action.

Bradshaw filed Motion to Void/Vacate Judgment on March 16, 2005. [ER 60]. However, no notice of hearing for the motion was filed until July 7, 2005. Bradshaw filed a Request Leave of Court to Amend Motion to Void/Vacate Judgment on May 27, 2005 along with an Amended Motion to Void/Vacate Judgment appending additional affidavits. [ER 90]. Bisom filed opposition to the motion to vacate on July 21, 2005. Bradshaw subsequently filed four different sets of papers titled answers and amended answers to the opposition. The motion was finally heard on October 4, 2005. The Superior Court entered Order Granting Robert Bradshaw's Motion to Vacate Judgment on December 29, 2005. [ER 99]. Notice of appeal was timely filed January 30, 2006. [ER 115].



Exh. 9

## STATEMENT OF FACTS[2]

In March, 1993 Bisom signed an Excepted Services Employment Contract to be Legal Counsel to the Office of the Public Auditor (OPA) for a two year period. [Ex C]. He began work on April 24, 1993 under the Public Auditor, Scott Tan.

On November 25, 1993 Tan's term of office as Public Auditor expired. [Ex AZ] On November 26, 1993 Bradshaw was appointed Temporary Public Auditor. [Ex. L] Bradshaw had been working at the Department of Finance as a special assistant to the Director of Finance. [Ex. BA]. Bradshaw was appointed by Governor Guerrero, who had earlier that month, lost his bid for re-election, and whose term of office was to end on January 10, 1994.

At the time that Bradshaw took office OPA was in the process of organizing and beginning to implement the year-end audit of the CNMI government for the fiscal year that ended September 30, 1993. The amount of the budget deficit that had been incurred by the government had been a key issue in the previous gubernatorial campaign. Accordingly, the out-going administration had an incentive to minimize that finding, and likewise, the incoming administration would find more political ammunition in a higher dollar amount. On his first day in office, November 29, 1993, Bradshaw addressed the whole OPA staff and told them that one of his priorities was to complete the audit before the end of Governor Guerrero's term.

During the first several days that Bradshaw was in the office, Bisom was confused and uncertain about the legality of Bradshaw's appointment and, therefore, his authority to act as Public Auditor. This was for several reasons:

First, he had been told previously by Scott Tan that Tan's term of office did not expire until the end of December, 1993, and so Bisom could not understand how someone else could

---

[2] The trial testimony has never been transcribed. In the prior appeal an agreed statement of facts was prepared to address a limited part of the testimony relevant to the evidentiary and damages issue then presented, but not relevant to the issues in this appeal. References labeled "Ex" herein are to trial exhibits.

/10/


EXH. B
5

be appointed. This situation was exacerbated by the fact that at the time of Bradshaw's appointment and his assuming office, Tan was gone from the Commonwealth, having taken a trip to Hong Kong with the governor-elect, Froilan Tenorio, who was a friend of Tan; so Tan was not available to consult with.

Secondly, Bisom was told by Bradshaw on the morning of Bradshaw's first day at OPA, that Bradshaw had previously been the Public Auditor in 1979 and 1980, that at that time he filed suit against the government under his employment contract, that the case was settled, and as part of the settlement, Bradshaw had agreed that he would not be reappointed as Public Auditor.

Thirdly, Bisom believed that Bradshaw had not completely severed his ties with the Department of Finance (DOF), but, in fact, had regular communication with the Director of Finance, who had been Bradshaw's superior at DOF. Also, Bradshaw had told him that he was at OPA on a temporary basis, and he was still going to be paid by DOF. Because DOF would be the agency of central focus for the audit, Bisom saw this as a major conflict of interest on the part of Bradshaw.

Bisom had an acute awareness of problems of conflicts of interest by government officials because under the Government Ethics Code Act of 1992 (1 CMC § 8501 et seq.) the Public Auditor was charged with various duties, including investigation, hearings and reports of charges of violations of that act. Tan had put Bisom in charge of the fulfilling OPA's duties in this regard.   In fact, in fulfilling those duties, he had undertaken some investigations and made some findings that resulted in animosities with members of the out-going administration.

On the afternoon of November 29, 1993, the first day Bradshaw was at OPA, there was a meeting with several people who would be involved in the year-end audit, including personnel from the accounting firm of Deloitte and Touche, then the only firm that had submitted a bid for the audit. Bisom accompanied Bradshaw to the meeting. At the meeting



5

Exh. 5

Bradshaw announced that the contract to conduct the audit was awarded to Delloitte and Touche, and he emphasized the need to have it completed quickly and finished before the end of December. At the meeting Bisom addressed the group and said he believed it would be wrong to go forward because there had only been one bidder for the contract, that he did not see any need to finish the audit so quickly, and that he thought it could not be done adequately if rushed.

Also on that first day Bisom talked to Bradshaw about taking leave. He had two things for which he needed time off from work. One was to get medical attention in Guam for a lump on his left arm. The other was to go to Japan, his point of hire, to get his personal effects and arrange shipment, for which he had not had time to arrange before then. He had procured an extension until December 31, 1993 to do this. [Ex. H]. He told Bradshaw that this leave had already been approved by Tan.

During the time that Bisom was out of the office Bradshaw wrote a series of letters to him. There were twenty of them. Among them was one dated December 6, 1993 terminating his contract without cause. [Ex. DDD]. Later, by letter of December 28, 1993 Bradshaw terminated Bisom's contract again, this time with cause. [Ex. AAA]. In between these letters Bradshaw had the termination without cause rescinded. [Ex. BB]. The significance of termination with cause was to disqualify Bisom from having his shipping and repatriation costs, and require him to vacate his government housing a day earlier. [Ex. AO]. The letter of termination for cause has twelve attachments, which are prior letters of Bradshaw to Bisom in which he charged Bisom with various wrongs.

Bisom and Bradshaw were in the office together for only two days. Bisom was out of the office from December 3 through 5, first on medical leave for minor surgery, then on annual leave. Bisom did come to the office on December 1 to turn in his government car, which he had been ordered to do. [Ex O]. He also came to the office on December 7, which is when he learned his employment had been terminated. He also learned of several



6

Ex. 4: S

restrictions on his office activities and authority, as outlined in Bradshaw's letter dated

December 3, 1993 and memo of the same date. [Ex. N, Ex. CCC] He also learned that he

had been moved out of his office and had his work space put in a hallway on a typing table

without a telephone. This too was directed by a letter. [Ex. EEE]. When Bisom learned this

he felt that he was put in a position where he could not do his job, which included handling

ethics complaints that required confidentiality. He saw no purpose in going back to the office

after that. Bisom had retained an attorney for himself, Richard W. Pierce, who wrote

Bradshaw to tell him that because of his harassment, Bisom would be on annual leave then

leave without pay until January 15, 1994. [Ex. Q].

In two separate letters Bradshaw told Bisom that he planned to report Bisom to the

Attorney General for criminal prosecution and to the CNMI Bar Association for ethical

violations. {Ex. AAA, attachments E and F}. Criminal charges were never brought, but

Bradshaw did file a formal complaint with the Bar Association's ethics committee. The

charges were numerous and it took about a year before the investigation was completed.

Eventually there was a finding by the ethics committee that the charges had no basis.

Bradshaw also sent a letter to the newspapers that outlined his charges in the

complaint to the bar  It appeared in the Pacific Star on December 24, 1993. [Ex. T]. So

knowledge that Bisom was fired and investigation into his ethical qualifications became

public.

Bradshaw left Saipan in early January, 1994, before the Tenorio administration took

office. He never returned to the CNMI. He did get the year-end audit for fiscal 1993

completed before he left, getting it done faster than any audit done up until the trial. [Ex. AP].

Scott Tan was appointed by the new governor to be Temporary Public Auditor. [Ex.

AZ]. Tan asked Bisom to come back to OPA, which Bisom did for a period of days in

January. However, because his employment had been officially terminated, he could not

function as a lawyer. [Ex. AB]. What procedure to use to rehire him became an issue. [Ex.



7

EXH. 5
5

AC]. The process of rehiring dragged on and eventually the relationship between Tan and Bisom soured. In mid-March Bisom learned he would not be rehired at OPA.

Bisom tried to find other work as a lawyer, but because of the fact that he had been terminated from his job and had an outstanding ethics complaint against him, he could find none. Even after the complaint was dismissed he was unable to find work in the legal profession. Eventually he left Saipan to return to Japan to teach English, where he remains.

## ARGUMENT

### I. RULE 60 (b) DOES NOT AUTHORIZE VACATING THIS JUDGMENT BY MOTION BROUGHT MORE THAN ONE YEAR AFTER ENTRY

A. The requirement for an independent action was ignored.

Bradshaw based his motion to void or vacate the judgment against him on the allegation that he had never been properly served, and that any proof of service on him was "obtained by alleged fraud and conspiracy and gross incompetence, malfeasance and malpractice on the part of some or all of the various parties involved at the trial in the CNMI in February-March 2000." [Motion to Void/Vacate Judgment, p.4, ¶10; ER 63].

Other than making reference to certain constitutional principles in very general terms, the moving papers do not cite any legal basis for vacating or voiding the judgment. However, relief from judgments or orders is governed by Rule 60 of the Commonwealth Rules of Civil Procedure. Under subsection (b) of that rule, all such motions "shall be made within a reasonable time," and where the basis is under any of the first three provisions of that subsection, including subsection (3), "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party," then the motion must be "not more than one year after the judgment, order, or proceeding was entered or taken."

The judgment against Bradshaw was entered on March 10, 2000. [ER 49]. Bradshaw filed his motion to void/vacate the judgment five years later on March 16, 2005. [ER60]. The

EXH. #5

one year time limitation began when judgment was entered. *Corn V. Guam Coral Co.*, 318 F.2d 622, 629 (9th Cir. 1963).

The Superior Court order (herein referred to as "the order" or "the SC order") gets around this time limitation by referring to the so-called "savings provision" of the Rule 60(b), which states: "This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided by law, or to set aside a judgment for fraud upon the court." The order concludes that since Bradshaw claims he was not personally notified as provided by law and because he claims a fraud upon the court, the fact that more than one year passed "does not limit the Court's ability to grant relief." [Order, p.7, l.22; ER 105].

There are several fallacies at work in this reasoning. First, it ignores pivotal language in Rule 60(b) that does, in fact, limit the power of the court. While the order emphasizes that part of the rule with the words "actually personally notified as provided by law," it completely ignores the language that says the power of the court is "to entertain an independent action." Here Bradshaw did not bring an independent action. Rather, he brought a motion in the context of the original action. This is not an unimportant distinction. This is a critical distinction.

The Advisory Committee notes to Federal Rule of Civil Procedure makes clear that two separate procedures are contemplated by Rule 60(b):

> Two types of procedure to obtain relief from judgments are specified in the rules ... One procedure is by motion in the court and in the action in which the judgment was rendered. The other procedure is by a new or independent action to obtain relief from a judgment, which action may or may not be begun in the court which rendered the judgment. ... In each case there is a limit upon the time within which resort to a motion is permitted, and this time limit may not be enlarged under Rule 60(b). If the right to make a motion is lost by the expiration of the time limits fixed in these rules, the only other procedural remedy is by a new or independent action to set aside a judgment...

[15]

EXH.
S

This important distinction was explained in more detail in *Bankers Mtg. Co. v. U.S.*, 423 F.2d 73 (5th Cir. 1970):

> Rule 60(b) contemplates two distinct procedures for obtaining relief from a final judgment. The first is by motion...This procedure is intended to completely replace the ancillary common law and equitable remedies of coram nobis, coram vobis, audita querela, bill of review and bill in the nature of bill of review, which are specifically abolished by this rule. The motion for relief from final judgment must be filed in the district court and in the action in which the original judgment was entered. No independent jurisdictional ground is necessary because the motion is considered ancillary to or a continuation of the original suit.
> .....
> The second procedure contemplated by Rule 60(b) is an independent action to obtain relief from a judgment, order, or proceeding. The first saving clause specifically provides that 60(b) does not limit the power of the court to entertain such an action. It is important to emphasize that "independent action," as used in this clause, was meant to refer to a procedure which has been historically known simply as an independent action in equity to obtain relief from a judgment. This action should under no circumstances be confused with *ancillary* common law and equitable remedies or their modern substitute, the 60(b) motion.

*Id.* at 77-78, (footnotes omitted). (Emphasis in original)

As one appellate court has observed: "Clearly, an 'independent action' is not a motion." *Giles v. Giles*, 37 P.3d 589, 601 (Haw. App. 2001). An independent action should not be filed in the original case, but filed separately, with a separate case number. *Id.*

The order notes: "CNMI courts consider the interpretation of counterpart federal rules to be highly persuasive in interpreting Commonwealth procedural rules." Order, p. 11, line 3-4, citing *Tudela v. Marinas Pub. Land Corp.*, 1 N.M.I. 179,184 (MP1990) [ER 109]. The *Tudela* case also states: "A basic principle of construction is that language must be given its plain meaning. When the language of a court rule is clear, we will not construe it contrary to its plain meaning." *Id.* at 185, citing *State v. Raper*, 736 P.2d 680 (Wash. App. 1987). The plain meaning of Rule 60(b) requires that in order for relief from a judgment on grounds of fraud be given to someone seeking it after one year from the judgment's entry, then it must be

done by bringing a new and independent action. This was not done here. Thus, the trial

court's order did not apply the correct law, thereby committing an abuse of discretion.

*Pangelinan v. Itaman*, 4 N.M.I. 114,118 (MP1994) (The trial court abuses it discretion and

may be reversed when it bases its decision on a clearly erroneous finding of fact, or if it does

not apply the correct law.)

B.  The correct standard to determine whether to grant relief under the independent action

clause of Rule 60(b) was not employed.

There is good reason to pay attention to the distinction made in Rule 60(b) between

motions and independent actions in equity. In *United States v. Beggerly*, 524 U.S. 38, 141

L.Ed.2d 32, 118 S.Ct. 1862 (1998) the U.S. Supreme Court explained that independent

actions must not be allowed to subvert the one year stature of limitations for Rule 60 motions:

> If relief may be obtained through an independent action in a
> case such as this, where the most that may be charged against
> the Government is a failure to furnish relevant information that
> would at best form the basis for a rule 60(b)(3) motion, the
> strict 1-year time limit on such motions would be set at naught.
> Independent actions must, if Rule 60(b) is to be interpreted as a
> coherent whole, be reserved for those cases of injustices which,
> in certain instances, are deemed sufficiently gross to demand a
> departure from rigid adherence to the doctrine of res judicata.

*Beggerly*, 524 U.S. at 46. The court concluded that "...under the Rule, an independent

action should be available only to prevent a grave miscarriage of justice." *Id.* at 47.

The Supreme Court of Vermont has addressed the scope of the clause: "the

independent action clause in Rule 60(b) simply preserves the historical authority of the courts

of equity to reform judgments in special circumstances. However, this catch-all provision is

available only when a ground justifying relief is not encompassed within any of the first five

classes of the rule." *Levinsky v. State*, 503 A.2d 534, 536 (Vt. 1985)(internal quotation marks

omitted.) As to the reason the power to grant relief is limited to "special circumstances," it

reasoned: "This power has been and must continue to be exercised guardedly, as it carries

with it an inevitable clash of two competing principles of judicial administration: the



EXH.
S

11

principle of finality and repose of judgments, which is so fundamental to our system of

justice, and the ultimate principle that justice must be done unto the parties." *Id.* at 536-37.

In order to preserve these principles, i.e. retaining some meaning to the one-year time

limitation in Rule 60(b)(1) through (3) and giving due regard for finality of judgments, courts

that have addressed the issue have uniformly set forth stringent parameters to sustain such an

independent action. The essential elements are:

> (1) a judgment which ought not, in equity and good conscience,
> to be enforced; (2) a good defense to the alleged cause of action
> on which the judgment is founded; (3) fraud, accident, or
> mistake which prevented the defendant in the judgment from
> obtaining the benefit of his defense; (4) the absence of fault or
> negligence on the part of defendant; (5) the absence of any
> adequate remedy at law.

*National Surety Co. v. State Bank, 120* F 593, 599 (8th Cir.1903); *Levinsky ,* 503 A.2d at 537;

*Bankers Mtg. Co,* 423 F.2d at 79; *Carteret Sav. & Loan Asso., F.A. v. Jackson*, 812 F.2d 36, 39

n.6 (1st Cir. 1987); *N.C. v. W.R.C.*, 317 S.E.2d 793, 797 (W. Va. App. 1984). These have been

termed "indispensable elements" required for an independent action in equity. *Humanetics,*

*Inc. v. Kerwit Medical Products, Inc.* 709 F.2d 942, 943 (5th Cir. 1983), quoting 11 Wright and

Miller, Federal Practice and Procedure §2868, at 238 (1973). [3]

*Middleton v. McDonald*, 388 F.3d 614 (8th Cir. 2004) upheld the denial of a Rule 60(b)

motion on the grounds of timeliness where the plaintiff sought in 2003 to set aside a

settlement and dismissal entered in 1999. In doing so, the plaintiff's request to avoid the time

limitations by having his motion construed as an independent action was addressed. In

denying the request, the opinion, pointing to the "heavy burden" entailed, said that in order to

have an independent action entertained the movant "must show that it would be manifestly

unconscionable to enforce the judgment." *Id.* at 618, quoting from *Griffin v. Fed. Deposit Ins.*

*Corp.*, 831 F.2d 799, 803 (8th Cir. 1987).

---

[3] This court recently quoted this five-part test laid out by the Eighth Circuit in 1903, noting
that it "is still viewed by some courts and commentators as a valid description of an
independent action." *Sullivan v. Tarope*, 2006 MP 11 P33.



*EXH. S*

Even if this had been an independent action seeking relief from the judgment, the trial court would have abused its discretion by failing to apply the correct law in that it did not apply the five elements set forth above, nor did it insist on Bradshaw showing that there was a grave miscarriage of justice or that enforcement would be unconscionable.

C.  The erroneous application of Rule 60(b) was prejudicial.

In support of his motion Bradshaw submitted three affidavits of his own testimony, three other affidavits and thirteen pieces of correspondence. [ER 60-98].   From the recitation of the factual and procedural background in the SC order, it appears that the Superior Court accepted the representations in those self-serving affidavits and accepted that the letters attached to the motion were genuine and presented all that was relevant to the issue.  For example, the SC order quotes Bradshaw's Answer to Plaintiff's Opposition of Vacate to the effect that Bradshaw maintained a business and was available to be served personally at the relevant times, accepting this representation as fact even though it is not even in the form of an affidavit, but was included in a what is a reply memorandum.  [Order p.10;ER 108].

Because Bradshaw sought relief by way of motion rather than in the form of an independent action, Bisom did not have the opportunity to cross examine Bradshaw on any of his representations, nor did he have the tools of discovery at his disposal to develop any evidence.  He was not able to determine, for example, whether there was other correspondence in the files of the Attorney General that Bradshaw was ignoring.  In the proper form of a separate case, he would have been able to do that.

In addition to evidentiary issues, an important aspect of such actions in equity is that "[i]ndependent actions may be barred through laches." *Sullivan v. Tarope*, 2006 MP 11 P33. "That doctrine serves as a bar when the party seeking relief has not exercised due diligence in presenting his claim or defense, and the opposing party has been prejudiced by such delay." *Lockwood v. Bowles*, 46 F.R.D. 625, 629 (D.C. D.C. 1969).  Bradshaw never explained why it took five years for him to bring this matter to court. Yet, the superior court's order does not

address this long delay in any way. Neither was there any opportunity for Bisom to demonstrate prejudice, which after five years could include such key items as the loss of witnesses, as well as the relocation of parties and counsel. In the context of an independent action, the factual basis for laches could have been developed and presented.

### II. THE TRIAL COURT'S CONCLUSION THAT BRADSHAW WAS NOT PROPERLY SERVED IS BASED ON A MISINTRPRETATION OF COM.R.CIV.P 4

A. The trial court ignored several applicable sections dealing with service of process of out-of-state defendants.

Service of process upon persons within the United States is governed by Com.R.Civ.P. 4(e), which provides, in pertinent part:

> Unless otherwise provided by Commonwealth law, service upon an individual...may be effected in any jurisdiction in the United States (including the Commonwealth);
> (1) in any manner proscribed or authorized by any law of the Commonwealth; or
> (2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

The SC order concludes that certified mail sent to Bradshaw was not effective because it "did not conform to 1996 Commonwealth Rules of Civil Procedure or the Washington State Rules of Civil Procedure." [Order p. 8; ER 106]   In arriving at this conclusion the trial court quotes Rule 4(e)(2), but does not quote, and, in fact, ignores the language in Rule 4(e)(1). Because that rule allows any manner of service authorized by "any law of the Commonwealth," that would include the manner proscribed in 7 CMC §§1102 and 1104.

Even though Bradshaw was no longer residing in the Commonwealth when this case was filed, he was nevertheless subject to the jurisdiction of the CNMI courts by virtue of 7 Commonwealth Code, Division 1, Chapter 1, Section 1102, our "so-called long-arm



EXH. S A S

statue." *See, Sirok v. Rotec Engineering*, 1 CR 1065, 1072 (D.C. N.M.I. 1984).  Because the events complained of by Bisom occurred in the Commonwealth while Bradshaw was present therein, there is no question but that personal jurisdiction over Bradshaw existed. 7 CMC § 1102 (1), (4), and (5).  In fact, in the four and a half years of litigation leading up to the trial, this issue was never contested.

Subparagraph (b) of section 1102 reads: "Service of process upon any person who is subject to the jurisdiction of the courts of the Commonwealth, as provided in this section, may be made as provided by 7 CMC § 1104, if the person cannot be found in the Commonwealth, with the same force and effect as if process had been personally served within the Commonwealth."   Section 1104(a) says, in pertinent part:  "When service of process is provided by 7 CMC §§ 1102 and 1103, service shall be made by leaving a certified copy with the Attorney General,...; provided, that notice of the service and a copy of the summons and of the complaint are served upon the defendant personally...; *or sent by certified or registered mail, postage prepaid, with return receipt requested, by the plaintiff or the plaintiff's attorney to the defendant.*" (Emphasis added).

The Order overlooks these statutes and rules completely.  Had the Superior Court taken cognizance of these provisions, it could not have concluded that CNMI law did not allow for service on defendants outside the Commonwealth by certified or registered mail.

B.  CNMI law regarding service on nonresident defendants does not require compliance with the service provisions of the statutes and rules of the state where the defendant is residing.

The SC order concludes that Bradshaw was not legally served by receipt of the packages with summons and complaint he saw and refused because the procedure employed did not comply with the specifications of service in the statutes and rules of the state of Washington, where Bradshaw was residing at the time. [Order, pp. 8-9; ER 106-107].

This conclusion is premised on the language in Com.R.Civ.P. 4(k): "All process may be served anywhere within the Commonwealth, and, when not prohibited by law, beyond the

21

EXH. A

territorial limits of the Commonwealth." The Order construes the phrase "and not prohibited by law" as meaning that the law of the state of the nonresident defendant must specifically allow the kind of service used in order for such procedure to be lawful. There are several problems with this construction of Rule 4(k).[4]

1. Legislative intent.

It is worth noting that no authority is cited in the SC order for this proposition. It is likely that none exists, as there is no incentive for any jurisdiction to place such a limitation on their methods of bringing persons who are charged with civil wrongs before their tribunals.

When interpreting a statute a court's objective is to give effect to the intent of the legislature. *In re Estate of Rofag*, 2 N.M.I. 18, 29 (MP 1991). The legislative purpose is expressed in the ordinary meaning of the words used. *Commonwealth Ports Auth. v. Hakobotan Saipan Enter. Inc*, 2 N.M.I. 212, 222 (MP 1991).

The legislative purpose of the Commonwealth's long-arm statute is expressly stated in 7 CMC §1102(e): "The legislature intends that jurisdiction under this section shall be coextensive with the minimum standards of due process as determined in the United States federal courts." Due to this language, it has been observed: "the very liberal language of Section 1102 clearly indicates that the intent of the statute was to expand the jurisdiction of the Commonwealth's courts to the extent permitted by the Due Process Clause of the Fourteenth Amendment." *Sirok*, 1 CR at 1075-1076.

Thus, since the stated purpose of the legislature was to maximize the reach of the long-arm statute, it would be antithetical to that end to suppose that the legislature wanted to

---

[4]   In footnote 2 of the SC order, it says that it appears that service would have been untimely, although dismissing the point as moot in light of the finding that that the mailings did not constitute service. [Order, p. 9, n.2; ER 107]. However, the Superior Court apparently overlooked the fact that when the second amended complaint was filed on May 30, 1997, an amended summons for Bradshaw was issued at the same time, making service in June, 1997 well within the 120 days allowed by Com.R.Civ.P. 4(m). Moreover, the case was removed to federal court by defendants on December 31, 1996 and not remanded to superior court until March 27, 1997. Since the superior court lost jurisdiction and its summons was no longer valid, that time is not be counted in the 120 days. See, *Bruley v. Lincoln Property Co.*, 140 F.R.D. 452 (D.C. Colo. 1991).

EXH. S

limit so severely the methods allowed to bring those over whom the courts have jurisdiction before those courts. It is much more in keeping with that stated intent to interpret Rule 4(k) to mean that service may be effected so long as it does not offend constitutional prohibitions.

2. Plain meaning.

Rules of procedure should be given their plain meaning, and the Supreme Court has said when that meaning is plain from looking at the words of the rule, it will not construe it differently. *Tudela*, 1 N.M.I. at 185. For example, this rule of construction was employed in *Mafnas v. Commonwealth*, 1 N.M.I. 400 (MP 1990) and the Supreme Court, in interpreting a rule of appellate procedure that allows briefs to be deemed filed when mailed, refused to read in a requirement that the mailing must be postmarked, even though the court saw merit to such a requirement. Nevertheless, it pointed out: "Clearly the rule does not expressly impose such a requirement." *Id.* at 403.

Likewise, here the wording "not prohibited by law" does not expressly mean that the nonresident defendant's state must specifically authorize the manner of service employed. The plain meaning is that this part of Rule 4(k) disallows a type of service of process only if the nonresident defendant's state has an express prohibition against any person within its borders being subjected to that kind of service. Although Washington may not authorize service of process by registered or certified mail for actions maintained within its borders, it has no "prohibition," as that word is used in the rule, against its use. In this instance, the Superior Court order interpreted Rule 4(k) as if it read: All process may be served anywhere within the Commonwealth, and, *when authorized by the other jurisdiction*, beyond the territorial limits of the Commonwealth.

Also, when one looks at the language in Rule 4(k) as a whole, it really addresses location—that is, the geographical reach of process; it does not really address the manner or method of service at all.



Exh. 5

3. Analogous case law.

The Federal Rules of Civil Procedure has similar wording, including the phrase "unless prohibited by law," in its provisions governing service outside the country. Fed.R.Civ.P. 4(f) provides for service on individuals outside the United States, which is incorporated into the rule for service on corporations.  The pertinent sections read:

> (f) Unless otherwise provided by federal law, service…may be effected in a place not within any judicial district of the United States:
> …
> (2) if there is no internationally agreed means of service…
> …
> (C)  unless prohibited by the law of the foreign country, by
> …
> (ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served.

In the recent case of *Polargrid LLC v. Videsh Sanchar Nigan Ltd.*, 2006 U.S. Dist. LEXIS 17531 (S.D.N.Y. April 7, 2006) this rule came under scrutiny when defendant, an Indian corporation, asserted that service by Federal Express courier on it was not effective because the law of India, which is not a signatory to any international agreement regarding service of process, does not recognize this method of service.  It argued that this service was "prohibited" within the meaning of Rule 4(f)(2)(C) since what is not an allowed method of service is, by implication, prohibited.  This argument was rejected by the court. "This interpretation of Rule 4(f)(2)(C)(ii) has been repeatedly rejected in favor of the view that the method of service specified in that rule is acceptable so long as such service does not actually violate the law of the country where service is attempted." *Polargird LLC* , at p. 6, citing, *Resource Ventures, Inc. v. Resources Mgmt. Int'l., Inc.*, 42 F. Supp. 2d 423, 430 (D. Del. 1999); *Dee-K Enterprises, Inc. v. Heveafil SDN.BHD*, 174 F.R.D. 376, 380 (E.D. Va. 1997).



EXH. S

### III. ~~THE FACT THAT~~ BRADSHAW PURPOSEFULLY AVOIDED MAIL SERVICE IS RELEVANT AND SHOULD HAVE BEEN CONSIDERED

While Bradshaw maintains he was not served, he does not deny that he received certified mail that in fact contained summons and complaint. He says in his affidavit of March 2, 2005: "In 1996 and again in 1997, I did receive two packages which were unidentified as to senders. They came via certified mail without any identification as to who their mailers were—although they did have a return post office box address. These two packages or mailings were returned to their senders by the post office as I will not willingly accept unidentified mailings from unknown party or parties." [ER 89]. Additionally, the affidavit of David Vanderholm, Bradshaw's previous postman, submitted as Exhibit "E" in support of the amended motion, says in its second paragraph that two brown envelopes from Saipan "were returned by the Elk Post Office as Mr. Bradshaw refused to accept them." [ER 97].

Plaintiff, in fact, sent two such envelopes with summons and complaint during May and June, 1997 to defendant at his address in Elk, Washington by certified mail, true copies of which were attached to Bisom's memorandum in opposition to the motion. They were returned unopened, stamped by the postal service as unclaimed. [ER 35-38].

The SC order found as fact that "Bradshaw clearly was avoiding service." [Order, p. 10; ER 108]. But the order concludes that because the manner of service was impermissible under CNMI and Washington law, it did not matter. As demonstrated above in section II, this is incorrect, as CNMI's long-arm statute specifically does allow for service by registered or certified mail, and whether Washington's law does or does not should not be determinative of effective service.

Several courts have addressed this issue and uniformly reject the argument that service can be avoided by simply refusing to accept one's mail, as Bradshaw did.

EXH. S

25

In *Merriott v. Whitsell,* 476 S.W.2d 230 (Ark. 1972), a non-resident defendant refused

to accept a Summons and Complaint sent by certified mail. The court said:

> We agree with appellant that one who is subject to the
> jurisdiction of the courts of this state under the act, cannot
> defeat the jurisdiction by the simple expedient of refusing to
> accept a registered letter. The avoidance of authorized service
> of proper process by a willful act or refusal to act on the part
> of the defendant would create an intolerable situation and
> should not be permitted.

*Id.* at 232.

In *Creadick v. Keller,* 160 A. 909 (Del. 1932), the court said:

> It is clear from the record that the plaintiff's failure to fully
> comply with the requirements of the statute was caused by the
> defendant's refusal to receive the letters and sign the receipt.
> Such refusal made it impossible for the plaintiff to file the
> return receipt with his declaration. It would create an
> intolerable situation if the defendant could, by his own willful
> act, or refusal to act, prevent the plaintiff from maintaining his
> action. It is a situation the Court cannot recognize.

In *Patel v. Southern Brokers, Ltd.,* 289 S.E.2d 642, 643 (S.C. 1982): "[W]e

think it can hardly be logically argued that one may avoid the process of the court by

merely refusing to accept a letter known to contain Summons and Complaint."; and

see, *Cherry v. Hefferman,* 182 So. 427, 429 (Fla. 1938) ("If defendant chooses to flout

the notice and refuse to accept it, he will not be permitted to say in the next breath that

he has not been served.")

While the Superior Court order does not deal directly with the overwhelming

weight of authority that holds that one can not choose not to be served by

registered/certified mail, it does say that even if he had been served by mail, federal

courts would not consider it completed service, citing cases dealing with service by

mail under the Federal Rules of Civil Procedure. [Order p. pp. 10-11; ER 108-109].

Here again, the SC order is on the wrong page. It refers to the "waiver of

service" provisions of Rule 4, which are also found in our Commonwealth Rules of

[26]

*Exh. 5A*
*S*

Civil Procedure, corresponding to the same federal rule. Com.R.Civ.P. 4(d).[5]  This

procedure is different in kind and intent from the service provisions in the long-arm

statute. Under Rule 4(d) service need only "be dispatched through first-class mail or

other reliable means." Rule 4(d)(2)(B). By contrast, when the mails are employed for

service under the long-arm statute, it requires registered or certified mail, return

receipt requested, with the filing of an affidavit attaching the signed return receipt

plus service of a certified copy of summons and complaint with the Attorney General.

7 CMC § 1104.

Most importantly, the waiver of service provisions are voluntary as far as a

defendant is concerned, calling for the cooperation of the defendant to effect service.

This is made clear in the 1993 Advisory Committee Notes:

> ..........
> This practice was introduced to the rule in 1983 by an act of
> congress authorizing "service-by-mail," a procedure that
> effects economic service with cooperation of the defendant.
> ........
> The former text described this process as service-by-mail.
> This language misled some plaintiffs into thinking that service
> could be effected by mail without the affirmative cooperation
> of the defendant. [citation] It is more accurate to describe the
> communication sent to the defendant as a request for a waiver
> of formal service.
> ..........
> ...Unless the addressee consents, receipt of the request under
> the revised rule does not give rise to any obligation to answer
> the lawsuit.[and] does not provide a basis for default
> judgment.....

---

[5]  The Order references Rule 4(c)(2)(C)(ii). [Order, p. 11; ER 109]. However, the 1993
amendments to Fed.R.Civ.P. 4 changed the subsections of the rule so that the substance of
subdivision 4(c)(2)(C) and (D) were included in the revised subdivision 4(d). See, 1993
Advisory Committee Notes to Fed.R.Civ.P. 4.

EXH. [5]

5

The cases cited and discusses in the SC order at footnote 5 are all cases that deal with Rule 4(d), formerly Rule 4(c)(2)(C),[6] and not with forms of service that do not depend on the voluntary cooperation of the person served, such as 7 CMC §1104.

There is, however, one federal case worth noting that is very close to this one on its facts. *Nikwei v. Ross School of Aviation, Inc.*, 822 F.2d 939 (10th Cir. 1987) was an appeal from a denial of a motion under Rule 60(b) to set aside a default judgment on grounds that the defendant had not been properly served. Service on the individual defendant, Babcock, had been done pursuant to Oklahoma's statute allowing service by certified mail with a request for a return receipt. However, the return receipt came back unsigned and marked "refused." After evidentiary hearings with witnesses, including Babcock's postal carrier, the district court found that either Babcock or his wife had refused the certified package delivered to their house. There was also evidence that "put Babcock on notice of the pending action, thereby making him inclined to refuse personal service of process." *Nikwei*, 822 F.2d at 943. In affirming, the circuit court cites and discusses several cases from around the country dealing with the refusal to accept certified or registered mail service. It notes that where delivery by mail has been refused by the addressee then returned to sender with that notation, "the almost unanimous line of authorities indicates that due process has been satisfied and the court has acquired personal jurisdiction of the defendant." *Id.* at 944-945, quoting Note, *Constitutional Law: The Validity of Service of Process by Mail When There is No Return Receipt: The Outer Limits of Due Process*, 25 Okla. L. Rev. 566, 567 (1972). "Thus, the courts view service by registered or certified mail as being complete when such is refused though the act of the defendant." *Nikwei*, 822

---

[6] The two cases from the Ninth Circuit cited in footnote 5 give table case citations, as both are unpublished opinions, not to be cited to or by courts of the circuit. Ninth Circuit Rule 39-3.



EXH. S.
S

F.2d at 945. The opinion quotes with approval this language from *Wax v. Van Marter*,

189 A. 537, 539 (Pa. Super. 1936):

> Such willful, artificial conduct...ought not to be rewarded
> with success. Fortunately, a good service does not depend on
> whether the signature of the defendant is on the return receipt,
> but rather on the reasonable probability that the notice reached
> him. Statutes are to be construed so as may best effectuate the
> intentions of the makers.

The same should be said here. The envelopes that Bradshaw returned

unopened are clearly identified as being from plaintiff's attorney, and he knew what

they contained. At this point in the litigation, he was well aware that the federal

claims had been dismissed and that plaintiff had refiled the case in Superior Court.

He should not be allowed to choose whether he is served or not when summons and

complaint had been properly sent by certified mail as authorized by statute.

## IV. DEFENDANT WAIVED ANY DEFECT OF SERVICE BY APPEARING THROUGH COUNSEL AND BY FAILING TO CHALLENGE SUFFICIENCY OF PROCESS

The Attorney General purported to act on behalf of Bradshaw as a defendant

on several occasions in this case. Thus, defendant appeared generally through counsel

in the following instances:

December 31, 1996 - Removal of case to Federal Court

June 26, 1997 - Motion for More Definite Statement, Motion to Require Bond

and Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim and

Insufficiency of Process. [7]

July 23, 1997 - Motion to Dismiss for Lack of Personal Jurisdiction and

Failure to State a Claim

---

[7]    The insufficiency of process argument was as to defendants Tan and CNMI only, not as to
Bradshaw.



December 16, 1997 - Notice of Substitution of Party Defendant (This substituted LaMotte for Bradshaw and Tan in their official capacities)

January 23, 1998 - Removal to Federal Court

June 3, 1998 - Appearance for Trial Setting

November 27, 1998 - Stipulation to extend time to Answer Complaint

In none of these appearances did the Attorney General ever indicate that Bradshaw was not represented by that office nor that service was defective. In fact, in the motion to dismiss, two of the claims that were challenged, the Sixth and Eight causes of action, were brought solely against Bradshaw in his individual capacity. In these the AG was clearly acting on behalf of Bradshaw personally.

The Superior Court's order concludes that these appearances did not constitute a waiver of objection to service of process despite expressly acknowledging that the AG filed motions under Com.R.Civ.P. 12(b) on Bradshaw's behalf but did not raise any objection to service of process, and noting that under Com.R.Civ.P. 12(h)(1) objection was required to be raised in order to avoid waiver. [Order, p. 12, n.6; ER 110]. It does this by examining the correspondence submitted by Bradshaw, noting the confusion it exhibits about whether he had been served or not and what to do about it, noting also that the AG failed to keep Bradshaw properly informed, then later withdrew as counsel, and it finds some support in the fact that the court later ruled that Bradshaw made no request for indemnity. Besides ignoring the plain meaning of Rule 12(h)(1) and disregarding it, there are some fallacies of fact and law in this reasoning.

Factually, although the Superior Court's order recites it [Order, p.14; ER 112], the record does not show that the AG ever withdrew as Bradshaw's counsel. It is correct that the AG, having taken the position that Bradshaw had not been served, did not file an answer on his behalf. In fact, the AG maintained that position even after

EXH. A

[30]

the trial judge ruled otherwise on February 7, 2000, still not filing an answer for Bradshaw, thereby allowing Bisom to request his default on February 14, 2000.

Despite this, in fact, the AG defended Bradshaw in the trial and afterwards. In part this is due to the fact that the AG represented the CNMI government and liability of the government on claims of breach of contract and wrongful termination were based on the acts of Bradshaw in firing Bisom. Thus, the AG's defense of the government was congruent with the interests of Bradshaw. And, because there was no way to separate out the facts of the other claims against Bradshaw as the evidence came in at trial, the AG, as a practical matter, defended him on those claims as well.

But the AG's efforts on Bradshaw's behalf even went further than that. After the verdict and entry of judgment, Bisom sought attorney's fees under 1 CMC §8153, a provision in the Political Coercion Statute. As noted in the order granting a portion of the fees requested, "only Bradshaw, in his individual capacity, was sued and found liable for political coercion." [Decision and Order filed June 7, 2000, p. 7; ER 57]. Yet, even though the C.N.M.I. government had no responsibility nor any exposure for paying any attorney's fee award, the AG challenged the application for attorney's fees on Bradshaw's behalf. [Decision and Order filed June 7 at pages 2, 4; ER 52,54]. These objections resulted in the fee award being reduced from the $83,020 requested to $33,078.28.

In terms of legal analysis, the SC order misses the mark by focusing on the actual authority of the AG vis-à-vis Bradshaw, when it is the apparent authority that really matters. After all, all of the correspondence that the SC order relies on to document the ambiguities of the relationship was between the AG and Bradshaw, and neither Bisom nor the trial judge was privy to them. It was the impression The AG and Bradshaw created rather than the dynamics between them that is important.

[31]

EXH. #
5

The scope of apparent authority of an attorney as to procedural matters is quite broad.

> The general employment of an attorney to prosecute or defend a cause or proceeding ordinarily vests in a plaintiff's attorney the implied authority to take all steps or do all acts necessary or incidental to the regular and orderly prosecution or management of the suit, and in a defendant's attorney the power to take such steps as he deems necessary to defend the suit and protect the interests of defendant, in so far as they affect only the remedy. By virtue of such employment the attorney also acquires, as to the courts and other parties or their counsel, the apparent authority to bind the client by taking all steps or exercising all powers that are ordinarily taken by, or conferred upon, attorneys in similar actions or causes. In proceedings before a court of record this apparent authority of an attorney is so broad, so far as the court and opposing parties are concerned, as to have been characterized as plenary in nature; and, in the absence of fraud and collusion, almost any act or omission in litigation which affects only the remedy or procedure will be treated as coming within his authority to bind his client, for the courts must deal with the parties as though they were actually present and acting in the persons of their attorneys. Otherwise stated, the authority of an attorney extends to the management of the case in all the exigencies which arise during its progress, and his broad authority in this connection cannot be questioned by the client because of the want of specific authority to do the act done or consented to, or because the attorney has in fact exceeded or violated instructions or limitations not communicated to the court or opposing parties or their counsel.

*Gasior* v. *Wentz,* 89 N.W.2d 886, 889 (N.D. 1958), quoting 7 C.J.S., Attorney and

Client, § 80, pp. 898-899.

"The appearance of an attorney is prima facie evidence of his authority to

appear in the cause, and his appearance for any purpose other than to specially attack

jurisdiction waives service of process, and constitutes a general appearance..." *In re*

*Grant*, 52 F.2d 223, 224-25 (M.D.N.C. 1931). "A general appearance or responsive

pleading by a defendant that fails to dispute personal jurisdiction will waive any

defect in service or personal jurisdiction." *Benny v. Piper*, 799 F.2d 489, 492 (9th Cir.

1986). The aforementioned procedures undertaken on behalf of and for the benefit



*Exh: 5*

of defendant Bradshaw effected a waiver of any defects there might have been in

serving him, if any there were.

### V. THESE ISSUES HAVING ALREADY BEEN HEARD AND DETERMINED, THE LAW OF THE CASE DOCTRINE APPLIES TO PREVENT GRANTING THIS MOTION

Before the jury trial began defendants filed their Motion to Remove Case from

Trial Docket. That motion was essentially based on the argument that Bradshaw had

not been served, and since he was central to the case, the matter should not go to trial,

but should go off calendar. Opposition was submitted and the motion was heard

before the trial was begun. The result was the Order Denying Motion to Remove

Case from Trial Docket filed February 22, 2000.[ER 42]. That order made specific

findings, including: that defendant Robert D. Bradshaw was properly served but

purposefully avoided service, that the Attorney General's office had appeared on his

behalf, and that he had previously waived any challenge to insufficiency of process.

[ER 43].

Courts are generally required to follow legal decisions of the same or a higher

court in the same case; this is the law of the case doctrine. *Wobol v. Villacruisis*, 4

N.M.I. 314, 318 (MP 1995), quoting *Camacho v. J.C. Tenorio Enters., Inc.*, 2 N.M.I.

407, 413-14 (MP 1992) (" Law of the case principles...are a matter of practice that

rests on good sense and the desire to protect both court and parties against the burdens

of repeated reargument by indefatigable diehards.")

The Superior Court order discusses Judge Castro's order of February 22, 2000

a couple of times [Order, p. 10, 11; ER 108,109], but disregards any "law of the case"

implications. This despite the fact that the issue was presented and briefed in Bisom's

opposition, including attaching a copy of the order to the opposition with a request to

take judicial notice of it pursuant to Com. R Evid. 201.

*EXH.*
*5*

/33/

> Under the "law of the case" doctrine, "a court is generally
> precluded from reconsidering an issue that has already been
> decided by the same court, or a higher court in the identical
> case." [citation]The doctrine is not a limitation on a tribunal's
> power, but rather a guide to discretion. [citation] A court may
> have discretion to depart from the law of the case where: 1)
> the first decision was clearly erroneous; 2) an intervening
> change of the law has occurred; 3) the evidence on remand is
> substantially different; 4) other changed circumstances exist;
> or 5) a manifest injustice would otherwise result. *Failure to*
> *apply the doctrine of the law of the case absent one of the*
> *requisite conditions constitutes an abuse of discretion.*

*Untied States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (citations

omitted)(emphasis added)

Judge Castro's February 22, 2000 order was not erroneous at all, and the SC

order does not attempt to make a case that it was. There was neither any intervening

change of law, nor other changed circumstances between 2000 and 2005. The

material evidence was the same, as Bradshaw's letter of July14, 1999 was presented

as part of the AG's motion to remove the case from the trial docket. [ER 29-34]. Both

judges came to the same conclusion, namely, that Bradshaw had been served by

certified mail, but had purposefully avoided accepting it. [Order, p.10; ER 108; Order

Denying Motion to Remove Trial from Trial Docket filed Feb. 22, 2000, ¶ 2; ER 43].

Perhaps the Superior Court felt that it would be unjust for Bradshaw to bear the

responsibility; but as can be seen, the Superior Court viewed the case through a prism

of distorted and misapplied law. In any event, the Superior Court's order fails to

explain its reason for overruling the prior findings. This failure is another abuse of

discretion.

## CONCLUSION

> "A basic tenet of statutory construction, …, is that a statute
> should be construed so that effect is given to all its provisions,
> so that no part will be inoperative or superfluous." If courts
> were free to pick to pick and choose what part of a statute
> or…regulation to rely on and what part to ignore, then the

/34/

*EXH. A*
*5*

courts—and not Congress ...--would, in effect, draft the law
as well as construe its meaning.

*Florez ex rel Wallace v. Callahan*, 156 F.3d 438, 443 (2nd Cir 1998), quoting

*Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 31 (3rd Cir. 1995).

By ignoring the need for an independent action required by Rule 60(b) and by

ignoring the provisions of the long-arm statute, the Superior Court's order applied law

quite different from what the legislature intended and the plain meaning directs to

reach the conclusion that defendant is entitled to relief from the judgment against him.

Likewise, the Superior Court order notes and acknowledges that by counsel making

motions under Rule 12 without challenging service of process of Bradshaw there is a

waiver of the defense of insufficiency of process, but then simply disregards the

waiver here.  The order finds as fact that Bradshaw clearly avoided the attempts to

serve him by certified mail, but excuses Bradshaw from that conduct, saying that it

did not matter, based on its incorrect assessment that service by certified mail was

prohibited.  Lastly, the order fails to give any deference to the prior rulings by the trial

judge, who surely was more intimately involved and familiar with the case. Thus, in

several respects the SC order constitutes an abuse of discretion.  The Superior Court's

order vacating judgment against Robert D. Bradshaw must be reversed and the

judgment reinstated.

Respectfully submitted,

Jay H. Sorensen
(CNMI Bar No. F0127)
Attorney for Appellant

EXH. A
5



29