JAY H. SORENSEN
Attorney at Law
4th Floor, Suite A
Horiguchi Building
P.O. Box 1184
Saipan, MP 96950
Tel. No. 234-1414
Fax. No. 234-1417

Attorney for Plaintiff

## IN THE SUPERIOR COURT
## FOR THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT A. BISOM, | ) CIVIL CASE NO. 96-1320 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **AFFIDAVIT OF PLAINTIFF** |
| | ) **IN SUPPORT OF MOTION FOR** |
| COMMONWEALTH OF THE | ) **PARTIAL SUMMARY JUDGMENT** |
| NORTHERN MARIANA ISLANDS, | ) |
| LEO L. LAMOTTE, CNMI Public | ) |
| Auditor, in his official capacity, | ) |
| ROBERT D. BRADSHAW, formerly | ) |
| appointed Temporary Public Auditor, | ) |
| in his individual capacity; | ) |
| SCOTT KHENG SHANG TAN, | ) |
| formerly CNMI Public Auditor, | ) Date: |
| in his individual capacity, | ) Time: |
| | ) Judge: |
| Defendants. | ) |
| ———————————————— | ) |

I, Robert A. Bisom, being duly sworn upon oath, hereby depose and state:

1. I am the plaintiff in this case. I submit this affidavit in support of the motion for

partial summary judgment. The information herein is of my own knowledge and I am

competent to testify as to these matters.

*Exhibit V*

1

2. I was hired as Legal Counsel for the office of Public Auditor for a two year term beginning April 4, 1993. A true copy of the employment contract is attached as Exhibit A.

3. In late November, 1993 I learned that the term of office of the Public Auditor, Scott Tan, had expired on November 25, 1993, and that Robert Bradshaw had been appointed by Lorenzo I. De Leon Guerrero, then Governor, who had been defeated in his bid for re-election earlier that month. The Governor's term of office expired on January 10, 1994, when the administration of Froilan Tenorio took office.

4. On the first day in which Mr. Bradshaw was in office, Monday, November 29, 1993, he held a meeting with most of the staff of the Public Auditor's office. He told us that the thing that he was principally hired to do was to push through and complete the government-wide audit for Fiscal Year 1993, which ended September 30, 1993, and that he wanted to have it completed within 3 to 4 weeks.

5. I was out of the office on Wednesday, December 1, 1993 through Friday, December 3, except for a brief period when I turned in keys to the government vehicle that I had been using, which I had been told to do by Mr. Bradshaw. This was due to leave I had previously arranged for and had approved. During that time I went to Guam to see a doctor regarding some surgery I had done.

6. During the next week there were delivered to me a series of letters from Mr. Bradshaw. Among these was a letter dated December 3, 1993 in which I was directed to turn over all of the files I had in my possession to him, not to make or receive phone calls in the office without prior permission from Bradshaw, not to talk to anyone outside OPA in my official capacity, to turn over my file keys and to refer all matters to him or the office

EXHIBIT
V

administrator or chief auditor.  (Attached as Exhibit B).

7.  Also included in the letters received was one dated December 6, 1993 notifying me that my employment was terminated "without cause" effective thirty days thereafter. (Exhibit C).

8.  Another of the letters delivered to me was one dated December 7, 1993 wherein I was advised in writing that I had been removed from my office space and had been given a workspace at a table in "the administrative area" of the office.  It also instructed me to turn over all my keys.  A copy is attached as Exhibit D.  When I went into the office on the morning of Tuesday, December 7, 1993 I saw that this had already been done.

9.  Because of the restrictions placed on me by the terms of the December 3 letter (Ex. B) and because Mr. Bradshaw had taken away my office and relegated my workspace to a table in a hallway where there was no privacy and no way to work on confidential matters, (which had been a major part of my duties as legal counsel), I could no longer do my job. Because of this and because I had been previously told I could use my annual leave during the month of December by Scott Tan, and later by Mr. Bradshaw, I did not report back to work during the remainder of the time Mr. Bradshaw was in office.

10.  Later on, some additional letters from Mr. Bradshaw were delivered to me, including one dated December 28, 1993, which changed the termination of my employment to one "with cause", citing the grounds for doing so, and giving the effective date as seven days thereafter.  (Exhibit E hereto).

11.  During this timeframe there appeared in one of the newspapers in circulation in Saipan, the *Pacific Star*, the charges that Mr. Bradshaw leveled at me in several of the letters

EXHIBIT
V

3

he wrote to me, which are referred to in the December 28 termination letter, and were attached thereto. Among the acts of wrongdoing he charged me with, which are reflected in the published documents, are: (1) disclosing matters that are confidential in violation of the Commonwealth Code; (2) disclosing matters that were, according to him, confidential communications to legal counsel, in violation of the Model Rules of Professional Conduct; and (3) using a government vehicle in violation of CNMI law and regulations. Also included in the publication was his statement that he was going to file an ethics complaint against me with the bar association for having violated Commonwealth laws. A copy of the applicable portions of the *Pacific Star* issue of December 24, 1993 is attached as Exhibit F.

12. Mr Bradshaw, in fact, by letter of December 10, 1993 lodged a complaint with the Disciplinary Committee of the CNMI Bar Association based essentially on the same things he listed in the letter of December 28, 1993 terminating my employment for cause. After an investigation that took a year to complete, the committee found that none of the complaints had any legal or factual basis.

13. A later article in the January 14, 1994 issue of the *Pacific Star* reiterated these charges by Mr. Bradshaw, which were included in a quote from him. (Exhibit G).

14. After the departure of Mr. Bradshaw and the change in the administration, Scott Tan was appointed as Temporary Public Auditor. Despite prior and new assurances from him that I would be re-hired or that my termination would be rescinded, that never happened. However, for a period of three days, at the request of Scott Tan, I did go back to work at OPA on administrative matters, but not as Legal Counsel, due to issues about whether I could act as an attorney under the circumstances. This request is documented in a

EXHIBIT
V

memorandum from Mr. Tan, dated January 17, 1994, a copy of which is attached as Exhibit H. I accepted Mr. Tan's request and worked for three days during January, 1994. I fully expected to be paid for the work I did.

15. At no time was I ever given any hearing on whether cause existed for my termination, nor on whether I had committed acts that reflected on my honesty and integrity as a government employee and as an attorney.

16. As a result of these events it became generally known throughout Saipan that I had been fired for reasons that included violations of law and of legal ethics, and that I had a disciplinary complaint pending against me. This had a devastating effect on my ability to find other employment.

_____
ROBERT A. BISOM

SUBSCRIBED AND SWORN to before me on this _____ day of _____, 1999.

_____

[ Original acknowledged signature will be provided as soon as available before hearing]

I hereby certify that the foregoing hereof is a true and correct copy of the original on file in the office of the Clerk of Court, Saipan, Mariana Islands.

Dated: __OCTOBER 31, 2005__

CLERK OF COURT
NORTHERN MARIANA ISLANDS
SAIPAN, MP 96950

EXHIBIT
V

COMMONWEALTH    THE NORTHERN MARI.    ISLANDS

EXCEPTED SERVICE EMPLOYMENT CONTRACT    **DFR-93-**

EXECUTIVE BRANCH    **073**

Agency:

Amendment No. _____

CONTRACT NO: __300 7C__
__45115__

Contract for personal services is entered into between the COMMONWEALTH OF THE NORTHERN MARIANA _____ hereinafter referred to as "EMPLOYER" and ____ROBERT A. BISOM____ hereinafter referred to as "EMPLOYEE".

EMPLOYER requires the services of a qualified ____GENERAL COUNSEL   Legal counsel__

_____ . PD = _____

requirements of this position are stated in the attached Job Description, which both the EMPLOYER and the EMPLOYEE have read and understand. The EMPLOYEE hereby states that he/she possesses the necessary degree of skill, training, and knowledge to fulfill the obligations specified in the Job Description. The EMPLOYEE shall be _____ on the island of ____SAIPAN_____ ___ Office/Agency/Department of ____OFFICE OF THE PUBLIC AUDITOR_____

_____

Contract is for a two-year period beginning on the _____9th_____ day of ____APRIL_____ _____ and shall continue until the ____9th____ day of ____APRIL____ __ 19 __

EMPLOYER agrees to pay the EMPLOYEE an annual salary of $ __45,000.00_____ in bi-weekly _____ . The total government obligation is not to exceed $ __45,000.00____ . The _____ base salary of EMPLOYEE was $ __45,000.00____

EMPLOYER and the EMPLOYEE agree that the terms and conditions of this contract include all the provisions

EXHIBIT A

*EXHIBIT V*

6.

Personnel Office

ereby certify that the service contracted for qualifies as Excepted Service under 1 CMC Section 8131 of the Commonwealth Code.

Norbert A. Sablan

_____    _____
:::  2.2.'93                      NOBERT S. SABLAN, ACTING
                                      PERSONNEL OFFICER

I. Department of Finance

hereby certify that there are sufficient funds available for Account No. _____1090/6111_____ for the execution
this contract in the amount of $ __45,350.70__ tax 🖋
                                1090 - 211090

_____         _____
atc:  3/27/43                              ENON E / INOS
                                           DIRECTOR OF FINANCE

V. Attorney General

hereby certify that this contract has been numbered, reviewed and approved as to form and legal capacity.

TS hei Wan AAg

_____    _____
Date:  3/25/43                     ROBERT C. NARAJA
                                      ATTORNEY GENERAL

V. Signatures of Parties

_____    _____
S:ate  3/29/93                     LORENZO I. DE LEON GUERRERO

                                                          EXHIBIT
                                                             V

7.

# CONDITIONS OF EMPLOYMENT

The following are conditions of every Excepted Service contract. The employee must read these terms before signing the contract. The signing of the contract will show assent to each and every one of the terms set out below.

**PRE-EMPLOYMENT CONDITION STANDARDS:**

   A. The Employer requires that all persons appointed to the Excepted Service be certified as physically capable of performing the duties of the position. They must be free from communicable diseases and any present or potential medical condition which would be detrimental to successful performance of duty or the health of other Employees, or reflect discredit upon the Employer.

   B. The Employee shall be examined by medical personnel authorized by the Employer to conduct such examinations for employment purposes, and the results shall be recorded on forms prescribed by the Personnel Officer.

**EXCEPTED SERVICE REGULATIONS:**

The Employee shall comply with the Excepted Service Regulations promulgated by the Civil Service Commission pursuant to 1 CMC §8117.

**COMPENSATION AND WORK SCHEDULE:**

   A. The Employee shall earn his salary on the basis of a twelve month (12) work year consisting of twenty-six (26) bi-weekly pay periods. In cases of early termination, the gross pay is reduced by the period in which no service is rendered.

   B. **Overtime:** The Employer's workday and workweek may vary from time to time according the needs of the Government. Every effort will be made to maintain a reasonable five (5) day, forty (40) hour workweek. Pursuant to Public Law 1-20, §5(b) any excepted service employee is considered executive, administrative or professional personnel. Therefore, an excepted service employee does not qualify for overtime or standby rates of pay.

**MANDATORY PARTICIPATION IN RETIREMENT FUND:** Public Law 6-17. The NMI Retirement Fund Act of 1988, and as amended by Public Law 6-41, requires mandatory participation in the Retirement Fund for all government employees.

   A. Employees who were members of the Fund before May 7, 1989, are Class II members. These members have the option of transferring to Class I members at anytime. The contribution rate for Class II members is 9% of gross wages.

   B. Employees hired on or after May 7, 1989 and employees who opted not to join the Retirement Fund before May 7, 1989, are Class I members. These employees contribute 6.5% of gross wages to the Retirement Fund:

     1) Class I members hired before January 19, 1990, having less than three (3) years of vesting service credits with the Retirement Fund, will be eligible for refund of their contribution including interest, upon separation from employment.

     2) Class I members are not entitled to a refund after three (3) years of vesting service

     3) Class I members having three (3) or more years of vesting service credits have a vested right to a pension upon attaining age sixty-two (62) or meeting normal retirement eligibility.

**LEAVE:**

   A. **Annual Leave:** Annual leave shall accrue to the Employee at the rate of __eight__ 5 hours per pay period.

     1) The Employee employed in the first year of the Contract shall be entitled to use of annual Leave only after having been employed for a continuous period of ninety (90) days

*EXHIBIT*
*V*

without a break in service.

(2) Annual Leave may be used only upon prior written approval of the Employee's immediate supervisor.

(3) The Employee who terminates his employment at the completion of the present employment contract or resigns, and is departing the duty station on final separation, will receive on the next regular pay day a lump-sum payment of all unused annual leave at the current hourly rate, based on twenty-six (26) bi-weekly pay periods and 2,080 hours in a work-year, provided the necessary documents of clearance are received by the Northern Mariana Islands Payroll Office.

    (a) Where an offer and acceptance for a new period of employment is agreed upon under a new employment contract, all accrued and unused Annual Leave credits from the prior contract may be paid immediately or carried over, at the election of the Employee.

B  Sick Leave:  Sick Leave shall accrue to the Employee at the rate of four (4) hours per pay period.

  (1) The Employee is entitled to use Sick Leave from the time Sick Leave is first earned.

  (2) Any absence on sick leave where the Employee misses more than three (3) continuous days of work must have the illness verified by a note from a medical doctor in order to claim Sick Leave.

  (3) Upon completion of the present employment contract or termination of employment, whichever occurs first, no payment will be made for accrued and unused Sick Leave credits.

  (4) Where an offer and acceptance for a new period of employment is agreed upon under a new contract, all accrued and unused Sick Leave credits from the prior contract will be carried over.

  (5) If the Employee's supervisor believes the Employee is misusing Sick Leave, or requesting Sick Leave for purposes other than illness, the supervisor may request proof of illness for periods of less than three days. If the proof is not provided, or is unpersuasive, the supervisor may deny the request for Sick Leave.

  (6) Sick Leave may be accumulated without limit.

C  Leave Without Pay:  Leave Without Pay may be taken only after obtaining the written approval of the Employee's immediate supervisor.

D  Administrative Leave With Pay:  Administrative Leave With Pay is granted only in exceptional circumstances such as typhoons and state funerals, by the Governor.

E  Holidays:  The Employee shall be released from work on all legal holidays, except during emergencies, without loss of pay or charge to leave account.

F  Advance Leave:  Where for good reason, the Employee requires an advance of Annual or Sick Leave, the Personnel Officer may grant leave in advance up to a maximum of one-half (1/2) of the total earnable leave credits for one (1) year from the date the request is approved or for the remainder of the employment contract, whichever is shorter.

6. HOUSING

A  The Employee shall receive either free government housing or a housing allowance.

  1) Employees with dependents shall receive family government housing or a housing allowance of $600 per month, at the discretion of the Personnel Officer.

  2) Employees without dependents shall receive a government apartment or a housing allowance of $400 per month, at the discretion of the Personnel Officer.

  3) The Personnel Officer may, upon recommendation by the department head, increase the housing benefits of the Employees.

  4) Government housing, if provided to the Employee, shall be in habitable condition.

B  If government housing is unavailable and private housing has not been arranged for the Employee, the Employer shall pay a temporary lodging allowance to the Employee equal to the government's established per diem rate for travel at the duty station. When the Personnel Officer has determined that this rate is insufficient to pay for temporary lodging and meals,

9.

*EXHIBT*

*V*

then a greater allowance may be authorized for the Employee.

C. Responsibilities:

  (1) The Employee is responsible for utility and trash collection costs.

  (2) The Employer is responsible for repairs to government housing or a government apartment.

  (3) The Employee is responsible for returning government premises and furniture/appliances to the Personnel Officer at the termination of his contract of employment, in a similar condition as that at the beginning of his occupancy of government housing, ordinary wear and tear excepted. The Employee will be assessed a Deposit Fee payable to the government within forty-five (45) days subsequent to his occupancy of government housing, to cover the cost of any damage to premises and/or furniture/appliances, or excessive cleanup. Deposit Fees shall be $400 for employees without dependents. and $600 for employees with dependents. At the termination of the employee's contract. and subsequent to the packing and removal of the employee's belongings for shipment. the Personnel Officer, or his designee, shall inspect the premises. If no repairs or cleanup are required by the government. the employee's deposit shall be refunded in his final payroll check. The Deposit Fee requirement applies only to employees recruited subsequent to July 1, 1983.

  (4) The Employee is responsible for taking reasonable action to protect government housing entrusted to the Employee from damage caused by a storm.

  (5) The Employee shall comply with any housing regulations promulgated by the Personnel Officer.

D. Government housing is intended for the use of the Employee and the Employee's dependents. No person who is not a dependent may remain in government housing for more than thirty days unless it is approved, in writing, by the Personnel Officer.

E. Housing benefits apply only to Excepted Service Employees whose point of recruitment is outside the Commonwealth of the Northern Mariana Islands, unless the Governor directs otherwise and housing is provided for in the special terms section of this contract.

F. No employee whose contract is terminated or has expired shall remain in the quarters provided after that termination or expiration unless it is approved by the Personnel Officer upon request of the appointing authority.

JOB DESCRIPTION:

A. In order to be a valid and binding agreement. this contract (unless it is for renewal) must have attached a detailed job description of the Employee. a complete employment application and other pertinent documents such as a college transcript.

EXPATRIATION AND REPATRIATION:

A. Travel:  Travel and transportation expenses shall be paid by the Employer as follows:

  (1) Coach or tourist-class air transportation costs by the shortest direct route for the Employee and the Employee's dependents from the point of recruitment to the duty station.

  (2) Perdiem for the Employee only, at established Government rates not to exceed necessary travel time by the shortest direct route from the point of recruitment to the duty station. in accordance with U.S.G.S.A Federal Travel Regulations.

B. Transportation of Personal Effects:

The Employer shall pay the expense of transportation of personal effects. as follows:

  (1) Employer shall pay the cost for shipment of two hundred (200) pounds to be shipped by air from the place of recruitment to the duty station for Employees who have dependents.

  (2) The Employer shall pay the cost for shipment of one hundred (100) pounds to be shipped by air from the place of recruitment to the duty station for Employees who have no dependents.

C. Upon request by the appointing authority and approval by the Personnel Officer. shipment and storage of household goods and personal effects may be authorized for positions that are

3

10.

*EXHIBIT*

*V*

considered to be hard to fill. This authorization shall be limited to the ...wing:

1) Shipment by Sea:

  (a) The Employer shall pay the cost for one shipment of household goods and personal effects, at the time of recruitment not to exceed 3,000 pounds net weight from the Employee's point of recruitment to his duty station in the case of Employees with dependents.

  (b) The Employer shall pay the cost for one shipment of household goods and personal effects, at the time of recruitment not to exceed 1,500 pounds net weight from the Employer's point of recruitment to his duty station in the case of Employees without dependents.

  (c) The shipment must originate within six (6) months of the date of entry on duty, unless extended by the Personnel Officer for just cause. In the event temporary storage of household goods and personal effects intended for shipment to the duty station is necessary at the point of recruitment after pick-up by the carrier and prior to departure by sea, the government shall pay the cost of such temporary storage.

  (d) Only those items may be shipped which are not restricted by Commonwealth or Federal Regulations. Household goods and personal effects means personal property which can be transported legally in interstate commerce and which belongs to an employee and his immediate family at the time shipment or storage begins. The term shall include household furnishings, equipment and appliances, furniture, clothing, books and similar property. It shall not include property which is for resale or disposal rather than for use by the employee or members of his immediate family. It shall not include such items as automobiles, station wagons, motorcycles and similar motor vehicles, airplanes, house trailers, camper trailers, boats, pets, explosives, inflammables such as matches, cleaning fluids, photo flash bulbs, fireworks, firearms, property belonging to any persons other than the employee or his immediate family, or any property intended for use in conducting a business or other commercial enterprise.

2) Storage:  The Employer shall pay the expense for storage of household goods and personal effects at the point of recruitment for the Employee not to exceed:

  (a) two thousand (2,000) pounds net weight in the case of Employees with dependents.

  (b) one thousand (1,000) pounds net weight in the case of Employees without dependents. and

D  Repatriation:  Upon completion of the agreed upon period of service under this contract or any subsequent excepted service contract entered into upon the expiration of this contract, the Government shall pay all return travel and transportation expenses to the point of recruitment, to the same extent and subject to the same limitations as enumerated in sections 8(A) and 8(B), and if authorized Section 8(C), shipment of household goods and personal effects subject to the conditions of Section 8(C), and limited to the actual weight shipped upon recruitment. However, the Employer will be discharged of this responsibility if repatriation expenses are not incurred within one (1) year of the termination date.

1) Check-out:  Before repatriation benefits are afforded and the final paycheck is issued, the Employee must obtain signatures from the Departments of Finance, Public Works, the Commonwealth Utilities Corporation, Public Health, and Personnel Officer as evidence that the Employee has no outstanding debts owed to the Government.

2) Early Termination of Contract:  "Early termination" occurs where an Employee refuses to perform duties, fails to perform at work satisfactorily, resigns, is removed for cause or willfully vacates his position.

  (a) If the Employee terminates the contract within the first year, then there will be no repatriation benefits and the Employee must repay the cost to the Employer of the Expatriation benefits enumerated in sections 8(A), 8(B) and 8(C), and other costs paid by Employer related to recruitment.

  (b) If the Employee terminates the contract after completing one year of service, then there will be no repatriation benefits, but the Employee does not have to repay the expatriation benefits enumerated in sections 8(A), 8(B) and 8(C).

*EXHIBIT V*

11.

(E) Home Leave Eliminated: Excepted service employees who are initially hired after July 1, 1983, shall not be entitled to home leave benefits upon renewal of their contract. Any employee who receives repatriation benefits upon expiration or termination of a contract shall not be eligible for expatriation benefits under a new contract within six (6) months of that expiration or termination.

9. OUTSIDE EMPLOYMENT: The Employee may provide services to persons other than the Employer only if:

(A) the Employee receives the prior written approval of the Employee's immediate supervisor, and

(B) the outside employment is not, nor does it appear to be, adverse to the interests of the Government.

10. INSURANCE:

(A) Workmen's Compensation: In the event of on-the-job related injury or illness, the Employee shall be entitled to benefits under the Workmen's Compensation Insurance Contract in force for the Northern Mariana Islands Government. The Employee is responsible for reporting any on-the-job work related injury or illness to the Employee's supervisor as soon as possible.

(B) Health & Life Insurance: Group Health and Group Life Insurance coverage is available for those who wish to apply. The Government will pay part of the cost of this insurance, in accordance with the agreement between the Northern Mariana Islands Government and the insurance carriers.

(C) Limitation on Insurance: The Employee is advised that the Government provides no insurance except that referred to in paragraphs A and B above, and the Government assumes no liability for loss or damage in the circumstances set out below. The employee is responsible for insurance coverage, including but not limited to the following:

(1) For household goods and personal effects of the Employee or his dependents in transit from point of recruitment to the Northern Mariana Islands and in transit from the Northern Mariana Islands to another point of the Northern Mariana Islands.

(2) For household goods and personal effects of the Employee and dependents in temporary storage at the expense of the Government if authorized under Section 8(C).

(3) For household goods and personal effects of the Employee and dependents located in housing furnished by the Government or otherwise present in the Northern Mariana Islands.

11. EMPLOYEE'S DEPENDENTS: The Employee's dependents are defined as spouse, children including step-children and legally adopted children), unmarried and under twenty-one (21) years of age, or physically or mentally incapable of supporting themselves regardless of age, wholly dependent parents of the Employee and/or spouse, or children by a previous marriage for whom the Employee or his spouse has legal custody. Children by a previous marriage who are primarily domiciled by Court Order in other than the Employee's household, are not considered dependents. With respect to the foregoing, if a member of the immediate family reaches his twenty-first (21st) birthday while the Employee is assigned to duty in the Northern Mariana Islands, such member will be returned to the Employee's point of recruitment at the Government expense.

12. ADDITIONAL TERMS AND CONDITIONS: Upon mutual agreement of the Employer and Employee, and approval by the Personnel Officer, placed in writing and attached to these conditions of employment, further terms may be added to this contract to the extent that they are not inconsistent with and in no way purport to amend these conditions of employment.

13. RENEWAL OF THE CONTRACT:

(A) This contract is not automatically renewable, nor does it create any option to renew the contract.

(B) It is wholly within the discretion of the Employer whether an offer to renew the contract

EXHIBIT
V

(r.

should be made to the Employee. The Employer has no obligation t     ⁄ide the Employee advance notice of termination of employment upon completion of this contract.

(C)  If the Employer decides not to offer a new period of employment and not to execute a new employment contract, that decision cannot be repealed, regardless of the reason, if any, for the decision.

14.  EARLY TERMINATION AND RESIGNATION:

(A)  Gubernatorial Appointees:

(1)  Any Employee who is an appointee of the Governor serves at the pleasure of the Governor and may be terminated by the Governor without cause and without prior notice.

(2)  In order to terminate employment by resignation, an Employee who is a gubernatorial appointee must first give sixty days notice. The Governor may waive this requirement of advance notice.

(B)  Other Excepted Service Employee:

(1)  The Employer may terminate the Employee without cause upon notice sixty days in advance of termination of employment. This may be shortened only by placing a lesser number in the following blank space: _30 days_ .

(2)  The Employer may terminate the Employee with cause upon notice seven days in advance of termination of employment.

(3)  When resigning, the Employee must give notice sixty days in advance of termination of employment. This time may be shortened only by placing a lesser number in the following blank space: _30 days_ . The director of the Employee's department may waive this requirement of advance notice at the time of resignation.

I have read the terms and conditions of these Conditions of Employment and understood them. By my signature I agree to abide by them as part of the terms and conditions of my employment.

Date: _4/28/93_

_____
NORBERT S. SABLAN
PERSONNEL OFFICER

Date: _6-19-93_

_____
Robert A. Bisom
NAME:          EMPLOYEE

_____
Kyoto, Japan
POINT OF RECRUITMENT

EXHIBIT
V



**Office of the Public Auditor**
**Commonwealth of the Northern Mariana Islands**
P.O. Box 1399
Saipan, MP 96950

Tel: 234-6481-2/866
Fax: 234-7812
Cable Address:
Pub Aud NMI Saipan

December 3, 1993

Mr. Robert A. Bisom
Legal Counsel
Office of the Public Auditor
P.O. Box 1399
Saipan,  MP  96950

Dear Mr. Bisom:

Effective immediately, any work you do at this office will be under my direct, personal supervision.

You are not to leave this office or contact anyone about this office without my personal approval.  In my absence (1) Merlinda and (2) Dolores will act for me in granting such an approval.

If anyone contacts you about this office and work, you will immediately refer them to (1) me, or (2) Merlinda, or (3) Dolores in this order depending on our availability.

If you have in your possession presently any records, documents or correspondence (beyond US/CNMI laws and regulations) pertaining to this office, you are to turn them over to (1) Merlinda (if they pertain to the work of this office) or (2) Dolores (if they pertain to administrative matters) and brief them on their turnover and any work needed on them.  If you have any office or file keys I want them turned in immediately to Dolores (or Dora in her absence).

Effective immediately, you have no authority to act for me or this office in contacts with outsiders without my prior approval.

In the conduct of this office, (1) Merlinda and (2) Dolores have the authority to speak for me when I am not here.

EXHIBIT B

14.

If you believe any of these instructions violate your constitutional rights or your contract with this office, please advise me and I will discuss it with you for resolution.

Thank you.


Yours very truly,


Robert D. Bradshaw
Temporary Public Auditor


EXHIBIT
V



# Office of the Public Auditor
## Commonwealth of the Northern Mariana Islands
### P.O. Box 1399
### Saipan, MP 96950

Tel: 234-6481-2/86c
Fax: 234-7812
Cable Address:
Pub Aud NMI Saipan

December 6, 1993

Mr. Robert A. Bisom
Legal Counsel
Office of the Public Auditor
P.O. Box 1399
Saipan,  MP  96950

Dear Mr. Bisom:

Under the terms of paragraph 14(B)(1) of your Excepted Service
Employment Contract with this office, official notice is hereby
given that you are being terminated "without cause" from your
position today to take effect thirty days from now on January 5,
1994.

Thank you.

Yours very truly,

Robert D. Bradshaw
Temporary Public Auditor

EXHIBIT C  *EXHIBIT*
*V*

16.



# Office of the Public Auditor
## Commonwealth of the Northern Mariana Islands
### P.O. Box 1399
### Saipan, MP 96950

Tel: 234-6481-2/866
Fax: 234-7812
Cable Address:
Pub Aud NMI Saipan

December 7, 1993

Mr. Robert A. Bisom
Legal Counsel
Office of the Public Auditor
P.O. Box 1399
Saipan, MP 96950

Dear Mr. Bisom:

Please be advise that in my review of the physical facilities at OPA, I have found that I need the office you are occupying for another employee and the sensitive work she is doing.

Therefore, it will be necessary for you to move to a work table in the administrative area and section of OPA. Your typewriter has already been moved.

Additionally, I want all of the keys you have for this office turned into Dolores immediately. If you have any questions or concern over this, please advise me in writing.

Thank you for your cooperation.


Yours very truly,

Robert D. Bradshaw
Temporary Public Auditor


EXHIBIT D

EXHIBIT
V

17.



**Office of the Public Auditor**
**Commonwealth of the Northern Mariana Islands**
**P.O. Box 1399**
**Saipan, MP 96950**

Tel: 234-6481-2/86
Fax: 234-7812
Cable Address:
Pub Aud NMI Saipa

December 28, 1993

Mr. Robert A. Bisom
Legal Counsel
Office of the Public Auditor
P.O. Box 1399
Saipan, MP 96950

Dear Mr. Bisom:

This letter is to officially inform you that the Office of the
Public Auditor is terminating your employment as Legal Counsel
effective seven days from the date your receive this letter. This
action is being taken pursuant to Part I.9.B of the Excepted
Service Personnel Regulations and Section 14(B) (2) of the
Conditions of Employment (part of your Excepted Service Contract)
which you signed on April 18, 1993.

The general/specific reasons for initiating this action are due to
the following:

1. Your abandonment of your job on or about December 1, 1993
   (see attached letter - Exhibit A).

2. Your refusal to respond in writing to the following letters
   addressed and delivered to you and/or your attorney Mr.
   Richard Pierce - as follows:

        a. letter to Mr. Bisom dated 12/2/93 (exhibit F)
        b. letter to Mr. Bisom dated 12/2/93 (exhibit C)
        c. letter to Mr. Bisom dated 12/2/93 (exhibit D)
        d. letter to Mr. Bisom dated 12/3/93 (exhibit E)
        e. letter to Mr. Bisom dated 12/3/93 (exhibit F)
        f. letter to Mr. Bisom dated 12/3/93 (exhibit G)
        g. letter to Mr. Bisom dated 12/3/93 (exhibit H)
        h. letter to Mr. Bisom dated 12/6/93 (exhibit I)
        i. letter to Mr. Bisom dated 12/7/93 (exhibit J)
        j. letter to Mr. Bisom dated 12/10/93 (exhibit K)
        k. letter to Mr. Bisom dated 12/23/93 (exhibit L)

EXHIBIT. E

EXHIBIT V

18.

3. Your unauthorized disclosure of confidential information from this office, in possible violation of P.L. 3-91 and P.L. 8-11.

4. Your disclosure of privileged information given to you as Legal Counsel for this office.

5. Your acts to ostensibly be on "sick leave" and/or having medical attention on Guam all the while you have been taking care of personal business and contacting people on Saipan.

6. You were absent from this office without an authorization on November 30, 1993 from 12:30 p.m. to 2:30 p.m.

7. Your use of a government automobile for personal reasons and your continued use of it after I pointed out your possible violations of CNMI laws and personnel regulations and after I ordered you to turn the car into our office immediately.

8. Your actions to try to interfere in and/or cause trouble for this office and/or to humiliate and embarrass me, your supervisor, over the award of an audit contract.

9. Your personal disrespectful and discourteous acts toward me as your immediate supervisor.

10. Your general rebellion and disobedience towards orders and instructions I have given you as your immediate supervisor.

11. Your disregard and lack of attention to work details and requirements.

12. Your inappropriate and out of color of office public statements which appeared to bring disrespect and embarrassment on me and/or this office.

We believe that your actions constitute grounds for termination. Consequently, we have concluded that your employement with the Office of the Public Auditor should be terminated with cause upon seven days notice.

This Office reserve the right to provide more specific information should it become necessary to defend this termination action.

EXHIBIT
V

19.

Upon receipt of this letter, please acknowledge by writing your
name and the date in the space provided below.

Sincerely,

Robert D. Bradshaw
Temporary Public Auditor

cc: 12 Enclosures

Received By: _____        Date: _____

EXHIBIT
V

20.

# On the record: Bradshaw-Bisom feud

*Editor's note: The following events, which were received Star this week, are being had so the public may have a understanding of the latest controversy at the Office of Public Auditor which concerns the appointment of Robert D. Bradshaw as temporary public auditor on Nov. 28 and the termination of the public auditor's term, Robert Bisom, on '3)*.

## s for the record
## ROBERT D. BRADSHAW

NOV. 30, 1993, at about 8:30 I arrived for work at the Public Auditor's office in accordance with Governor's letter. I called him at 9 a.m. with all of the including, Mr. Robert Bisom. the meeting, I informed everyone that I was now in charge of the office, Public Auditor functions, activities, etc. except as stated in line of duty, color of position or as I otherwise settled. I made the point that the Public Auditor work was confidential and that I didn't want staff people to in conversations about it to this office without proper authority.

In connection with this statement by John Schaibley, DOF (Department of Finance), about this office and the problem that information discussed would be leaked to outsiders among some people on Saipan, was concern over giving information to the Public Auditor since there were people here to carry it to outsiders without authorization.

At three more meetings, one that day and two each the day with supervisors (with present), I brought up the point and stressed that I had of spies and unethical people who would leak and disclose public auditor information to outsiders and without authority. I stressed that I wanted no confidential discussed outside of line of duty with outsiders.

November 29, 1993, at about 1 a.m. I had a private meeting with Bisom in his office with the door shut regarding some privileged information I was sharing with him in his role as Legal Counsel and this office. I specifically asked Bisom for legal advice in his role as "Legal Counsel" noted two or three times the sensitive nature and confidentiality the information I was sharing with him.

I asked that in 1981 I had a agreement as public auditor against government. It was settled in 1981. The terms of the settlement was that I resign the office and I would be paid and this was the settlement. It was covered in

the local papers and everyone knew it.

In the meantime, the day Asst AG Van Esser delivered me the check, he asked me orally if I would agree to not to accept a re-appointment as "Acting" Public Auditor from "Senate President Pedro Tenorio" at that time (this was in the law in 1981). I said "yes" as I was then preparing to leave the Island for the US mainland. Esser was concerned that I would resign and Tenorio would reappoint me the next day as Acting Public Auditor as that was then the appointment provision in the law. I note this law completely changed to the Governor.

As I best recall now, Esser handed me a piece of paper which said something like that and asked me to sign it. None of this was ever included in any "easy" press coverage. My lawyer never had a copy of the paper. If you looked at the paper and I explained to Bisom my conversation with Esser except him and I. It came after the settlement had been made and reported in the press as a realignment only.

Some years ago, I had contacted the AG office and tried to find information on any settlement. They could not find it. I also had been to court house and went through the files and the paper in question was not there and did not seem to be part of the final settlement. I was aware that my lawyer's files on the case was destroyed in a fire. I was under the belief that there was no record on this, if it was legitimate and if it in fact did exist. I was also sure that no one on Saipan would know about it except me since it was basically oral and was not publicized.

I noted to Bisom that the Governor had contacted me on Nov. 26, 1993 and asked if I would come and serve as "Temporary" Public Auditor for a few days which I understood to be for the Government, on behalf of the government, for the benefit of the government and for the convenience of the government. At that time, I gave no thought to whatever that may have occurred in 1981.

The night of Nov. 28, 1993, while in bed, I recalled that there "might" be some question on the Oct. 1981 settlement. Bisom knowing of the differences in the law from 1981 to 1985, knowing of the plain intent of both Esser and I at our 1981 meeting, and knowing of the Governor's role as chief executive officer of the CNMI, I felt there was no problem because in my opinion, the Governor and I have effectively amended, changed or rescinded any previous agreement - if one did in fact exist.

Knowing I had a legal counsel in the office I had decided to pose the problem to him for legal advice on how to proceed. I told Bisom that I was now seeking his legal advice as my office lawyer.

Bisom listened attentively and

ethical for him to prepare such a rescission document. I thought for a moment of what he had just said about his need to look at the actual agreement to be specific and his other legal advice statements and I supposed that was why he raised the issue of ethics.

I accepted his judgment and said "alright, I will prepare something." I sat down at a typewriter, typed out the statement. I made one copy of it on the copy machine. I put it in my pocket and gave the other to Bisom to take that paper to AG Robert Naraja personally, give it to Naraja personally, explain to him what Bisom and I has just talked about and Bisom's legal advice, and see to it that Naraja can be either sign it or please research the question and try to come up with an alternative to this office will be totally legal and proper by law and in accordance with Governor Guerrero's appointment. I note the point that this was confidential Information and I wanted it discussed with no one but Naraja personally.

Later in the afternoon, Bisom said he had left a word with Naraja to call him but Naraja had not done so. Therefore, at around 3:30 to 4 p.m. on Nov. 29, 1993, I said, "thank you, give me the paper and I will take care of it. I will give it to Eloy Inos and ask him to give it to Naraja since they have much contact."

That was the end of my conversation with Bisom and I had no further discussions with him on

the subject. I do note that several days later, after this 11-29-93 conversation was possibly leaked by Bisom, that I wrote Mr Bisom a letter and asked him certain information about his contacts with outsiders. I alluded to the privileged conversation but I was discreet and careful so that while he would understand what I was referring to, no one else reading the letter could comprehend what was involved since there was no revelation of the conversation.

On Dec. 1, 1993, Wednesday morning, Congressman Torres called Eloy Inos about the matter and described it almost exactly as I had typed on the piece of paper. As it turned out Eloy Inos had been and was off Island so John Schaibley took the call. I was so advised of Schaibley of Torres' comments.

Based on Congressman Torres' comments and descriptions (which talked almost exactly with the paper I had given to Bisom who may or may not have made copies) to Schaibley and the fact that Torres' comments were directed to Eloy Inos who I had told Bisom I was turning it over to, it at once appeared possible to me that Bisom had "leaked" my privileged conversation with him to some person or persons at the Legislature. Also on this line of thought, it should be noted that Bisom alleged to have close ties, friendship and/or some link with the Legislative Counsel's office.

*(Continued on page 20)*

---

**DECEMBER 10, 1993**

## PUBLIC ANNOUNCEMENT

The Commonwealth Utilities Corporation would like to announce to its customers that a new utility payment office schedule will be in effect beginning December 13, 1993. The new scheduled hours is as follows:

1. LOWER BASE, MAIN OFFICE
   Monday through Friday, 7:30 a.m. to 4:30 p.m.

2. SAN JOSE PAYMENT BRANCH OFFICE
   Monday through Friday, 7:30 a.m. to 4:30 p.m.

The Commonwealth Utilities Corporation will <u>no longer open</u> its <u>payment office at Lower base on Saturdays</u> beginning December 18, 1993 thereafter.

All payment offices will be closed in observance of all CNMI and U.S. Holidays.

Your cooperation and understanding is greatly appreciated.

/s/RAMON S. GUERRERO
Executive Director

12/17,24,31,1/7,14/94

EXHIBIT F

21,

20  December 24, 1993

## PAC... C ST★R

# On the record...

Continued from page 19)

(Editor's note: Representative Stanley Torres, in a statement to the Star, detailed this alleged conversation with Schanbley)

Subsequently, Bisom's lawyer as made statements to Asst AG erome Messenbourg indicating hat Bisom allegedly did "leak" he information ostensibly because a "his opinion", it was not legal dvice from him and not covered y ethical demands for privileged nformation. Therefore, in Bisom's pinion, he could leak or spread hat information around without my problems whatsoever.

I will finally note that on the fternoon of Nov. 30, 1993 I discovered that Mr. Bisom was using Public Auditor car for what ▒▒ to me to be personal use ▒ in possible violation of CNMI aws and regulations. I immediately called in to Bisom's attention and ordered him to turn the car into he office immediately. I had the xpression that he was angry and ndignant with me and upset over he car. This possibility may have ffected his later actions.

I will also add that at no time ave I discussed this matter with nyone in or out of this office xcept as follows:

1. I saw Eloy Inos briefly late on ov. 29, 1993. He was getting eady to go out of town so he took ne paper, exhibit B, put it with ther papers on his desk. I understand he left town and talked to no ne until Thursday, Dec. 2, 1993 hen he returned and talked to the AG.

2. John Schanbley described to ne on the afternoon of Dec. 2, 993, the comments of Torres.

3. On Dec. 2-3, 1993, I discussed the matter with Dep AG ierb Soll and Asst AG essenbourg. Soll advised me that

he will search all of the files for the agreement and will take corrective action. I understood from him there should be no problem but the Governor or I because we had been properly for the convenancy of the Commonwealth.

4. In a brief conversation with Randy Fennel, my former lawyer, I brought up the issue. He did not remember it and his copies of the paper's have been fanned up. He did say it was a simple matter and the government and I could just rescind the agreement for the convenance of the government.

To this date, I have not ▒caused this leaked with the ▒▒ persons and certainly with the ▒▒ in this office. I Commission, pleased be advised that ▒▒ please state the ▒▒▒ ▒▒ have acted in all ▒▒ forward manner with ▒▒ this matter.

Dated this December 3, at Saipan, CNMI....

Bradshaw demands ▒▒ then

December 3, 1993

Dear Mr. Bisom,
On November 29, 1993, I discussed with you some aspects about my appointment as Temporary Public Auditor. I had this conversation in private and in the context of your duty position as "Legal counsel" to this office. I considered our conversation to be privileged and confidential and thus subject to your professional ethical demands as well as being in compliance with any publicly stated position directing you and other employees not to discuss Public Auditor business with persons outside this office except in line of duty.

In our private November 29,

1993 talk you specifically noted that the words Acting Public Auditor and Temporary meant the same thing in terms of my concern as well as mentioning several other relevant facts. All of this was done in the context of confidential, privileged information. You were specifically directed to not discuss it with anyone.

Recently allegations have surfaced that you have been in contact with personnel at the Legislature and that you have disclosed our privileged conversation on this matter.

I want a written response from you on this by 11:30 a.m. the day you receive this letter.

In accordance with your legal right under the US and CNMI Constitution, pleased be advised that you may decline to answer. If please state the reason.

Please be advised that this information may result in legal and/or disciplinary actions being filed against you. I ask that this process of resolving this communication to the satisfaction on this and other matters that have been brought to my attention in regards to your conduct.

Robert D. Bradshaw
Temporary Public Auditor

Use of government car
December 7, 1993
Dear Mr. Bisom:
At a supervisor's staff meeting on November 30, 1993, at about 3 p.m., I learned that you had a Government automobile in your possession which you were using to go back and forth to work by hard to and from lunch. I directed that your car be turned over immediately to the Administrative Officer, Dolores Castro.

I pointed out that in my opinion, it is a violation of CNMI public laws for employees to be driving a Government vehicle in such instances. I noted that CNMI laws provide that public appropriated monies can only be expended for "public" purposes.

Though you are legal counsel for this office, you offered no comment on this but you fervently argued that you have a contractual right to the car. I said let me see your contract.

You left that day without showing me your contract. And even in the context of driving the car being a possible violation of the CNMI laws you went on and took the car home that night.

While absent for "sickness" on December 1, 1993, at about 12:30 p.m., you finally returned the car to this office.

The next day, December 2, 1993, I checked your contract and I can find no contractual rights for you to be using the government car for your personal use. Surely, you must have known what was in your contract.

I find it strange that you, being a lawyer and surely informed on your own contract and of CNMI laws and particularly just after I discussed them with you, that you would consciously and willingly proceed to use the car in possible violation of CNMI laws.

May I have your comment on this problem at once. Please be aware of your rights under the US and CNMI Constitutions.
Robert D. Bradshaw
Temporary Public Auditor
Bisom's contacts
December 3, 1993

Dear Mr. Bisom:
Allegations have come to my attention that the week of November 26, 1993 to December 3, 1993, you have personally contacted two or more persons outside the office of the Public Auditor and discussed things about the Office of the Public Auditor under my tenure since I became Temporary Public Auditor on November 28, 1993. If these allegations are true, they are most serious. Be assured that I will launched an inquiry to try to determine with the propriety and the extent if any, of your leaks to outsiders. If the leaks are true and you have acted improperly to leak or otherwise communicate Public Auditor information to persons outside this office without authorization and beyond your duties as Legal Counsel possibly in a way that can discredit or embarrass me or this office, be advised that I will initiate the following actions:

1. advice the Attorney General Office for them to investigate and see if CNMI laws have been violated.

2. take other appropriate disciplinary action.

Also, in the interim, please be advised that I will file an ethics complaint against you with the applicable bar associations on this matter and on the possibility that you may have violated Commonwealth laws which I am outlining in other communications to you at this time.

In the mean time I want to reiterate my position that the leaking of information or having discussions outside this office and office staff about the discussions, activities, functions and conversations ongoing in the office of the Public Auditor violates my policies as well as your personal ethics as legal counsel for this office. I have stated this position on four occasions to you and others at staff or supervisor meetings on November 29 and 30. I have said to you and others that I warned Public Auditor information in the Public Auditor's Office when staff personnel leave this office for personal activities.

Furthermore, I have had private conversations with you about this office and my position as Temporary Public Auditor which I considered to be confidential and privileged information since you are the Legal Counsel for this office.

In short, I want to state that I will not tolerate the unauthorized and/or improper disclosure of Public Auditor information to activities, agencies and people outside this office.

May I please have your comments in writing about this matter by 4:30 p.m. on the date you receive this letter. Please remember your legal constitutional rights when replying.

Robert D. Brads.
Temporary Public
Deloitte contract
December 3, 1993

Dear Mr. Bisom:
Upon my assumption ▒ as Temporary Public ▒ I told you that I would ▒ intention to proceed with ▒ ing a contract to Deloitte and for audit of the CNMI Govt ment. It was my understand that they were the successful bidders on the public announcements on proposals.

Late... I was told by staff personnel that the Governor elect had contacted my predecessor and had expressed his desire to have the audit delayed. I said I will not delay the audit for possible political reasons.

After you fully knew and understand my decision, you, other staff members and myself attended a meeting with Deloitte and Touche personnel and Department of Finance representatives in the DOF conference room.

During the course of this meeting I announced my decision and Deloitte and Touche, DOF, Merlinda and I discussed the particulars of the audit and contract.

After we had finished and being all in accord, you said you have something to say. As I remember, you said that you had told Deloitte and Touche not to submit a proposal and this audit was not to proceed. (Apparently as envisioned in the public announcement).

It appeared to me that your actions may have possibly been designed to embarrass or discredit me or this office or for political purpose.

I would like to hear from you a statement in writing regarding your authority to act as you did and the basis for your statement. Please remember your constitutional privileges in responding.
Robert D. Bradshaw
Temporary Public Auditor

December 9, 1993
To:    Mr. Robert Bradshaw, Temporary Public Auditor
Fr:   Michael Johnson, MSJ Partner Deloitte and Touche
Re:  Events related to the letting of the contract to perform the CNMI Single Audit for fiscal year 1993 and correspondence with then Office of the Public Auditor Legal Council, Mr. Richard Bisom.

On November 17, 1993 a preproposal conference was held at the office of the CNMI Director of Finance. In attendance were the following:

Ms. Merlinda Deramas Office of the Public Auditor
Mr. Robert Bisom Legal Counsel OPA
Mr. Eloy Inos Director of Finance
Mr. John Schanbley Special Assistant to the Director of Finance
Mr. David Burger Partner, KPMG Peat Marwick
Mr. John Lawlor
(Continued on page 21)

---

Commonwealth of the Northern Mariana Islands
Office of the Director of Public Works

PUBLIC NOTICE

The Department of Public Works would like to inform the general public that the Building Safety Code (P.L. 6-45, as amended) will commence — Residences Building Permit effective this December 31, 1993. All notification construction activities category will be assessed and proposed structure to be built on or after December 31, 1993, must conform to standards adopted by P.L. 6-45, as amended, including CABO ONE & TWO FAMILY DWELLING Code and other local Child regulation and laws. Applicants are urged to come in and obtain building permit application at the Building Safety Code Division, Department of Public Works at Lower Base, Tanapag, Saipan.

The following forms and other pertinent information is applying for Residential Building Permit are now available:

1  Application for Building Permit and Plan Review.
2  Application for Building Permits & Inspection (Building Inspection Schedule).
3  Application for Building Permits & Inspection Application & Permit for Clearing & Grading.
4  Residential Building Permit Brochure

For more detail information, please contact Telephone Nos. 322-9636 or 322-9688.

REVIEWED BY:

MANUEL S. PANGELINAN
Acting Director of Public Works
Date   10/28/93

221

EXHIBIT
V

## the record...

d from page 20)

...G Peat Marwick
Mr. Michael Johnson
oitte and Touche
4s. Katrina Faulkner
loitte and Touche
ference related to
to perform a Single
Government of the
acal year 1993. The
ly been published in
wspaper during Sep-
, and have been issued
costal conferences was
September 22, 1993
on October 4, 1993.
proposal conference
22, I received a call
ublic Auditor Scott
ting me that the
onferences and the bid
late would be post-
e CNMI Single Au-
ear 1992 was in draft
ports were submit-
ning of Finance in
of November and
al conference was
November 17. At
I conference copies
2 reports were pre-
sentatives of the
ublic Auditor and
arwick. The Direc-
astructed that pro-
due on November
draft copies of the
Single Audit must
by December 31,
January 10, 1994.
ndance seemed to
s with these dates
no objections.
r, 1993 I received
Merlinda Dernnas
I thought the dead-
eproposal confer-
nable. I said that I
loitte and Touche
deadlines set I

inquired as to why she was asking
the question and she responded
that there was some talk as to
whether the deadlines were rea-
sonable and that OPA had received
a letter from Mr. David Burger of
KPMG Peat Marwick saying that
they could not meet the deadlines
and that they would not bid on the
CNMI fiscal year 1993 audit.

On November 22, 1993 I re-
ceived a call from Mr. Robert
Bisom asking me not to propose
on November 24. He said that he
had been in consultation with Mr.
Scott Tan and that Scott wanted to
wait on the selection of auditors
for the fiscal year 1993 Single
Audit until he returned to Saipan
on November 29.

On November 23, 1993 I called
Mr. Eloy Inos and informed him
of the request from Mr. Bisom.
Mr. Inos stated that the date for
submission of the proposals had
been set in the preproposal confer-
ence and that he had not been in-
formed of any change in submis-
sion date. Mr. Inos advised me that
I should submit a proposal on No-
vember 24.

On November 24, 1993 I sub-
mitted the proposal of Deloitte &
Touche to perform the Single Au-
dit of the CNMI for fiscal year
1993 for the following reasons:

1. Mr. Bisom's directive was
oral and was not documented.

2. The process to date for RFP93-
0049 was poorly executed and for
the most part undocumented. The
published RFP said that bids should
be submitted to the Office of Pro-
curement and Supply but the speci-
fications issued by the Office of
the Public Auditor said that the
bids should be submitted to the
Office of the Public Auditor. Nei-
ther the deadlines or the submis-
sion dates set at the preproposal

conference were in writing. Be-
cause of the numerous inconsist-
encies in the process to date I did
not want to be penalized for not
proposing.

On November 26, 1993, Mr.
Scott Tan's contract as the Public
Auditor was not renewed and Mr.
Robert Bradshaw was appointed
Temporary Public Auditor.

On November 29, 1993 I was
asked to come to the Director of
Finance's Office to discuss our
proposal. In attendance at this
meeting were:

Mr. Robert Bradshaw
Temporary Public Auditor
Office of the Public Auditor
Mr. Robert Bisom
Legal Council, OPA
Mr. Ross Zapata
Office of the Public Auditor
Mr. Eloy Inos
Director of Finance
Mr. John Schalbley
Special Assistant to the Director
of Finance
Mr. David Igitol
Chief, Finance and Accounting
Mr. Michael Johnson
Partner, Deloitte & Touche
Ms. Katrina Faulkner
Manager, Deloitte & Touche

At this meeting it was announced
that Deloitte & Touche had been
awarded the contract to perform
the Single Audit of the CNMI for
fiscal year 1993. Mr. Bisom said
that he wanted to state for the
record that in his phone call to me
of November 22 I had said that I
would not propose. Mr. Inos said
that he had instructed me to pro-
pose because Mr. Bisom's direc-
tive came at the request of Mr.
Scott Tan who's contract was over
on November 25 and Mr. Tan could
not extend deadlines into periods
for which he would not be Public
Auditor. At this meeting it was
also disclose that the contract to

perform the audit would include a
penalty clause to include monetary
penalties if deadlines were not
adhered to.

Later the day of November 29 I
received a call from Mr. Bisom
stating that he was going to submit
my name to the ethics division of
the American Institute of Certified
Public Accountants. I told him I
did not wish to discuss the matter
any further. This was my last cor-
respondence to date with Mr.
Bisom.

I hope the above meets with
your request. If you have any fur-
ther questions please do not hesi-
tate to call me.

Bisom's counsel
December 8, 1993
Re:    Robert A. Bisom

Dear Mr. Bradshaw:

I represent Robert A. Bisom
concerning his employment con-
tract with the Office of the Public
Auditor. You have, in your brief
tenure, engaged in a pattern of
behavior toward Mr. Bisom de-
signed to humiliate him and drive
him from his position.

As it is, you have constructively
discharged Mr. Bisom without
cause by your unreasonable acts
and demands based in your nu-
merous letters to him. It is likely
that you engaged in this behavior

in retaliation for Mr. Bisom's ques-
tioning the legality of certain acts.
It is fundamental that even an em-
ployee at will may not be termi-
nated for following the precepts of
the law.

Because of the harassment, his
need to look for other work in
order to mitigate his damages, and
to attend to a medical problem,
Mr. Bisom will be on annual leave
until such leave expires. You have
previously approved of his leave.
At the end of the period, in partial
settlement, it is requested that you
place Mr. Bisom on administra-
tive leave without pay until Janu-
ary 15, 1994. At that time, you will
be gone and your successor can
determine whether Mr. Bisom
should be retained. It is obvious
that you have no need nor desire
for Mr. Bisom's services and that
the attorney/client-relationship
between Mr. Bisom and the office,
as personified by you, has disinte-
grated. You will need to withdraw
your notification of discharge.

The Office of the Public Audi-
tor is now indebted to Mr. Bisom
for the travel allowance of 1,500
pounds. Quotations on the ship-
ment costs will be forthcoming
short. Prompt payment will be ac-
cepted.

Richard W. Pierce

# CHIROPRACTIC
*the Natural way
to Health*
**Dr. David C. Rothbaum**
Chiropractor
Hours by appointment only—322-5546

EXHIBIT
√

23.

**PACIFIC ST★R**    January 14, 1994 **15**

# Bradshaw rejects Torres' demand

TEMPORARY Public Auditor Robert D. Bradshaw has refused to retract his previous statements regarding Representative Stanley T. Torres' inquiries about a court settlement agreement in 1981 which allegedly prohibited Bradshaw from accepting re-appointment to the public auditor's position.

At the same time, Bradshaw cited rumors that he was not the real target of Torres' investigation. "Allegedly, you are doing all of this by trying to find something you can embarrass Governor (Lorenzo) Guerrero over," he said in a letter to Torres on Jan.6, a copy of which was sent to the Star on Jan. 7.

Bradshaw also questioned Torres' motive. "This whole thing makes me wonder if there is an undisclosed motive behind your actions...," Bradshaw said. "Could politics enter into this in some fashion?"

Torres, in an earlier letter to Bradshaw, demanded a retraction of the public auditor's statements regarding a conversation between the lawmaker and John Schnebly of the Department of Finance during which Torres allegedly commented on the provisions of the settlement agreement between Bradshaw and the government.

Bradshaw said that starting Dec. 1 as many as ten people from different agencies and entities told the public auditor that Torres was investigating the 1981 settlement agreement.

"Of course, I could care less about your investigation and I certainly would have just ignored it were it not for the fact that the reports alerted me that possibly the basis for your work was an alleged leak directly or indirectly to you of privileged information possessed by attorney Robert A. Bisom of this office," Bradshaw said.

He added that Bisom acknowledged and confirmed the leaking of the information. "Whether Bisom leaked it directly to you or someone else, we may never know unless you will say 'how' you came into this information," the public auditor said.

Bradshaw said he was told by the attorney general and procurement people "that you have made one or more trips to the AG files in an old bunker trying to find those old records on me.

Randall Fennell, Bradshaw's former lawyer, told the latter that on or about Dec. 1 Torres contacted Fennell regarding Bradshaw's case. Torres was told the lawyer's files were burned years ago.

"The constant stream of reports that I have received since December 1, 1993 would suggest that you and/or people in your office have been in contact with many agencies and people in your investigation of me," Bradshaw said.

Commenting on Torres' demand for retraction, Bradshaw said: "I

find your statement to be most interesting in view of the fact that your letter with this statement went to 'Governor-elect Tenorio' - per the letter distribution list."

Bradshaw said he also found it strange that Torres would be involved in an extensive and time-consuming investigation of the public auditor. "Actually, with the many, many allegations about OPA (Office of Public Auditor) lawyer Robert A. Bisom violating laws, leaking privileged information, missing government automobiles (this used to be one of your concerns) and on and on, I would have thought that you might launch an investigation into his activities," Bradshaw said.

In an interview Monday, Torres said he had received Bradshaw's letter. He promised to give the Star a copy of his response. As of press time yesterday nothing has been received from Torres.



REPRESENTATIVE Stanley T. Torres bows head during prayer on the first day of session of the Ninth Legislature Monday. Standing beside him is Rep. Heinz Hofschneider.

**EXHIBIT** G

*EXHIBIT*

*V*

24,



*OFFICE OF THE PUBLIC AUDITOR*  **COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**
*Saipan, MP 96950*

# MEMORANDUM

**TO**        : Robert A. Bisom                    DATE: 01/17/94

**FROM**      : Temporary Public Auditor

**SUBJECT** : Your Duties Until Further Notice

This is to let you know that I would like you to carry out administrative tasks for me at the Office of the Public Auditor until your status is regularized, after which I would like again carry out your job as OPA Legal Counsel.

I understand that you will not be giving me any legal advice or performing any legal work for me until your contractual and legal situation allows you to do so.

Sincerely yours,

Scott K. Tan

**EXHIBIT** H