**JAY H. SORENSEN**
**Attorney at Law**
**4th Floor, Suite A**
**Horiguchi Building**
**P.O. Box 1184**
**Saipan, MP 96950**
**Tel. No. 234-1414**
**Fax. No. 234-1417**

Attorney for Plaintiff

## IN THE SUPERIOR COURT
## FOR THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| ROBERT A. BISOM, | ) | CIVIL CASE NO. 96-1320 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OF POINTS** |
| | ) | **AND AUTHORITIES IN** |
| COMMONWEALTH OF THE | ) | **SUPPORT OF MOTION** |
| NORTHERN MARIANA ISLANDS, | ) | **FOR PARTIAL SUMMARY** |
| LEO L. LAMOTTE, CNMI Public | ) | **JUDGMENT** |
| Auditor, in his official capacity, | ) | |
| ROBERT D. BRADSHAW, formerly | ) | |
| appointed Temporary Public Auditor, | ) | |
| in his individual capacity; | ) | |
| SCOTT KHENG SHANG TAN, | ) | |
| formerly CNMI Public Auditor, | ) | Date: |
| in his individual capacity, | ) | Time: |
| | ) | Judge: |
| Defendants. | ) | |
| | ) | |

Exhibit
JJ

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES................................................................ i-vii

MEMORANDUM OF POINTS AND AUTHORITIES..................................... 1

INTRODUCTION............................................................................. 1

FACTUAL SUMMARY...................................................................... 1

PRINCIPLES OF SUMMARY ADJUDICATION......................................... 5

ARGUMENT................................................................................... 6

    I.      PLAINTIFF'S PROPERTY RIGHT IN HIS EMPLOYMENT WAS
          TERMINATED WITHOUT DUE PROCESS OF LAW BY
          FAILURE TO GIVE HIM A HEARING BEFORE OR AFTER
          THE TERMINATION........................................................... 6

    II.     PLAINTIFF'S LIBERTY INTEREST IN HIS REPUTATION
          WAS VIOLATED BY THE FAILURE TO GIVE HIM AN
          OPPORTUNITY TO CLEAR HIS NAME................................. 8

    III.    PLAINTIFF HAS A CLAIM FOR DAMAGES AGAINST THE
          CNMI ARISING OUT OF THE VIOLATION OF PERSONAL
          RIGHTS GUARANTEED BY ARTICLE I OF THE
          COMMONWEALTH CONSTITUTION...................................... 11

        A.  Common Law.................................................................. 12

        B.  The Restatement and Policy Analysis...................................... 14

              1.  The Nature of the Provision...................................... 15
              2.  The Adequacy of Existing Remedies............................ 16
              3.  The Extent to Which a Tort Action Might Aid or Interfere
                   With Existing Remedies.......................................... 17
              4.  The Relative Importance of the Underlying Right Being
                   Protected............................................................ 17
               5.  The Extent to Which Tort Law May Be Changed............. 18
              6.  The Extent to Which Recognition of these Claims may
                   Tend to Burden the Commonwealth Courts.................... 19

*EXHIBIT*

*JJ*

C. CNMI Precedent.......................................................... 20

IV.  PLAINTIFF IS ENTITLED TO PAYMENT FOR SERVICES
     RENDERED FOR THREE DAYS WORK IN JANUARY, 1994...... 23

CONCLUSION................................................................... 24

EXHIBIT
JJ

# TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Anderson v. Viking Pump Division, Hondaille Industries, Inc.*, 545 F.2d 1127
(8th Cir. 1976)................................................................ 6

*Appeal of Crescent Precision Products, Inc.*, 516 P.2d 275 (Okla. 1973).............. 21

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)..................... 14, 19
                                                                          20

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701,
33 L.Ed.2d 548 (1972)................................................ 9

*Bott v. DeLand*, 922 P.2d 732 (Utah 1996)................................. 14, 18

*Brady v. Gebbie*, 859 F.2d 1543 (9th Cir. 1988)........................... 9, 10

*Brown v. State*, 674 N.E.2d 1129 (N.Y. 1996)............................. 14, 18
                                                                          20, 21
                                                                          22

*Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)............... 19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct., 2548, 91 L.Ed.2d 265 (1986).... 6

*Chamberlain v. State Through DOTD*, 624 So.2d 874 (La. 1993)........................ 22

*City of Shawnee v. Williamson*, 338 P.2d 355 (Okla. 1959)............................. 21

*Commonwealth v. Bergonia*, 3 N.M.I. 22 (1992)............................................ 11

*Commonwealth v. Condino*, 3 N.M.I. 501 (1993), *aff'd*, 33 F.3d 58
(9th Cir. 1994), *cert. den.* 514 U.S. 1021, 115 S.Ct. 1368, 131 L.E.2d 224 (1995).. 11

*Corum v. University of North Carolina*, 413 S.E.2d 276 (N.C. 1992)................... 13, 18
                                                                          23

*Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)............... 14

*Endler v. Schutzbank*, 436 P.2d 297 (Cal. 1968)............................................. 16

*Erdman v. Mitchell*, 56 A. 327 (Pa. 1903)..................................................... 22

*Ex Parte Berman*, 87 N.E.2d 716 (Ohio App. 1949)......................................... 22

*Fitzgerald & M. Cons't. Co. v. Fitzgerald*, 137 U.S. 98, 11 S.Ct. 36,
34 L.Ed. 608 (1890)............................................................................ 24

*Flake v. News Co.*, 212 N.C. 780, 195 S.E. 55 (1938)..................................... 13

*Gay Law Students Association v. Pacific Telephone & Telegraph*,
595 P.2d 592 (Cal. 1979)..................................................................... 13

*Govendo v. MPLC*, 2 N.M.I. 482 (1992)................................................... 20, 23

*Gray v. Bryant*, 125 So.2d 846 (Fla. 1960)............................................... 21, 22

*Harley v. Schuykill County*, 476 F.Supp. 191 (E.D.Pa. 1979)............................ 22

*Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 1281 (1976)............ 19

*In re "C.T.M."*, 1 N.M.I. 410 (1990)........................................................ 11

*In re Seman*, 3 N.M.I. 57 (1992).............................................................. 16

*Jacobs v. United States*, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed.142 (1933)............... 14

*Knudson v. City of Ellensburg*, 832 F.2d 1142 (9th Cir. 1987)............................. 9

*Lovell v. City of Griffin*, 303 U.S. 444, 56 S.Ct. 666, 82 L.Ed. 949 (1938)............ 16

*Matthews v. Harney County, Or., School Dist. No. 4*, 819 F.2d 889
(9th Cir. 1987)............................................................................... 9, 10

*Merrell v. All Seasons Resorts, Inc.*, 720 F.Supp. 815 (C.D.Cal. 1989)................ 22

*Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)................... 18

EXHIBIT

JJ

*Moresi v. State, Dept. of Wildlife and Fisheries*, 567 So.2d 1081 (La. 1990).......... 14, 17

*Morgan v. Board of Supervisors*, 192 P.2d 236 (Ariz. 1948).............................. 21

*N.A.A.C.P. v. City of Dearborn*, 434 N.W.2d 444 (Mich.App. 1988)
app.den. 447 N.W.2d 751............................................................... 22

*Old Tuckaway v. City of Greenfield*, 509 N.W.2d 323 (Wis.App. 1993)............... 14

*People ex.rel. Wayburn v. Schupf*, 350 N.E.2d 906 (N.Y. 1976)....................... 16

*People v. Carroll*, 148 N.E.2d 765 (N.Y.1958).............................................. 21

*Phillips v. Youth Development Program, Inc.*, 459 N.E.2d 453 (Mass. 1983)......... 14

*Re Holta's Estate*, 68 N.W.2d 314 (Iowa 1955)............................................. 24

*Robb v. Shockoe Slip Foundation*, 324 S.E.2d 674 (Va. 1985).......................... 22

*Rockefeller v. Hogue*, 429 S.W.2d 85 (Ark. 1968)........................................ 21

*Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529 (Cal. 1971)..................................... 15

*Schreiner v. McKenzie Tank Lines, Etc.*, 408 So.2d 711 (Fla.App. 1982)............. 22

*State ex. rel. City of Fulton v. Smith*, 194 S.W.2d 302 (Mo. 1946)..................... 21

*State ex. rel. Russell v. Bliss*, 101 N.E.2d 289 (Ohio 1951).............................. 21

*Torres v. MPLC*, 3 N.M.I. 484 (1993)....................................................... 21, 23

*Truax v. Raich* (1915) 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131........................... 15

*Under 21 Catholic Home v. City of New York*, 481 N.Y.S.2d 632
(N.Y.Sup. 1984)......................................................................... 22

*Walinski v. Morrison & Morrison*, 377 N.E.2d 242 (Ill.App. 1978).................... 14

*West Virginia State Board v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178,
87 L.Ed. 1628 (1943)................................................................... 16

*EXHIBIT*

*JJ*

*Wigdeon v. Eastern Shore Hosp. Center*, 479 A.2d 921 (Md. 1984)..................... 12, 17

*Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).... 9

*Woodruff v. Board of Trustees*, 319 S.E.2d 372 (W.Va 1984)............................ 13

## CONSTITUTION, STATUTES AND RULES

Article I, Section 2 of the CNMI Constitution............................................... 13, 16

Article I, Section 5 of the CNMI Constitution............................................... 7, 10, 11

Article I, Section 6 of the CNMI Constitution............................................... 11, 20

Article I, Section 9 of the CNMI Constitution............................................... 20, 21 23

Article XI, Section 5(e) of the CNMI Constitution.......................................... 21

Com. R. Civ. P. 56(a)............................................................................ 5

Com. R. Civ. P. 56(c)............................................................................ 6

Com. R. Civ. P. 56(d)............................................................................ 6

1 CMC § 8134..................................................................................... 7

1 CMC §8501 et seq.............................................................................. 3

42 U.S.C. § 1981, et seq........................................................................ 18

N.Y. Const., art. I, § 11....................................................................... 20

## OTHER AUTHORITIES

Restatement (Second) of Torts, Section 874A................................................ 14, 15 19, 20

Restatement of Restitution, § 1, com. b..................................................... 24

EXHIBIT

JJ

66 AmJur 2d, Restitution and Implied Contracts, § 20..................................... 24

*Cooley, 1 Treatise on Constitutional Limitations*, (8th Cir. 1927)........................ 22

EXHIBIT
JJ

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This motion is brought because as to a few of the claims in the Fourth Amended Complaint there is no substantial dispute about the operative facts; so, they can be decided as a matter of law and can be eliminated as issues for trial. Specifically, the following issues, may be decided:

1. Plaintiff was denied his right of due process when he was not given a hearing after his employment was terminated, as alleged in the Third Claim, paragraph 28, of the Fourth Amended Complaint.

2. Plaintiff was denied his right of due process when he was not given the opportunity to refute the public attack by Robert Bradshaw on plaintiff's reputation for truthfulness and integrity, as alleged in the Third Claim, paragraph 30, of the Fourth Amended Complaint.

3. Plaintiff may maintain a direct cause of action as against the Commonwealth for the violation of Personal Rights guaranteed by Article I of the Commonwealth Constitution when done by a public official acting in his official capacity.

4. The Commonwealth owes plaintiff payment for services rendered (quantum meruit) during the three days that plaintiff worked at OPA at the special request of the Acting Public Auditor.

### FACTUAL SUMMARY

In April, 1993 plaintiff BISOM was hired as legal counsel to the CNMI's Office of the Public Auditor (OPA). BISOM was hired by defendant TAN under a written contract for

1

*EXHIBIT*

*JJ*

2 years.

On November 25, 1993 TAN's term of office as Public Auditor expired, at which time defendant BRADSHAW, who had been working at the Department of Finance, was appointed Temporary Public Auditor. BRADSHAW was appointed by the then governor, Guerrero, who had earlier that month, lost his bid for re-election, and whose term of office was to end on January 10, 1994.

At the time that BRADSHAW replaced TAN the Public Auditor's Office was in the process of organizing and beginning to implement the year-end audit of the CNMI government for the fiscal year that ended September 30, 1993 (referred to as the "single audit"). The amount of the budget deficit that had been incurred by the government had been a key issue in the previous gubernatorial campaign. Accordingly, the out-going administration had an incentive to minimize that finding, and likewise, the incoming administration would find more political ammunition in a higher dollar amount. When BRADSHAW took over as Public Auditor he let it be known to the OPA staff that his main priority was to complete the audit before the new administration took over.

During the first several days that BRADSHAW was in the office, BISOM was confused and uncertain about the legality of BRADSHAW's appointment and, therefore, his authority to act as Public Auditor. This was for several reasons:

First, he had been told previously by TAN that TAN's term did not expire until the end of December, 1993, and so BISOM could not understand how someone else could be appointed. This situation was exacerbated by the fact that at the time of BRADSHAW's appointment and his assuming the office, TAN was gone from the Commonwealth, having

2

EXHIBIT
JJ

taken a trip to Hong Kong with the governor-elect, who was a friend of TAN.

Secondly, BISOM was told by BRADSHAW on the morning of BRADSHAW's first day at OPA, and later by others that BRADSHAW had previously been the Public Auditor, in 1979 and 1980, that at that time he filed suit against the government under his employment contract when funding for his office was withdrawn, that the case was settled, and as part of that settlement BRADSHAW agreed that he would not be reappointed as Public Auditor. BRADSHAW became irritated at BISOM's position that because this was not an OPA issue, but rather a personal legal problem, BISOM could not help him with this; BISOM told BRADSHAW that he should seek private counsel about it.

Thirdly, BISOM believed that BRADSHAW had not completely severed his ties with the Department of Finance (DOF), but, in fact, had regular communication with the Director of Finance, who had been his superior at DOF. BRADSHAW also told BISOM he was still being paid from DOF. Because DOF would be the agency of central focus for the audit, BISOM saw a conflict of interest on the part of BRADSHAW.

BISOM had an acute awareness of problems of conflicts of interest by government officials because, under the CNMI's Government Ethics Code Act of 1992 (1 CMC §8501 et seq.), the Public Auditor was charged with various duties, including investigation, hearings and reports of charges of violations of that act. TAN had put BISOM in charge of fulfilling the OPA's obligations in this regard.

On the afternoon of November 29, 1993, the first day that BRADSHAW had assumed duties as Public Auditor, there was a meeting with several people who would be involved in the single audit, including personnel from the accounting firm of Deloitte and Touche, the

3

EXHIBT

JJ

only firm to submit a bid for the audit.  BISOM accompanied BRADSHAW to the meeting.
At the meeting BRADSHAW announced that the contract to conduct the audit was awarded
to Deloitte and Touche, and he emphasized the need to have it completed quickly--to be
finished before the end of December.  At that meeting BISOM addressed the group and
stated that he believed it to be wrong to go forward with the single audit due to the fact that
there had been only one bidder, and it should go through the bidding process again; and
secondly, it could not be done properly in the time that had been allotted.  One of the
reasons BISOM did this was because TAN had told him before leaving for Hong Kong that
he and the Governor-Elect's Transition Committee were opposed to the audit proceeding with
just one bidder for the contract.  Another reason he opposed going forward with the audit
was that after the bid from Deloitte and Touche was received, it was rejected by Scott Tan,
who was still then in office; so BISOM believed that the contract had to be rebid.

BISOM and BRADSHAW were only in the office together for two days.  BISOM was
out of the office from December 1 through 3, first on medical leave for regarding surgery,
then on annual leave.  Except to turn in the keys to the government car he had been using on
December 1, 1993, which BRADSHAW insisted he do, he was not into the OPA office until
December 7, 1993.  In the interim BRADSHAW had sent BISOM a series of about a dozen
letters on various things he accused BISOM of doing wrong.  Some of these are referred to
in BRADSHAW's letter terminating BISOM's employment.  Among these were:

- a letter of December 3, 1993 that stated: "You are not to leave this office or contact
anyone about this office without my personal approval," directing him to refer all contacts to
BRADSHAW, directing him to turn over all his files, and withdrawing all authority to act on

4

EXHIBIT

JJ

behalf of OPA without BRADSHAW's prior approval.  (Ex. B).

- a letter of December 6, 1993 terminating BISOM's employment without cause,
effective 30 days thereafter. (Ex. C).  This was later rescinded so that termination would be
with cause, as reflected in BRADSHAW's letter to plaintiff dated December 23, 1993. (Ex.
E).

- a letter of December 7, 1993 advising BISOM that his office was reassigned to
another employee, and that he was to work on a table in an administrative area that was
open, offering no privacy or security for confidential matters.  (Ex. D).

When BISOM was handed this letter memorandum on December 7, 1993 as he
reported to work, he considered himself constructively terminated as of that time, as he felt it
was impossible for him to function in his job with these restrictions and no suitable place to
work.

BRADSHAW left the Commonwealth in early January, 1994, never to return.  TAN
was appointed by the new governor to be the Public Auditor on a temporary basis.  TAN
asked BISOM to come back to OPA, which BISOM did for a period of three days in
January.  However, a new contract, although promised, never did materialize.

## PRINCIPLES OF SUMMARY ADJUDICATION

> A party seeking to recover upon a claim, counterclaim, or
> cross-claim or to obtain a declaratory judgment may, at any time
> after the expiration of 20 days from the commencement of the
> action or after service of a motion for summary judgment by the
> adverse party, move with or without supporting affidavits for a
> summary judgment in the party's favor upon all or any part
> thereof. Com. R. Civ. P. 56(a).
>
> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and

5

EXHIBIT

JJ

admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Com. R. Civ. P. 56(c).

Case Not Fully Adjudicated On Motion.  If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.  Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.  Com. R. Civ. P. 56(d).

Summary judgment procedure is properly regarded not as a disfavored procedural short cut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct., 2548, 2555, 91 L.Ed.2d 265 (1986).

Summary judgment is a procedure which advances the salutary objective of avoiding useless, expensive, the time-consuming trials where there is no genuine, factual issue remaining to be tried.  *Anderson v. Viking Pump Division, Hondaille Industries, Inc.*, 545 F.2d 1127 (8th Cir. 1976).

## ARGUMENT

I.    PLAINTIFF'S PROPERTY RIGHT IN HIS EMPLOYMENT WAS TERMINATED WITHOUT DUE PROCESS OF LAW BY FAILURE TO GIVE HIM A HEARING BEFORE OR AFTER THE TERMINATION.

At the special request of the court, the parties briefed the question whether plaintiff,

6

EXHIBIT

JJ

as an attorney for the Public Auditor with Excepted Service Employee status, was entitled to the protections afforded by the Civil Service System.[1] This Court held: "Plaintiff does have a constitutionally protected property right which, as claimed in paragraph 28 of the Second Amended Complaint, was violated by Defendants' failure 'to give plaintiff proper notice and an opportunity to be heard to contest the adverse personnel action.'"[2] The issue was readdressed at length in defendants' motion to reconsider; but reconsideration was denied.[3]

Paragraph 28 of the Fourth Amended Complaint is identical to that of the Second Amended Complaint, stating: "Defendants have violated plaintiff's right to procedural due process guaranteed by Article I, Section 5 of the CNMI Constitution in that when defendant terminated the employment of plaintiff, defendant failed to give plaintiff proper notice and an opportunity to be heard to contest the adverse personnel action."

The Civil Service Act provides:

> (a) Any person aggrieved by any action of the Personnel Officer or management or who has been suspended, demoted, or dismissed may appeal to the Civil Service Commission for redress pursuant to its rules and regulations.
>
> (b) If the Civil Service Commission, after a hearing, orders an employee who has been demoted, dismissed or suspended reinstated, it may reinstate the employee under such conditions as it deems proper.  1 CMC § 8134.

Inasmuch as there can be no factual dispute that plaintiff was not afforded a hearing nor any opportunity to seek redress of the termination of his employment contract, the

---

[1]  Order filed August 7, 1997.

[2]  Decision and Order filed November 6, 1998, p. 5, lines 6-9.

[3]  Order Denying Motion for Reconsideration, filed March 16, 1999.

7

EXHIBIT
JJ

liability part of this issue is ripe for determination by motion and may be eliminated as an

issue at trial.  As set forth in plaintiff's declaration herein, he was never given any such

notice and/or opportunity.  (Bisom affidavit, ¶ 15).

II.    PLAINTIFF'S LIBERTY INTEREST IN HIS REPUTATION WAS VIOLATED BY
       THE FAILURE TO GIVE HIM AN OPPORTUNITY TO CLEAR HIS NAME.

In addition to the deprivation of due process from plaintiff's termination of his

employment contract, plaintiff has alleged another due process violation which is averred in

paragraph 30 of the Fourth Amended Complaint.  This claim arose out of the attack on

plaintiff's reputation for honesty, integrity and morality, the public disclosure of those

charges, and the fact that the accuracy of those charges was disputed by plaintiff.

Not only did Robert Bradshaw fire plaintiff for cause, he brought charges of unethical

conduct before the Bar Association Disciplinary Committee for the same things that he had

cited as the grounds for termination.  (Bisom affidavit, ¶ 12).  Beyond that, he furnished to

the *Pacific Star*, a newspaper then in general circulation in Saipan, a running account of the

events that led to his decision to fire plaintiff, including some of Mr. Bradshaw's personal

notes, labeled "Memo for the Record", and letters to plaintiff that were included with the

letter of termination he gave plaintiff dated December 28, 1993.  (Bisom affidavit, Ex. F &

G).  Among the things Bradshaw charged plaintiff with are: (1)  disclosing confidential

information in violation of the Commonwealth Code; (2) disclosing confidences in violation

of legal ethics; (3) violating CNMI law and regulation in the private use of a government

vehicle.  In addition, he stated in the letters published in the *Pacific Star*:"...please be

advised that I will file an ethics complaint against you with the applicable bar associations on

this matter and on the possibility that you may have violated Commonwealth laws..."  The

8

EXHIBIT
JJ

republication of these charging letters were all signed by Bradshaw as the Temporary Public Auditor.

It is well settled that "where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and opportunity to be heard are essential." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971).

Later cases have developed this concept, identifying it with a constitutionally protected liberty interest. "[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Matthews v. Harney County, Or., School Dist. No. 4*, 819 F.2d 889, 891 (9th Cir. 1987). "The Fourteenth Amendment's guarantee of procedural due process protects individuals from erroneous or unjustified deprivations of life, liberty, or property, and assures them that the government will deal with them fairly." *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1144 (9th Cir. 1987). Accordingly, where the liberty interest in one's "good name, reputation, honor or integrity" is attacked by a government agency, body or official, due process affords one the opportunity to have a hearing to refute the charges. *Board of Regents of State Colleges v. Roth, supra.*

These principles came into play in *Brady v. Gebbie*, 859 F.2d 1543 (9th Cir. 1988), reviewing an award in favor of a former state medical examiner who brought a civil rights deprivation suit following his discharge. The court said:

> In order to trigger the procedural protections of due process attendant to a properly presented liberty interest claim, a

EXHIBIT

JJ

plaintiff must show that "(1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment." *Id.* at 1552, quoting *Matthews v. Harney County, Or., School Dist. No. 4, supra* at 891-92.[4]

All three of these elements are evident in Exhibit F, the *Pacific Star* article. The charges are obviously made public by virtue of being published in a newspaper. They are made in connection with Bradshaw's termination of plaintiff's employment contract. And the last part of the article, a letter from Richard W. Pierce, the attorney for plaintiff at the time, to Bradshaw is also published. In it he says: "you have constructively discharged Mr. Bisom without cause by your unreasonable acts and demands in your numerous letters to him." This makes it evident that plaintiff contested the charges.

In affirming the verdict, the *Brady* court noted:

> [T]he fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner. [citation] At a minimum, due process requires notice and a hearing where the individual has a meaningful opportunity to confront the evidence against him.
>
> …
>
> Where a person has been deprived of a liberty interest without due process, the hearing required must provide the aggrieved party with an opportunity to clear his name. *Brady v. Gebbie, supra* at 1554.

Plaintiff was never given an opportunity to clear his name. This is a fact which cannot be disputed. Article I, Section 5 of the Commonwealth constitution provides the same

---

[4] It is noteworthy that this liberty interest has the right to protection independent of any property interest. "[W]hile *Brady*'s position in the unclassified service--or his at-will employment--bars his property claim,…it does not preclude his liberty claim." *Brady v. Gebbie, supra* at 1553.

10

EXHIBIT

JJ

procedural due process protections as the Fourteenth Amendment. It states: "No person shall be deprived of life, *liberty*, or property without due process of law." (Emphasis added). Commonwealth Courts have looked favorably to decisional law interpreting U.S. Constitutional provisions in order to determine the scope of protections afforded under the Commonwealth Constitution. *Commonwealth v. Condino*, 3 N.M.I. 501 (1993), *aff'd*, 33 F.3d 58 (9th Cir. 1994), *cert. den.* 514 U.S. 1021, 115 S.Ct. 1368, 131 L.E.2d 224 (1995); *In re "C.T.M."*, 1 N.M.I. 410 (1990); *Commonwealth v. Bergonia*, 3 N.M.I. 22 (1992). Drawing on the Ninth Circuit authority enforcing the same due process language applicable through the Fourteenth Amendment, plaintiff has established as a matter of law that his personal rights under Article I, Section 5 of the Commonwealth Constitution were violated by the complete failure to give him the opportunity to clear his name after it was demeaned by the Temporary Public Auditor in the process of terminating plaintiff's employment.

III.    PLAINTIFF HAS A CLAIM FOR DAMAGES AGAINST THE CNMI ARISING OUT OF THE VIOLATION OF PERSONAL RIGHTS GUARANTEED BY ARTICLE I OF THE COMMONWEALTH CONSTITUTION.

In the Third Claim of the Fourth Amended Complaint, plaintiff has alleged four separate violations of his rights as a citizen of the CNMI under Article I of the Commonwealth Constitution. Two of those are for violations of Article I, Section 5, deprivations of due process regarding his property and liberty interests. In addition, in paragraph 27 it is alleged that his freedom of speech was infringed by virtue of being fired for having disagreed with Bradshaw and for questioning his authority. Then in paragraph 29 plaintiff alleges his right of equal protection under Article I, Section 6 was violated by terminating him because he is of the Jewish race.

11

EXHIBIT
JJ

These claims are brought against Bradshaw in both his individual and official capacity, and against the CNMI government as being legally responsible for the acts of Bradshaw, who acted in all these instances while functioning as the Temporary Public Auditor. That is to say, Bradshaw had the ability to do these harms only because he had been empowered by the Governor of the CNMI to function in the position of Public Auditor. It follows that the CNMI government is responsible for such harms and that it is a matter of judicial discretion as to the proper remedy. In these circumstances, money damages is the only appropriate and available remedy. This conclusion is supported by common law authority, by the Restatement of Torts and by CNMI precedent.

    A. Common Law.

Several states have held that a direct action for damages may be maintained against a government entity for violation of personal rights guaranteed by their state's constitution.

*Wigdeon v. Eastern Shore Hosp. Center*, 479 A.2d 921 (Md. 1984) entertained a question certified from the United States District Court for the District of Maryland: "Does the law of Maryland provide an action for damages for violation of enumerated articles of the Declaration of Rights of the Constitution of Maryland, *viz*, Articles 24 and 26?" Id. at 922, n.1. Article 24 deals with the deprivation of liberty and property interests and Article 26 with illegal searches and seizures. The Court found the answer in the common law of England, which had been followed by Maryland courts, further supported by authority in the Federal courts and those of other states. *Id.* at 924-928. It concluded that "under the common law, there...exists an action for damages to remedy violations of constitutional rights." *Id.* at 929.

12

EXHIBIT

JJ

A very full discussion of the issues is found in *Corum v. University of North Carolina*, 413 S.E.2d 276 (N.C. 1992), where a professor who was discharged from his position as dean brought an action against the university and university officials, alleging his discharge violated his right to free speech under the equivalent of Article I, Section 2 of our constitution. The court said that the emphatic language of the provision "are a direct personal guarantee of each citizen's right of freedom of speech." *Id.* at 289. It noted that actions for the government's taking or damaging private property in public use without just compensation was well established, and reasoned:

> This great bulwark of liberty is one of the fundamental cornerstones of individual liberty and one of the great ordinances of our Constitution. Freedom of speech is equal, if not paramount, to the individual right of entitlement to just compensation for the taking of property by the State. *Flake v. News Co.*, 212 N.C. 780, 790, 195 S.E. 55, 62 (1938). Certainly, the right of free speech should be protected at least to the extent that individual rights to possession and use of property are protected. *Id.* A direct action against the State for its violations of free speech is essential to the preservation of free speech. *Corum v. Univ. of North Carolina, supra* at 289.

The *Corum* decision goes on to say that because it is the judiciary that has the responsibility to protect its citizen's fundamental rights, because their state constitution is more detailed and specific than the federal Constitution, and because no other remedy was apparent, "our common law guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional freedom of speech rights." *Id.* at 290.

There are many other states that have recognized that an individual may redress a state constitutional deprivation by instituting a damage action. See, e.g. *Woodruff v. Board of Trustees*, 319 S.E.2d 372 (W.Va 1984); *Gay Law Students Association v. Pacific*

13

*EXHIBIT*

*JJ*

*Telephone & Telegraph*, 595 P.2d 592 (Cal. 1979); *Bott v. DeLand*, 922 P.2d 732 (Utah

1996); *Brown v. State*, 674 N.E.2d 1129 (N.Y. 1996); *Moresi v. State, Dept. of Wildlife and*

*Fisheries*, 567 So.2d 1081 (La. 1990); *Old Tuckaway v. City of Greenfield*, 509 N.W.2d 323

(Wis.App. 1993); *Walinski v. Morrison & Morrison*, 377 N.E.2d 242 (Ill.App. 1978);

*Phillips v. Youth Development Program, Inc.*, 459 N.E.2d 453 (Mass. 1983).

Likewise, the United States Supreme Court, as well as numerous other federal courts

have held that violations of the constitutional guarantees give rise to private damage actions.

*See*, e.g. *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)(Fifth

Amendment equal protection right gives rise to damage action); *Bivens v. Six Unknown*

*Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d

619 (1971) (damage action appropriate to remedy government conduct in violation of Fourth

Amendment); *Jacobs v. United States*, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed.142 (1933) (Fifth

Amendment right that government render just compensation enforceable by damage action).

B. The Restatement and Policy Analysis.

The Restatement (Second) of Torts, Section 874A states:

> When a legislative provision protects a class of persons by
> proscribing or requiring certain conduct but does not provide a
> civil remedy for the violation, the court may, if it determines
> that the remedy is appropriate in furtherance of the purpose of
> the legislation and needed to assure the effectiveness of the
> provision, accord to an injured member of the class a right of
> action, using a suitable existing tort action or a new cause of
> action analogous to an existing tort action.

The term "legislative provision", as used in this section, includes constitutional

provisions. *Id.*, com. a.

The thirteen page commentary to section 874A provides a comprehensive explanation

14

EXHIBIT

JJ

of how this determination should be approached. In essence, this process is one that "involves looking for the policy behind the legislative provision, attempting to perceive the purpose for which it was enacted, and then, having ascertained that policy or purpose, determining the most appropriate way to carry it out and identifying the remedy needed to accomplish that result." *Id.* at com. d. The primary test to determine whether a court should provide a tort remedy is whether this remedy is (a) consistent with the legislative provision, (2) appropriate for promoting its policy, and (3) needed to assure its effectiveness. The commentary lists six factors to consider in making this determination. *Id.* at com. h. These will be discussed here.

1. The Nature of the Provision. Generally, the more specific the provision in question, the more it lends itself to judicial enforcement by way of a civil action. "[G]eneralized constitutional provisions are less likely to be utilized but may nevertheless be used if a fundamental right is involved." *Id.* at com. h.

Notably, the rights that are alleged to have been violated in the Third Claim of the Fourth Amended Complaint are fundamental ones. The right to practice a profession or to work is considered one of the fundamental rights.

> The right to work and the concomitant opportunity to achieve economic security and stability are essential to the pursuit of life, liberty and happiness. As early as 1915, the United States Supreme Court declared that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of [the Fourteenth] Amendment to secure." (*Truax v. Raich* (1915) 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131.) ... Limitations on this right may be sustained only after the most careful scrutiny. *Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529, 539 (Cal. 1971).

15

EXHIBIT

JJ

Additionally, freedom of speech, press and association, embodied in the First

Amended to the U.S. Constitution and an Article I, Section 2 of the Commonwealth

Constitution, is among the fundamental rights and liberties protected by the Fourteenth

Amendment from invasion by state action. *Lovell v. City of Griffin*, 303 U.S. 444, 56 S.Ct.

666, 82 L.Ed. 949 (1938). This is the right alleged to have been violated in paragraph 27 of

the Fourth Amended Complaint. Likewise, the allegations of paragraph 29 of discrimination

based on plaintiff being Jewish implicate the freedom of religion and belief, which is another

fundamental right. *West Virginia State Board v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87

L.Ed. 1628 (1943).

The liberty interest that everyone has in his good name and reputation relating to

one's chosen line of work is recognized as a fundamental one. *Endler v. Schutzbank*, 436

P.2d 297, 309 (Cal. 1968)("[F]undamental fairness requires that an individual be permitted to

defend himself publicly against official charges, however informal, which threaten to stain

his personal and professional future."). "[The] right to liberty [is] a fundamental right that is

recognized in the constitutional sense as carrying a preferred status and so is entitled to

special protection." *In re Seman*, 3 N.M.I. 57, 68 (1992), quoting *People ex.rel. Wayburn*

*v. Schupf*, 350 N.E.2d 906, 908 (N.Y. 1976).

The precious nature of these rights and the heightened standard of protection that are

afforded to them therefore militate in favor of allowing compensation when they are

infringed.

2. <u>The Adequacy of Existing Remedies.</u> These provisions of Article I of the

Commonwealth Constitution have no express remedies provided. The question then become

16

EXHIBIT

JJ

whether there is some good reason not to allow damages, and confine the available remedial measures to declaratory judgments and other equitable relief. This case illustrates why that would be inadequate. Because time has passed and plaintiff's job has been long sense filled, reinstatement is not a practical alternative. The only meaningful way to right the wrong in this instance is compensation by way of money damages.

Additionally, as noted above, at common law damages were always an optional remedy. "Historically, damages have been regarded as the appropriate remedy for invasion of a person's interest in liberty or property." *Moresi v. Dept. of Fish and Wildflife, supra* at 1081.

In *Widgeon v. Eastern Shore Hosp. Center, supra*, the availability of other non-constitutional remedies was considered:

> It is a well-settled rule, however, that where a particular set of facts gives rise to alternative causes of action, they may be brought together in one declaration, and where several remedies are requested, an election is not required prior to final judgment. [citations] Additionally, under some circumstances, a state constitutional provision may recognize and preserve an interest that is wholly unprotected under state common law and statutes. [citations] Thus, the existence of other available remedies, or a lack thereof, is not a persuasive basis for resolution of the issue before us. 479 A.2d at 928.

3. The Extent to Which a Tort Action Might Aid or Interfere With Existing Remedies. The rights abridged in this case are not generally the subject of either overlapping criminal nor administrative provisions, so that there is no need to be concerned with infringing on discretionary actions by other government agencies.

4. The Relative Importance of the Underlying Right Being Protected. "Does it involve a fundamental right or a minor matter." *Id.* at com. g. As set forth above, we are

17

EXHIBIT

JJ

dealing here with fundamental constitutional rights, which have the highest order of significance in terms of how they are treated. Indeed, because the personal rights guaranteed by state constitutions are of such paramount importance, to leave those persons who are injured by the violation of those rights without a remedy would be so anomalous that recognizing a damage action is compelled. See, *Brown v. State*, 674 N.Ed.2d at 1140-41; *Corum v. University of North Carolina*, 276 S.E.2d at 291.

  5. <u>The Extent to Which Tort Law May Be Changed.</u> The right to damages for constitutional violations is nothing new. In fact it has extensive historical support. It first emanated from the common law of England. "The history of individual rights as embodied in the Magna Charta and other fundamental documents support this view. Under English law, individuals had access to remedies of money damages for violations of their individual rights, [citations] and these rights, enumerated in fundamental documents, were the forerunners of many of the provisions adopted in federal and state bills of rights." *Bott v. DeLand*, 922 P.2d at 739.

  Constitutional tort claims were recognized after the Civil War when Congress authorized civil damage actions against those, "who, under color of" State law, or custom have deprived others of constitutional rights. (Act of Apr. 20, 1871, ch. 22, § 1, 17 U.S. Stat. 13). Those statutes, now codified in 42 U.S.C. § 1981, et seq. remained relatively obscure until the 1961 decision of the Supreme Court in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In *Monroe*, the Court held that a plaintiff whose constitutional rights have been infringed by one acting under color of State law can bring a Federal action under section 1983 even where the State provides an adequate remedy at

18

EXHIBIT

JJ

common law. The statute was intended to create "a species of tort liability" in favor of persons deprived of their constitutional rights. See, *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 1281 (1976).

In 1971, the Supreme Court recognized a cause of action for damages based upon duties defined in the Federal Constitution. See, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Court did not predicate recovery on the civil rights statutes but implied a cause of action for damages based on the guarantees against unlawful searches and seizures contained in the Fourth Amendment. And more recently, adopting the rationale of *Bivens*, most of the states that have addressed the issue have similarly recognized causes of action against individuals and governments for violations of rights under their own state constitutions. (See cases cited supra at 13-14). Thus, to recognize an action for damages here would not constitute any abrupt shift in the law, but would be well grounded in historical precedent, following the lead of the great majority of states that have considered the issue.

6. The Extent to Which Recognition of these Claims may Tend to Burden the Commonwealth Courts. The comments make it clear: "This factor, of course, does not carry weight if a fundamental is being impaired or other remedies are not adequate to protect it..." Rest.2d, Torts, §874A, com. h(6). The reason for that was probably best expressed by Justice Harlan in his concurring opinion in *Bivens*:

> "Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of

19

*EXHIBIT*

*JJ*

> legally protected interests. And current limitations upon the
> effective functioning of the courts arising from budgetary
> inadequacies should not be permitted to stand in the way of the
> recognition of otherwise sound constitutional principles." (403
> U.S. at 411, 91 S.Ct., at 2012).

*Brown v. State*, *supra*, establishes what it terms "constitutional torts" under New

York's state constitutional guarantee of equal protection and against discrimination[5] and the

guarantee against unreasonable search and seizures. In doing so, it references Section 874A

and rests the basis of the decision, in part, on the rule formulated therein. In addition to the

Restatement, it finds support for the decision in the analogy to *Bivens*, and in the historical

support in common law precedent for tort remedies for invasion of these constitutional rights.

"[I]mplying a damage remedy here is consistent with the progress underlying the duties

imposed by these provisions and is necessary and appropriate to ensure the full realization of

the rights they state." *Brown v. State*, *supra* at 1139, citing, *inter alia*, *Bivens*, supra, 403

U.S. at 406, 91 S.Ct. at 2010 [Harlan, J. concurring], and Restatement (Second) of Torts §

874A, comment d.

    C.  CNMI Precedent.

    In *Govendo v. MPLC*, 2 N.M.I. 482 (1992) the dismissal of a cause of action alleging

a violation of Article I, Section 9, dealing with the right to a clean and healthful

---

[5]  New York's provision is very similar to Article I, Section 6 of the Commonwealth
Constitution. It reads:

> "No person shall be denied the equal protection of the laws of
> this state or any subdivision thereof. No person shall, because
> of race, color, creed or religion, be subjected to any
> discrimination in his civil rights by any other person or by any
> firm, corporation, or institution, or by the state or any agency
> or subdivision of the state." (N.Y. Const., art. I, § 11.)

20

*EXHIBIT*

*JJ*

environment, was reversed.  The Court held that Article I, Section 9 was self executing (*Id.* at 502, n. 16); and, that if it is violated by a private person or entity or by a government agency a citizen "may bring an action to enjoin such violation *and recover damages* for injuries sustained." *Id.* at 502 (Emphasis Added).  Similarly, it held that Article XI, Section 5(e), which is one of the "Fundamental Policies" of MPLC in dealing with public lands, to be self-executing and allows CNMI citizens of Northern Marianas descent to seek injunction or damages for violations.  *Id.* at 500, n. 14.  The self-executing nature of Article I, Section 9 was reiterated in *Torres v. MPLC*, 3 N.M.I. 484, 492 (1993).

A civil damage remedy cannot be implied for a violation of a constitutional provision unless the provision is self-executing--that is, it takes effect immediately, without the necessity for supplementary or enabling legislation.  *Brown v. State*, *supra* at 1137.  The test to determine whether or not the provision lays down a sufficient rule by means of which the right it gives or the purpose it is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment.  If the provision lays down a sufficient rule, it is self-executing.  *State ex. rel. City of Fulton v. Smith*, 194 S.W.2d 302 (Mo. 1946); *City of Shawnee v. Williamson*, 338 P.2d 355 (Okla. 1959); *Gray v. Bryant*, 125 So.2d 846 (Fla. 1960).

There is a general presumption that all constitutional provisions are self-executing. *People v. Carroll*, 148 N.E.2d 875 (N.Y. 1958); *State ex. rel. Russell v. Bliss*, 101 N.E.2d 289 (Ohio 1951); *Morgan v. Board of Supervisors*, 192 P.2d 236 (Ariz. 1948); *Rockefeller v. Hogue*, 429 S.W.2d 85 (Ark. 1968); *Appeal of Crescent Precision Products, Inc.*, 516 P.2d 275 (Okla. 1973).  The reasons for this presumption has been expressed:

*EXHIBIT*

*JJ*

> The will of the people is paramount in determining whether a
> constitutional provision is self-executing and the modern
> doctrine favors the presumption that constitutional provisions are
> intended to be self-operating. This is so because in the absence
> of such presumption the legislature would have the power to
> nullify the will of the people expressed in their constitution, the
> most sacrosanct of all expressions of the people. *Gray v.*
> *Bryant, supra* at 851.

Constitutional provisions contained in the Bill of Rights are usually considered to be

self-executing. *Robb v. Shockoe Slip Foundation*, 324 S.E.2d 674, 676 (Va. 1985); *Ex Parte*

*Berman*, 87 N.E.2d 716 (Ohio App. 1949); *Merrell v. All Seasons Resorts, Inc.*, 720 F.Supp.

815, 818 (C.D.Cal. 1989)("It is axiomatic that a constitutional right needs no enabling

legislation to provide for its enforcement."). The three constitutional provisions sued upon

here are all ones that have parallels in the Bill of Rights.

"[P]rohibitory or negative constitutional provisions are self-executing as no

supplementary legislation is needed to give them effect." *Chamberlain v. State Through*

*DOTD*, 624 So.2d 874, 882 (La. 1993), citing *Cooley, 1 Treatise on Constitutional*

*Limitations*, 167 n.1 (8th Cir. 1927). All three of the constitutional provisions involved here

begin with the word "No".

State constitutional provisions guaranteeing equal protection and prohibiting

discrimination have been held to be self-executing. See, *Harley v. Schuykill County*, 476

F.Supp. 191 (E.D.Pa. 1979); *Erdman v. Mitchell*, 56 A. 327 (Pa. 1903); *Schreiner v.*

*McKenzie Tank Lines, Etc.*, 408 So.2d 711 (Fla.App. 1982), aff'd 432 So.2d 567; *Brown v.*

*State, supra* at 1137; *N.A.A.C.P. v. City of Dearborn*, 434 N.W.2d 444 (Mich.App. 1988)

app.den. 447 N.W.2d 751; *Under 21 Catholic Home v. City of New York*, 481 N.Y.S.2d 632

(N.Y.Sup. 1984). Likewise, the provision of the North Carolina constitution which protects

22

*EXHIBIT*

*JJ*

the right of freedom of speech was held to be self-executing. *Corum v. University of North Carolina, supra* at 289.

Thus, given the general presumption of self-execution, given the fact that all of the constitutional provisions that the Third Claim are predicated upon are from the Bill of Rights, and given that they are negative and prohibitory in their language, the conclusion must be that like Article I, Section 9, they too are self-executing. Consequently, as in *Govendo v. MPLC, supra,* and *Torres v. MPLC, supra,* violation of them gives rise to an action for damages.

## IV.    PLAINTIFF IS ENTITLED TO PAYMENT FOR SERVICES RENDERED FOR THREE DAYS WORK IN JANUARY, 1994.

In the Ninth Claim of the Fourth Amended Complaint, plaintiff seeks to be paid for three days during which he returned to work at OPA during January, 1994, after his employment was terminated, at the request of Scott Tan, who by then had been reappointed and was Acting Public Auditor. As set forth in his declaration, plaintiff agreed to return to work, although he limited his activities to non-legal matters due to some concern about whether he could act as legal counsel under circumstances where official government hiring procedures had not been completed.

Defendants' answer denies on the basis of insufficient information the allegation that plaintiff worked three days and that he was not paid for them. However, in Response to Plaintiff's Interrogatories to Defendants-Set One, defendants answered "No" to the following interrogatory:

> 1. Do you contend that plaintiff is not entitled to compensation for the few days of services performed during January, 1994 at the request of the then Temporary Public Auditor, Scott K. Tan?

23

*EXHIBIT*

*JJ*

Where one person has performed services for another which are requested, or are known to and accepted by the latter, the law will imply a promise to pay the reasonable value of such services, even though there is no express agreement as to the compensation. *Fitzgerald & M. Cons't. Co. v. Fitzgerald*, 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608 (1890); *Re Holta's Estate*, 68 N.W.2d 314 (Iowa 1955); and see, Restatement of Restitution, § 1, com. b.; 66 AmJur 2d, Restitution and Implied Contracts, § 20.

Under the circumstances presented here, it must be presumed that the parties, in particular plaintiff and Tan, expected that plaintiff would be compensated for these three days of work.

## CONCLUSION

As set forth above, there are four issues that may be eliminated from consideration at trial as there are no material issues of disputed fact. Summary adjudication of these issues should be entered.

Respectfully submitted,

JAY H. SORENSEN
Attorney for Plaintiff

I hereby certify that the foregoing hereof is a full true and correct copy of the original on file in the Office of the Clerk of Courts, Susupe, Saipan, Mariana Islands.

Date: OCTOBER 31, 2006

CLERK OF COURT
NORTHERN MARIANA ISLANDS
SAIPAN, MP 96950

24

EXHIBIT

JJ