F I L E D
Clerk
District Court

SEP 21 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

Robert D. Bradshaw
PO Box 473
1530 W. Trout Creek Road
Calder, Idaho 83808
Phone 208-245-1691

Plaintiff, Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT D. BRADSHAW ) | Case No. CV 05-0027 |
| Plaintiff ) | |
| v. ) | |
| COMMONWEALTH OF THE NORTHERN ) | **THIRD AMENDED COMPLAINT** |
| MARIANA ISLANDS (hereafter referred to ) | |
| as the CNMI); NICOLE C. FORELLI, former ) | |
| Acting Attorney General of the CNMI, in her ) | |
| personal/individual capacity; WILLIAM C. ) | |
| BUSH, former Assistant Attorney General of ) | |
| the CNMI, in his personal/individual capacity; ) | |
| D. DOUGLAS COTTON, former ) | |
| Assistant Attorney General of the CNMI ) | |
| in his personal/individual capacity; L. ) | |
| DAVID SOSEBEE, former Assistant Attorney ) | |
| General of the CNMI, in his personal/individual ) | |
| capacity; ANDREW CLAYTON, former ) | |
| Assistant Attorney General of the CNMI, in his ) | |
| personal/individual capacity; Other ) | |
| UNKNOWN and UNNAMED person or ) | |
| persons in the CNMI, in their ) | |
| personal/individual capacity; ) | |
| PAMELA S. BROWN, former ) | |
| Attorney General of the CNMI; in her ) | |
| personal/individual capacity; ) | |

1

Received  Sep-22-2006 06:26       From-                    To-US DISTRICT COURT, N    Page 003

ROBERT A. BISOM; and JAY H. SORENSEN.   ) Defendant SORENSEN Has Requested a
       Defendants                           ) Jury Trial

Plaintiff alleges:

## JURISDICTION

1. This case was first filed in the US District Court (USDC) of Idaho on Mar 7, 2005 (Civil case 05-84). It was dismissed on July 25, 2005 for lack of personal jurisdiction without prejudice with notice to plaintiff on July 29, 2005. It is being refiled in the USDC of the CNMI.

2. It is a civil rights action seeking redress for plaintiff BRADSHAW due to acts and omissions by defendants, who, generally with alleged color of law and color of authority, have subjected the plaintiff to the deprivation of his rights and privileges under the US Constitution and laws; and the Civil Rights Acts of 1870; 42 USC sections 1983; 1985 and 2000; and for violations of 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1964; and for violations to plaintiff's constitutional rights under the 14th Amendment of the US Constitution.

3. While the defendant CNMI officials, officers, employees and agents, as cited herein, have pretended to be clothed with alleged color of law/authority in their acts and omissions against plaintiff, they have actually violated a number of US laws and the US Constitution which they were duty bound to uphold and support, as will hereafter be described.

4. Section 903 of the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America," states: "Nothing herein shall prevent the presentation of cases or controversies arising under this Covenant to courts established by the Constitution or laws of the United States. It is intended that any such cases or controversies will be justifiable in such courts." The CNMI, like the US states, is not

immune for its actions involving discrimination on the basis of race, color, religion, age, sex, handicap, national origin and other forms, and/or violations of civil and/or constitutional rights, and/or violations against their own duties under law and/or when federal funding is involved. The CNMI is not immune from law suits involving situations related to incidents involving any program that receives assistance in federal funding (42 USC 2000). Much of CNMI activities involve US funding/grants.

5. As this case involves an action over $75,000 and between citizens of different US states and jurisdictions, the US Courts have jurisdiction. The issue herein offers both personal and subject matter jurisdiction to the Federal courts as per the US Constitution.

6. The court has original jurisdiction of the claims by virtue of the Federal Rules of Civil Procedure; Federal Rules of Evidence; Title 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1965; Title 28 USC 1331, 1332, 1339, 1343, 1391, 1392, and 1652; Title 42 USC 1983 to 2000; the US Constitution; and the Common Law. Title 28 USC 1339 applies because this suit involves alleged postal fraud under 18 USC 1341-1342, and 1707 in that some of the defendants misappropriated US postal forms to use in fraud and conspiracy upon plaintiff BRADSHAW. The court has supplemental jurisdiction over the related claims arising under the laws of the CNMI pursuant to 28 USC 1367.

**PARTIES**

7. Plaintiff is a citizen of the United States and during the times relevant to this complaint was a resident of the CNMI, and the states of Washington and Idaho.

8. Defendant NICOLE C. FORELLI, former Acting AG of the CNMI from on or about Jan. 25, 2000 to on or about Feb. 10, 2000, is a citizen of the United States and a resident of

3

Hawaii.

9. Defendant WILLIAM C. BUSH, former Assistant (Asst) AG of the CNMI in 1999, is a citizen of the United States and a resident of Washington, DC.

10. Defendant L. DAVID SOSEBEE, former Asst AG of the CNMI, in 2000, is a citizen of the United States and a resident of Texas.

11. Defendant ANDREW CLAYTON, former Asst AG of the CNMI from about 2000 to 2002, is a citizen of the United States and possibly a resident of China or the US.

12. Defendant D. DOUGLAS COTTON, former Asst AG of the CNMI in 1996-1999, is a citizen of the United States and a resident of Texas.

13. Defendant(s) UNKNOWN and UNNAMED person or persons in the CNMI, in 1996-2005, are currently unidentified and/or unknown to plaintiff, and could not be reasonably discovered prior the filing of this Complaint, but whose identities plaintiff expects will become known through discovery. Plaintiff will amend this Complaint to allege said defendant(s) true names and capacities when that information becomes known through discovery. Plaintiff is informed, believes and thereon alleges that these UNKNOWN and UNNAMED defendants are also legally responsible and liable for the incidents, injuries and damages hereinafter set forth, and that each of said defendant(s) proximately caused the injuries and damages by reason of gross negligence, carelessness, deliberately indifferent, intentional, willful or wanton misconduct, and fraud and conspiracy or conspiracies in creating and otherwise causing the incidents, conditions and circumstances hereinafter set forth, or by reason or impugned negligence or vicarious fault or breach of duty arising out of the matters herein alleged.

14. Deleted.

15. Defendant ROBERT A. BISOM, plaintiff in CNMI SP Civil Case 96-1320, is a citizen of the United States, and is possibly a resident of Japan or the US.

16. Defendant JAY H. SORENSEN, attorney for ROBERT A. BISOM in SP Civil Case 96-1320, and an officer of the CNMI courts in that trial in Feb -Mar 2000 and during its 2002 appeal to the CNMI Supreme Court (Appeal Nos. 00-0016 & 0023-GA, Consolidated) is a citizen of the United States and possibly a resident of the US or China.

17 Defendant PAMELA S. BROWN is the former Attorney General of the CNMI in 2004 and 2005. She is a citizen of the United States and a resident of the CNMI.

18. Defendants BROWN, FORELLI, BUSH, COTTON, CLAYTON and SOSEBEE of the CNMI AG's office were all employees, officials, officers and agents of the defendant CNMI at the time of their actions and omissions involving plaintiff BRADSHAW.

19. Defendant COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS (CNMI) is a political and governmental entity in union with the United States of America with its primary and central government offices located on Saipan Island.

20. The relationship and linkage between the USA and the CNMI is set forth primarily in the 1976 "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America" and Title 48 USC 1801.

### FACTS AND GENERAL ALLEGATIONS

21. On Nov 25, 1993, plaintiff was appointed the CNMI Temporary Public Auditor under an outgoing Governor Guerrero's administration. Governor-elect Tenorio was to take over in Jan 1994. Defendant BISOM was legal counsel of the Public Auditor's office (OPA).

BISOM worked in the office under BRADSHAW's supervision for a little over one day.

22. Unbeknown to BRADSHAW, BISOM was involved in negotiations on Nov 25-27, 1993 with the former Public Auditor and the Governor-elect to interfere in and stop a scheduled audit of the CNMI by a local CPA firm. BRADSHAW proceeded with the audit as required, per his official duty.

23. Per BISOM's later complaints in USDC case 95-0042 and CNMI SC case 96-1320 (para 60-61 of the CNMI Complaint and para 63-64 in the 4th Amended Complaint), promises were made that if he was fired for his actions against BRADSHAW, he would be rehired in Jan 1994 when Governor-elect Tenorio took over. These promises were allegedly made to BISOM by former Public Auditor Tan and Governor-elect Tenorio in Saipan on Nov 25-27, 1993.

24. After the one plus day of work in the OPA office in Nov 1993, BISOM abandoned his job and began publicly attacking OPA, the audit and BRADSHAW personally.

25. BISOM then went to the CNMI legislature and revealed confidential and privileged information which he had obtained in the OPA. He next commenced a campaign of going to the CNMI press to condemn and verbally attack BRADSHAW and the audit under way.

26. Though BISOM was using the CNMI media to slander and attack BRADSHAW, BRADSHAW never responded with any personal comments to the media about BISOM. BRADSHAW then fired BISOM for cause in Dec 1993. Next BRADSHAW reported BISOM's conduct to the CNMI Bar Association for action in Dec 1993. BRADSHAW returned to the US in Jan 1994. BISOM was not rehired by Tenorio in Jan 1994.

Received Sep-22-2006 06:26      From-      To-US DISTRICT COURT, N      Page 008

27. On Nov 14, 1995, BISOM sued BRADSHAW and others in the CNMI US court case 95-0042. BRADSHAW was sued in his official and individual capacities but the pleadings were made that BRADSHAW acted in his official capacity and for official duties. BISOM plead that BRADSHAW's acts were politically motivated and involved racial discrimination against him.

28. BRADSHAW was served with the complaint in an unidentified certified mailing envelope showing only a Saipan post office box. The name of the mailer was not on the envelope. On receipt, BRADSHAW contacted the Attorney General (hereafter the AG) to file the answer.

29. The case was dismissed without prejudice. BRADSHAW submitted a claim of $130 in personal expenses defending the suit. The $130 was added to the bill of costs. This $130 was never paid. In the 2003 CNMI settlement with BISOM, the CNMI allegedly canceled the $130 due BRADSHAW. Despite requests for reimbursement, BRADSHAW was never paid or informed of the status of the $130.

30. In the dismissal, the USDC NMI court order of Nov 22, 1996 found that BISOM's complaint was against BRADSHAW in his official and individual capacities. But the pleadings all involved BRADSHAW's official duties and capacities. The Court quoted Johnson v. Bd of County Comm'rs for County of Fremont (85 F 3d 489, 493 [10th Cir, 1996]) that "When a governmental official is sued in his official and individual capacities for acts performed in each capacity, those acts are 'treated as the transaction of two different legal personages.'"

7

31. On Dec 5, 1996, BISOM refiled his complaint in the CNMI SC Case 96-1320. Defendant SORENSEN was his lawyer. BISOM sued BRADSHAW in both his official and individual capacities with essentially the same charges as in 95-0042. BISOM added words in the pleadings to allege both official and individual capacities/actions which were the same ones as cited in 95-0042.

32. BISOM's pleadings were always in the context of BRADSHAW's actions in his official capacity and for his official duties. BISOM never alleged that BRADSHAW acted beyond the scope of his designated powers (i.e. ultra vires). He cited the same charges of politics and racial discrimination. But he made them for both federal and CNMI claims in his complaint. BISOM continued statements against BRADSHAW which were patently false.

33. On Dec 31, 1996, the CNMI removed 96-1320 to the USDC where it became USDC 96-0052. The Court order of Mar 27, 1997 dismissed the actions under res judicata with the federal claims dismissed with prejudice. The Court found that "the instant lawsuit is nearly identical to one which plaintiff previously filed in this court (95-0042); plaintiff and all defendants are the same, the two federal causes of action are the same and the Commonwealth claims are the same" (p. 4 of the order).

34. Rather than complying with the USDC order, BISOM continued most of the same allegations in his 1st and 2d amended complaints. He did delete the actual commentary and pleadings for the two federal claims of racial discrimination and politics. But he left the claims as titled/captioned in his complaints.

35. The 1st and 2d amended complaints were allegedly served on BRADSHAW through return postal receipts which were clearly fraudulent, per later court representations.

36. The BISOM suit in BRADSHAW's official capacity continued until Dec 11, 1997 when the CNMI acted to have official capacity on the caption/title changed to Leo Lamotte, then Public Auditor. On the caption, BRADSHAW remained in his individual capacity.

37. On Dec 24, 1997 the 3d amended complaint was filed to reflect this change in the caption. The CNMI removed 96-1320 to the USDC NMI on Jan 23, 1998 where it became 98-0002. The Court ordered the dismissal of the federal claims for the third time. Again, they were dismissed with prejudice.

38. A 4th amended complaint was filed Nov 18, 1998 which continued the same specific charges that BRADSHAW acted in his official/individual capacities in the pleadings.

39. This 4th one became the official complaint allegedly heard by Judge CASTRO in the CNMI SC. It offered no distinction between official and individual capacities or duties. In fact, the duties all continued in the same vein as all of previous complaints in that they were official duties. The USDC in 95-0042 said that BRADSHAW could not be sued for his official duties as that would offer him qualified immunity

40. The CNMI was duty bound to legally defend and indemnify BRADSHAW as the complaint and 1st and 2d amended complaints were all filed by BISOM with BRADSHAW sued in his official capacity and alleging acts by BRADSHAW in his official capacity.

41. Even the 3d and 4th amended complaints involved official capacity and duties which brought forth the CNMI duty to defend and indemnify BRADSHAW.

42. With BRADSHAW being sued in his official capacity, the CNMI had a de jure fiduciary duty to provide legal assistance and indemnification to BRADSHAW per the CNMI Constitution (article III, section 11) and other CNMI laws.

9

43. With the continuing charges of official capacity and duties in the 3d and 4th amended complaints, the CNMI duty to BRADSHAW continued. Certainly, the CNMI had a de facto fiduciary duty to BRADSHAW in all of the BISOM actions.

44. The CNMI AG knew that USDC 95-0042 produced a bar for BRADSHAW to be sued in his official capacity and without making any distinction between his official acts and his individual acts as stated in the USDC 95-0042 order.

45. The AG failed to exercise due diligence by ignoring this bar in the BISOM litigation. This bar was sufficient for 96-1320 to be dismissed in the SC.

46. BISOM's continuation of the litigation against BRADSHAW for essentially the same claims which were dismissed by the USDC NMI three times constituted a malicious prosecution.

47. BISOM, his attorney and the AG knew and understood the implications of BISOM's continuing malicious prosecution against BRADSHAW. The AG had a duty to go into court and have the case dismissed on this basis. But the AG failed to exercise due diligence.

48. The original complaint in 96-1320 was filed on Dec 5, 1996 and a summons on BRADSHAW was issued that day. Per the 120 day limit on service in SC rule 4(m), the judge on his own initiative or on motion was obligated to dismiss the action without prejudice. The 120 days was up on Apr 4, 1997. There is nothing in the case docket allowing that this rule was obeyed.

49. No motion was made by BISOM for a time extension. No motion was made by the AG for dismissal. The court issued no order with a new time deadline for service or for a dismissal. Even if the AG and BISOM agreed for a time extension, it was invalid and illegal

Received Sep-22-2006 06:35        From-              To-US DISTRICT COURT, N      Page 002

for BRADSHAW without BRADSHAW's stipulation.

50. The AG was not authorized by BRADSHAW to accept service or to negotiate any extensions of time for service. With BRADSHAW's limitations on the AG accepting service, an extension of time would have had to involve a court order.

51. Both the AG and BISOM fully knew and understood that they could not agree on extending service on BRADSHAW. Only a court order from the judge would suffice. No such order came forth. Thus, all proceedings involving BRADSHAW after Apr 4, 1997 were illegal and without force of law.

### The Alleged Service on BRADSHAW

52. Yet, BISOM's alleged certified letters with summons and complaint to BRADSHAW were mailed in May (over 150 days later) and June 1997 (over 180 days later). Not only did BISOM's actions produce fraudulent documents, but they were illegal and without force of law per the CNMI civil procedure rule 4(m).

53. Per the 96-1320 docket, there is no citation of any court order for the issuance of the first two amended complaints.

54. CNMI rule 4(d) did authorize mail service if defendant signed a waiver. But BRADSHAW never signed a waiver. Certified mail was allowed in 7 CMC. It provided no default provision but only for publication by court order if service could not be effected by certified mail

55. In WA state, there was no provision for certified mail service beyond a court order. The Revised Code of Washington (4.28.80) has a case note which says that those to be served with process are under no obligation to arrange time and place for service or to

Received Sep-22-2006 06:35        From-        To-US DISTRICT COURT, N        Page 003

otherwise accommodate process server. Weiss v. Glemp, 127 Wash. 2d 726, 903 P 2d 455 (1995). Obviously, the same reasoning applies to certified mail. No one in the state of Washington has to accept it or be found avoiding service.

56. Case 96-1320 produced correspondence between BRADSHAW and the CNMI. Exhibit A is BRADSHAW's affidavit of letters received. The letters are attached. Exhibit B is an affidavit of BRADSHAW's letters sent the CNMI. The letters are attached. Exhibit C is another affidavit on the extent of correspondence with the CNMI.

57. In 1996, BRADSHAW discussed with the AG the practice of lawyer SORENSEN sending out certified mail without his name or identification on the mailing envelope. BRADSHAW was concerned with any need to even accept such mailings from an unidentified party. Discussions were held with former Asst AG Robert Kingsley, and possibly also Robert Dunlap/Doug Cotton.

58. BRADSHAW was told that a person has no legal obligation to accept mail, certified or not, from anyone. While acceptance of such mail can create a legal tie, non-acceptance or refusal to accept or claim such mail does not establish a legal binding relationship. Although once a person is properly served with process and comes under the jurisdiction of the court, a legal need then arises to accept further mailings and legal notices.

59. So while accepted mail can constitute service of process, non accepted mail cannot be used to prove refusal of service of process in an initial service of process to establish court jurisdiction over a person.

60. In a letter from Mr Cotton, BRADSHAW was asked if he wanted the AG to accept service for him. Though the AG was the legal attorney for BRADSHAW and OPA,

BRADSHAW does not allow other persons to accept initial service of legal processes to establish court jurisdiction over him in any action in his individual capacity. BRADSHAW insists that any such initial services be made on him personally so that he can fully know and understand the complaint. Too, the CNMI procedure for indemnification per PELDIA (the employee's indemnification act) is for a party to be first served and then the party is to contact the AG to file an answer.

61. Though BRADSHAW was informed by the AG that he could expect service, there was no requirement for him to accept certified letters unless a waiver had been signed. But BRADSHAW signed no waiver.

62. In BRADSHAW v. CNMI et. al. (USDC Idaho 5-84), defendants SORENSEN and BISOM received notice of service of process. Yet both objected to it in their motion to dismiss on July 7, 2005 on the premise that "Knowledge does not constitute service... Actual notice does not substitute for proper service of process, otherwise it would be nonsensical for the Federal Rules of Civil Procedure to provide for a motion to dismiss based on insufficiency of service of process (Dahl v. Kanawha Inv. Holding Co., 161 f.R.D. 673, 681, N.D. Iowa 1995)."

63. In 1996/1997, BRADSHAW received two certified mail envelopes which only showed a Saipan post office box number. They appeared to be similar to the certified mail from lawyer SORENSEN to BRADSHAW in 1995. But BRADSHAW did not note the box number on the mailings in 1996/1997 to be sure. BRADSHAW did not accept these 1996/1997 mailings. BRADSHAW on Jun 2, 1997 brought one letter and his assumption that it was from SORENSEN to the attention of the AG in a privileged letter (Exhibit "B").

Received Sep-22-2006 06:35      From-      To-US DISTRICT COURT, N      Page 005

64. BRADSHAW was available daily in Elk, WA in 1996-1998 for service of process as he operated a retail business. He never hid from a process server. He did not refuse legitimate service of process. He expected to be served by a process server at once. Yet, it never happened.

65. Subsequently, BISOM filed four amended complaints on this case in SC. None of them were served on BRADSHAW. BRADSHAW sent the AG letters on Jan 31, 1997; Jun. 2, 1997; Jul. 14, 1999; and Jul. 15, 2000 (Exhibit "B").

66. In a letter to BRADSHAW on Jun. 30, 1999 (Exhibit B6), Asst AG BUSH asked about service. BUSH said that answers to his letter would "be protected under the attorney-client privilege." BUSH added that "If there has been no service perfected, then I might be able to get you out of 96-1320 on the two-year statute of limitations for tort claims."

67. The first thing about this letter is that it involved privileged communications as stated by Mr BUSH. BRADSHAW never authorized the CNMI to release his letter to the SC in 96-1320. Yet, in Mr SOSEBEE's motion to take the case off of the calendar (Feb 1, 2000), he submitted this privileged letter to the court without BRADSHAW's permission.

68. BRADSHAW's letter of Jul. 14, 1999 to the AG addressed BUSH's questions and said that some two certified mail packets from an unidentified party came from Saipan in 1996 and 1997. They were not accepted.

69. BRADSHAW's reply also added that no service was made and that any alleged service by BISOM would constitute a fraud. BRADSHAW's letter mentioned a cut off for service of 180 days (it was correctly 120 days) and questions over the statute of limitations.

14

These are subject matter questions which certainly went before CASTRO when he read BRADSHAW's letter.

70. BRADSHAW's Jul 14 letter said "Should you file a motion to strike my name individually from the suit? Since you have suggested it, it seems like a good idea...Accordingly, if you wish to file a motion to have me removed individually from the CNMI case, you have my permission and agreement... Should you represent me further? Again, I don't think I am a party to that CNMI case and if that is true, the answer is no (if the answer is yes then of course I would need representation;..."

71. BRADSHAW's letter of Jul. 14, 1999 plainly asked the AG to go into court and have BRADSHAW's name stricken from 96-1320 on the basis of no service. For sure, the AG should have contacted BRADSHAW at once if an affidavit or BRADSHAW's presence was needed for the court on Saipan. Certainly, the exchange of correspondence was predicated on the fact the AG was BRADSHAW's lawyer and expected further help to resolve the case.

72. From June 30, 1999 until about April 22, 2004, BRADSHAW in ID and WA always believed and acted on the premise that indeed the AG had went into court and had BRADSHAW's name removed as a defendant from the BISOM suit.

73. The BRADSHAW letter of Jul. 14, 1999 was clear that BRADSHAW was not served and that BRADSHAW expected and anticipated further AG assistance in resolving the case. But this letter did not authorize the AG to withdraw or deny BRADSHAW indemnification (if BRADSHAW was served).

**US Postal Fraud**

Received   Sep-22-2006 06:35       From-       To-US DISTRICT COURT, N   Page 007

74. Unbeknown to BRADSHAW, BISOM/SORENSEN or person(s) under their misappropriated some certified mail/return receipt forms from the US Post Office possibly in 1997 and certainly by Aug 1999.

75. BISOM/SORENSEN used these forms to prepare fraudulent postal return receipts showing service of process on BRADSHAW by certified mail in Jun and Jul 1997 for the first two amended complaints. They submitted these fraudulent receipt records to the CNMI SC.

76. It is unclear when the AG first learned of these fraudulent documents in the 96-1320 file. But Asst AG SOSEBEE knew by Aug 27, 1999 when he received a letter from SORENSEN stating "service by certified mail on (Bradshaw) on two occasions. We also have the return receipt cards." Per the CNMI SC Order to Void on Dec 29, 2005, these receipts are identified as Z 142 485 879, dated Jun 4, 1997 and Z 142 485 883, dated Jul 2, 1997. They both bore the signature of "Manny" (the last name was possibly Mongohia).

77. Exhibit "D" has an affidavit of David Vanderholm, the postal carrier in Elk WA. The original of his affidavit is filed in BRADSHAW's Amended Motion to Void/Vacate Judgment in the CNMI SC 96-1320 file. Vanderholm categorically declares that the name Manny is unknown on his mail route.

78. On Sep 3, 1999, BISOM's "Reply to Opposition to Motion for Partial Summary Judgment" said that proofs of service on BRADSHAW was filed in 1997 and that these proofs were provided to the AG.

79. From Aug 27, 1999 to early Feb 2000, the AG evidently did nothing of substance on case 96-1320, per the case file. The AG made no contact with BRADSHAW to advise him of the trial, of the alleged service made by BISOM or the conflict in the various documents in

16

Received  Sep-22-2006 06:35        From-             To-US DISTRICT COURT, N        Page 008

possession of the AG.

### Judge CASTRO's Gross Incompetence

80. The AG's "Motion to Remove Case from Jury Trial Docket," filed on Feb 1, 2000, said: "plaintiff purports to have sent the Amended Summons and Complaint to defendant, Robert D. Bradshaw, 40203 N. Newport Hwy., Elk, WA 99009, on May 5, 1997. Exhibit A. Plaintiff also purports to have sent a Second Complaint and Amended Summons to defendant Bradshaw at the same address, on June 3, 1997. Exhibit B. Plaintiff has previously supplied copies of two United States Mail Domestic Return Receipt cards, neither of which bear the signature of defendant, Robert D. Bradshaw. Exhibit C. Defendant Bradshaw has not authorized anyone to accept service for him and has not been served with the any of the complaints in this case. Exhibit D, July 14, 1999 letter from Bradshaw to the Office of the Attorney General."

81. This AG motion included a copy of BRADSHAW's privileged letter of Jul 14, 1999, as evidence that BRADSHAW had not been served. Per the later Supreme Court decision, the AG notified the Court and SORENSEN that the AG withdrew that date as BRADSHAW's attorney. BRADSHAW was never noticed of this withdrawal, of the trial, or of the documents in court alleging service on BRADSHAW. This involved AG malpractice/lack of due diligence.

82. The trial was scheduled for Feb 7th. The various court filings, fraudulent receipts, and documents were all submitted to Judge CASTRO. CASTRO was thoroughly informed about all aspects of case 96-1320 by Feb 7, 2000.

83. The trial of CNMI SC 96-1320 commenced under CASTRO. It was characterized by much confusion and contradictory paradoxes. CASTRO allowed the mess into evidence.

17

But he did not allow BRADSHAW's letter of Jul 14, 1999 into evidence.

84. CASTRO obviously read BRADSHAW's letter of Jul 14, 1999. Surely he understood its message. Or did he? Anyway, it totally contradicted everything which BISOM submitted to the court on alleged evidence.

85. Judge CASTRO made no effort to resolve the total contradicting, confusing and impossible pieces of evidence before him from BRADSHAW and BISOM. A later Dec 29, 2005 void order from the SC proved the gross incompetence of CASTRO and his court.

86. CASTRO took the way out by ignoring the conflicts in his court. He accepted the evidence submitted by BISOM. But per BRADSHAW's letter, the BISOM evidence was totally conflicting, confusing, contradicting and fraudulent. This paradox indicates a de facto conspiracy.

87. CASTRO violated CNMI court rules/laws and allowed the conflicting, confusing, contradicting and fraudulent material from BISOM into evidence as truth with no effective opposition from the AG.

88. Rather than obey CNMI rules/laws, CASTRO made his own rules and law as he went along to deprive BRADSHAW of his constitutional and due process rights.

89. On Feb 14, 2000, BISOM entered a motion for default judgment against BRADSHAW. It was supported on Feb 16, 2000 by a declaration to the Court in the request of entry of default.

90. The Clerk of Court entered this default in the official CNMI SC records on 2-14-00. The justification from BISOM for the default was "return of service" forms filed with the court showing service on BRADSHAW on the first and second amended complaints and service

was made on Asst AG COTTON on the fourth amended complaint.

91. BISOM's request for default judgment stated that service was made and that BRADSHAW did not answer the served complaints. The AG filed no answer on the fourth complaint allegedly served on Mr COTTON.

92. In BISOM's Jul 2005 "Opposition to Motion to Void/Vacate Judgment" (p. 4), filed in 96-1320, BISOM/SORENSEN referred to the postal receipts and acknowledged that BISOM had "represented to the court that he had served defendant (in reference to BRADSHAW) by certified mail and defendant had signed the receipt,...There is nothing to indicate that plaintiff (in reference to BISOM) had any way to know or even suspect that the postal receipt that was returned did not bear the signature of the person it was addressed to."

93. From a Feb 22, 2000 "Order Denying Motion to Remove Case From Trial Docket," as signed by judge CASTRO, the CNMI's motion on Feb 1, 2000 to have 96-1320 removed from the trial docket was heard on Feb 7, 2000. This order on Feb 22, 2000 appears to confirm his decision to proceed with the trial.

94. In denying removing the case from the trial docket, CASTRO said: "1. The motion relies on facts set forth in a form that fails to comply with the requirements of a supporting affidavit or declaration. 2. Defendant Robert D. Bradshaw was properly served by mail, return receipt requested but purposely avoided service. 3. The Office of the Attorney General has appeared on behalf of Robert D. Bradshaw as his attorney of record. 4. Defendant Robert D. Bradshaw, has waived any potential challenge to insufficiency of service of process by his previously bringing a motion to dismiss without joining such motion..."

19

Received Sep-22-2006 06:42      From-      To-US DISTRICT COURT, N      Page 001

95. It was strange that Judge CASTRO issued this order claiming that proper service was made and that BRADSHAW avoided service all the while that BISOM's motion for a default judgment was predicated upon allegations that BRADSHAW was served (both by certified mail and with service on the AG) and had failed to answer that service.

96. If "proper service was made," as stated by CASTRO, why is that CASTRO added that BRADSHAW "avoided service"? The later SC order to void on Dec 29, 2005 found that CASTRO's decision completely lacked any basis in facts or in law. Thus, they were voided.

97. It is unclear what basis CASTRO used for this order since there was no evidence in court to substantiate the allegation of avoiding service except for BRADSHAW's Jul 14, 1999 letter and its remarks about the two unidentified certified letters from unidentified mailers not claimed by BRADSHAW.

98. This privileged letter to the AG was the only document in court which could have influenced CASTRO's decision. But the evidence also indicates that CASTRO's decision was made on the basis of a conspiracy with BISOM/SORENSEN.

99. BRADSHAW's Jul. 14, 1999 privileged letter was presented to the court by his alleged former attorney, the AG, despite the AG's withdrawal from the case about Feb 1, 2000, six days before the trial started.

100. Allegedly, the AG submitted this Jul. 14, 1999 letter from BRADSHAW to the court; not to help BRADSHAW, but rather to justify the actions of the AG. There is clear evidence of AG collusion with defendants BISOM/SORENSEN in a conspiracy to defraud BRADSHAW.