101. BISOM's motion for a default judgment was predicated upon service being made upon both BRADSHAW and the AG. Rather than ruling on this motion, CASTRO chose to approve the default judgment on the basis that BRADSHAW had avoided service.

102. Thus, CASTRO made up his own rules/laws and contradicted the actual records filed by BISOM in the case. CASTRO ignored Washington state laws on service. He also ignored CNMI rules/laws requiring service by publication or personal service if attempted service by certified mail failed.

103. Since the CNMI rules do not address the use of certified mail for service (except by 7 CMC which provides for publication as the remedy) and since the CNMI SC had never established personal jurisdiction over BRADSHAW in any legally authorized method of service, CASTRO's decision that BRADSHAW avoided service was wrong and lacked legal justification. The later SC void order of Dec 29, 2005 proved this condition.

104. Of course, it would be absolutely ludicrous to believe that BRADSHAW refused service all the while that BRADSHAW and his alleged AG lawyer also accepted service. Which way was it? Did BRADSHAW refuse service or did he accept service? Yet, CASTRO allowed both options into evidence as true.

105. Too the AG maintained six days before the trial and during the trial that the AG did not represent BRADSHAW (per the Supreme Court's decision, p. 21). Yet CASTRO in his Feb 22, 2000 order actually found that the AG did represent BRADSHAW. Which way was it? Did BRADSHAW have AG representation or not? This is more prima facie evidence of conspiracy between BISOM/SORENSEN, CASTRO and SOSEBEE.

21

106. CASTRO's illegal, confusing, unclear and contradicting actions were certifiably reckless, deliberate, malicious and intentional with an objective to place injury and hurt on BRADSHAW

107. BRADSHAW was not present and had no lawyer in court and without any notice of the action in progress in court. As a minimum, CASTRO took the way out and found for BISOM and against the unrepresented BRADSHAW.

108. CASTRO, as the presiding judge, must have understood what was happening in his own court room. He accepted the AG withdrawal and proceeded with the trial though BRADSHAW had no representation and was never given notice of the trial.

109. Not only did CASTRO lack personal jurisdiction over BRADSHAW, but the facts of the case disclose that he also lacked subject matter jurisdiction. In BRADSHAW's letters at Exhibit D, numerous issues involving subject matter jurisdiction are broached. Many of them were covered in BRADSHAW's letter of Jul 14, 1999.

110. For example, the Jul 14 letter mentioned the question over the statute of limitations which is clearly a subject matter issue. BRADSHAW also mentioned BISOM's complaint that BRADSHAW discriminated against him because of his Jewish "race." According to Jewish encyclopedias (like Encylopaedia Judaica, Universal Jewish Encyclopedia, etc), there is no Jewish race. BRADSHAW can find no legal basis in Civil Rights laws or court cases allowing a discrimination lawsuit over an alleged Jewish race which does not exist.

111. By Judge CASTRO's actions, he completely closed the door for BRADSHAW to have any opportunity to question subject matter jurisdiction. Besides the questions just

22

Received Sep-22-2006 06:42 From- To-US DISTRICT COURT, N Page 004

noted, there were other questions over subject matter jurisdiction which BRADSHAW would have raised if given a chance.

112. For instance, the CNMI is quick to claim qualified immunity for her officials which certainly concerns subject matter. Given a chance, BRADSHAW would have proven his possession of qualified immunity. He could show that he acted reasonably, carried out applicable statutes and regulations in every respect and complied with BISOM's due process rights.

113. BISOM's own actions were both illegal per his oath of office to obey CNMI laws and his own contract. Former CNMI public Auditor Scott Tan and Governor-elect Tenorio neither held a position in the CNMI government in late Nov and Dec 1993.

114. BISOM had no authority to negotiate with them on OPA. BRADSHAW was the Public Auditor and had legal authority for the office and its audits. BISOM's illegal acts are spelled out in his complaints in cases 95-0042 and 96-1320.

115. When BISOM was fired for cause in 1993, BRADSHAW's actions were completely coordinated with both the AG and Civil Service Commission. In no instance did BRADSHAW deviate from their procedural instructions.

116. The original complaint and the first and second amended complaints in 96-1320 were all filed in BRADSHAW's official capacity as well as his individual capacity. Per CNMI SC rule 4(l), the CNMI AG should have been served for the official capacity complaints. BISOM did not do this.

117. Castro failed to exercise due care and responsibility as the trial judge by allowing the trial to proceed in the absence of BRADSHAW being present or having counsel

present or of being given notice of the trial.

118. In the interest of justice, CASTRO had a duty to exercise due care and concern over the interests and constitutional rights of BRADSHAW, who was not in court and who was not represented by his supposed legal and proper attorney, the AG.

119. Yet, CASTRO did little or nothing in the trial to establish justice. He entered a default judgment against BRADSHAW when there was substantial evidence of fraud and conspiracy on the part of BISOM; and evidence of fraud, conspiracy, malfeasance, malpractice, inexcusable neglect and general incompetence on the part of the AG, who was supposed to be representing and defending BRADSHAW.

120. Though the evidence was plain enough of what was happening, CASTRO denied BRADSHAW's basic rights under the US Constitution. He proceeded to order a judgment of $139,000 individually against BRADSHAW and then refused to allow the imposition of the CNMI Indemnification Act to relieve the burden from BRADSHAW.

121. The charges made against BRADSHAW by BISOM were effectively declared true by the actions of CASTRO. BRADSHAW was found guilty of practicing discrimination against BISOM; of making alleged statements that his appointment was political, and of discharging BISOM illegally/improperly. BRADSHAW never had his day in court to answer the charges-- whether they be true or false.

122. As a minimum, the case file 96-1320 is clear enough that Justice CASTRO is totally and grossly incompetent and not qualified to be on the bench deciding cases.

123. It is also clear that CASTRO exercised 42 USC 1981 discrimination against BRADSHAW on the basis of BRADSHAW's citizenship, national origin and domicile (a US

24

Received Sep-22-2006 08:42        From-         To-US DISTRICT COURT, N        Page 006

state sider). Since BRADSHAW was not present and had no attorney, it was easy for CASTRO to violate BRADSHAW's rights.

124. Per US law, 42 USC 1981 is not limited to the technical restrictive meaning of the word "race." While the American BISOM was at issue, it was far more practical and easier for judge CASTRO to simply decide issues against BRADSHAW than against BISOM since BISOM's lawyer was in court demanding and arguing issues for BISOM.

125. There are also issues about Justice CASTRO's involvement of corruption and conspiracy with BISOM while on the bench.

126. For years, some of the CNMI courts and judges have been accused of corruption and racketeering in their actions. Judge CASTRO as a probate judge in 2000 arranged for his colleague Pedro Atalig (who was one of the Supreme Court Justices who heard the 96-1320 appeal) to receive large sums of money in cases before CASTRO.

127 Allegedly, these CASTRO directed payments were improper. Allegedly, CASTRO shared in this money plunder funneled through Pedro Atalig.

### The Trial

128. When the 96-1320 case went to trial, the AG made no contact with BRADSHAW or proper preparations for the trial. In the Feb-Mar 2000 trial in SC, the CNMI was represented by Asst AG SOSEBEE as lead attorney.

129. On Feb 3, 2000, BISOM/SORENSEN submitted a "Opposition to Motion to Remove Case From Trial Docket." This motion cited BRADSHAW's letter of Jul 14, 1999 by saying: Mr. Bradshaw received two certified mail packets from Saipan in 1996 and 1997. Plaintiff, in fact, sent two such envelopes with summons and complaint, true copies of which

25

are attached. They were returned unopened."

130. The return receipts on the envelopes submitted as evidence for this BISOM opposition carries the precise same numbers as found on the return receipts supposedly signed by "Manny." Judge CASTRO accepted both sets of documents as true and allowed them into evidence.

131. BRADSHAW has no knowledge/remembrance of the two envelopes submitted in court by BISOM. The envelopes entered by BISOM in 96-1320 allegedly had the mailer(s) identified as "Jay H. Sorensen, Esq."

132. BRADSHAW had no knowledge of these two envelopes until they were brought to his attention in the summer of 2005 when BISOM filed an answer to BRADSHAW's motion to void/vacate judgment in 96-1320. This answer included two Xerox copies of two alleged envelopes sent BRADSHAW by certified mail in 1997.

133. In 1999, BRADSHAW acknowledged two certified mailings from "unidentified" mailers which had a Saipan post office box for a return address. This Jul 14 letter was written back in 1999 when the facts were close and first hand knowledge to BRADSHAW.

134. To this day in 2006, BRADSHAW's memory distinctively recalls these two envelopes with unidentified mailers.

135 BRADSHAW remembers visually looking at least one of the unidentified certified letters in 1996/1997 and noting its similarity to the one sent him in 1995 from lawyer SORENSEN (copy of which is at Exhibit "E"). BRADSHAW did not note the post office box numbers on the ones in 1996/1997 to be sure that they were the same as the one in 1995. But they looked similar.

136. In 1997, BRADSHAW did assume in 1997 that the unidentified envelopes in 1996/1997 were from SORENSEN. But since BRADSHAW was not thereafter served, by 1999, BRADSHAW became unsure who the envelopes were from in 1996/1997.

137. Based on the 1995 mailing from SORENSEN, it appears that lawyer SORENSEN follows the practice of mailing summons in envelopes without his name on them. This seems to be his MO or modus operandi.

138. Regardless, the presence of one of them was reported at once to the AG. The AG was notified based on BRADSHAW's assumption that the envelope was from SORENSEN. If these envelopes constituted service, then the AG was notified of that service.

139. When a court is dealing with crooks who have and will enter fraudulent documents in court in order to obtain a default judgment, alleged mailings like these two certified mail letters prove nothing simply because it is such a simple task to fraudulently prepare envelopes like these two were prepared. Admittedly, with the new post office tracking capability since 2004, certified documents are easier to now validate. But in 1997, this was out of the question. Thus, it is easy to have fraudulent rubber post office stamps made to stamp any document. For that matter, on Saipan, it would be easy to pay a bribe to a Saipan postal employee and have documents date stamped however desired.

140. In any case, the certified numbers on these two documents were only three numbers apart which seems awful strange that only three certified letters left the Saipan post office in a 30 day period. Too, the certified mail numbers were precisely the same ones which were submitted to the court showing acceptance of service of the complaints by the fictitious Manny. It is clear that the two sets of postal documents cannot be true.

27

141. BRADSHAW's privileged letter of Jul 14, 1999 was brought to the attention of Judge CASTRO as it totally conflicted with everything happening in his court. Judge CASTRO refused to allow BRADSHAW's letter into evidence. Yet, he allowed in the documents submitted by BISOM both on alleged service and non-service.

142. CASTRO then proceeded to enter a default judgment and so instructed the jury. With the default judgment, BISOM ultimately received $140,000 from the CNMI and a judgment against BRADSHAW for $139,000. BISOM asked the court to have the CNMI pay the $139,000 judgment on the basis of the Indemnification Act. The SC denied this request.

143. Both the default judgment of $139,000 against BRADSHAW and the ultimate pay out of $140,000 in 2003 damaged the reputation, name and professional conduct of BRADSHAW. Both of these judgments were predicated on BRADSHAW's actions per the illegal default judgment entered by CASTRO.

### The Supreme Court Appeal

144. The CNMI appealed the SC decision but later dropped its appeal. BISOM also appealed because the trial court excluded certain evidence and denied plaintiff's request for indemnification for BRADSHAW.

145. In the Supreme Court appeal in Mar-Sep 2002, the CNMI was represented by Asst AG CLAYTON. On the appeal, the Supreme Court upheld the trial court. But importantly, just as the trial court had BRADSHAW's letter of Jul 14, 1999, the Supreme Court also had it and quoted part of it in its decision.

146. Whereas CASTRO found that the AG supposedly was BRADSHAW's attorney and supposedly represented BRADSHAW at the trial (per the CASTRO order of Feb 22,

2000), the Supreme Court (in its Sep 13, 2002 decision) said that the AG was not BRADSHAW's attorney. The court added that BISOM had been so informed by the AG at least six days prior to trial (p. 12 of the Supreme Court's decision) and that the trial court was so informed at the oral arguments presented by the AG (p. 21 of the decision).

147. The Supreme Court also found that "before the trial court... the Attorney General's Office allowed a default judgment to be taken against Bradshaw. This fact alone permits an equally persuasive inference that Bradshaw had not, in fact, requested a defense. The trial court's determination that Bradshaw did not request a defense was not clearly erroneous" (p. 21 of the decision). The court also found "As there has been no showing that BRADSHAW requested a defense or indemnification, it can not be said that BRADSHAW wants indemnification."

148. In both the CNMI SC and Supreme Court cases, the report that the AG was not representing BRADSHAW was apparently predicated upon BRADSHAW's Jul 14, 1999 letter. Despite not allowing this letter into evidence, this letter was the only evidence available which the AG had to support its contention that the AG had withdrawn from the case at BRADSHAW's request.

149. Judges MANGLONA and BELLAS (along with Judge Pro Tem Pedro M. Atalig, now deceased), in the Supreme Court review in Mar.-Sep. 2002, were all exposed to CASTRO's violations of court rules/laws, the basic trial results and BRADSHAW's letter of Jul 14, 1999. They saw the absolute confusion and pandemonium from the trial of 96-1320. Yet, they did nothing to resolve the mess. They supported CASTRO's decision.

150. While the Supreme Court justices were also guilty of misconduct in the way they handled case 96-1320, plaintiff BRADSHAW is not making a claim against them in this 2d amended complaint. Because of judicial immunity and questions of jurisdiction, these justices would probably escape any liability for their wrong/illegal actions.

151. BRADSHAW was a defendant in the appeal of SC 96-1320 to the Supreme Court. Yet BRADSHAW was never notified of the hearing by the AG or the court, was not present in court, had no attorney present (as the AG had withdrawn from representing BRADSHAW six days before the trial), and had no opportunity in court to defend himself.

### The Post Trial

152. Although the AG sent no further communications to BRADSHAW, after Jun 1999 until 2004, the 96-1320 case file did have some more US post office return receipts in it from the AG, as allegedly signed by "Manny" for BRADSHAW. As a minimum, these receipts show collusion and conspiracy to defraud between BISOM/SORENSEN and some other person(s) in the CNMI.

153. While BRADSHAW and his supposed AG attorney had contact up until July 1999, the AG discontinued contact with BRADSHAW after Jun 1999. BRADSHAW wrote the AG after the Jul 14, 1999 letter and again in 2000 but his letters were never acknowledged or answered.

154. During all of this interchange between SORENSEN and the AG, none of this was ever brought to the attention of BRADSHAW. BRADSHAW knew nothing about this interplay. BRADSHAW had no knowledge at all that the trial was underway and that BRADSHAW was a defendant in the trial or its appeal. All along, BRADSHAW believed that the AG was indeed

Received Sep-22-2006 06:48       From-            To-US DISTRICT COURT, N       Page 002

his attorney and that the AG had went into court and had BRADSHAW's name removed.

155. While the AG acted to keep BRADSHAW informed in 1996-1998 on some events on Saipan relative to BRADSHAW, the AG entered into a process of silence in 1999 which eventually turned into an hostile adversarial relationship at least six days before the trial of 96-1320. In April 2004, at BRADSHAW's initiation, the AG notified BRADSHAW of the outcome of 96-1320 in 2000 and its appeal in 2002.

156. The CNMI Supreme Court's decision, appeal nos. 00-0016 & 0023-GA, consolidated (on pages 12, 13, and 22), cited repeated cases of mistakes and mistaken actions (plural) by the AG. On page 22, the Supreme Court decision opened the possibility that an attorney or attorneys in the Office of the AG had violated the Bar Association ethics rules. The Supreme Court did not establish which person or persons individually were responsible for the malpractice, mistakes, and so forth. In its decision (page 12), the Supreme Court also allowed that in the AG appearance and presentation there was a conflict of interest between the CNMI and BRADSHAW.

157. All of this translated to Supreme Court decided gross incompetence and malpractice by the AG. It contributed to violations of BRADSHAW's rights to due process and equal protection of the laws under the US Constitution. The CNMI AG's actions were deliberate, malicious, intentional and extremely irresponsible in creating a total mess of case 96-1320 and great injury and damage being placed upon BRADSHAW and the CNMI.

158. As a minimum, if the certified letters sent by BISOM (unclaimed by BRADSHAW) communicated an avoidance of service, the AG was fully informed by BRADSHAW on these letters and should have done something about them. With the first one, whether identified or

Received Sep-22-2006 06:48       From-               To-US DISTRICT COURT, N       Page 003

not, the AG should have immediately contacted BRADSHAW about the consequences of the letters being unclaimed or filed an answer.

159. During the filings of the several actions by BISOM, the AG accepted service for BRADSHAW in his individual capacity on one or more of the complaints without BRADSHAW's knowledge, authorization and/or request. The AG made no answer in court on any of the summons it had accepted.

160. BRADSHAW was never informed on these acceptances of service by the AG. The AG did nothing about advising the court or BISOM of the insufficiency of service of process. The AG violated the CNMI court rules and failed in not discharging its duties and due diligence on this case.

161. Despite being frequently informed that no service on the BISOM complaint in 96-1320 had ever been made personally on BRADSHAW and that constructive service was impossible, the AG made no effective effort to go into court and have the question of service resolved on the basis that BISOM and/or his attorney was practicing deception and fraud upon the CNMI courts (in their presentation of alleged postal documents showing alleged service/refusal of service by BRADSHAW when no actual/constructive service existed).

162. In view of the BRADSHAW letter of Jul 14, 1999 notifying the AG of no service and no possibility for constructive service, all of these alleged postal documents should have been sufficient to alert members of the AG's office that they were openly suspicious and involved possible fraud and deception.

163. The AG should have been properly monitoring 96-1320 and promptly brought the discrepancies (between what BISOM was saying and BRADSHAW's letter to the AG on

Received Sep-22-2006 06:48       From-                    To-US DISTRICT COURT, N       Page 004

Jul 14, 1999) to the attention of the court

164. Whenever the AG found out about the postal documents (which were a total complete contradiction to BRADSHAW's letter of Jul 14, 1999), the AG should have protested to the court and at least filed an appeal to the Supreme Court on the illegal postal documents filed by BISOM. Clearly, the AG was grossly incompetent, irresponsible and malpracticing in not addressing the fraudulent postal documents used by BISOM/SORENSEN.

165. The primary action of the AG was to allow the court to enter a default judgment on BRADSHAW (per the CNMI Supreme Court, p. 21) without any opposition and without exercising due care and recognizing the fiduciary responsibility which the AG had in its role of protecting and defending the CNMI and its officials, like BRADSHAW.

166. BRADSHAW was sued in the complaint and 1st and 2d amended complaints in his official capacity along with allegations involving his official duties in the OPA. In the 3d and 4th amended complaints, the title caption of the actors dropped BRADSHAW in his official capacity, but the allegations in the documents remained that BRADSHAW was being sued officially for his work.

167. The 1st and 2d Amended complaints were the ones allegedly served on BRADSHAW by the fraudulent receipts. They were also the ones where CASTRO declared that BRADSHAW avoided service. Certainly, the CNMI had a fiduciary duty to protect and indemnify BRADSHAW for his official duties.

168. BRADSHAW was never notified or informed at all on what was happening in court on this case or on the AG's withdrawal or of the entry of the default judgment on BRADSHAW as made without opposition from the AG. Thus, the AG sat back, did nothing

Received  Sep-22-2006 06:48        From-                       To-US DISTRICT COURT, N        Page 005

and allowed the default judgment to take place (per the Supreme Court).

169. At some point in time, the AG violated CNMI court rules/laws and also produced alleged postal receipts on supposed communications sent by the AG to BRADSHAW by certified mail None of these communications were received by BRADSHAW. But the postal receipts that were made out and submitted to the court by the AG showed receipt by allegedly the same unidentified and unknown Manny as the receipts which were presented by BISOM to the SC; thus presenting prima facie evidence of conspiracy between BISOM and some person(s) in the AG's office.

170. The AG's presentation of fraudulent postal receipts in connection with alleged communications to BRADSHAW raise the spectrum that the AG's action not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his constitutional rights. The US Supreme Court has ruled that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitations" (Supermarket of Marlinton v. Meadow Gold Dairies).

171. The actions and omissions of the AG during the years 1997-2002 were sufficient to establish that there was gross incompetence, malfeasance, malpractice, omissions, lack of care, violations of laws/rules and fraud and conspiracy by the AG. The AG persons deliberately and maliciously denied BRADSHAW his rights under the US Constitution.

172. At BRADSHAW's initiation, the AG on Apr 6, 2004 sent him a copy of the SC order on 96-1320 and the decision on the Supreme Court Appeal. A copy of the Apr. 6, 2004 transmittal letter is at Exhibit "A." This letter was a shock to BRADSHAW in that he had

34

previously believed and acted on the premise that the AG had went into court and had his name removed as a defendant from SC 96-1320. This increased the level of emotional duress and stress and loss of the enjoyment of life on BRADSHAW

173. In the summer of 2004, BRADSHAW began unsuccessful efforts to find a lawyer to undertake a case against the CNMI and to have someone on Saipan check the actual case file. BRADSHAW could not find a lawyer who would take the case because of economic prejudice and fear of retaliation from Judge CASTRO.

174. BRADSHAW did learn from Micronesian Legal Services that BISOM entered into evidence documents showing alleged service on both the AG for BRADSHAW and on BRADSHAW via alleged postal mail receipts which showed receipt of service on BRADSHAW by an unidentified/unknown third party (named Manny) who incontrovertibly does not exist.

### AG Brown Lies

175. Though suspicious that person or persons in the AG office presently might be untrustworthy and unreliable and act to further damage BRADSHAW, plaintiff BRADSHAW, without funds to hire a counsel and unable to obtain help from Idaho Legal Services or Micronesian Legal Services, reluctantly did turn to the AG on Sep. 12, 2004 for relief. BRADSHAW talked by phone to Heather, Mr Lemon and Mr Buckingham. Buckingham later briefed AG BROWN and was given the go ahead to investigate BRADSHAW's complaints over 96-1320.

176. BRADSHAW requested that the fraudulent documents be sent to US Postal Inspectors/the FBI and that the AG go to court and have the $139,000 judgment against

Received Sep-22-2006 06:48        From-        To-US DISTRICT COURT, N    Page 007

BRADSHAW voided. One of BRADSHAW's letters is at Exhibit F.

177. After many phone calls and letters from BRADSHAW which were never answered by the AG, AG Brown did respond on Feb 15, 2005 (Exhibit A6). BROWN's letter notified BRADSHAW for the first time that the AG was not BRADSHAW's attorney.

178. It was then clear that the AG would provide no legal help to BRADSHAW and was in fact a hostile adversarial party. This effort before Feb 15, 2005 cost BRADSHAW over $100. The AG inaction further increased the level of emotional stress and loss of enjoying life on BRADSHAW

179. If BROWN would have acted responsibly to resolve the issues before her with some action as the chief law enforcement officer of the CNMI, BRADSHAW's litigation before the US courts would have been unnecessary. Much of this case could have been easily handled by the CNMI without any particular expense or effort. As a minimum, BROWN could have written BRADSHAW explaining the alleged basis, legality and propriety of the default judgment.

180. Yet, BROWN did nothing in 2003-2005, but acted to hide information from BRADSHAW and keep BRADSHAW in ignorance about what was in the case file and what the AG was doing on it.

181. In the summer of 2005, plaintiff learned from the SC Clerk that the fraudulent mailing receipts in the CNMI case file were, all of a sudden, missing. Since these documents were in the possession of AG BROWN (as BRADSHAW was so informed by personnel in the office of the AG), she was responsible for them.

36

182. Too, this BROWN influence also reached to other CNMI employees outside the AG's office. The result has been hidden or destroyed records from the 96-1320 case file.

183. Regardless of whatever role BROWN had in the loss or hiding of those court documents, as a minimum, BROWN was grossly and maliciously incompetent. Her office spent ten months investigating the alleged receipts. As a minimum, she would have had to have access to those documents to do any investigating. If the documents are now missing, it certainly shows that she is totally irresponsible and incompetent beyond description.

184. Being alerted in Sep 2004 that BISOM had committed fraud against the CNMI, Brown should have immediately acted to secure the alleged fraudulent documents and have them properly referred to US authorities.

185. This reality and the facts outlined above plainly outline the hiding of criminal acts by defendant BROWN in cases which were before both the CNMI SC (96-1320) and the US District Court of Idaho (05-84).

186. As far as the alleged mailing envelopes from BISOM to BRADSHAW, now in the 06-1320 file supposedly justifying the default judgment, BROWN must have known about these documents. Yet she never informed BRADSHAW. This hiding of information from BRADSHAW has necessitated much guesswork in 2005 on what happened.

187. Defendant BROWN appears to never put anything in writing, but rather to only commit to writing when it becomes absolutely necessary. Without written documents, any contact with the AG becomes difficult. Without things in writing, it is easy for the AG to lie, deceive, twist, distort, deny, obsfucate, and stall.

Received   Sep-22-2006 06:48       From-                        To-US DISTRICT COURT, N     Page 009

188. After many letters and phone calls over a period of five/six months from BRADSHAW to the AG requesting indemnification on the BISOM judgment, BROWN finally acknowledged BRADSHAW's many attempts to resolve that issue. On Feb. 23, 2005, BRADSHAW received the letter at Exhibit A from AG BROWN. Though characterized by at least one mistake, this letter denied BRADSHAW indemnification by essentially citing the Supreme Court decision.

189. On the mistake in this letter, the AG charged that since its April 2004 letter that "Almost six months later," BRADSHAW sent the AG a request for indemnification. This charge is not correct and it does matter if the present AG is attempting to prove that BRADSHAW neglected this case with any unnecessary time delays after his notification in April 2004. Actually, following the conversation with the AG on Sep. 12, 2004 (as elsewhere described herein), BRADSHAW, faxed a letter requesting indemnification to the AG (on Sep 13, 2004 and copies of the material covered under the affidavits at Exhibits A to C).

190. Later, Asst AG Ed Buckingham orally confirmed the receipt of these faxes in a telephone conversation. BRADSHAW next sent the AG registered mail with the Sep. 12, 2004 request for indemnification on Sep. 13, 2004. This registered letter was receipted by the AG on Sep. 28, 2004. Yet the AG's letter seems disingenuous in alleging that BRADSHAW's request was received "almost six months later" on Sep. 29, 2004, a day after it was actually received (implying that BRADSHAW took almost six months to contact the AG).

191. The initial notification letter from the AG, dated Apr. 6, 2004 (at Exhibit "A," which, per its mailing envelope, was mailed on Saipan on Apr. 7, 2004), was also received some fifteen days later by BRADSHAW about Apr. 22, 2004. This means that the actual elapse of

38

time between the AG notification to BRADSHAW and his contact of the AG was over four months and not almost six months as alleged by the AG. This time was spent in pursuit of trying to find legal help and someone to actually check the 96-1320 file to determine what had happened.

192. Thus, Ms BROWN made it plain that the AG would do nothing for me beyond a short "limited" telephone call to a local attorney on my options. This meant that henceforth BRADSHAW was denied any legal assistance from the AG. Actually, it appears that AG discontinued legal assistance to BRADSHAW in 1999 and never told BRADSHAW about it.

193. The AG has done nothing for BRADSHAW since Jun 1999 beyond being an adversary and constantly working against BRADSHAW.

194. This means that all of BRADSHAW's letters, phone calls and contacts have been a total waste of time as the AG did nothing and made no effort to apprise BRADSHAW of the status of case 96-1320. If BRADSHAW had of been informed that the AG was his adversary, BRADSHAW could have saved much money, time and effort.

195. Otherwise, it is to be noted that paragraphs two, three and four of the AG letter of Feb. 15, 2005 also clearly acknowledge that BRADSHAW was first given notice in April 2004 of the CNMI court actions that took place to damage and hurt him in 1997-2002.

196. Defendant BROWN's actions have been deliberately designed to keep BRADSHAW in a state of ignorance about what had happened on case 96-1320 and not allow BRADSHAW to obtain needed documents to prove the conspiracy and fraud perpetuated upon him by BISOM and the CNMI.

39

Received Sep-22-2006 06:54     From-     To-US DISTRICT COURT, N     Page 001

### BRADSHAW Had to Take Legal Action in 2005

197. From Sep. 12, 2004 to date, BRADSHAW went to great effort and exhausted all remedies available to him in the CNMI to resolve this case and the dispute without further court actions/legal processes. BRADSHAW's efforts failed. The AG effectively did nothing.

198. The passage of a few days short of six months without resolution was sufficient to demand action on Mar 7, 2005. BRADSHAW, pro se and at his own expense, filed a petition in the SC asking the SC to void/vacate its judgment against BRADSHAW. This action costs BRADSHAW $4000. It was decided on Dec 29, 2005 when the SC issued an order to void the $139,000 judgment.

199. But this judgment did not address or alter the public slander, wrong, lack of due process and expense placed on BRADSHAW by the actions of the CNMI through its agents.

200. BRADSHAW simultaneously filed a suit similar to this one in the US District Court of Idaho (Case 05-0084). Because of Title 18 USC 4 and the need to report felonies as soon as possible to a US judge, it was essential that this case be filed in Idaho. In case 05 0084, BRADSHAW obeyed the law and reported the postal fraud felonies described herein with a citation of 18 USC 4.

201. Too, BRADSHAW was recruited to go to Saipan from Idaho. BRADSHAW suffered damage in Idaho. BRADSHAW expected to get copies of the fraudulent documents and get them to US Postal inspectors in Idaho. Finally, with the documents, BRADSHAW expected to employ a Idaho handwriting expert to prove that the documents were not signed by BRADSHAW. This case cost BRADSHAW $4000. The Idaho case was dismissed without prejudice in Jul 2005 for lack of personal jurisdiction. It was refiled in the CNMI in Aug 2005.

40