F I L E D
Clerk
District Court

JAN - 5 2007

For The Northern Mariana Islands
By_____
(Deputy Clerk)

**Robert D. Bradshaw**
**PO Box 473**
**1530 W. Trout Creek Road**
**Calder, Idaho 83808**
**Phone  208-245-1691**

Plaintiff, Pro Se

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN MARIANA ISLANDS

ROBERT D. BRADSHAW

      Plaintiff

      v.

COMMONWEALTH OF THE NORTHERN
MARIANA ISLANDS (hereafter referred to
as the CNMI); NICOLE C. FORELLI, former
Acting Attorney General of the CNMI, in her
personal/individual capacity; WILLIAM C.
BUSH, former Assistant Attorney General of
the CNMI, in his personal/individual capacity;
D. DOUGLAS COTTON, former
Assistant Attorney General of the CNMI
in his personal/individual capacity; L.
DAVID SOSEBEE, former Assistant Attorney
General of the CNMI, in his personal/individual
capacity; ANDREW CLAYTON, former

)  Case No. CV 05-0027
)
)
)  **FOURTH AMENDED COMPLAINT**
)
)
)
)
)
)
)
)
)
)
)
)
)

1

Assistant Attorney General of the CNMI, in his )
personal/individual capacity; Other )
UNKNOWN and UNNAMED person or )
persons in the CNMI, in their )
personal/individual capacity; )
PAMELA S. BROWN, former )
Attorney General of the CNMI; in her )
personal/individual capacity; )
ROBERT A. BISOM; and JAY H. SORENSEN. )
                                                 ) Defendant SORENSEN Has Requested a
            Defendants        ) Jury Trial

_____

Plaintiff alleges:

## JURISDICTION

1. This case was first filed in the US District Court (USDC) of Idaho on Mar 7, 2005 (Civil case 05-84). It was dismissed on July 25, 2005 for lack of personal jurisdiction without prejudice with notice to plaintiff on July 29, 2005. It is being refiled in the USDC of the CNMI.

2. It is a civil rights action seeking redress for plaintiff BRADSHAW due to acts and omissions by defendants, who, generally with alleged color of law and color of authority, have subjected the plaintiff to the deprivation of his rights and privileges under the US Constitution and laws; and the Civil Rights Acts of 1870; 42 USC sections 1983; 1985 and 2000; and for violations of 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1964; and for violations to plaintiff's constitutional rights under the 14th Amendment of the US Constitution.

3. While the defendant CNMI officials, officers, employees and agents, as cited herein, have pretended to be clothed with alleged color of law/authority in their acts and omissions against plaintiff, they have actually violated a number of US laws and the US Constitution

which they were duty bound to uphold and support, as will hereafter be described.

4.  Section 903 of the "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America," states:  "Nothing herein shall prevent the presentation of cases or controversies arising under this Covenant to courts established by the Constitution or laws of the United States.  It is intended that any such cases or controversies will be justifiable in such courts..."  The CNMI, like the US states, is not immune for its actions involving discrimination on the basis of race, color, religion, age, sex, handicap, national origin and other forms, and/or violations of civil and/or constitutional rights, and/or violations against their own duties under law and/or when federal funding is involved.  The CNMI is not immune from law suits involving situations related to incidents involving any program that receives assistance in federal funding (42 USC 2000).  Much of CNMI activities involve US funding/grants.

5.  As this case involves an action over $75,000 and between citizens of different US states and jurisdictions, the US Courts have jurisdiction.  The issue herein offers both personal and subject matter jurisdiction to the Federal courts as per the US Constitution.

6.  The court has original jurisdiction of the claims by virtue of the Federal Rules of Civil Procedure; Federal Rules of Evidence; Title 18 USC 241-242, 1341-1342, 1349, 1707, 1961-1965; Title 28 USC 1331, 1332, 1339, 1343,  1391, 1392, and 1652; Title 42 USC 1983 to 2000; the US Constitution; and the Common Law.  Title 28 USC 1339 applies because this suit involves alleged postal fraud under 18 USC 1341-1342, and 1707 in that some of the defendants misappropriated US postal forms to use in fraud and conspiracy upon plaintiff BRADSHAW.  The court has supplemental jurisdiction over the related claims arising under

the laws of the CNMI pursuant to 28 USC 1367.

## PARTIES

7.  Plaintiff is a citizen of the United States and during the times relevant to this complaint was a resident of the CNMI, and the states of Washington and Idaho.

8.  Defendant NICOLE C. FORELLI, former Acting AG of the CNMI from on or about Jan. 25, 2000 to on or about Feb. 10, 2000, is a citizen of the United States and a resident of Hawaii.

9.  Defendant WILLIAM C. BUSH, former Assistant (Asst) AG of the CNMI in 1999, is a citizen of the United States and a resident of Washington, DC.

10.  Defendant L. DAVID SOSEBEE, former Asst AG of the CNMI, in 2000, is a citizen of the United States and a resident of Texas.

11.  Defendant ANDREW CLAYTON, former Asst AG of the CNMI from about 2000 to 2002, is a citizen of the United States and possibly a resident of China or the US.

12.  Defendant D. DOUGLAS COTTON, former Asst AG of the CNMI in 1996-1999, is a citizen of the United States and a resident of Texas.

13.  Defendant(s) UNKNOWN and UNNAMED person or persons in the CNMI, in 1996-2005, are currently unidentified and/or unknown to plaintiff, and could not be reasonably discovered prior the filing of this Complaint, but whose identities plaintiff expects will become known through discovery.  Plaintiff will amend this Complaint to allege said defendant(s) true names and capacities when that information becomes known through discovery.  Plaintiff is informed, believes and thereon alleges that these UNKNOWN and UNNAMED defendants are also legally responsible and liable for the incidents, injuries and

4

damages hereinafter set forth, and that each of said defendant(s) proximately caused the injuries and damages by reason of gross negligence, carelessness, deliberately indifferent, intentional, willful or wanton misconduct, and fraud and conspiracy or conspiracies in creating and otherwise causing the incidents, conditions and circumstances hereinafter set forth, or by reason or impugned negligence or vicarious fault or breach of duty arising out of the matters herein alleged.

14.  Deleted.

15.  Defendant ROBERT A. BISOM, plaintiff in CNMI SP Civil Case 96-1320, is a citizen of the United States, and is possibly a resident of Japan or the US.

16.  Defendant JAY H. SORENSEN, attorney for ROBERT A. BISOM in SP Civil Case 96-1320, and an officer of the CNMI courts in that trial in Feb.-Mar. 2000 and during its 2002 appeal to the CNMI Supreme Court (Appeal Nos. 00-0016 & 0023-GA, Consolidated) is a citizen of the United States and possibly a resident of the US or China.

17  Defendant PAMELA S. BROWN is the former Attorney General of the CNMI in 2004 and 2005.  She is a citizen of the United States and a resident of the CNMI.

18.  Defendants BROWN, FORELLI, BUSH, COTTON, CLAYTON and SOSEBEE of the CNMI AG's office were all employees, officials, officers and agents of the defendant CNMI at the time of their actions and omissions involving plaintiff BRADSHAW.

19.  Defendant COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS (CNMI) is a political and governmental entity in union with the United States of America with its primary and central government offices located on Saipan Island.

20.  The relationship and linkage between the USA and the CNMI is set forth primarily in the 1976 "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union With the United States of America" and Title 48 USC 1801.

## FACTS AND GENERAL ALLEGATIONS

21.  On Nov 25, 1993, plaintiff was appointed the CNMI Temporary Public Auditor under an outgoing Governor Guerrero's administration.  Governor-elect Tenorio was to take over in Jan 1994.  Defendant BISOM was legal counsel of the Public Auditor's office (OPA).  BISOM worked in the office under BRADSHAW's supervision for a little over one day.

22.  Unbeknown to BRADSHAW, BISOM was involved in negotiations on Nov 25-27, 1993 with the former Public Auditor and the Governor-elect to interfere in and stop a scheduled audit of the CNMI by a local CPA firm.  BRADSHAW proceeded with the audit as required, per his official duty.

23.  Per BISOM's later complaints in USDC case 95-0042 and CNMI SC case 96-1320 (para 60-61 of the CNMI Complaint and para 63-64 in the 4th Amended Complaint), promises were made that if he was fired for his actions against BRADSHAW, he would be rehired in Jan 1994 when Governor-elect Tenorio took over.  These promises were allegedly made to BISOM by former Public Auditor Tan and Governor-elect Tenorio in Saipan on Nov 25-27, 1993.

24.  After the one plus day of work in the OPA office in Nov 1993, BISOM abandoned his job and began publicly attacking OPA, the audit and BRADSHAW personally.

25.  BISOM then went to the CNMI legislature and revealed confidential and privileged information which he had obtained in the OPA.  He next commenced a campaign of going to

the CNMI press to condemn and verbally attack BRADSHAW and the audit under way.

26.  Though BISOM was using the CNMI media to slander and attack BRADSHAW, BRADSHAW never responded with any personal comments to the media about BISOM. BRADSHAW then fired BISOM for cause in Dec 1993.  Next BRADSHAW reported BISOM's conduct to the CNMI Bar Association for action in Dec 1993.  BRADSHAW returned to the US in Jan 1994.  BISOM was not rehired by Tenorio in Jan 1994.

27.  On Nov 14, 1995, BISOM sued BRADSHAW and others in the CNMI US court case 95-0042. BRADSHAW was sued in his official and individual capacities but the pleadings were made that BRADSHAW acted in his official capacity and for official duties. BISOM plead that BRADSHAW's acts were politically motivated and involved racial discrimination against him.

28.  BRADSHAW was served with the complaint in an unidentified certified mailing envelope showing only a Saipan post office box.  The name of the mailer was not on the envelope.  On receipt, BRADSHAW contacted the Attorney General (hereafter the AG) to file the answer.

29.  The case was dismissed without prejudice.  BRADSHAW submitted a claim of $130 in personal expenses defending the suit.  The $130 was added to the bill of costs.  This $130 was never paid.  In the 2003 CNMI settlement with BISOM, the CNMI allegedly canceled the $!30 due BRADSHAW.  Despite requests for reimbursement, BRADSHAW was never paid or informed of the status of the $!30.

30.  In the dismissal, the USDC NMI court order of Nov 22, 1996 found that BISOM's complaint was against BRADSHAW in his official and individual capacities.  But the

7

pleadings all involved BRADSHAW's official duties and capacities.  The Court quoted

Johnson v. Bd of County Comm'rs for County of Fremont (85 F 3d 489, 493 [10th Cir, 1996]}

that "When a governmental official is sued in his official and individual capacities for acts

performed in each capacity, those acts are 'treated as the transaction of two different legal

personages.'"

    31.  On Dec 5, 1996, BISOM refiled his complaint in the CNMI SC Case 96-1320.

Defendant SORENSEN was his lawyer.  BISOM sued BRADSHAW in both his official and

individual capacities with essentially the same charges as in 95-0042.  BISOM added words

in the pleadings to allege both official and individual capacities/actions which were the same

ones as cited in 95-0042.

    32.  BISOM's pleadings were always in the context of BRADSHAW's actions in his

official capacity and for his official duties.  BISOM never alleged that BRADSHAW acted

beyond the scope of his designated powers (i.e. ultra vires).  He cited the same charges of

politics and racial discrimination.  But he made them for both federal and CNMI claims in his

complaint.  BISOM continued statements against BRADSHAW which were patently false.

    33.  On Dec 31, 1996, the CNMI removed 96-1320 to the USDC where it became

USDC 96-0052.  The Court order of Mar 27, 1997 dismissed the actions under res judicata

with the federal claims dismissed with prejudice.  The Court found that "the instant lawsuit is

nearly identical to one which plaintiff previously filed in this court (95-0042); plaintiff and all

defendants are the same, the two federal causes of action are the same and the

Commonwealth claims are the same" (p. 4 of the order).

34. Rather than complying with the USDC order, BISOM continued most of the same allegations in his 1st and 2d amended complaints. He did delete the actual commentary and pleadings for the two federal claims of racial discrimination and politics. But he left the claims as titled/captioned in his complaints.

35. The 1st and 2d amended complaints were allegedly served on BRADSHAW through return postal receipts which were clearly fraudulent, per later court representations.

36. The BISOM suit in BRADSHAW's official capacity continued until Dec 11, 1997 when the CNMI acted to have official capacity on the caption/title changed to Leo Lamotte, then Public Auditor. On the caption, BRADSHAW remained in his individual capacity.

37. On Dec 24, 1997 the 3d amended complaint was filed to reflect this change in the caption. The CNMI removed 96-1320 to the USDC NMI on Jan 23, 1998 where it became 98-0002. The Court ordered the dismissal of the federal claims for the third time. Again, they were dismissed with prejudice.

38. A 4th amended complaint was filed Nov 18, 1998 which continued the same specific charges that BRADSHAW acted in his official/individual capacities in the pleadings.

39. This 4th one became the official complaint allegedly heard by Judge CASTRO in the CNMI SC. It offered no distinction between official and individual capacities or duties. In fact, the duties all continued in the same vein as all of previous complaints in that they were official duties. The USDC in 95-0042 said that BRADSHAW could not be sued for his official duties as that would offer him qualified immunity.

40. The CNMI was duty bound to legally defend and indemnify BRADSHAW as the complaint and 1st and 2d amended complaints were all filed by BISOM with BRADSHAW

sued in his official capacity and alleging acts by BRADSHAW in his official capacity.

41.  Even the 3d and 4th amended complaints involved official capacity and duties which brought forth the CNMI duty to defend and indemnify BRADSHAW.

42.  With BRADSHAW being sued in his official capacity, the CNMI had a de jure fiduciary duty to provide legal assistance and indemnification to BRADSHAW per the CNMI Constitution (article III, section 11) and other CNMI laws.

43.  With the continuing charges of official capacity and duties in the 3d and 4th amended complaints, the CNMI duty to BRADSHAW continued.  Certainly, the CNMI had a de facto fiduciary duty to BRADSHAW in all of the BISOM actions.

44.  The CNMI AG knew that USDC 95-0042 produced a bar for BRADSHAW to be sued in his official capacity and without making any distinction between his official acts and his individual acts as stated in the USDC 95-0042 order.

45.  The AG failed to exercise due diligence by ignoring this bar in the BISOM litigation.  This bar was sufficient for 96-1320 to be dismissed in the SC.

46.  BISOM's continuation of the litigation against BRADSHAW for essentially the same claims which were dismissed by the USDC NMI three times constituted a malicious prosecution.

47.  BISOM, his attorney and the AG knew and understood the implications of BISOM's continuing malicious prosecution against BRADSHAW.  The AG had a duty to go into court and have the case dismissed on this basis.  But the AG failed to exercise due diligence.

48.  The original complaint in 96-1320 was filed on Dec 5, 1996 and a summons on BRADSHAW was issued that day.  Per the 120 day limit on service in SC rule 4(m), the judge

on his own initiative or on motion was obligated to dismiss the action without prejudice. The 120 days was up on Apr 4, 1997. There is nothing in the case docket allowing that this rule was obeyed.

49. No motion was made by BISOM for a time extension. No motion was made by the AG for dismissal. The court issued no order with a new time deadline for service or for a dismissal. Even if the AG and BISOM agreed for a time extension, it was invalid and illegal for BRADSHAW without BRADSHAW's stipulation.

50. The AG was not authorized by BRADSHAW to accept service or to negotiate any extensions of time for service. With BRADSHAW's limitations on the AG accepting service, an extension of time would have had to involve a court order.

51. Both the AG and BISOM fully knew and understood that they could not agree on extending service on BRADSHAW. Only a court order from the judge would suffice. No such order came forth. Thus, all proceedings involving BRADSHAW after Apr 4, 1997 were illegal and without force of law.

### The Alleged Service on BRADSHAW

52. Yet, BISOM's alleged certified letters with summons and complaint to BRADSHAW were mailed in May (over 150 days later) and June 1997 (over 180 days later). Not only did BISOM's actions produce fraudulent documents, but they were illegal and without force of law per the CNMI civil procedure rule 4(m).

53. Per the 96-1320 docket, there is no citation of any court order for the issuance of the first two amended complaints.

11

54. CNMI rule 4(d) did authorize mail service if defendant signed a waiver. But BRADSHAW never signed a waiver. Certified mail was allowed in 7 CMC. It provided no default provision but only for publication by court order if service could not be effected by certified mail.

55. In WA state, there was no provision for certified mail service beyond a court order. The Revised Code of Washington (4.28.80) has a case note which says that those to be served with process are under no obligation to arrange time and place for service or to otherwise accommodate process server. Weiss v. Glemp, 127 Wash. 2d 726, 903 P 2d 455 (1995). Obviously, the same reasoning applies to certified mail. No one in the state of Washington has to accept it or be found avoiding service.

56. Case 96-1320 produced correspondence between BRADSHAW and the CNMI. Exhibit A is BRADSHAW's affidavit of letters received. The letters are attached. Exhibit B is an affidavit of BRADSHAW's letters sent the CNMI. The letters are attached. Exhibit C is another affidavit on the extent of correspondence with the CNMI.

57. In 1996, BRADSHAW discussed with the AG the practice of lawyer SORENSEN sending out certified mail without his name or identification on the mailing envelope. BRADSHAW was concerned with any need to even accept such mailings from an unidentified party. Discussions were held with former Asst AG Robert Kingsley, and possibly also Robert Dunlap/Doug Cotton,

58. BRADSHAW was told that a person has no legal obligation to accept mail, certified or not, from anyone. While acceptance of such mail can create a legal tie, non-acceptance or refusal to accept or claim such mail does not establish a legal binding

12

relationship. Although once a person is properly served with process and comes under the jurisdiction of the court, a legal need then arises to accept further mailings and legal notices.

59. So while accepted mail can constitute service of process, non-accepted mail cannot be used to prove refusal of service of process in an initial service of process to establish court jurisdiction over a person.

60. In a letter from Mr Cotton, BRADSHAW was asked if he wanted the AG to accept service for him. Though the AG was the legal attorney for BRADSHAW and OPA, BRADSHAW does not allow other persons to accept initial service of legal processes to establish court jurisdiction over him in any action in his individual capacity. BRADSHAW insists that any such initial services be made on him personally so that he can fully know and understand the complaint. Too, the CNMI procedure for indemnification per PELDIA (the employee's indemnification act) is for a party to be first served and then the party is to contact the AG to file an answer.

61. Though BRADSHAW was informed by the AG that he could expect service, there was no requirement for him to accept certified letters unless a waiver had been signed. But BRADSHAW signed no waiver.

62. In BRADSHAW v. CNMI et. al. (USDC Idaho 5-84), defendants SORENSEN and BISOM received notice of service of process. Yet both objected to it in their motion to dismiss on July 7, 2005 on the premise that "Knowledge does not constitute service... Actual notice does not substitute for proper service of process, otherwise it would be nonsensical for the Federal Rules of Civil Procedure to provide for a motion to dismiss based on insufficiency of service of process (Dahl v. Kanawha Inv. Holding Co., 161 f.R.D. 673, 681, N.D. Iowa 1995)."

63. In 1996/1997, BRADSHAW received two certified mail envelopes which only showed a Saipan post office box number. They appeared to be similar to the certified mail from lawyer SORENSEN to BRADSHAW in 1995. But BRADSHAW did not note the box number on the mailings in 1996/1997 to be sure. BRADSHAW did not accept these 1996/1997 mailings. BRADSHAW on Jun 2, 1997 brought one letter and his assumption that it was from SORENSEN to the attention of the AG in a privileged letter (Exhibit "B").

64. BRADSHAW was available daily in Elk, WA in 1996-1998 for service of process as he operated a retail business. He never hid from a process server. He did not refuse legitimate service of process. He expected to be served by a process server at once. Yet, it never happened.

65. Subsequently, BISOM filed four amended complaints on this case in SC. None of them were served on BRADSHAW. BRADSHAW sent the AG letters on Jan 31, 1997; Jun. 2, 1997; Jul. 14, 1999; and Jul. 15, 2000 (Exhibit "B").

66. In a letter to BRADSHAW on Jun. 30, 1999 (Exhibit B6), Asst AG BUSH asked about service. BUSH said that answers to his letter would "be protected under the attorney-client privilege." BUSH added that "If there has been no service perfected, then I might be able to get you out of 96-1320 on the two-year statute of limitations for tort claims."

67. The first thing about this letter is that it involved privileged communications as stated by Mr BUSH. BRADSHAW never authorized the CNMI to release his letter to the SC in 96-1320. Yet, in Mr SOSEBEE's motion to take the case off of the calendar (Feb 1, 2000), he submitted this privileged letter to the court without BRADSHAW's permission.

68. BRADSHAW's letter of Jul. 14, 1999 to the AG addressed BUSH's questions and said that some two certified mail packets from an unidentified party came from Saipan in 1996 and 1997. They were not accepted.

69. BRADSHAW's reply also added that no service was made and that any alleged service by BISOM would constitute a fraud. BRADSHAW's letter mentioned a cut off for service of 180 days (it was correctly 120 days) and questions over the statute of limitations. These are subject matter questions which certainly went before CASTRO when he read BRADSHAW's letter.

70. BRADSHAW's Jul 14 letter said "Should you file a motion to strike my name individually from the suit? Since you have suggested it, it seems like a good idea...Accordingly, if you wish to file a motion to have me removed individually from the CNMI case, you have my permission and agreement... Should you represent me further? Again, I don't think I am a party to that CNMI case and if that is true, the answer is no (if the answer is yes then of course I would need representation;..."

71. BRADSHAW's letter of Jul. 14, 1999 plainly asked the AG to go into court and have BRADSHAW's name stricken from 96-1320 on the basis of no service. For sure, the AG should have contacted BRADSHAW at once if an affidavit or BRADSHAW's presence was needed for the court on Saipan. Certainly, the exchange of correspondence was predicated on the fact the AG was BRADSHAW's lawyer and expected further help to resolve the case.

72. From June 30, 1999 until about April 22, 2004, BRADSHAW in ID and WA always believed and acted on the premise that indeed the AG had went into court and had BRADSHAW's name removed as a defendant from the BISOM suit.

15

73. The BRADSHAW letter of Jul. 14, 1999 was clear that BRADSHAW was not served and that BRADSHAW expected and anticipated further AG assistance in resolving the case. But this letter did not authorize the AG to withdraw or deny BRADSHAW indemnification (if BRADSHAW was served).

## US Postal Fraud

74. Unbeknown to BRADSHAW, BISOM/SORENSEN or person(s) under their misappropriated some certified mail/return receipt forms from the US Post Office possibly in 1997 and certainly by Aug 1999.

75. BISOM/SORENSEN used these forms to prepare fraudulent postal return receipts showing service of process on BRADSHAW by certified mail in Jun and Jul 1997 for the first two amended complaints. They submitted these fraudulent receipt records to the CNMI SC.

76. It is unclear when the AG first learned of these fraudulent documents in the 96-1320 file. But Asst AG SOSEBEE knew by Aug 27, 1999 when he received a letter from SORENSEN stating "service by certified mail on (Bradshaw) on two occasions. We also have the return receipt cards." Per the CNMI SC Order to Void on Dec 29, 2005, these receipts are identified as Z 142 485 879, dated Jun 4, 1997 and Z 142 485 883, dated Jul 2, 1997. They both bore the signature of "Manny" (the last name was possibly Mongohia).

77. Exhibit "D" has an affidavit of David Vanderholm, the postal carrier in Elk WA. The original of his affidavit is filed in BRADSHAW's Amended Motion to Void/Vacate Judgment in the CNMI SC 96-1320 file. Vanderholm categorically declares that the name Manny is unknown on his mail route.

78.  On Sep 3, 1999, BISOM's "Reply to Opposition to Motion for Partial Summary Judgment" said that proofs of service on BRADSHAW was filed in 1997 and that these proofs were provided to the AG.

79.  From Aug 27, 1999 to early Feb 2000, the AG evidently did nothing of substance on case 96-1320, per the case file.  The AG made no contact with BRADSHAW to advise him of the trial, of the alleged service made by BISOM or the conflict in the various documents in possession of the AG.

### Judge CASTRO's Gross Incompetence

80.  The AG's "Motion to Remove Case from Jury Trial Docket," filed on Feb 1, 2000, said: "plaintiff purports to have sent the Amended Summons and Complaint to defendant, Robert D. Bradshaw, 40203 N. Newport Hwy., Elk, WA 99009, on May 5, 1997.  Exhibit A. Plaintiff also purports to have sent a Second Complaint and Amended Summons to defendant Bradshaw at the same address, on June 3, 1997.  Exhibit B.  Plaintiff has previously supplied copies of two United States Mail Domestic Return Receipt cards, neither of which bear the signature of defendant, Robert D. Bradshaw.  Exhibit C.  Defendant Bradshaw has not authorized anyone to accept service for him and has not been served with the any of the complaints in this case.  Exhibit D, July 14, 1999 letter from Bradshaw to the Office of the Attorney General."

81.  This AG motion included a copy of BRADSHAW's privileged letter of Jul 14, 1999, as evidence that BRADSHAW had not been served.  Per the later Supreme Court decision, the AG notified the Court and SORENSEN that the AG withdrew that date as BRADSHAW's attorney.  BRADSHAW was never noticed of this withdrawal, of the trial, or of the documents

in court alleging service on BRADSHAW.  This involved AG malpractice/lack of due diligence.

82.  The trial was scheduled for Feb 7th.  The various court filings, fraudulent receipts, and documents were all submitted to Judge CASTRO.  CASTRO was thoroughly informed about all aspects of case 96-1320 by Feb 7, 2000.

83.  The trial of CNMI SC 96-1320 commenced under CASTRO.  It was characterized by much confusion and contradictory paradoxes.  CASTRO allowed the mess into evidence.  But he did not allow BRADSHAW's letter of Jul 14, 1999 into evidence.

84.  CASTRO obviously read BRADSHAW's letter of Jul 14, 1999.  Surely he understood its message.  Or did he?  Anyway, it totally contradicted everything which BISOM submitted to the court on alleged evidence.

85.  Judge CASTRO made no effort to resolve the total contradicting, confusing and impossible pieces of evidence before him from BRADSHAW and BISOM.  A later Dec 29, 2005 void order from the SC proved the gross incompetence of CASTRO and his court.

86.  CASTRO took the way out by ignoring the conflicts in his court.  He accepted the evidence submitted by BISOM.  But per BRADSHAW's letter, the BISOM evidence was totally conflicting, confusing, contradicting and fraudulent.  This paradox indicates a de facto conspiracy.

87.  CASTRO violated CNMI court rules/laws and allowed the conflicting, confusing, contradicting and fraudulent material from BISOM into evidence as truth with no effective opposition from the AG.

88.  Rather than obey CNMI rules/laws, CASTRO made his own rules and law as he went along to deprive BRADSHAW of his constitutional and due process rights.

89. On Feb 14, 2000, BISOM entered a motion for default judgment against BRADSHAW. It was supported on Feb 16, 2000 by a declaration to the Court in the request of entry of default.

90. The Clerk of Court entered this default in the official CNMI SC records on 2-14-00. The justification from BISOM for the default was "return of service" forms filed with the court showing service on BRADSHAW on the first and second amended complaints and service was made on Asst AG COTTON on the fourth amended complaint.

91. BISOM's request for default judgment stated that service was made and that BRADSHAW did not answer the served complaints. The AG filed no answer on the fourth complaint allegedly served on Mr COTTON.

92. In BISOM's Jul 2005 "Opposition to Motion to Void/Vacate Judgment" (p. 4), filed in 96-1320, BISOM/SORENSEN referred to the postal receipts and acknowledged that BISOM had "represented to the court that he had served defendant (in reference to BRADSHAW) by certified mail and defendant had signed the receipt,...There is nothing to indicate that plaintiff (in reference to BISOM) had any way to know or even suspect that the postal receipt that was returned did not bear the signature of the person it was addressed to."

93. From a Feb 22, 2000 "Order Denying Motion to Remove Case From Trial Docket," as signed by judge CASTRO, the CNMI's motion on Feb 1, 2000 to have 96-1320 removed from the trial docket was heard on Feb 7, 2000. This order on Feb 22, 2000 appears to confirm his decision to proceed with the trial.

94. In denying removing the case from the trial docket, CASTRO said: "1. The motion relies on facts set forth in a form that fails to comply with the requirements of a supporting

affidavit or declaration.  2. Defendant Robert D. Bradshaw was properly served by mail, return receipt requested but purposely avoided service.  3. The Office of the Attorney General has appeared on behalf of Robert D. Bradshaw as his attorney of record.  4.  Defendant Robert D. Bradshaw, has waived any potential challenge to insufficiency of service of process by his previously bringing a motion to dismiss without joining such motion..."

95.  It was strange that Judge CASTRO issued this order claiming that proper service was made and that BRADSHAW avoided service all the while that BISOM's motion for a default judgment was predicated upon allegations that BRADSHAW was served (both by certified mail and with service on the AG) and had failed to answer that service.

96.  If "proper service was made," as stated by CASTRO, why is that CASTRO added that BRADSHAW "avoided service"?  The later SC order to void on Dec 29, 2005 found that CASTRO's decision completely lacked any basis in facts or in law.  Thus, they were voided.

97.  It is unclear what basis CASTRO used for this order since there was no evidence in court to substantiate the allegation of avoiding service except for BRADSHAW's Jul 14, 1999 letter and its remarks about the two unidentified certified letters from unidentified mailers not claimed by BRADSHAW.

98.  This privileged letter to the AG was the only document in court which could have influenced CASTRO's decision.  But the evidence also indicates that CASTRO's decision was made on the basis of a conspiracy with BISOM/SORENSEN.

99.  BRADSHAW's Jul. 14, 1999 privileged letter was presented to the court by his alleged former attorney, the AG, despite the AG's withdrawal from the case about Feb 1, 2000, six days before the trial started.

100. Allegedly, the AG submitted this Jul. 14, 1999 letter from BRADSHAW to the court; not to help BRADSHAW, but rather to justify the actions of the AG. There is clear evidence of AG collusion with defendants BISOM/SORENSEN in a conspiracy to defraud BRADSHAW.

101. BISOM's motion for a default judgment was predicated upon service being made upon both BRADSHAW and the AG. Rather than ruling on this motion, CASTRO chose to approve the default judgment on the basis that BRADSHAW had avoided service.

102. Thus, CASTRO made up his own rules/laws and contradicted the actual records filed by BISOM in the case. CASTRO ignored Washington state laws on service. He also ignored CNMI rules/laws requiring service by publication or personal service if attempted service by certified mail failed.

103. Since the CNMI rules do not address the use of certified mail for service (except by 7 CMC which provides for publication as the remedy) and since the CNMI SC had never established personal jurisdiction over BRADSHAW in any legally authorized method of service, CASTRO's decision that BRADSHAW avoided service was wrong and lacked legal justification. The later SC void order of Dec 29, 2005 proved this condition.

104. Of course, it would be absolutely ludicrous to believe that BRADSHAW refused service all the while that BRADSHAW and his alleged AG lawyer also accepted service. Which way was it? Did BRADSHAW refuse service or did he accept service? Yet, CASTRO allowed both options into evidence as true.

105. Too the AG maintained six days before the trial and during the trial that the AG did not represent BRADSHAW (per the Supreme Court's decision, p. 21). Yet CASTRO in

his Feb 22, 2000 order actually found that the AG did represent BRADSHAW.  Which way was it?  Did BRADSHAW have AG representation or not?  This is more prima facie evidence of conspiracy between BISOM/SORENSEN, CASTRO and SOSEBEE.

106.  CASTRO's illegal, confusing, unclear and contradicting actions were certifiably reckless, deliberate, malicious and intentional with an objective to place injury and hurt on BRADSHAW

107.  BRADSHAW was not present and had no lawyer in court and without any notice of the action in progress in court.  As a minimum, CASTRO took the way out and found for BISOM and against the unrepresented BRADSHAW.

108.  CASTRO, as the presiding judge, must have understood what was happening in his own court room.  He accepted the AG withdrawal and proceeded with the trial though BRADSHAW had no representation and was never given notice of the trial.

109.  Not only did CASTRO lack personal jurisdiction over BRADSHAW, but the facts of the case disclose that he also lacked subject matter jurisdiction.  In BRADSHAW's letters at Exhibit B, numerous issues involving subject matter jurisdiction are broached.  Many of them were covered in BRADSHAW's letter of Jul 14, 1999.

110.  For example, the Jul 14 letter mentioned the question over the statute of limitations which is clearly a subject matter issue.  BRADSHAW also mentioned BISOM's complaint that BRADSHAW discriminated against him because of his Jewish "race." According to Jewish encyclopedias (like Encylopaedia Judaica, Universal Jewish Encyclopedia, etc), there is no Jewish race.  BRADSHAW can find no legal basis in Civil Rights laws or court cases allowing a discrimination lawsuit over an alleged Jewish race

which does not exist.

111.  By Judge CASTRO's actions, he completely closed the door for BRADSHAW to have any opportunity to question subject matter jurisdiction.  Besides the questions just noted, there were other questions over subject matter jurisdiction which BRADSHAW would have raised if given a chance.

112.  For instance, the CNMI is quick to claim qualified immunity for her officials which certainly concerns subject matter.  Given a chance, BRADSHAW would have proven his possession of qualified immunity.  He could show that he acted reasonably, carried out applicable statutes and regulations in every respect and complied with BISOM's due process rights.

113.  BISOM's own actions were both illegal per his oath of office to obey CNMI laws and his own contract.  Former CNMI public Auditor Scott Tan and Governor-elect Tenorio neither held a position in the CNMI government in late Nov and Dec 1993.

114.  BISOM had no authority to negotiate with them on OPA.  BRADSHAW was the Public Auditor and had legal authority for the office and its audits.  BISOM's illegal acts are spelled out in his complaints in cases 95-0042 and 96-1320.

115.  When BISOM was fired for cause in 1993, BRADSHAW's actions were completely coordinated with both the AG and Civil Service Commission.  In no instance did BRADSHAW deviate from their procedural instructions.

116.  The original complaint and the first and second amended complaints in 96-1320 were all filed in BRADSHAW's official capacity as well as his individual capacity.  Per CNMI SC rule 4(l), the CNMI AG should have been served for the official capacity complaints.

23

BISOM did not do this.

117.  Castro failed to exercise due care and responsibility as the trial judge by allowing the trial to proceed in the absence of BRADSHAW being present or having counsel present or of being given notice of the trial.

118.  In the interest of justice, CASTRO had a duty to exercise due care and concern over the interests and constitutional rights of BRADSHAW, who was not in court and who was not represented by his supposed legal and proper attorney, the AG.

119.  Yet, CASTRO did little or nothing in the trial to establish justice.  He entered a default judgment against BRADSHAW when there was substantial evidence of fraud and conspiracy on the part of BISOM; and evidence of fraud, conspiracy, malfeasance, malpractice, inexcusable neglect and general incompetence on the part of the AG, who was supposed to be representing and defending BRADSHAW.

120.  Though the evidence was plain enough of what was happening, CASTRO denied BRADSHAW's basic rights under the US Constitution.  He proceeded to order a judgment of $139,000 individually against BRADSHAW and then refused to allow the imposition of the CNMI Indemnification Act to relieve the burden from BRADSHAW.

121.  The charges made against BRADSHAW by BISOM were effectively declared true by the actions of CASTRO.  BRADSHAW was found guilty of practicing discrimination against BISOM; of making alleged statements that his appointment was political, and of discharging BISOM illegally/improperly.  BRADSHAW never had his day in court to answer the charges-- whether they be true or false.

122.  As a minimum, the case file 96-1320 is clear enough that Justice CASTRO is totally and grossly incompetent and not qualified to be on the bench deciding cases.

123.  It is also clear that CASTRO exercised 42 USC 1981 discrimination against BRADSHAW on the basis of BRADSHAW's citizenship, national origin and domicile (a US state sider).  Since BRADSHAW was not present and had no attorney, it was easy for CASTRO to violate BRADSHAW's rights.

124.  Per US law, 42 USC 1981 is not limited to the technical restrictive meaning of the word "race."  While the American BISOM was at issue, it was far more practical and easier for judge CASTRO to simply decide issues against BRADSHAW than against BISOM since BISOM's lawyer was in court demanding and arguing issues for BISOM.

125.  There are also issues about Justice CASTRO's involvement of corruption and conspiracy with BISOM while on the bench.

126.  Stricken

127.  Stricken

## The Trial

128.  When the 96-1320 case went to trial, the AG made no contact with BRADSHAW or proper preparations for the trial.  In the Feb-Mar 2000 trial in SC, the CNMI was represented by Asst AG SOSEBEE as lead attorney.

129.  On Feb 3, 2000, BISOM/SORENSEN submitted a "Opposition to Motion to Remove Case From Trial Docket."  This motion cited BRADSHAW's letter of Jul 14, 1999 by saying:  Mr. Bradshaw received two certified mail packets from Saipan in 1996 and 1997. Plaintiff, in fact, sent two such envelopes with summons and complaint, true copies of which

are attached.  They were returned unopened."

130.  The return receipts on the envelopes submitted as evidence for this BISOM opposition carries the precise same numbers as found on the return receipts supposedly signed by "Manny."  Judge CASTRO accepted both sets of documents as true and allowed them into evidence.

131.  BRADSHAW has no knowledge/remembrance of the two envelopes submitted in court by BISOM.  The envelopes entered by BISOM in 96-1320 allegedly had the mailer(s) identified as "Jay H. Sorensen, Esq."

132.  BRADSHAW had no knowledge of these two envelopes until they were brought to his attention in the summer of 2005 when BISOM filed an answer to BRADSHAW's motion to void/vacate judgment in 96-1320.  This answer included two Xerox copies of two alleged envelopes sent BRADSHAW by certified mail in 1997.

133.  In 1999, BRADSHAW acknowledged two certified mailings from "unidentified" mailers which had a Saipan post office box for a return address.  This Jul 14 letter was written back in 1999 when the facts were close and first hand knowledge to BRADSHAW.

134.  To this day in 2006, BRADSHAW's memory distinctively recalls these two envelopes with unidentified mailers.

135.  BRADSHAW remembers visually looking at least one of the unidentified certified letters in 1996/1997 and noting its similarity to the one sent him in 1995 from lawyer SORENSEN (copy of which is at Exhibit "E").  BRADSHAW did not note the post office box numbers on the ones in 1996/1997 to be sure that they were the same as the one in 1995.  But they looked similar.

136. In 1997, BRADSHAW did assume in 1997 that the unidentified envelopes in 1996/1997 were from SORENSEN. But since BRADSHAW was not thereafter served, by 1999, BRADSHAW became unsure who the envelopes were from in 1996/1997.

137. Based on the 1995 mailing from SORENSEN, it appears that lawyer SORENSEN follows the practice of mailing summons in envelopes without his name on them. This seems to be his MO or modus operandi.

138. Regardless, the presence of one of them was reported at once to the AG. The AG was notified based on BRADSHAW's assumption that the envelope was from SORENSEN. If these envelopes constituted service, then the AG was notified of that service.

139. When a court is dealing with crooks who have and will enter fraudulent documents in court in order to obtain a default judgment, alleged mailings like these two certified mail letters prove nothing simply because it is such a simple task to fraudulently prepare envelopes like these two were prepared. Admittedly, with the new post office tracking capability since 2004, certified documents are easier to now validate, But in 1997, this was out of the question. Thus, it is easy to have fraudulent rubber post office stamps made to stamp any document. For that matter, on Saipan, it would be easy to pay a bribe to a Saipan postal employee and have documents date stamped however desired.

140. In any case, the certified numbers on these two documents were only three numbers apart which seems awful strange that only three certified letters left the Saipan post office in a 30 day period. Too, the certified mail numbers were precisely the same ones which were submitted to the court showing acceptance of service of the complaints by the fictitious Manny. It is clear that the two sets of postal documents cannot be true.

141. BRADSHAW's privileged letter of Jul 14, 1999 was brought to the attention of Judge CASTRO as it totally conflicted with everything happening in his court. Judge CASTRO refused to allow BRADSHAW's letter into evidence. Yet, he allowed in the documents submitted by BISOM both on alleged service and non-service.

142. CASTRO then proceeded to enter a default judgment and so instructed the jury. With the default judgment, BISOM ultimately received $140,000 from the CNMI and a judgment against BRADSHAW for $139,000. BISOM asked the court to have the CNMI pay the $139,000 judgment on the basis of the Indemnification Act. The SC denied this request.

143. Both the default judgment of $139,000 against BRADSHAW and the ultimate pay out of $140,000 in 2003 damaged the reputation, name and professional conduct of BRADSHAW. Both of these judgments were predicated on BRADSHAW's actions per the illegal default judgment entered by CASTRO.

### The Supreme Court Appeal

144. The CNMI appealed the SC decision but later dropped its appeal. BISOM also appealed because the trial court excluded certain evidence and denied plaintiff's request for indemnification for BRADSHAW.

145. In the Supreme Court appeal in Mar-Sep 2002, the CNMI was represented by Asst AG CLAYTON, On the appeal, the Supreme Court upheld the trial court. But importantly, just as the trial court had BRADSHAW's letter of Jul 14, 1999, the Supreme Court also had it and quoted part of it in its decision.

146. Whereas CASTRO found that the AG supposedly was BRADSHAW's attorney and supposedly represented BRADSHAW at the trial (per the CASTRO order of Feb 22,

28

2000), the Supreme Court (in its Sep 13, 2002 decision) said that the AG was not BRADSHAW's attorney. The court added that BISOM had been so informed by the AG at least six days prior to trial (p. 12 of the Supreme Court's decision) and that the trial court was so informed at the oral arguments presented by the AG (p. 21 of the decision).

147. The Supreme Court also found that "before the trial court... the Attorney General's Office allowed a default judgment to be taken against Bradshaw. This fact alone permits an equally persuasive inference that Bradshaw had not, in fact, requested a defense. The trial court's determination that Bradshaw did not request a defense was not clearly erroneous" (p. 21 of the decision). The court also found "As there has been no showing that BRADSHAW requested a defense or indemnification, it can not be said that BRADSHAW wants indemnification."

148. In both the CNMI SC and Supreme Court cases, the report that the AG was not representing BRADSHAW was apparently predicated upon BRADSHAW's Jul 14, 1999 letter. Despite not allowing this letter into evidence, this letter was the only evidence available which the AG had to support its contention that the AG had withdrawn from the case at BRADSHAW's request.

149. Judges MANGLONA and BELLAS (along with Judge Pro Tem Pedro M. Atalig, now deceased), in the Supreme Court review in Mar.-Sep. 2002, were all exposed to CASTRO's violations of court rules/laws, the basic trial results and BRADSHAW's letter of Jul 14, 1999. They saw the absolute confusion and pandemonium from the trial of 96-1320. Yet, they did nothing to resolve the mess. They supported CASTRO's decision.

150.  While the Supreme Court justices were also guilty of misconduct in the way they handled case 96-1320, plaintiff BRADSHAW is not making a claim against them in this 2d amended complaint.  Because of judicial immunity and questions of jurisdiction, these justices would probably escape any liability for their wrong/illegal actions.

151.  BRADSHAW was a defendant in the appeal of SC 96-1320 to the Supreme Court.  Yet BRADSHAW was never notified of the hearing by the AG or the court, was not present in court, had no attorney present (as the AG had withdrawn from representing BRADSHAW six days before the trial), and had no opportunity in court to defend himself.

### The Post Trial

152.  Although the AG sent no further communications to BRADSHAW, after Jun 1999 until 2004, the 96-1320 case file did have some more US post office return receipts in it from the AG, as allegedly signed by "Manny" for BRADSHAW.  As a minimum, these receipts show collusion and conspiracy to defraud between BISOM/SORENSEN and some other person(s) in the CNMI.

153.  While BRADSHAW and his supposed AG attorney had contact up until July 1999, the AG discontinued contact with BRADSHAW after Jun 1999.  BRADSHAW wrote the AG after the Jul 14, 1999 letter and again in 2000 but his letters were never acknowledged or answered.

154.  During all of this interchange between SORENSEN and the AG, none of this was ever brought to the attention of BRADSHAW.  BRADSHAW knew nothing about this interplay. BRADSHAW had no knowledge at all that the trial was underway and that BRADSHAW was a defendant in the trial or its appeal.  All along, BRADSHAW believed that the AG was indeed

his attorney and that the AG had went into court and had BRADSHAW's name removed.

155.  While the AG acted to keep BRADSHAW informed in 1996-1998 on some events on Saipan relative to BRADSHAW, the AG entered into a process of silence in 1999 which eventually turned into an hostile adversarial relationship at least six days before the trial of 96-1320.  In  April 2004, at BRADSHAW's initiation, the AG notified BRADSHAW of the outcome of 96-1320 in 2000 and its appeal in 2002.

156.  The CNMI Supreme Court's decision, appeal nos. 00-0016 & 0023-GA, consolidated (on pages 12, 13, and 22), cited repeated cases of mistakes and mistaken actions (plural) by the AG.  On page 22, the Supreme Court decision opened the possibility that an attorney or attorneys in the Office of the AG had violated the Bar Association ethics rules.  The Supreme Court did not establish which person or persons individually were responsible for the malpractice, mistakes, and so forth.  In its decision (page 12), the Supreme Court also allowed that in the AG appearance and presentation there was a conflict of interest between the CNMI and BRADSHAW.

157.  All of this translated to Supreme Court decided gross incompetence and malpractice by the AG.  It contributed to violations of BRADSHAW's rights to due process and equal protection of the laws under the US Constitution.  The CNMI AG's actions were deliberate, malicious, intentional and extremely irresponsible in creating a total mess of case 96-1320 and great injury and damage being placed upon BRADSHAW and the CNMI.

158.  As a minimum, if the certified letters sent by BISOM (unclaimed by BRADSHAW) communicated an avoidance of service, the AG was fully informed by BRADSHAW on these letters and should have done something about them.  With the first one, whether identified or

not, the AG should have immediately contacted BRADSHAW about the consequences of the letters being unclaimed or filed an answer.

159.  During the filings of the several actions by BISOM, the AG accepted service for BRADSHAW in his individual capacity on one or more of the complaints without BRADSHAW's knowledge, authorization and/or request.  The AG made no answer in court on any of the summons it had accepted.

160.  BRADSHAW was never informed on these acceptances of service by the AG. The AG did nothing about advising the court or BISOM of the insufficiency of service of process.  The AG violated the CNMI court rules and failed in not discharging its duties and due diligence on this case.

161.  Despite being frequently informed that no service on the BISOM complaint in 96-1320 had ever been made personally on BRADSHAW and that constructive service was impossible, the AG made no effective effort to go into court and have the question of service resolved on the basis that BISOM and/or his attorney was practicing deception and fraud upon the CNMI courts (in their presentation of alleged postal documents showing alleged service/refusal of service by BRADSHAW when no actual/constructive service existed).

162.  In view of the BRADSHAW letter of Jul 14, 1999 notifying the AG of no service and no possibility for constructive service, all of these alleged postal documents should have been sufficient to alert members of the AG's office that they were openly suspicious and involved possible fraud and deception.

163.  The AG should have been properly monitoring 96-1320 and promptly brought the discrepancies (between what BISOM was saying and BRADSHAW's letter to the AG on

Jul 14, 1999) to the attention of the court.

164.  Whenever the AG found out about the postal documents (which were a total

complete contradiction to BRADSHAW's letter of Jul 14, 1999), the AG should have protested

to the court and at least filed an appeal to the Supreme Court on the illegal postal documents

filed by BISOM.   Clearly, the AG was grossly incompetent, irresponsible and malpracticing in

not addressing the fraudulent postal documents used by BISOM/SORENSEN.

165. The primary action of the AG was to allow the court to enter a default judgment

on BRADSHAW (per the CNMI Supreme Court, p. 21) without any opposition and without

exercising due care and recognizing the fiduciary responsibility which the AG had in its role

of protecting and defending the CNMI and its officials, like BRADSHAW.

166.  BRADSHAW was sued in the complaint and 1st and 2d amended complaints in

his official capacity along with allegations involving his official duties in the OPA.  In the 3d

and 4th amended complaints, the title caption of the actors dropped BRADSHAW in his

official capacity, but the allegations in the documents remained that BRADSHAW was being

sued officially for his work.

167.  The 1st and 2d Amended complaints were the ones allegedly served on

BRADSHAW by the fraudulent receipts.  They were also the ones where CASTRO declared

that BRADSHAW avoided service.  Certainly, the CNMI had a fiduciary duty to protect and

indemnify BRADSHAW for his official duties.

168.  BRADSHAW was never notified or informed at all on what was happening in

court on this case or on the AG's withdrawal or of the entry of the default judgment on

BRADSHAW as made without opposition from the AG.  Thus, the AG sat back, did nothing

and allowed the default judgment to take place (per the Supreme Court).

169.  At some point in time, the AG violated CNMI court rules/laws and also produced alleged postal receipts on supposed communications sent by the AG to BRADSHAW by certified mail  None of these communications were received by BRADSHAW.  But the postal receipts that were made out and submitted to the court by the AG showed receipt by allegedly the same unidentified and unknown Manny as the receipts which were presented by BISOM to the SC; thus presenting prima facie evidence of conspiracy between BISOM and some person(s) in the AG's office.

170.  The AG's presentation of fraudulent postal receipts in connection with alleged communications to BRADSHAW raise the spectrum that the AG's action not only involved fraud and conspiracy with BISOM; but also that the conspiratorial action involved intentional concealment of the fraud on BRADSHAW to keep BRADSHAW ignorant of the proceedings in court and the violation of his constitutional rights.  The US Supreme Court has ruled that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitations" (Supermarket of Marlinton v. Meadow Gold Dairies).

171.  The actions and omissions of the AG during the years 1997-2002 were sufficient to establish that there was gross incompetence, malfeasance, malpractice, omissions, lack of care, violations of laws/rules and fraud and conspiracy by the AG.  The AG persons deliberately and maliciously denied BRADSHAW his rights under the US Constitution.

172.  At BRADSHAW's initiation, the AG on Apr 6, 2004 sent him a copy of the SC order on 96-1320 and the decision on the Supreme Court Appeal.  A copy of the Apr. 6, 2004 transmittal letter is at Exhibit "A."  This letter was a shock to BRADSHAW in that he had

previously believed and acted on the premise that the AG had went into court and had his name removed as a defendant from SC 96-1320.  This increased the level of emotional duress and stress and loss of the enjoyment of life on BRADSHAW

173.  In the summer of 2004, BRADSHAW began unsuccessful efforts to find a lawyer to undertake a case against the CNMI and to have someone on Saipan check the actual case file.  BRADSHAW could not find a lawyer who would take the case because of economic prejudice and fear of retaliation from Judge CASTRO.

174.  BRADSHAW did learn from Micronesian Legal Services that BISOM entered into evidence documents showing alleged service on both the AG for BRADSHAW and on BRADSHAW via alleged postal mail receipts which showed receipt of service on BRADSHAW by an unidentified/unknown third party (named Manny) who incontrovertibly does not exist.

### AG Brown Lies

175. Though suspicious that person or persons in the AG office presently might be untrustworthy and unreliable and act to further damage BRADSHAW, plaintiff BRADSHAW, without funds to hire a counsel and unable to obtain help from Idaho Legal Services or Micronesian Legal Services, reluctantly did turn to the AG on Sep. 12, 2004 for relief. BRADSHAW talked by phone to Heather, Mr Lemon and Mr Buckingham.  Buckingham later briefed AG BROWN and was given the go ahead to investigate BRADSHAW's complaints over 96-1320.

176.  BRADSHAW requested that the fraudulent documents be sent to US Postal Inspectors/the FBI and that the AG go to court and have the $139,000 judgment against

BRADSHAW voided.  One of BRADSHAW's letters is at Exhibit F.

177.  After many phone calls and letters from BRADSHAW which were never answered by the AG, AG Brown did respond on Feb 15, 2005 (Exhibit A6).  BROWN's letter notified BRADSHAW for the first time that the AG was not BRADSHAW's attorney.

178.  It was then clear that the AG would provide no legal help to BRADSHAW and was in fact a hostile adversarial party.  This effort before Feb 15, 2005 cost BRADSHAW over $100.  The AG inaction further increased the level of emotional stress and loss of enjoying life on BRADSHAW.

179.  If BROWN would have acted responsibly to resolve the issues before her with some action as the chief law enforcement officer of the CNMI, BRADSHAW's litigation before the US courts would have been unnecessary.  Much of this case could have been easily handled by the CNMI without any particular expense or effort.  As a minimum, BROWN could have written BRADSHAW explaining the alleged basis, legality and propriety of the default judgment.

180.  Yet, BROWN did nothing in 2003-2005, but acted to hide information from BRADSHAW and keep BRADSHAW in ignorance about what was in the case file and what the AG was doing on it.

181.  In the summer of 2005, plaintiff learned from the SC Clerk that the fraudulent mailing receipts in the CNMI case file were, all of a sudden, missing. Since these documents were in the possession of AG BROWN (as BRADSHAW was so informed by personnel in the office of the AG), she was responsible for them.

182.  Too. this BROWN influence also reached to other CNMI employees outside the AG's office.  The result has been hidden or destroyed records from the 96-1320 case file.

183.  Regardless of whatever role BROWN had in the loss or hiding of those court documents, as a minimum, BROWN was grossly and maliciously incompetent.  Her office spent ten months investigating the alleged receipts.  As a minimum, she would have had to have access to those documents to do any investigating.  If the documents are now missing, it certainly shows that she is totally irresponsible and incompetent beyond description.

184.  Being alerted in Sep 2004 that BISOM had committed fraud against the CNMI, Brown should have immediately acted to secure the alleged fraudulent documents and have them properly referred to US authorities.

185.  This reality and the facts outlined above plainly outline the hiding of criminal acts by defendant BROWN in cases which were before both the CNMI SC (96-1320) and the US District Court of Idaho (05-84).

186.  As far as the alleged mailing envelopes from BISOM to BRADSHAW, now in the 96-1320 file supposedly justifying the default judgment, BROWN must have known about these documents.  Yet she never informed BRADSHAW.  This hiding of information from BRADSHAW has necessitated much guesswork in 2005 on what happened.

187.  Defendant BROWN appears to never put anything in writing, but rather to only commit to writing when it becomes absolutely necessary.  Without written documents, any contact with the AG becomes difficult.  Without things in writing, it is easy for the AG to lie, deceive, twist, distort, deny, obsfucate, and stall.

188.  After many letters and phone calls over a period of five/six months from BRADSHAW to the AG requesting indemnification on the BISOM judgment, BROWN finally acknowledged BRADSHAW's many attempts to resolve that issue.  On Feb. 23, 2005, BRADSHAW received the letter at Exhibit A from AG BROWN.  Though characterized by at least one mistake, this letter denied BRADSHAW indemnification by essentially citing the Supreme Court decision.

189.  On the mistake in this letter, the AG charged that since its April 2004 letter that "Almost six months later," BRADSHAW sent the AG a request for indemnification.  This charge is not correct and it does matter if the present AG is attempting to prove that BRADSHAW neglected this case with any unnecessary time delays after his notification in April 2004.   Actually, following the conversation with the AG on Sep. 12, 2004 (as elsewhere described herein), BRADSHAW, faxed a letter requesting indemnification to the AG (on Sep 13, 2004 and copies of the material covered under the affidavits at Exhibits A to C).

190.  Later, Asst AG Ed Buckingham orally confirmed the receipt of these faxes in a telephone conversation.  BRADSHAW next sent the AG registered mail with the Sep. 12, 2004 request for indemnification on Sep. 13, 2004.  This registered letter was receipted by the AG on Sep. 28, 2004.  Yet the AG's letter seems disingenuous in alleging that BRADSHAW's request was received "almost six months later" on Sep. 29, 2004, a day after it was actually received (implying that BRADSHAW took almost six months to contact the AG).

191.  The initial notification letter from the AG, dated Apr. 6, 2004 (at Exhibit "A," which, per its mailing envelope, was mailed on Saipan on Apr. 7, 2004), was also received some fifteen days later by BRADSHAW about Apr. 22, 2004.  This means that the actual elapse of

time between the AG notification to BRADSHAW and his contact of the AG was over four
months and not almost six months as alleged by the AG.  This time was spent in pursuit of
trying to find legal help and someone to actually check the 96-1320 file to determine what
had happened.

192.  Thus, Ms BROWN made it plain that the AG would do nothing for me beyond a
short "limited" telephone call to a local attorney on my options.  This meant that henceforth
BRADSHAW was denied any legal assistance from the AG.  Actually, it appears that AG
discontinued legal assistance to BRADSHAW in 1999 and never told BRADSHAW about it.

193.  The AG has done nothing for BRADSHAW since Jun 1999 beyond being an
adversary and constantly working against BRADSHAW.

194.  This means that all of BRADSHAW's letters, phone calls and contacts have been
a total waste of time as the AG did nothing and made no effort to apprise BRADSHAW of the
status of case 96-1320.  If BRADSHAW had of been informed that the AG was his adversary,
BRADSHAW could have saved much money, time and effort.

195.  Otherwise, it is to be noted that paragraphs two, three and four of the AG letter of
Feb. 15, 2005 also clearly acknowledge that BRADSHAW was first given notice in April 2004
of the CNMI court actions that took place to damage and hurt him in 1997-2002.

196.  Defendant BROWN's actions have been deliberately designed to keep
BRADSHAW in a state of ignorance about what had happened on case 96-1320 and not
allow BRADSHAW to obtain needed documents to prove the conspiracy and fraud
perpetuated upon him by BISOM and the CNMI.

## BRADSHAW Had to Take Legal Action in 2005

197.  From Sep. 12, 2004 to date, BRADSHAW went to great effort and exhausted all remedies available to him in the CNMI to resolve this case and the dispute without further court actions/legal processes.  BRADSHAW's efforts failed.  The AG effectively did nothing.

198.  The passage of a few days short of six months without resolution was sufficient to demand action on Mar 7, 2005.    BRADSHAW, pro se and at his own expense, filed a petition in the SC asking the SC to void/vacate its judgment against BRADSHAW.  This action costs BRADSHAW $4000.  It was decided on Dec 29, 2005 when the SC issued an order to void the $139,000 judgment.

199.  But this judgment did not address or alter the public slander, wrong, lack of due process and expense placed on BRADSHAW by the actions of the CNMI through its agents.

200.  BRADSHAW simultaneously filed a suit similar to this one in the US District Court of Idaho (Case 05-0084).  Because of Title 18 USC 4 and the need to report felonies as soon as possible to a US judge, it was essential that this case be filed in Idaho.  In case 05-0084, BRADSHAW obeyed the law and reported the postal fraud felonies described herein with a citation of 18 USC 4.

201.  Too, BRADSHAW was recruited to go to Saipan from Idaho.  BRADSHAW suffered damage in Idaho.  BRADSHAW expected to get copies of the fraudulent documents and get them to US Postal inspectors in Idaho.  Finally, with the documents, BRADSHAW expected to employ a Idaho handwriting expert to prove that the documents were not signed by BRADSHAW.  This case cost BRADSHAW $4000.  The Idaho case was dismissed without prejudice in Jul 2005 for lack of personal jurisdiction.  It was refiled in the CNMI in Aug 2005.

202.  Ever since trying to obtain some resolution on this case from the CNMI AG and courts (from Sep 2004 to date), the AG consistently has avoided writing letters to BRADSHAW or allowing BRADSHAW to have any knowledge of the facts in the case. Instead, the AG has generally acted to lie, deceive, twist, distort, stall, delay, obfuscate, hide and deny BRADSHAW any information which would help him learn the facts.

203.  BRADSHAW tried to obtain copies of documents from the AG--both before filing US civil action 05-84 and afterwards in the form of two requests for documents under discovery (in May and June 2005).  The AG simply refused to honor the requests.  Since Jun 1999, the AG has consistently kept the facts of 96-1320 in secret from BRADSHAW.

204.  Starting in Feb 2005, BRADSHAW made many phone calls and sent numerous letters to the SC Clerk of Court with checks enclosed for copies of documents.  In Oct 2005, BRADSHAW wrote the Chief Judge about the matter.  Starting in early Dec 2005, the clerk began filling some of these requests for documents from the 96-1320 case file.

205.  But in a Jun 2005 telephone conversation, the Clerk said that the postal receipts in question are not now in the file.

206.  In learning of the missing records, BRADSHAW contacted the CNMI lawyer, Hall Farley, who sent back the enclosed letter Exhibit "G."

207.  In the Hall Farley letter, the CNMI AG denied ever seeing the alleged fraudulent postal receipts.  The AG pretended to be in total ignorance about its contacts with BRADSHAW from Sep 2004 until Mar 2005.  This AG alleged ignorance happened three months after the 05-84 suit was filed in the US Idaho court over this very question.

208.  In a Jun 18, 2006 letter (Exhibit "H"), the Clerk further informed BRADSHAW  that the attached exhibit/letter to the 02/03/00 "Opposition to Motion to Remove Case From Trial Docket" is now missing.  This letter is important in establishing the fraud in 96-1320.  It is clear that some person(s) have reviewed/rifled the 96-1320 court case file and removed and hid or destroyed a number of documents.

209.  While the case file has been rifled and altered and documents hidden or destroyed, a copy of the fraudulent receipts from BISOM/SORENSEN remained.  They are attached to the AG's motion of Feb 1, 2000 to take the case off of the calendar.  Exhibit "I" a is copy of the fraudulent receipts entered by BISOM/SORENSEN.

210.  BRADSHAW's contacts with the AG in 2004-2005 are spelled out in the affidavit at Exhibit "J" as filed in the CNMI SC case 96-1320 in the summer of 2005.  Local newspaper reports of the trial finding BRADSHAW guilty of BISOM's allegations are at Exhibit "K."

### FIRST CLAIM--Civil Rights Violations (42 USC 1983)

211.  Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

212.  In 1996-2003 at the CNMI SC in case 96-1320 on Saipan, defendant ROBERT A. BISOM and his attorney defendant JAY H. SORENSEN violated plaintiff's due process, equal protection of the law and other rights under the US Constitution and the 14th amendment of the US Constitution and 42 USC 1983.

213.  BISOM/SORENSEN engaged in malicious prosecution to bring on the injury to plaintiff.  Three times the USDC NMI dismissed the BISOM claims.  Among other things, BISOM never addressed the distinction between official and individual capacities and duties.

214.  Yet, BISOM kept and maintained the essential same allegations against BRADSHAW in all six of his complaints in 95-0042 and 96-1320.

215.  BISOM/SORENSEN knew that there was a bar against them to proceed with their litigation against BRADSHAW.

216.  By the summer of 1999, BISOM/SORENSEN then misappropriated US postal forms for purposes of fraud.  In 1999 and 2000, they entered fraudulent US mail postal receipts and submitted contradictory alleged mailing envelopes to BRADSHAW in case 96-1320 to obtain a default judgment against BRADSHAW in violation of 18 USC 241-242; 1341; 1342; 1349; 1707; and 39 USC 3005/4005.

217.  BISOM/SORENSEN submitted two sets of postal documents to the court.  In 1999, the set of fraudulent receipts were submitted.  On Feb 3, 2000, BISOM/SORENSEN submitted two alleged mailing envelopes which involved the exact same certified numbers as for the two return receipts.  The mailing envelopes showed them to be undelivered and returned to sender.  The two sets of documents were contradictory and impossible.

218.  In the 2005 Opposition to Motion to Void/Vacate Judgment in the CNMI case 96-1320, BISOM/SORENSEN admitted submitting both sets of contradicting documents to the SC.  Obviously, one or both sets of postal documents were fraudulent.

219.  BRADSHAW allows that both of them could be fraudulent.  Certainly, the return postal receipts were fraudulent.  Whether BISOM/SORENSEN ever mailed the envelopes submitted to the court remains a question mark.

220.  BISOM/SORENSEN violated CNMI court rule 4 (d), (e), (l) and (m), 7 CMC Sections 1102 and 1104 and WA state laws and rules by not serving BRADSHAW in

accordance with the law  They denied BRADSHAW his day in court to answer their complaint.

221.  In the BISOM complaints, BISOM admitted that he worked outside official government channels and without authority to block and oppose the audit work of BRADSHAW.

222.  In a CNMI AG deposition with BISOM in 1996, he also admitted that in 1993 he went to the CNMI legislature and discussed confidential OPA information with certain legislatures.  These facts prove that BISOM was properly fired by BRADSHAW for cause.

223.  BISOM/SORENSEN obtained a judgment against BRADSHAW for $139,000. They also obtained a judgment and settlement of $140,000 in 2003 from the CNMI in part as a result of the illegal default judgment.  BRADSHAW was due $130 from BISOM in case 95-0042.  In the 2003 settlement of 96-1320, BRADSHAW lost this $130.

224.  The illegal actions and improper judgments allowed by the defendants brought a loss of property (money) to plaintiff.  BRADSHAW was also slandered and defamed in the CNMI media.

225.  BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged.  His professional status as a CPA was damaged in the media to affect his ability to earn a living when he resumes the practice of accounting.

226.  These events further brought much emotional distress, pain and suffering to BRADSHAW.  They also brought about a loss of enjoyment of life to BRADSHAW.

227.  The actions of BISOM/SORENSEN were extreme and outrageous.  They were done recklessly, maliciously and intentionally with a desire to inflect monetary, emotional and

other damage on BRADSHAW.

228.  To address the illegal judgment, BRADSHAW brought action in the CNMI SC in 2005 to void the default judgment of $139,000.  The SC granted this motion on Dec 29, 2005.  This action costs BRADSHAW personally $4,000.  The actions of BISOM/SORENSEN make BRADSHAW continue to incur expense in the courts to obtain relief from the injuries BISOM/SORENSEN caused.

229.  BRADSHAW prays for relief from the actual damages of the $130 in case 95-0042, $4,000 in case 96-1320, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to BISOM/SORENSEN.

230.  Since BISOM/SORENSEN collected $140,000 illegally from the CNMI because of the alleged actions of BRADSHAW and the default judgment, BRADSHAW asks that BISOM/SORENSEN be made to repay this $140,000 to the CNMI.  BRADSHAW further requests that the CNMI Bar Assn and US authorities be advised of this case for further action.

231.  Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $279,000 from BISOM and $279,000 from SORENSEN for emotional and mental distress and the loss of the enjoyment of life.

### SECOND  CLAIM--Civil  Rights  Violations  (42  USC  1983)

232. Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

233.  In 1996-2003 in CNMI case 96-1320, AG defendants FORELLI, COTTON, BUSH, CLAYTON and SOSEBEE each individually and collectively acted to violate BRADSHAW's

due process, equal protection and other rights under the US Constitution, the 14th amendment to the Constitution and 42 USC 1983 and their own oath of office.

234.  On Apr 4, 1997, the 120 days were up for service of the BISOM 96-1320 complaint.  Defendant COTTON was obligated to move in court for the dismissal of the complaint against BRADSHAW.

235.  Since there was a bar to BISOM"s suit as presented in the SC in 1996 and thereafter, the AG should have filed for dismissal against BRADSHAW. The AG failed to exercise due diligence.

236.  Since there was evidence of malicious prosecution in case 96-1320 in 1996 and thereafter, the AG should have filed for dismissal against BRADSHAW.  The AG failed to exercise due diligence.

237.  Since the CNMI SC lacked both personal and subject matter jurisdiction over BRADSHAW in 1996 and thereafter, the AG should have moved for a dismissal against BRADSHAW.  The AG failed to exercise due diligence.

238.  With the filing of the 1st amended compliant by BISOM in May 1997, the two-year statute of limitations was up on CNMI torts.  The AG should have filed for dismissal against BRADSHAW in 1997 and thereafter.

239.  With the filing of the complaint and the 1st and 2d amendments in 1996-1997 and thereafter, the AG should have moved for dismissal against BRADSHAW for lack of service of process.

240.  Per BISOM's later motion for default judgment, COTTON allegedly accepted service of the 4th amended complaint in 96-1320 and failed to file an answer, notify

BRADSHAW of the event or advise the SC that the AG did not represent BRADSHAW.

241. Defendant BUSH became the AG lead attorney on 96-1320 in the summer of 1999. BUSH offered to go into court and have BRADSHAW's name removed from the case for lack of service/statute of limitations. BRADSHAW agreed. BUSH did not do so.

242. Defendant SOSEBEE became lead attorney in Aug 1999. He learned in Aug 1999 that BRADSHAW claimed no service and yet BISOM/SORENSEN held US postal receipts showing alleged service on BRADSHAW to a person named Manny.

243. SOSEBEE sat on these facts from Aug 1999 to Feb 2000 and did nothing to resolve them for six months until six days before the trial.

244. On Feb 1, 2000, SOSEBEE filed a motion to take the case off of the 96-1320 calendar on the basis of the contradictory and confusing documents in the case. SOSEBEE filed in court both copies of the fraudulent receipts and the privileged letter from BRADSHAW to BUSH stating the lack of service. SOSEBEE did not have BRADSHAW's permission for the revealing of BRADSHAW's privileged letter in court. This was a lack of due diligence.

245. On or about Feb 1, 2000, SOSEBEE, with the approval of Acting AG FORELLi, notified the SC and SORENSEN that the AG was withdrawing from representing BRADSHAW. But BRADSHAW was never told of this decision.

246. The withdrawal was made despite the fact that BRADSHAW was sued in his official capacity for his duties as an official of the CNMI government. The AG had a fiduciary duty to legally protect the OPA and BRADSHAW.

247. By Feb 3, 2000, both SOSEBEE and FORELLI knew that BISOM/SORENSEN had submitted two sets of postal documents which were totally contradictory. One or both

sets had to be fraudulent.

248.  Yet, AG FORELLI refused to order a criminal investigation and prosecution of BISOM/SORENSEN though there was incontrovertible court documents showing the presence of fraud/attempted fraud on the CNMI and BRADSHAW.

249.  In 1999-2000, SOSEBEE sat back, did nothing and allowed the grossly incompetent CASTRO court to enter a default judgment against BRADSHAW to obtain judgments against BRADSHAW and the CNMI.

250.  The AG did file a notice of appeal to the Supreme Court.  But later, SOSEBEE/CLAYTON dropped the appeal.

251.  The CNMI AG persons were effectively found guilty of gross and malicious incompetence and malpractice by the CNMI Supreme Court in its review of case 96-1320 in 2002.

252.  Specifically the court cited AG personnel several times for mistakes (plural), and violation of ethic rules.  The court also allowed that the AG person(s) were involved in a conflict of interest in court.

253.  The CNMI AG had a fiduciary duty by the CNMI Constitution and laws to render legal assistance and indemnification to BRADSHAW for his official work in the CNMI.  The AG persons did not render this help.  After Jun 1999, they became adversaries and worked consistently against BRADSHAW.

254.  BRADSHAW was sued in his official capacity in the 96-1320 complaint and its 1st and 2d amended complaints.  In the pleadings, BRADSHAW was repeatedly cited in his official capacity and for his official duties in the CNMI.  Yet, the AG did nothing to defend

BRADSHAW in his official capacity.

255.  The AG persons abandoned BRADSHAW in about Jul 1999 and allowed a default judgment to be entered against him in the CNMI courts.  The AG then refused to appeal the illegal decision made in the CASTRO court.

256.  BRADSHAW was due $130 from BISOM in case 95-0042.  In the 2003 settlement of 96-1320 by CLAYTON, BRADSHAW lost this $130.

257.  The illegal actions and improper judgments allowed by the defendants brought a loss of money to plaintiff.  BRADSHAW was also slandered and defamed in the CNMI media.

258.  BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged.  His professional status as a CPA was damaged in the media to affect his ability to earn a living when he resumes the practice of accounting.  These events further brought much emotional distress, pain and suffering to BRADSHAW.  They also brought about a loss of enjoyment of life to BRADSHAW.

259.  The actions of the AG defendants were extreme and outrageous.  They were done recklessly, maliciously and intentionally with a desire to inflect monetary, emotional and other damage on BRADSHAW.

260.  To address the illegal judgment, BRADSHAW brought action in the CNMI SC in 2005 to void the default judgment of $139,000.  The SC granted this motion in Dec 2005.  This action costs BRADSHAW personally $4,000.  The actions of the AG defendants make BRADSHAW continue to incur expense in the courts to obtain relief from the injuries caused.

261.  BRADSHAW prays for actual damages of $4,000 in case 96-1320, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such

49

other relief as the court may decide and order/allocate to the AG defendants.

262.  Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $139,000 from SOSEBEE and $139,000 from the other AG defendants as the court may allocate for emotional and mental distress and the loss of the enjoyment of life.

263.  Defendants are not eligible for qualified immunity in that their acts were outside their designated duties.  Their acts were beyond the purview of a reasonable person.  Their acts violated US and CNMI laws and rules.  And their acts violated the due process and equal protection rights and benefits of BRADSHAW per the US Constitution and US law.

### THIRD CLAIM--Civil Rights Violations (42 USC section 1983).

264. Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

265.  Defendant Pamela BROWN violated BRADSHAW's rights and benefits to the US Constitution, the 14th amendments and 42 USC 1983 and her own oath of office.

266.  Though having a fiduciary duty to assist BRADSHAW and to indemnify BRADSHAW for his official work in the CNMI, she became an adversary to work against BRADSHAW in 2004/2005.  She engaged personally in or by influencing others to hide/destroy records in CNMI case 96-1320 and USDC (ID) case 05-0084.

267.  Per the affidavit of BRADSHAW's contacts with the AG, BRADSHAW was informed by AG personnel that BROWN's office had possession of the case file 96-1320 and the fraudulent postal receipts in question.  BROWN supposedly spent some ten months investigating the alleged fraud in case 96-1320.  She ended up hiding, losing or destroying

the key documents involved.

268.  BROWN or others under her influence hid or destroyed various documents in case file 96-1320 in violation of 18 USC 1503, 1510, 1511, and 1519 and 39 USC 3005/4005.

269.  Since BRADSHAW contacted the AG in Sep 2004 to obtain relief, BROWN and her office has consistently acted to lie, deceive, twist, distort, deny, obsfucate, and stall.

270.  The actions of AG BROWN were extreme and outrageous.  They were done recklessly, maliciously and intentionally with a desire to inflect monetary, emotional and other damage on BRADSHAW.

271.  To address the illegal judgment, BRADSHAW brought action in the CNMI SC in 2005 to void the default judgment of $139,000.  The SC granted this motion in Dec 2005. This action costs BRADSHAW personally $4,000 because BROWN refused to provide assistance.  The actions of BROWN makes BRADSHAW continue to incur expense in the courts to obtain relief from the injuries caused.

272.  BRADSHAW prays for relief for the actual damages of $100 due him in 96-1320 from Sep 2004 to Feb 2005; $4,000 in case 96-1320 for the void action, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to BROWN.

273.  Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $139,000 from BROWN as the court may allocate for emotional and mental distress and the loss of the enjoyment of life.

274.  BROWN is not eligible for qualified immunity in that her acts were outside her designated duties.  Her acts were not judicial in a courtroom.  Her acts were beyond the purview of a reasonable person.  Her acts violated US and CNMI laws and rules.  And her acts violated the due process and equal protection rights and benefits of BRADSHAW per the US Constitution and US law.

### FOURTH CLAIM--Civil Rights Violations (42 USC 1983)

275.  Plaintiff incorporates herein by reference paragraphs 1-210 as hereinabove alleged as if set forth here in full.

276.  An unknown person or persons in the CNMI took action in about 2000 and again later in 2004-2005 to deprive BRADSHAW of his due process and equal protection rights under the US Constitution.

277.  In about 2000, the person(s) misappropriated US postal forms.  These forms were prepared to illegally reflect something allegedly sent to BRADSHAW.  This unknown person(s) then entered fraudulent US mail postal receipts in case 96-1320. These documents contributed to the illegal $139,000 judgment against BRADSHAW.  These acts violated 18 USC 241-242; 1341-1342; 1349; 1707; and 39 USC 3005/4005.

278.  Another or the same unknown person(s) was influenced or ordered by AG BROWN to hide, lose or destroy documents from the 96-1320 case file in 2004-2005.  This action hurt BRADSHAW in cases before the CNMI SC and the USDC in Idaho.

279.  BRADSHAW was injured in his property (money).  His character was slandered in the CNMI media and the media coverage affected his ability to earn a living by his profession.  He lost the enjoyment of life he was entitled to by the US Constitution.

280. BRADSHAW prays for relief for the actual damages of $100 due him in 96-1320 from Sep 2004 to Feb 2005; $4,000 in case 96-1320 for the void action, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to the unidentified person(s).

281. Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $139,000 from unidentified person(s) as the court may allocate for emotional and mental distress and the loss of the enjoyment of life.

282. Defendant is not eligible for qualified immunity in that her acts were outside his/her designated duties. The acts were beyond the purview of a reasonable person. The acts violated US and CNMI laws and rules. And the acts violated the due process and equal protection rights and benefits of BRADSHAW per the US Constitution and US law.

### FIFTH CLAIM--Intentionally Omitted

283-303. Deleted

### SIXTH CLAIM--Intentionally Omitted

304-317. Deleted

### SEVENTH CLAIM--Civil Rights Violations (42 USC 1985)

318. Plaintiff incorporates herein by reference paragraphs 1-317 as hereinabove alleged as if set forth here in full.

319. The CNMI; through her agents CLAYTON, BROWN, SOSEBEE and his boss FORELLI; and defendant BISOM through his agent SORENSEN; conspired and committed acts in 1999-2000 individually/collectively to injure BRADSHAW in his person/property, and to interfere in and deprive BRADSHAW of due process and his rights and privileges under

the US Constitution in a defacto conspiracy to violate the US Constitution and 42 USC 1985. The prima facie and circumstantial evidence in case 96-1320 establish clear collusion by the defendants to systematically deny BRADSHAW his rights under US law.

320.  Under 42 USC 1985, a conspiracy can result from a meeting of the minds or an understanding or agreement among conspirators, and the existence of such conspiracy may be inferred from circumstances and need not be demonstrated to exist as a matter of express agreement (AM Jur 2nd, section 174 on Civil Rights).  A tacit understanding is sufficient to constitute a conspiracy and an inference of agreement can be made where particular acts performed together are unlikely to have been undertaken by the actors without such an agreemnt (ibid). The government actors worked under color of law but outside the scope of their employment.  But principals are responsible for the actions of their agents.

321.  Besides circumstantial evidence, there are facts supporting the alleged conspiracy.  First, the case file allegedly contained receipts in the file similar to the ones filed by BISOM showing that the AG office in 1996-2002 sent BRADSHAW an alleged message(s) in certified letter(s) which were similar to the fraudulent ones filed by BISOM showing receipt by the fictitious Manny.  Second, it is inconceivable that all involved responsible people in the AG's office could incompetently ignore and pass over very obvious fraudulent documents and assertions as filed by BISOM in Case 96-1320.  There is prima facie evidence of some compelling reasons(s) for the incredible malicious malpractice, gross incompetence, negligence and lack of due care in handling case 96-1320.  For some compelling reason(s), the CNMI AG's office acted on behalf of the CNMI government to hide, assist and aid BISOM in his illegal actions against BRADSHAW.  Aside from conspiracy, there is no plausible

explanation as to what happened.

322.  The defendants all knew and understood that BISOM/SORENSEN had entered fraudulent documents in case 96-1320 to defraud BRADSHAW and the CNMI.  They conspired and  acted together to hide and alter this fact to make out that the default judgment on BRADSHAW was ostensibly made for other reasons.  The ultimate culprit used by the CNMI and her agents in the conspiracy came to be a SC order of Feb 22, 2000 which charged that BRADSHAW had avoided service.  But this order was made eight days after BISOM had already entered his request for default on the premise that service had been made on BRADSHAW and that "return of service" forms had been filed with the court (evidently the fraudulent postal receipts which BISOM must have filed in court to support his default request).  But the SC order of Feb 22, 2000 was made on the basis that the court had taken under "advisement" a hearing on Feb 7, 2000 on certain questions.  If the issue was taken under advisement earlier, the decision and order was not made until the day of the order of Feb 22, 2000.  If the actors involved were acting responsibly and in good faith with some measure of prudence and intelligence, it would have been impossible for the parties to have alleged the same culprit and explanation for the default charge.  The culprit was alleged to be the SC order of Feb 22, 2000.  While CLAYTON and BROWN were not likely involved initially, they too joined in the understanding or agreement when they later became involved in the case.

323.  More evidence of the conspiracy surfaces from the fact that service on BRADSHAW had to be made within 120 days per CNMI rule 4(m); the fact that the SC issued an order on May 20, 1997 as approved by the SC which demanded that service on

BRADSHAW had to have been made by May 20, 1997 for BISOM's 1st amended complaint and by May 30, 1997 for BISOM's second amended complaint.  None of these legal deadlines were met.  The CNMI and BISOM and their agents were fully aware of these deadlines which had not been met.  Next, the service or lack of service alleged by BISOM in no case complied with 7 CMC 1102-1104, CNMI rules of service of process, Washington state laws on service (as BRADSHAW resided in WA state) or US laws and rules on due process and the US Constitution.  All of the actors involved were lawyers.  They fully understood all of these laws and rules.  They cannot all claim ignorance of the law.

324.  Another evidence of conspiracy between the AG and BISOM/SORENSEN surfaces in the case file show that Asst AG SOSEBEE had a habit of sometimes "personally" serving papers on lawyer SORENSEN.  It is unclear what prompted or necessitated personal visits by SOSEBEE and SORENSEN since they were ostensibly adversaries in a court action. Only a conspiracy makes sense.  The reasons for the conspiracy are clear enough. For BISOM/SORENSEN, the push was for gain and to put hurt on BRADSHAW who was not present to defend himself.  While some of the defendants may have participated in the plunder given BISOM, it is also plausible that the grossly incompetent malpracticing AG actors participated simply to avoid having to do work which would interfere in their leisure activities.

325.  The illegal actions and improper judgments allowed by the defendants brought a loss of money to plaintiff.  BRADSHAW was also slandered and defamed in the CNMI media. BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged.  His professional status as a CPA was damaged in the media to affect his ability to

earn a living when he resumes the practice of accounting. These events further brought

much emotional distress, pain and suffering to BRADSHAW. They also brought about a loss

of enjoyment of life to BRADSHAW. The actions of the defendants were extreme and

outrageous. They were done recklessly, maliciously and intentionally with a desire to inflect

monetary, emotional and other injury on BRADSHAW and/or to interfere in BRADSHAW's

civil rights per the US Constitution. Because the CNMI SC was totally incompetent and

biased, the actors were able to successfully bring this conspiracy to fruition and impose a

judgment on BRADSHAW which was illegal since service was never legally made.

326. To address the illegal judgment entered by the SC, BRADSHAW brought action

in the CNMI SC in 2005 to void the default judgment of $139,000. The SC granted this

motion in Dec 2005. This action cost BRADSHAW personally $4,000. The actions of the

defendants make BRADSHAW continue to incur expense in the courts to obtain relief from

the injuries caused.

327. BRADSHAW prays for relief for the actual damages of $4,000 in case 96-1320

for the void action, $4,000 in case 05-0084 and all other costs incurred to date in case 05-

0027 as expanded and such other relief as the court may decide and order/allocate to

BROWN, FORELLI, SOSEBEE, CLAYTON, BISOM, SORENSEN and the CNMI. BRADSHAW

prays for relief for the punitive, exemplary, compensatory, special, general and other

damages of $279,000 from FORELLI, SOSEBEE, BROWN, CLAYTON, BISOM , SORENSEN

and the CNMI as the court may allocate for emotional and mental distress and the loss of the

enjoyment of life.

## EIGHTH CLAIM--RICO Violations (18 USC 1961-1964)

328. Plaintiff incorporates herein by reference paragraphs 1-327 as hereinabove alleged as if set forth here in full.

329. The defendant CNMI conspired and acted through her agents FORELLI, BROWN, CLAYTON, and SOSEBEE and with BISOM and SORENSEN in 1997 to 2005 in the CNMI to defraud BRADSHAW. The defendants violated BRADSHAW's constitutional rights and his business and property interests under the US Constitution and 14th amendment and 18 USC 1961-1964.

330. The CNMI is engaged in promoting interstate and foreign commerce with the US and is an RICO enterprise by definition. Though the AG defendants acting in collusion are a de facto enterprise as well (to the extent that they could achieve personal gain), they are also agents acting for the CNMI enterprise which is primarily engaged in interstate and foreign commerce. Since lawyer SORENSEN was an officer of the CNMI Courts, he also was an agent for the CNMI enterprise as well as being a principal for his own part in the RICO activities.

331. The CNMI action against BRADSHAW involved collusion among its agents and SORENSEN and BISOM and with evidence of conspiracy (as established in the preceding claim seven on conspiracy). The actions involved criminal activities; established in a pattern; and involved a multiple number of related/linked incidents starting in 1997 and continuing till 2005. BRADSHAW was injured from this conspiracy.

332. RICO involved a series of actions. They included the acts of SORENSEN/BISOM by 1999 to prepare fraudulent documents to obtain a default judgment against BRADSHAW;

the acts of someone in the CNMI to also prepare fraudulent postal receipt documents; the acts of FORELLI and SOSEBEE in 2000 to illegally withdraw from representing BRADSHAW without notifying BRADSHAW before the trial; the acts of FORELLI in 2000 to ignore improper/illegal acts by BISOM/SORENSEN in the CNMI courts in 1999-2000; the actions of the CNMI courts in 1996-2000 to illegally assume jurisdiction over BRADSHAW which they lacked in order to enter a default judgment against BRADSHAW in a malicious and grossly incompetent manner; acts of CLAYTON to mishandle the appeal and not notify BRADSHAW and the acts of BROWN to personally or by influencing others to hide/destroy documents and work against Bradshaw in cases in 2004-2005 before the CNMI SC and the USDC of Idaho.

333. As cited/allowed in previously cited claims herein, the prima facie and circumstantial evidence in case 96-1320 establishes collusion and conspiracy by the parties. This has contributed to commit RICO. This evidence includes the presence of the same type of mysterious postal receipt documents from both BISOM/SORENSEN and the AG's office; the incredible decision of the AG's office to hide and cover up evidence of criminal acts of fraud by BISOM/SORENSEN; the obvious efforts of the AG's office to continuously work to aid and assist BISOM and work against BRADSHAW in its actions. The gross incompetence and malicious negligence and malpractice can only be only be explained in the vein of conspiracy. It is inconceivable that all of the several lawyers in the AG's office could all be so incompetent and negligent without the presence of conspiracy. Even the role of the SC in the case logically involved conspiracy. It is hard to appreciate that any judge could be so stupid and incompetent as was the SC judge in 96-1320--apart from conspiracy. Finally, there is the evidence of unnecessary and improper contact between SOSEBEE and SORENSEN.

All of this suggests conspiracy.

334.  Stricken.

335.  The illegal actions and improper judgments allowed by the defendants brought plaintiff a loss of property (money as well as unnecessary, excessive and destructive wear and tear on plaintiff's car in order  to go to distant legal libraries, consult lawyers, file papers, make copies, fax documents, etc).  BRADSHAW was also slandered and defamed in the CNMI media. BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged.  His professional status as a CPA was damaged in the media to affect his ability to earn a living when he resumes the practice of accounting.

336.  These events brought much emotional distress, pain and suffering to BRADSHAW.  Since these problems arose in the year 2004, the stress on BRADSHAW has created and exuberated health problems.  The legal conflicts forced on BRADSHAW and the need to proceed pro se have also brought about a loss of enjoyment of life to BRADSHAW. The actions of the defendants were extreme and outrageous.  They were done recklessly, maliciously and intentionally with a desire to inflect monetary, emotional and other damage on BRADSHAW.

337.  BRADSHAW prays for relief for the actual damages of $4,000 in case 96-1320 for the void action, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to FORELLI, SOSEBEE, CLAYTON, BROWN, BISOM, SORENSEN and the CNMI.  Finally, BRADSHAW prays for relief for the punitive, exemplary, compensatory, special, general and other damages of $279,000 from FORELLI, SOSEBEE, CLAYTON, BROWN, BISOM,

SORENSEN and the CNMI as the court may allocate for emotional and mental distress and the loss of the enjoyment of life.

338.  The CNMI acted through its agents in this claim.  A principal is responsible for the actions and omissions of an agent.

### NINTH CLAIM--Employment Contract Breached, Supplemental Claim

339.  Plaintiff incorporates herein by reference paragraphs 1-338 as hereinabove alleged as if set forth here in full.

340.  By the terms of BRADSHAW's employment contract with the CNMI, the CNMI implied its duty to provide BRADSHAW legal assistance and indemnification for his official actions.  This is a fiduciary duty for BRADSHAW's official capacity suit and actions.  There is also an implied benefit of the Employee's Indemnification Act (PELDIA) for BRADSHAW's personal and individual actions in the performance of his duties.  These benefits were denied BRADSHAW.

341.  The CNMI acted in 1997-2005 through its agents FORELLI, BUSH, COTTON, CLAYTON, SOSEBEE, and BROWN to breach BRADSHAW's contract.

342.  The illegal actions and improper judgments allowed by the defendants brought a loss of money to plaintiff.  BRADSHAW was also slandered and defamed in the CNMI media.

343.  BRADSHAW's personal character, reputation, good name, standing, property rights, etc were damaged.  His professional status as a CPA was damaged in the media. to affect his ability to earn a living when he resumes the practice of accounting.  These events further brought much emotional distress, pain and suffering to BRADSHAW.  They also brought about a loss of enjoyment of life to BRADSHAW.

344.  The actions of the defendants were extreme and outrageous.  They were done recklessly, maliciously and intentionally with a desire to inflict monetary, emotional and other damage on BRADSHAW.  They cased a loss of the enjoyment of life to BRADSHAW.

345.  BRADSHAW prays for relief for the actual damages of $4,000 in case 96-1320 for the void action, $4,000 in case 05-0084 and all other costs incurred to date in case 05-0027 as expanded and such other relief as the court may decide and order/allocate to the CNMI.

346.  Last, BRADSHAW prays for relief for the punitive, exemplary, special, general, compensatory and other damages of the amount of the contract ($55,000) from the CNMI as the court may allocate for emotional and mental distress and the loss of the enjoyment of life.

### TENTH  CLAIM--Intentionally  Omitted

347-355. Deleted

### ELEVENTH  CLAIM-Violation  Civil  Rights  Act  of  1870  and  42  USC  1981

356.  Plaintiff incorporates herein by reference paragraphs 1-355 as hereinabove alleged as if set forth here in full.

357.  The CNMI, acting through its activities of its agents in the AG's office (like BROWN, CLAYTON, SOSEBEE and FORELLI)  and SC in upholding illegal employment practices and actions in its courts, acted with BISOM (and his agent SORENSEN) to discriminate against BRADSHAW and deprive him of due process, equal rights under the law and constitutional rights on the basis of his national/racial origin as being a US state sider in contrast to the local NMI persons of NMI racial descent.  While the AG defendants and BISOM (through his agent SORENSEN) were all Americans of non NMI ancestry/racial descent, they

all participated in the discrimination for money or personal benefit/gain.  For

BISOM/SORENSEN, the gain is obvious, they stood to reap a court judgment against

BRADSHAW which was impossible without the participation and effective concurrence of the

AG's office and the SC.  SORENSEN was an officer of that court as well as being an agent for

BISOM.  The actions of the defendant CNMI and its agents and SORENSEN and BISOM

clearly violated the Civil Rights Act of 1870, 42 USC 1981 and the US Constitution. While the

courts have excluded the CNMI as a person under 42 USC 1983, the CNMI is a person

under the Civil Rights Act of 1870 and 42 USC 1981 and is therefore liable for depriving

BRADSHAW his rights under the US Constitution.

358.  It is CNMI government policy to discriminate against persons of non-NMI racial

descent as established in articles XI and XII of the CNMI Constitution which restricts land

ownership from so-called aliens (or persons of non NMI racial descent) and in local laws and

employment actions which grants favoritism to local indigenous people.  This racial

discrimination permeates throughout the whole structure of government in its dealing with

persons of non-NMI racial descent.  In the summer of 2002, the NMI legislature introduced a

bill to amend the NMI Constitution to prohibit anyone other than persons of Northern

Marianas descent from running for public office. This bill was defeated, but it shows the

attitude of local indigenous citizens to discriminate against outsiders.  In June 2006, the NMI

legislature passed Senate Bill 15-46 which provided that foreigners (which by definition

included US citizens of non-NMI descent) could obtain limited ownership interests in

condominium apartments above the ground floors.  US citizens from mainland America are

considered foreigners in the eyes of the CNMI. The AG lawyers and court officials know and understand this prevailing discrimination.  They either go along with it or they are out of a job.

359. The racial, ancestry and national origin discrimination in favor of local people of NMI racial descent, who are US citizens, and other US citizens, who are not of NMI descent, means that there are two distinctively different classes of US citizens in terms of the NMI, based on racial, ancestry or national origin factors. The US Constitution does not provide for two classes of US citizens. There is only one class per the Constitution. While the AG defendants may not in their own right likely engage in racial discrimination against a fellow American outsider like BRADSHAW, they would gladly accept money as paid lawyers to defend and work for the racial discrimination interests of the CNMI.  The same applies to defendants SORENSEN and BISOM who stood to gain by participating with the CNMI in its discrimination against BRADSHAW.

360.  The fact that the AG lawyers may not have discriminated against a fellow American means nothing in the long run.  They were bought and paid for by their employer. In order to earn their money, they willingly did and would engage in whatever was necessary in the context of their jobs.  They were agents working for the CNMI in its discrimination practices against BRADSHAW, the US Constitution; 42 USC 1981 and the Civil Rights Act of 1870.  The CNMI acted through its agents in this claim.  A principal is responsible for the actions and omissions of an agent.

361.  The actions of defendants in violating the Civil Rights Act of 1870 produced a cause of action, pursuant to which both legal and equitable remedies may be had, including compensatory and under certain circumstances, punitive damages (14A C.J.S. Section 226).

This remedy is separate, distinct and independent from other civil rights remedies (ibid.).  The actions of the defendants violated BRADSHAW's US Constitutional rights to due process and equal protection of the laws.  The defendants acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW.  BRADSHAW's character, professional reputation, good name, standing, property rights, etc.  BRADSHAW was damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants.

362.  BRADSHAW accordingly suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury.  BRADSHAW suffered loss of the enjoyment of life.  The remedy is for the court to order restitution, removal of the illegally gained judgments and payment of damages to the plaintiff as specified in the preceding claims.

### TWELFTH  CLAIM--Intentionally  Omitted

363-370.  Deleted.

### THIRTEENTH  CLAIM--Intentionally  Omitted

371-374.  Deleted.

### FOURTEENTH  CLAIM--Intentional,  Malicious  and/or  Irresponsible  Actions Causing  Damage  to  Plaintiff  BRADSHAW's  Reputation as  an  Employer,  Supervisor,  and  as  a  Person

375. Plaintiff  incorporates  herein  by  reference  paragraphs  1-374  as  hereinabove alleged as if set forth here in full.

376.  The NMI defendant and its agents FORELLI, BUSH, CLAYTON, SOSEBEE, BROWN, and COTTON; and BISOM/SORENSEN acted recklessly, deliberately, maliciously and with intent and foreknowledge to bring hurt, damage and injury on BRADSHAW. BRADSHAW's character, professional reputation, good name, standing, property rights, etc. were damaged, defamed, slandered, maligned and infringed upon by the actions of the defendants.

377.  From Dec 1996 to date, BRADSHAW accordingly has suffered much pain and distress (mentally, emotionally and physically) and expended much money, personal funds and recourses and efforts in an attempt to obtain redress and to correct the injury.

378.  The remedy is for the court to order restitution and removal of the illegally gained judgments and payment of damages by the defendants to the plaintiff as specified in the preceding claims

## FIFTEENTH CLAIM Intentional, Malicious and/or Irresponsible Actions Causing Emotional and Mental Distress On BRADSHAW

379.  Plaintiff incorporates herein by reference paragraphs 1-378 as hereinabove alleged as if set forth here in full.

380.  The failure to exercise legitimate and proper due care and concern and/or honesty and trueful actions in the conduct of their duties on SC case 96-1320 by defendant CNMI and BISOM; and SORENSEN have resulted in the slandering, libeling and damage to plaintiff BRADSHAW; and have resulted in placing great emotional and mental distress upon plaintiff BRADSHAW from 1996 to date.

381. BRADSHAW was accused of being political and an anti-Semite in the CNMI media as a result of the illegal CNMI and BISOM action and judgment against BRADSHAW (see Exhibit K herein and the motion for partial summary judgment and supporting memorandum and affidavit filed by BISOM in 1999--see Exhibits V and JJ to BRADSHAW's Affidavit supporting his motion for partial summary judgment as filed in this court on Sep 14, 2006). The anti-Semite charges will have adverse effect when BRADSHAW chooses in the future to make religious pilgrimages to the state of Israel and/or to relocate there for retirement (as is planned by plaintiff). The state of Israel is known to monitor the activities of people alleged to be anti-Semites. The political charges will affect BRADSHAW throughout the rest of his life--both in work and retirement. The BISOM/SORENSEN and the CNMI courts have branded BRADSHAW both an anti-Semite and political as such in the media.

382. The actions and omissions of the defendants were extreme and outrageous and done intentionally, recklessly and/or irresponsibly with the result of causing severe emotional and mental distress or were certain or substantially certain that such distress would result from their conduct, actions and omissions. The remedy is for the court to order restitution and removal of the illegally gained judgments and payment of damages by the defendants to the plaintiff as specified in the preceding claims.

### SIXTEENTH  CLAIM--Intentionally  Omitted

383-386 Deleted.

### SEVENTEENTH  CLAIM--Intentionally  Omitted

387-397.  Deleted.

**WHEREFORE,** Plaintiff BRADSHAW prays for judgment as follows:

1. For the CNMI to be compelled to produce for BRADSHAW's inspection/copying at the Clerk of SC's office all of the documents on process service/non-service on BRADSHAW and "all" alleged postal receipts as submitted to the SC by BISOM/AG in 96-1320.

2. Stricken.

3. Stricken.

4. Stricken.

5. For ROBERT A. BISOM to be ordered to repay the $140,000 which he collected from the CNMI in case 96-1320 on the premise that the money was obtained in an illegal manner.

6. For BRADSHAW to be declared to be eligible by CNMI laws for needed legal assistance and indemnification in SC case 96-1320 in connection with both the official and individual claims for his work in the CNMI in 1993-1994.

7. For actual damages (to include $8,230.00 in previous litigation and expenses by BRADSHAW) against the CNMI; defendants NICOLE C. FORELLI, WILLIAM C. BUSH, L. DAVID SOSEBEE, PAMELA S. BROWN, D. DOUGLAS COTTON and ANDREW CLAYTON of the Office of the CNMI AG; ROBERT A. BISOM; and attorney JAY H. SORENSEN according to proof and as apportioned, allocated, and assigned to each defendant by the trier of the facts;

8. For punitive, special, compensatory, general, exemplary and other damages of Two Million and Two hundred and Eighty-five Thousand Dollars ($2,285,000) against the CNMI; defendants NICOLE C. FORELLI, WILLIAM C. BUSH, L. DAVID SOSEBEE, D. DOUGLAS COTTON, PAMELA S. BROWN and ANDREW CLAYTON of the AG's office; ROBERT A.

BISOM; and JAY H. SORENSEN according to proof, in an amount to be apportioned, allocated and assigned to each defendant at the discretion of the trier of the facts;

9.  For damages against the CNMI; defendants NICOLE C. FORELLI, WILLIAM C. BUSH, D. DOUGLAS COTTON, L. DAVID SOSEBEE, ANDREW CLAYTON and PAMELA S. BROWN of the Office of the CNMI AG; ROBERT A. BISOM; and JAY H. SORENSEN; for interest at the prevailing rate thereon for outstanding claims;

10.  For reasonable attorney and investigatory fees and other expenses incurred by BRADSHAW in representation, consultations, inquiries and investigations;

11.  For costs of suit incurred;

12.  For such other and further relief as the court may deem proper.

## BRADSHAW FILES THIS ACTION PRO SE

13.  Pleadings in this case are being filed by plaintiff In Propria Persona, where they are to be considered without regard to technicalities.  Propria pleadings are not to be held to the high standards of perfection as practicing lawyers.  A claim can only be dismissed for failure to state a claim if it appears "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  See Haines v. Kerner et. al. 404 US 519; 92 S. Ct. 594, also See Power 914 F2d 1459 [11th Cir 1990], also see Hulsey v. Owens 63 F3d 354 [5th Cir 1995]. also see in Re Hall v. Bellmon 935 F 2d 1106 [10th Cir 1991]).

14.  In Puckett v. Cox, it was held that a pro-se pleading requires less stringent reading than one drafted by a lawyer (456 F2d 233 [Sixth Circuit USCA]).

15. Finally, a reviewing court is required to take notice of and incorporate relevant statutes and rules and precedents even if not pleaded in the complaint by a pro se plaintiff

(Haines v. Kerner, 404 US 519, 30 L. Ed 2d 652, 92 S. Ct. 594 (1972)).

I declare under the penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge and belief.

Dated this _____ day of _December_____ 200_6_ at Calder, Idaho.

_____
Robert D. Bradshaw, Plaintiff Pro Se

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _____day of _Dec__ 200_6_, I caused to be served a true
copy of the foregoing document by US Mail Postage Paid to each of the following:

Jay H. Sorensen, c/o Shanghai, PO Box 9022, Warren, MI 48090-9022
Gregory Baka, Dep Attorney General, Caller Box 10007, Capitol Hill, Saipan, MP 96950
Mark B. Hanson, PMB 738, PO Box 10,000, Saipan, MP 96950

_____
Robert D. Bradshaw, Plaintiff, Pro Se