F I L E D
Clerk
District Court

APR 1 3 2007

For The Northern Mariana Islands
By_____
(Deputy Clerk)

**Robert D. Bradshaw**
**PO Box 473**
**1530 W. Trout Creek Road**
**Calder, Idaho 83808**
**Phone 208-245-1691**

Plaintiff, Pro Se

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

ROBERT D. BRADSHAW

      Plaintiff

      v.

COMMONWEALTH OF THE NORTHERN
MARIANA ISLANDS (hereafter referred to
as the CNMI); et. al.

      Defendants

) Civil Action No. 05-0027
)
)
)
) **MEMORANDUM OF POINTS**
) **AND AUTHORITIES IN SUPPORT**
) **OF MOTION FOR**
) **CHANGE OF VENUE**
)
) Date: _____ MAY 1 7 2007 _____
)
) Time: _____ 9:00 AM _____
)

i

Received    Apr-18-2007 04:51    From-    To-US DISTRICT COURT, N    Page 002

# TABLE OF AUTHORITIES

CASES:                                                                PAGES

Anderson v. Johnson (1 Utah 2d 400, 268 P. 2d 427, 1954)              25

# TABLE OF CONTENTS

|                                                                                                                     | PAGES |
| ------------------------------------------------------------------------------------------------------------------- | ----- |
| Title Page                                                                                                          | i     |
| Table of Contents                                                                                                   | ii    |
| Table of Authorities                                                                                                | III   |
| Introduction and General                                                                                            | 1     |
| The Role of Justice Alexandro C. Castro of the CNMI Supreme Court                                                   | 4     |
| The Role of the CNMI AG, 2004 to 2007                                                                               | 6     |
| Convenience of the Parties, Witnesses and Counsel                                                                  | 12    |
| Familiarity of WA court with Washington laws and civil procedure rules                                             | 14    |
| Ends of Justice, Interests in Justice and Promotion of Justice                                                     | 14    |
| Local Prejudice, Local Jury Prejudice/Bias, and Inability of Plaintiff to obtain fair and impartial trial before a local jury | 15    |
| Unfavorable Publicity                                                                                               | 19    |
| Inability of Pro Se Plaintiff to Obtain a Local Counsel                                                            | 19    |
| Other Reasons for the Change                                                                                        | 22    |
| Conclusion                                                                                                          | 23    |

ii

Received    Apr-18-2007  04:51    From-    To-US DISTRICT COURT, N    Page 010

## TABLE OF AUTHORITIES

| CASES: | PAGES |
|---|---|
| Anderson v. Johnson (1 Utah 2d 400, 268 P. 2d 427, 1954) | 25 |
| Burroughs Corp v. Newark Electronics Corp, DCIII. 1970, 317 F. Supp. 191 | 13, 14 |
| CNMI case 96-1320 | 1, 2, 3, 4, 5, 6, 9, 10, 12, 14, 19, |
| CNMI case 06-0005 | 3, 7 |
| Davidson v. Miller (276 Md. 54, 344 A. 2d 422 [1075]) | 17 |
| Federal 05-0027 | 2, 4, 6, 7, 8, 9, 15, 16, 19, 21, 22, 23, |
| Federal 95-0042 | 19 |
| | |
| OTHER: | |
| American Jurisprudence and Practice Forms | 15 |
| Corpus Juris Secundum | 5, 16, 17, 25 |
| RICO | 4, 17, 18 |
| Rooker-Feldman doctrine | 7, |
| Saipan Tribune | 16 |
| US Constitution | 24, 25 |
| 42 USC 1981 | 17, 18 |

Received    Apr-16-2007 04:51    From-    To-US DISTRICT COURT, N    Page 008

## Introduction and General

1. COMES now plaintiff to submit this memorandum of points and authorities in support of his motion for change of venue. The Court's Order of Mar 16, 2007 on Plaintiff's Motion for Summary Judgment crystallized/defined/finalized the need for change of venue.

2. Consistently, Bisom/Sorensen have stressed the importance of the actions of Justice Castro in case 96-1320 and especially in his order of Feb 22, 2000 (at Ex X, enclosed with Affidavit of Robert D. Bradshaw in Support of Plaintiff's Motion for partial summary judgment as filed with the Court on Sep 14, 2006). From their view, the fraudulent documents and CNMI laws/rules were irrelevant and the Castro order of 2-22-2000 totally prevailed.

3. While the Court only granted summary judgment on RICO, the Mar 16, 2007 order has now proven to be crucial to establish venue for the actual trial of this case. This order defined some six of the items being addressed as being "not a material fact to the case."

4. These immaterial issues involved the CNMI rules and laws on service of process and the decision of justice Castro of Feb 22, 2000 which he made without personal jurisdiction (this was Bradshaw's item VII in Bradshaw's Motion for Partial Summary Judgment). For over two years, the defendants in this case have stressed the Castro order of 2-22-2000 as being the determining factor in this case. Effectively, the order of Mar 16, 2007 says defendants' stress has been wrong as the Castro order of 2-22-2000 is immaterial.

5. This Court's order of Mar 16, 2007 did define some three issues in plaintiff's motion for partial summary judgment as being genuine issues of material fact--the fraudulent postal forms, abuse of process (which plaintiff listed as malicious prosecution in an item VI) and the question of CNMI's fiduciary duties to Bradshaw. The Court granted plaintiff's request on

1

Received    Apr-16-2007  04:51    From-    To-US DISTRICT COURT, N    Page 004

RICO which therefore evidently involves a genuine material issue.

6. All of the issues which the Court found to not involve material facts were issues which are totally ascertainable from 96-1320 file and CNMI laws/rules of procedure. The same is true with the question of a fiduciary duty. The issue of malicious prosecution (or abuse of process per the Court) involves issues which are now a part of the 05-0027 file.

7. The only issue not totally settled is the question of the fraudulent postal documents. Actually, the Lizama decision of Dec 29, 2005 (Ex J of Bradshaw's Affidavit in support of motion for partial summery judgment) noted the contradiction/conflict between the postal records submitted by Bisom/Sorensen to the CNMI Courts and raised the prospects of fraud on the Court. Obviously, the presence of the totally conflicting documents from Bisom in case 96-1320 proved that one or both sets had to be false.

8. Of course, the ultimate proof of the alleged fraud lies with witnesses in Eastern Washington and North Idaho. There is no way that plaintiff can prove conclusively the fraudulent reality of which set of documents as submitted in court by Sorensen except by having the trial in Eastern WA or North ID (but Idaho is now out). In Washington, plaintiff expects to prove from witnesses that both sets of documents submitted by Sorensen are fraudulent. Conversely, Messers Bisom/Sorensen claim that both sets of the contradictory documents are valid and true. If Bisom/Sorensen wish to argue their point, then they should have a Washington trial so they can call witnesses from Washington to prove their point.

9. While Bisom has downplayed the role of the alleged postal documents from Elk, WA, that stance may have changed now that the Court has ruled that this issue is material while the Castro order of 2-22-2007 is immaterial. This subtle change is revealed in recent

2

filings in the CNMI Supreme Court (per its order of Mar 15, 2007--at Ex H, accompanying declaration). In supplying "affidavits" of service on 96-1320, Bisom's lawyer supplied no affidavits but he cleverly worked in documents to show service on Bradshaw via the false postal receipts (see Ex I of accompanying declaration with the cover and table of contents).

10. Thus, this Bisom submission lists the alleged certificates of mailing of the summons/complaints by Ms Guevarra (these certificates of service by Ms Guevarra are presented at Ex L, Bradshaw's affidavit in support of motion for partial summary judgment) and placed side by side were the alleged return receipts signed by the mysterious Manny (in items 8, 9, 10 and 11 on the Table of Contents, Ex I). While Bisom seems to be conveying the image to the Supreme Court that the postal receipts were returned by the Post office in response to the mailings by Ms Guevarra, there is a problem between what Bisom is now saying and what Sorensen said in his declaration of Feb 8, 2007 in opposition to Plaintiff's Motion for Partial Summary Judgment. Sorensen's declaration (item 3) alleged that the postal receipts were never furnished the court; but copies only were provided to Mr Sosebee (now Bisom says copies of the receipts were furnished the 96-1320 court).

11. Thus, Mr Sorensen has it that the postal receipts were never a part of the official case file and never used to prove service on Bradshaw. Paradoxically, Bisom presents the certificates of mailings by Ms Guevarra in the context of being tied to the postal receipts allegedly returned by the Elk Post office. The conclusion here is that after this Court ruled that the postal records were material, Bisom switched horses in the stream to now focus on the postal receipts as being actual proof of service on Bradshaw (where earlier Bisom ignored the postal receipts and focused on the Castro Order of Feb 22, 2000). With this new

3

focus by Bisom, he should be more than pleased to have this case transferred to WA state so he can address the validity of the contradictory/conflicting postal records in the 96-1320 file.

12. As for as the CNMI, their agent Robert Kingsley is in WA state. Plaintiff may need to call him over his legal advice furnished Bradshaw. The CNMI may need him too.

13. The complaint of RICO involves the presence of the several fraudulent postal documents. Even the RICO charges ultimately involve proving the fraudulent postal forms, plus the other records in the case file of 05-0027. The claims on malicious prosecution and fiduciary duty too involve a very clear tie to Washington state in that they were types of torts covered under Washington's long arm statutes which were committed against plaintiff while he was a resident of Washington state. Under Washington's long arm statutes, plaintiff would have every right to hale the CNMI defendants and Bisom/Sorensen to a Washington court over the fiduciary duty and malicious prosecution/abuse of process.

### The Role of Justice Alexandro C. Castro of the CNMI Supreme Court

14. Most of the 15,000 local indigenous citizens are related or otherwise linked (making it impossible to obtain a fair trial, in a case involving a CNMI jury). Too, virtually all of the people of the CNMI are subject to the influence, power and/or control of Supreme Court Judge Castro (often the Acting Chief Justice) who was a defendant in this action.

15. While Acting Chief Justice Castro was removed in this case, his work, reputation and credibility are at stake since he oversaw 96-1320. Since he will inevitably have a cousin, friend or colleague on any Saipan jury, it is evident that Castro will use his influence to further hurt and damage Bradshaw as he did in the past with his ridiculous decisions.

Received Apr-18-2007 04:51        From-        To-US DISTRICT COURT, N        Page 007

16. The pattern of Castro discrimination against Bradshaw is already established in the 96-1320 file. As Castro's reputation/judicial expertise is at stake here, he is not about to change. He will oversee this case with the jury to be sure that it turns out as he wants.

17. Corpus Juris Secundum (2000 ed, p. 433) discusses at length the grounds for a change of venue if the judge is a near relative of a party to this action or the fact that a near relative of the judge is interested in this case. There is no issue here on the Federal judge overseeing this case. But there is an issue in the prospective role of Justice Castro to monitor this case from the sidelines and affect its outcome though his influence on the local jury.

18. In Defendant Justice Castro's Opposition to Plaintiff's Petition for Declaratory Judgment, filed in Jul 2006, Justice Castro said: "it is highly unlikely that Bradshaw would ever come back to the NMI to reside or work after: (1) setting up a residence in Idaho; and (2) accusing 'some' courts, the people and the government of the CNMI of wholesale and wide ranging race-based discrimination." When a local CNMI person of power like Justice Castro comes out and accuses Bradshaw of wide ranging race-based discrimination against the local indigenous people, it means a certain calamity for Bradshaw to go before a jury made up of those persons. With the small population of 15,000 people, Castro will have enough cousins and connected persons on the jury to decide its outcome.

19. For sure, Justice Castro has formally raised the spectrum of racial discrimination from Bradshaw against the local people. This charge, whether true or false, means a prejudgment of the matter by one of the leading and most powerful persons in the CNMI. Incidentally, this is a trick which Bisom followed against Bradshaw in 1993-1995. Bradshaw fired Bisom for cause. Bisom responded by charging Bradshaw with racial discrimination

Received Apr-18-2007 04:51    From-    To-US DISTRICT COURT, N    Page 008

against him.  Instead of focusing on his actions, the issue in court became a focus on the

actions of Bradshaw.  Now, Justice Castro, as an agent for the CNMI, is laying the

groundwork for the CNMI and its coconspirators Bisom and Sorensen to go into court and

make Bradshaw the issue before a local jury and not Castro and his efforts to railroad

Bradshaw in 96-1320 without personal jurisdiction and due process.

    20. Obviously too, Justice Castro has raised the prospect that it would be a mistake/ or

bad for Bradshaw to return to Saipan.  The need for Bradshaw to be on Saipan for

conference and trial could put Bradshaw in serious jeopardy.  In view of the many unsolved

murders and disappearances of outsiders (non-local people) on Saipan, a return to Saipan

could mean trouble for plaintiff (as is explained in the declaration accompanying this motion).

    21. Justice Castro has an interest in the outcome of this case because of his judicial

role of trying it in the CNMI courts and his alleged conspiracy as an agent for the CNMI with

Bisom/Sorensen.  Knowing the reality of the clannish connections of the local indigenous

people (as discussed in the accompanying declaration), it has to be accepted that Castro can

control the decision of the jury.  His role will be further cited in the accompanying declaration.

### The Role of the CNMI AG, 2004 to 2007

    22. While it was clear from the beginning that Defendants Bisom and Sorensen were

virtually one and the same and hence would act in collusion to fight Bradshaw in court in

case 05-0027, there was never any plausible reason why the AG's office would choose to

become openly connected to Bisom/Sorensen in open collaboration, coordination and

conspiracy.  Yet, this reality became manifest in 2004-2007 despite reality that supposedly

Bisom and the AG were judicial adversaries; that Bisom had ripped off $140,000 from the

Received  Apr-16-2007 06:01        From-        To-US DISTRICT COURT, N    Page 001

CNMI illegally; and in 05-0027 Bisom had filed a cross-claim against the CNMI for the CNMI to pay Bisom's attorney fees and any costs he incurs in case 05-0027.

23. Plaintiff's accompanying declaration to this motion has Exhibit F, a letter from Ms St Peter on May 5, 2006 to this court outlining her contacts with Mr Sorensen. While Ms St Peter may have written this letter to get some of her ideas, requests etc before the court in a clandestine fashion, there is the revelation that she had been in contact with Mr Sorensen who represented Mr Bisom on the 06-0005 GA appeal of case 96-1320.

24. In its several filings for dismissal of the claims against the various AG defendants, starting with Asst AG James Livingstone under AG Brown in 2005 (i.e. Nov 25 and Dec 22) and intensifying in 2006 (i.e. Jul 10, 25, Aug 18) and with Ms St Peter under AG Gregory, the AG filed motions to dismiss Bradshaw's complaint on the premise of Rooker-Feldman.

25. Plaintiff noted the AG position repeatedly in opposing its motions for dismissal (i.e. Jul 24, Aug 5, Sep 2, 2006) and said that the applicability of the Rooker-Feldman only had one possible presence in the 17 claims in Bradshaw's complaint. That one case involved Bradshaw's plea that Bisom be made to refund the $140,000 illegally taken from the CNMI.

26. In Bradshaw's outline of damages on him, the case of the $140,000 payout by the CNMI to Bisom was cited with a request that Bisom be made to refund the illegally gained $140,000. It was totally incomprehensible that the AG kept bringing up opposition to Bradshaw's request that Bisom be made to repay the $140,000 to the CNMI. Obviously, the AG actions herein were smelly and bode for some strange reason(s) why the AG would be so passionate about defending the illegal payout of $140,000 by its client, the CNMI, to Bisom.

7

27. Ms St Peter left in the fall of 2006 and Gregory Baka took over 5-27. When the AG filed its answer to Bradshaw's complaint on Jan 3, 2007, the AG opposed paragraph 230 which specifically cited the illegal payout of $140,000 with a request that Bisom be made to refund the $140,000. The AG denied this paragraph and added that the CNMI defendants deny plaintiff is entitle to any relief whosoever (thus, denying that Bisom be made to refund the illegally gained $140,000 from the CNMI). For paragraph 5 under pleas (which addressed the need for Bisom to refund the illegally gained $140,000 to the CNMI), the AG denied it as well. The AG was totally opposed to any idea that Bisom refund the $140,000. The AG was supposed to be representing the CNMI and protecting its interest. Yet, the AG was clearly collaborating with Mr Bisom and working against the CNMI at every opportunity on the question of Bisom refunding the illegally gained $140,000 back to the CNMI.

28. Even if the AG wanted to oppose plaintiff, there was nothing to be gained by attacking and pleading for the dismissal and removal of the idea of the return of the $140,000. The AG could have opposed Bradshaw on other issues without opposing the plea for the refund of the $140,000. As a minimum, the AG could have simply been silent or non-committal on the refund issue and refrained from continuously attacking it. Common sense alone is sufficient to see that the AG was working against its client, the CNMI.

29. Bradshaw filed his motion for partial summary judgment which was heard by the Court on Mar 15, 2007. This motion specifically had one item which addressed the need for the $140,000 to be refunded to the CNMI. Again, in the CNMI opposition to the motion for partial summary judgment, filed Feb 22, 2007, the AG joined opposition from Bisom and Sorensen and vigorously opposed refunding the $140,000 to the CNMI and attacked

Received  Apr-16-2007 05:01        From-        To-US DISTRICT COURT, N      Page 003

Bradshaw for even bringing the issue before the Court. This time, the AG used the excuse that Bradshaw lacked standing for this damage placed on him. Besides joining in with Bisom and Sorensen, the AG painted a picture that somehow Mr Bisom was entitled to the $140,000 he took from the CNMI because "there was a trial and the CNMI government was vigorously defended at that trial." But the case file suggests that the AG's office did little or nothing to defend anyone at the trial. When Bisom presented conflicting/contradictory postal records to the Castro Court by Feb 3, 2000, the AG never even bothered to file a reply action in court to oppose the conflicting/contradictory postal documents. This is hardly a vigorous defense!

30.   The AG's persistent and unremitting actions opposing the idea of a refund of the $140,000 over a period of a year or half or so finally paid off. The Court in March 2007 said that it did not have subject matter jurisdiction. Thus, the AG eventually won on its opposition to the refund and had it removed from the complaint. Regardless, the important fact here is not that the AG finally prevailed to have the refund stricken; but rather the presence of the obvious collaboration between the AG and Messers Bisom and Sorensen to fight the refund.

31. All along, the CNMI independently (regardless of what Bradshaw did or did not do) could have taken action in the CNMI or Federal courts to argue for this refund in its own right. Too, the AG could have joined plaintiff in seeking the refund. But consistently, the CNMI (thru its AG) was totally uninterested in the refund. Instead, it opposed the idea and vigorously fought it at every chance. Obviously, the AG was not acting in any capacity to support the CNMI on this. The AG acted against the economic interests of its own client, the CNMI.

32. There was too the role of Supreme Court Judge Castro and the fact that his role and reputation as the presiding judge in 96-1320 was on the line in the 5-0027 case. The

9

involvement of Castro appears to be the motivation for AG personnel to constantly work against the economic interests of the CNMI. Nothing else makes sense when one examines the fear of attorneys on Saipan to oppose Castro (per paragraph 132, original complaint).

33. On Nov 3, 2006, Bisom's lawyer Mark Hanson filed a motion to strike parts of 9 paragraphs of the complaint. Eight dealt with criticism of CNMI judges and the AG. It was strange that Bisom was concerned about CNMI judges and AG people. In Jan 07, Bisom and the AG filed answers to the complaint. With but a few changes, the AG affirmative defenses seemed to be a exact repeat of Bisom's. On Feb 6, 07, Hanson called plaintiff with a request for an extension of time to file opposition to motion of summary judgment by him and the AG's office. Plaintiff's memo for record (Ex G, accompanying declaration) details this conversation. It was strange that Hanson was working on behalf of the AG's office and representing the AG.

34. Manifestly, the conspiracy first cooked up by Bisom/Sorensen has continued full blast with AG personnel Forelli, Sosebee, Clayton, Brown and Gregory. Surely, much of the motivation and push on this from Brown and Gregory has been maintained and influenced by the need to protect and support Castro and his work on case 96 1320 in 2000 and not on supporting the CNMI. It is Castro's image and reputation which are now at stake. Like other lawyers on Saipan, the AG lawyers are in no mood to cross Castro.

35. With all of this open AG support of Mr Bisom, contrary to the interests of the CNMI, one must wonder what kind of a tale Brown and Gregory told their bosses in the Governor's office. It is unthinkable that the Fitial administration would condone and support an effort by its AG to work overtime and passionately to defeat any prospect of obtaining a refund from Bisom for the illegally gained $140,000. Surely, the Governor's office would not knowingly

10

Received  Apr-16-2007 05:01      From—      To-US DISTRICT COURT, N    Page 005

approve of the actions of AG Brown and AG Gregory to work to cheat the CNMI out of the $140,000 without at least doing something positive to recover the illegally lost $140,000.

36. While Mr Hanson is obviously serving his client and involved in the understanding, agreement and conspiracy with the AG's office, his motives, work and efforts are plain enough to place the blame and damages on the CNMI so that Bisom can collect from the CNMI. Thus, much of the AG conspiracy with Sorensen/Hanson/Bisom since 2004 has focused against the CNMI. Manifestly, Bradshaw lacks standing to successfully argue this very apparent conspiracy to work against the interests of the CNMI.

37. But the fall out of this maneuver by the AG's office will have an ultimate adverse impact on Bradshaw in that both Bisom and Sorensen have requested a jury trial. If this case goes before a Saipan jury, there will be an obvious impact on the jury in that it will be faced with the prospect that any damages placed on Bradshaw from Bisom will have to be paid by the CNMI. Any damages due Bisom and even Bisom's attorney fees will ultimately be collectable from the CNMI if the Bisom cross claim prevails.

38. This places a great hindrance for Bradshaw to receive any consideration from a Saipan jury faced with enormous economic problems in financing the CNMI with its falling revenues. Logically, Bradshaw and the CNMI should be together to oppose Bisom on this matter and particularly in efforts to get Bisom to refund the illegal $140,000 he illegally obtained from the CNMI. But no, the AG in 2004-2007 has collaborated and conspired with Bisom to hurt the CNMI. This is unthinkable. But it has happened. Who has the AG been working for in 2004-2007? The answer is obvious--Castro. It's too bad for the CNMI; but the interests of Mr Castro in this case are considerably different from the interests of the CNMI.

11

Received  Apr-16-2007 05:01          From-          To-US DISTRICT COURT, N      Page 006

## Convenience of the Parties, Witnesses and Counsel

39. The point of the Court order of Mar 16, 2007 is that the genuine issues devolve to a need for the trial of 05-0027 to take place in Washington state. In particular, the fraudulent postal forms must be tried in the Eastern District of Washington for final determination. The Eastern District of Washington has to be the place of trial if all of the fraudulent postal documents are to be proven conclusively. Even on malicious prosecution, fiduciary duty and RICO, they must be tried in the Eastern District of Washington for justice to prevail.

40. The AG's disclosure statement of Mar 9, 2007 shows that there are no known persons with relevant information except for the parties. Mr Sorensen's statement of Mar 9, 2007 lists the parties with information and two persons who once worked for him on Saipan-- Ms Anabelle G. Marruzzo (formerly Guevarra) and Mr Elmer Barrogo. Ms Marruzzo, in Carona CA, may be a crucial witness for Mr Sorensen and possibly plaintiff as well as she was the person who allegedly processed, worked on, handled and mailed at the post office the several documents filed by Sorensen in case 96-1320. Bisom's disclosure statement on witnesses says some or all of the AG defendants and the two witnesses cited by Sorensen.

41. All of the primary parties of this conflict are in the US (actually Bradshaw, Sosoboo, Cotton, Bush, Forelli and the CNMI). Ms Brown is in the CNMI. Of course, the CNMI has corporate offices in the US as well as Saipan. Foreign parties (Sorensen, Bisom and Clayton) are subject to venue and can be tried in any US court so there is no relevance on their physical location. A forum in the US is the best possible place for the parties, except Ms Brown. But her testimony is not essential for the main issues in the case.

12

Received   Apr-18-2007 06:01        From-        To-US DISTRICT COURT, N     Page 007

42. Other than Ms Brown and possibly Mr Barrogo, the needed witnesses are in the US. Plaintiff has around a dozen or so witnesses in Eastern WA and Northern Idaho who are crucial to this case but plaintiff has none on Saipan. Since Ms Marruzzo handled the preparation and mailing of the several alleged postal documents from Sorensen to Bradshaw, she is a primary witness surely to Mr Sorensen and possibly also to Bradshaw. Bradshaw cannot envision that Mr Barrogo has any material information on this case.

43. The several alleged US postal documents submitted by Bisom/Sorensen to the CNMI courts all were allegedly worked on and processed in Elk, WA (meaning that Messers Bisom and Sorensen should be pleased with venue in East WA if they want to insist on the validity of the several postal documents allegedly acted upon in Elk, WA). Besides Ms Marruzzo, plaintiff has witnesses in Eastern WA and North Idaho who can precisely prove that these several documents are all false and therefore fraudulent. Plaintiff is indigent and simply lacks the means and money to bring these witnesses to Saipan.

44. Plaintiff is in the process of acquiring handwriting samples from Messers Bisom, Sorensen and other people associated with Sorensen. With a handwriting expert/analyst these samples may not only prove the fraudulent nature of the postal documents submitted by Sorensen but they may be able to prove exactly who prepared the fraudulent documents. It will be impossible to bring such an expert witness to Saipan. But they are readily available in most any District Court area in the US--including the Eastern District of Washington.

45. The primary convenience of Saipan hangs on the availability of the AG and Bisom lawyers being present there. No doubt these attorneys will try to build a case for a Saipan venue; but convenience of attorneys is an irrelevant factor for change of venue--Burroughs

13

Received    Apr-16-2007 06:01    From-    To-US DISTRICT COURT, N    Page 008

Corp v. Newark Electronics Corp, DCIll. 1970, 317 F. Supp. 191. The CNMI Office of the Attorney General has correspondent/affiliated/known attorneys in the US who can and would serve on this action and venue (there are numbers of former CNMI Asst AGs in the US)

### Familiarity of WA court with Washington laws and civil procedure rules

46. The Justice Lizama vacate order of Dec 29, 2005 relied extensively on Washington state rules and laws to establish that Bisom/Sorensen did not obey Washington state rules/laws in their attempted service on Bradshaw. The Lizama order has therefore placed a focus on WA state rules and laws governing service of process. Accordingly, the need for familiarity with WA state laws and rules indicate a need to try this case in Washington state.

### Ends of Justice, Interests in Justice and Promotion of Justice

47. One of the key legal doctrines supporting any case is the need for a case to be tried on the basis of its merits. The situation on Saipan is such that it will be impossible for merit to prevail over other reasons. As the records in 96-1320 disclose, the AG's office has spent 8 years coordinating, collaborating and conspiring with Bisom. But the efforts of Mr Gregory since Jan 06 to help Bisom intensified when he began filing numerous actions in court to try to stave off any idea of a refund of the $140,000 which Bisom illegally gained from the CNMI in case 96-1320. One would think, as a minimum, the AG would have been silent and non-committal on this refund idea. But no, the AG came out and aggressively/actively collaborated with Bisom and Sorensen to oppose all ideas of obtaining it.

48. The latest focus seems to involve Bisom's cross claim of Jan 3, 2007 so that however this case turns out Bisom will suffer no losses as the CNMI will pick up the tab for his attorney fees as well as any damages assigned against him. Not only does the CNMI stand to

lose on this, but plaintiff is adversely effected and prejudiced by this effort since the need for
the CNMI to pay off Bisom may influence a local jury to support Bisom at Bradshaw's
expense. For justice to prevail, both Bradshaw and the CNMI need to go before an impartial
jury in the US. Bradshaw lacks standing to address the CNMI losses, but he does have
standing to point out that the CNMI potential for losses ends up affecting the outcome of 05-
0027 in terms of Bradshaw in the context of a local jury trial.

49. The ends of justice can never be achieved on Saipan in the way the CNMI-Bisom
conspiracy has panned out. There is no way that a jury trial on Saipan can produce justice.
Plaintiff's accompanying declaration in Support of this Motion broaches this theme in detail.

**Local Prejudice/Bias & Inability to obtain fair trial before a local jury**

50. The broad subjects of local prejudice, local jury prejudice/bias and inability of
plaintiff to obtain a fair and impartial trial before a local jury on Saipan is discussed at length
in plaintiff's accompanying Declaration in Support of this Motion for change of Venue.

51. Otherwise, it must be noted that a Saipan jury elected to exercise local prejudice
against Bradshaw in Feb 2000 when it was induced to assess some $139,000 in a judgment
against Bradshaw based on illegal maneuvers and documents supplied by Bisom/Sorensen
to a prejudiced court which lacked personal jurisdiction and service of process on Bradshaw.
This already proven local bias violated Bradshaw's rights for due process under the US
constitution. Local prejudice against Bradshaw is a historic fact.

52. Per American Jurisprudence and Practice Forms (Venue, p. 404) the word
prejudice (on this matter) "is not limited to personal hatred, dislike, or ill will, but includes the
idea of prejudgment of the merits of a claim that may exist even though the party against

15

Received  Apr-16-2007 05:01        From-        To-US DISTRICT COURT, N    Page 010

whom it is directed is otherwise a person of good reputation in the community." Corpus Juris Secundum (2000 ed, article venue, p. 436) adds that "The prejudice is not limited to personal prejudice, but extends to prejudgment of the merits of the case...The rationale is that regardless of whether the case involves a pervasive hostility toward a party, or a pervasive prejudgment of the merits, it may be difficult or impossible to select an impartial jury."

53. The CNMI is a small chain of islands with a local indigenous population of 15,000 people (mainly on Saipan and with perhaps half of them children), a few mainland Americans and several thousand imported workers from Asia. The primary jobs for the local people is the CNMI government on Saipan which employs some 3,500 mainly local indigenous citizens who mostly work on Saipan (per the Jan 26, 2007 Saipan Tribune). These demographics mean that any paneled jury in case 05-0027 will surely involve adult local indigenous people who work for the CNMI government or whose main source of income is from a family member who does work for the CNMI government on Saipan.

54. The problem is compounded because the islands were in an economic boom for years from a local garment industry which used imported workers from Asia to turn out US made goods to be shipped duty free to the US. The garment factories have consistently paid low, subsistence level wages (now $3.05 per hour, which may go up under US legislation) far below the US minimum wage levels. The taxes from the garment factories, some tourism and huge sums of money from the US (in billions of dollars over the years) created an ideal situation where locals had assured government jobs and paid very little in taxes.

55. But the economic situation turned bad in 2006 when the garment factories started closing and tourism started drying up. Starting in 2006, the CNMI government was forced to

16

start cutting back on its expenditures with austerity no-pay holidays and now in March 2007 the legislature is addressing up to a 20% cut across the board in the government budget which means some layoffs and cut backs in the luxury of travel.

56. Obviously, in going before a local CNMI jury of government connected people, there has to be a fall-out in the prospects of receiving any restitution from that jury for the way the CNMI has treated plaintiff. As the CNMI government and its employees are virtually the same as the local indigenous people of the CNMI, it creates a tremendous presence of economic prejudice which is impossible for plaintiff to overcome in a local jury trial of this case and especially since the CNMI government is a defendant in this case. CNMI government linked people sitting on a local jury will be in no mood to hurt themselves in their already deteriorating economic situation.

57. The problem is defined in Corpus Juris Secundum's article on Venue (2000 ed, p. 436) which recognizes the need for venue to be in an area other than an area where a jury will be drawn from effected workers in the capitol city (see Davidson v. Miller, 276 Md. 54, 344 A. 2d 422 [1075]). The idea here is obvious in that a jury from the capitol city area will have prejudices influenced by the local seat of government. Certainly, on Saipan, it would be unfair to plaintiff to face a jury made up of people who either work for or receive monetary support from the local government which is a defendant in this case and a party which could end up having to pay out money to plaintiff.

58. As found in the Court's order of Mar 16, 2007, the RICO fact seems to fit into the category of being a genuine issue in this case. The whole subject of 1981 discrimination by the CNMI against outsiders (11th Claim) and RICO (8th Claim) will also present quite a

17

problem for any Saipan jury.  It becomes grossly unfair for a local Saipan jury to be in the jury's box to decide questions of CNMI RICO and discrimination against outsiders.  A local jury would be 100% in a conflict of interest to even begin to address these issues.

59. A fair and impartial determination of the issues must be made by a fair and impartial jury which simply cannot be found on Saipan.  It is not fair for issues like RICO and 1981 discrimination in the CNMI to go before a local jury.  Not only will it be impossible for a local jury to decide RICO and 1981 discrimination, but there is also a problem with a local jury to even broach the question of whether the CNMI owed Bradshaw a fiduciary duty or not.  The local people of the CNMI do not look with favor upon outsiders in the generic sense.

60. A perfect illustration of this is how the CNMI withholds paying tax rebates to aliens who come to Saipan to work.  Many of these outsiders are extremely poor and every dollar counts to them.  When the CNMI withholds payment of tax rebates, some of these workers will end up never receiving their legitimate rebates (as they will leave the island before the rebate checks are ever prepared).  This practice ends up producing a bonanza of uncashed or undelivered rebate payments to people who have left Saipan.  The CNMI is the victor in this case; reaping a windfall of money from extremely poor people in Asia.

61. Much of the local population could care less about its so called "guest" workers (which to many locals, include Americans working in the CNMI).  They are generally in no mood to give outsiders anything because of local prejudice (as discussed at length in the accompanying declaration). As noted above, there is a certain economic prejudice present in any situation with a local CNMI jury involved in a case against the local CNMI government.

18

62. The point is that there is and will be a definite conflict of interest for a local jury to fairly assess the question of a fiduciary duty to Bradshaw. The CNMI since 2004 has maintained that it doesn't owe plaintiff anything. It's hard to perceive any situation where a local jury will alter that course. Plaintiff deserves a trial before a fair and impartial jury of his peers. Only such juries are available in the US--not on Saipan.

## Unfavorable publicity

63. Starting in 1993 the basic facts surrounding USDC case 95 0042 and CNMI case 96-1320 began receiving local publicity in the local papers. The results of the 2000 trial and 2002 Supreme Court appeal which illegally convicted Bradshaw all received much press and some of it critical of plaintiff. For example, as the Complaint notes (Ex K), Mr Bisom went to the press to accuse Bradshaw of being anti-Jew or Anti-Semitic.

64. Defendant Brown reportedly had a journalism background/education. Any reading of the Saipan papers while she was AG immediately revealed her expertise at manipulating and working the Saipan papers to make her and her work look good. Though she had a running battle with a part of the CNMI Senate, she generally prevailed in favorable media coverage as the local reporters liked to give her the advantage in any conflict she had with anyone else. It is imperative that the issues of 05-0027 be impartially brought before an independent and impartial jury not contaminated by previous media publicity. All of the defendants need this fairness as well as plaintiff.

## Inability of pro se Plaintiff to obtain a local counsel

65. While the convenience of counsel is not a relevant issue for a change of venue, the fact that plaintiff has been unable to obtain a local counsel is relevant in that this factor may

19

go on to deny plaintiff a fair trial. In early 2005, plaintiff first began contacting some dozen or so lawyers on Saipan or Guam to try to get them to take this case. In 2005-2006 and until the court dismissed the Castro claims, the problem was always that a local lawyer was afraid of retaliation from Castro. With Castro being a Supreme Court judge and often the Acting Chief Judge, the position of Saipan lawyers has been that it would be a disaster to oppose him.

66. Thus, local lawyers panic and run in fear of being involved against Castro. If plaintiff had the money, he could have hired US lawyers to take this case and pursue it diligently on Saipan. But this option has been out of the question. Plaintiff does not have the money and has been forced by circumstances of having to pursue this case on a pro se basis--not because of wanting to be involved in court litigation.

67. The truth is that it has been a nightmare to plaintiff (and will surely cause plaintiff a loss of years of life). Numerous unsuccessful efforts have been made since early 2005 to get a Saipan attorney. The problem is not with the Court, the Judge, the Clerk, or even the court rules (which rules are extremely complicated), per se, but rather it is that many lawyers walk into court and say anything without much, if any, regard for truth and justice. The actions of opposing counsels have caused a tremendous burden of work for both the Court and plaintiff to sort out their frivolous, wrong, misleading, inapplicable and/or irrelevant arguments.

68. In an attempt to locate a CNMI lawyer, attorneys contacted by the plaintiff all categorically affirmed that they would not take any action against the local judges/officials (and particularly in the context of RICO and 1981 discrimination) for fear of retaliation. As one attorney said to plaintiff, it would be devastating for his career if he took this case

20

69. Too, many lawyers on Saipan are well aware of the problems in collecting judgments from the CNMI. The CNMI does not pay its bills. Newspaper articles have revealed that the CNMI has outstanding a large number of unpaid court judgments (now over $10 million and expanding). However, local lawyers with local clients do better on receiving satisfaction than outsiders because of nepotism and local political pull. Clearly, there is an issue of economic prejudice if this complaint is tried before a CNMI jury.

70. The fact of anticipated hostility/opposition from Castro meant that this fear of the vindictiveness from Justice Castro has continued even after the Court dismissed his claims. Local lawyers are not interested in crossing him now that Bradshaw has exposed his alleged incompetence/crookedness in 05-0027. Plaintiff did believe that with the claim to make Bisom refund the $140,000 to the CNMI that it would make it more practical to get a local lawyer and thus be easier to go before a local jury if the Court so rules and it has to be done.

71. Lawyers are available in the US who would take this case without fear of oppression, retaliation or retribution from Justice Castro or the other CNMI officials who can be vindictive and carry out revenge against outsiders like Bradshaw if he appears in the CNMI. Attorney Theodore Mahr of Moses Lake, WA 87837 has indicated his willingness to take this case in Washington state (Mahr was formally in the CNMI. He is familiar with the CNMI, its laws and how it operates). Attorney Bruce L. Jorgensen has indicated an interest in this case if he returns to the US by 2008. Jorgensen is familiar with the CNMI.

72. The CNMI consists of a few small islands with about 15,000 local indigenous people. Many/most of the people are related or linked in some fashion. As is true with many other peoples around the world, local people are very clannish and stick together against

21

outsiders. The declaration of plaintiff in support of this motion details how this works out.

73. The point is that plaintiff, with RICO and discrimination claims, coupled with the revelations of the incompetence and poor work of Justice Castro, means that plaintiff doesn't have a chance before a local jury. Castro and the other locally concerned people will impose upon their cousins and other linked people on a local jury to be sure that Bradshaw loses.

74. This is not to say that American AG people have any influence over a local jury. Of course not. But they have local people working for them who do have family, racial, or other connections with the persons to be on a jury in the CNMI; and too, they work for the local Governor who does have influence over local juries. With the small local population, it is impossible to avoid this reality. The only hope for any justice is got a change of venue.

75. Having said that, no one needs to start hollering about the Lizama decision which was apparently made on merit and an independent basis . Regardless, whatever happened back in 2005 in the CNMI Superior Court came when Justice Castro was a party to this case. The situation back in 2005 was considerably different than it is today in 2007. Surely, Justice Castro did things back then that he would not be under any pressure to do now. The climate has indeed changed for Justice Castro from 2005 to 2007 with judicial immunity in 05-0027.

### Other Reasons for This Change

76. From 1945 to date, the US has been the primary source of funding and financing of the defendant CNMI and especially in her predecessor entity status before 1976. After 1976, much of her funding for employees, officers, officials and agents have been US grants, gifts and aid in some form (now amounting to several billion dollars; part of which has come from the Eastern District of Washington). The illegal actions of the CNMI government and her

22

employees, officials, officers and agents have been made possible because of this US funding and a serious lack of oversight by the US Department of Interior.

77. A second important source of funding for the CNMI government and its employees, officers, officials and agents has been the CNMI garment industry (cited above) and the taxes it pays to the CNMI. Reportedly, some one billion dollars annually of goods made in the CNMI are shipped duty free into the US and sold in stores to people in the US (to include WA state). The people of the US (and Washington state) have financed and funded the defendant CNMI during the time of its illegal actions against plaintiff Bradshaw.

78. Most or all of the applicable court records from the CNMI have now been introduced into the 05-0027 case file and would be readily available to a court in the US. Otherwise, many of the CNMI court case records and the CNMI laws are available on the Internet (at www.cnmilaw.org) and/or in printed form available in the continental US. The CNMI statutes are available in five printed volumes in many U.S. libraries. The CNMI court rules, the CNMI Covenant with the U.S. and the CNMI Constitution are all available at the cnmilaw.org web site. It is difficult to imagine that any party will need to introduce anything on CNMI court documentation which is not readily available in the continental US or can be made available in the continental U.S. Otherwise, the plaintiff and surely the defendants will introduce into evidence anything else relevant and not readily available to the court.

### Conclusion

79. The need for promotion of justice on the basis of merits in a case must be paramount in a court's decision.  Therefore, the promotion of justice requires a change of venue of this case for trial. The leading witnesses in this case--defendants Sorensen,

23

Sosebee, Clayton, Cotton and Bush--are all in the mainland US (Texas and Washington DC) or China. Testimony of US witnesses will be crucial for justice to prevail. Besides defendants Sosebee, Bush and Cotton, plaintiff has some dozen or so other witnesses, including expert witnesses, all residing in the US (mainly in Washington state) whom he may call. Presently, Bradshaw sees no need to call any witnesses now residing in the CNMI

80. If defendants Bisom and Sorensen wish to continue insisting that the various postal documents allegedly processed and worked on in Elk, Washington are valid and legitimate, then these defendants should welcome the opportunity of having venue in Eastern Washington where they may call witnesses and cross examine the personnel from the Elk, WA post office which plaintiff will call. The position of Messers Bisom and Sorensen can easily be proven (or disproven) with post office people from Elk, WA.

81. For plaintiff, it will be impossible to get the needed witnesses to Saipan for a trial. Yet, they are readily available in the US and can be produced for a trial here. For the convenience of witnesses, the plaintiff, the individually named defendants in the US and other reasons cited above, the venue for this case should be in the US. Otherwise, injustice can result if it is tried in the CNMI because of the reasons cited above.

82. The wrongs and acts against plaintiff took place without Bradshaw being given legal notice from the AG, Bisom or the court; without Bradshaw having an opportunity to be heard to defend himself; and without Bradshaw being notified or even of having knowledge of the actions of the CNMI officials to grossly and openly discriminate against him and violate his rights under the U.S. Constitution while he was a resident of Washington state.

24

83. Venue on this case should be in a district court in Washington state because a substantial part of the real and immediate damage and hurt put on plaintiff Bradshaw by defendants occurred in Washington state.

84. Because of the presence of economic prejudice and discrimination and coercion and/or intimidation in the CNMI, all of which will go to violate plaintiff Bradshaw's rights, due process and equal protection of the law under the U.S. Constitution, venue should be placed in the US at a district court ideally first in Washington state; or otherwise anywhere in the US.

85. The inability to get justice in the CNMI is not due to the CNMI Federal District Court there; but rather it exists with the defendant CNMI; the power and influence of Supreme Court Acting Chief Justice Castro; the impossibility of plaintiff moving witnesses there; the extensive news coverage, and the inability to obtain a fair and impartial jury in the CNMI. The reasons cited above and other documentation in this motion for change of venue combine to make a change the only option for justice to prevail. In particular, plaintiff's state of health makes it impossible for plaintiff to have a trial on Saipan (as detailed in plaintiff's supporting declaration). Thus, plaintiff requests a change venue of this case for trial to a court in the US.

86. "...it has also been observed that the authority of a court to change the place of trial of an action on the ground of local prejudice or community bias existed at common law, as part of a court's inherent power to assure a fair and impartial trial in dispensing justice" (p. 434, Venue, 92A C.J.S., 2000 ed., which cites Anderson v. Johnson, 1 Utah 2d 400, 268 P. 2d 427, 1954). The provisions for change of venue on the basis of local prejudice will generally be liberally construed (p. 435-436, Venue, 92A C.J.S., 2000 ed).

Robert D. Bradshaw, Plaintiff, Pro Se

25

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ___14th___ day of ___APR___ 2007, I caused to be served a true copy of the foregoing document by US Mail Postage Paid to each of the following:

Jay H. Sorensen, c/o Shanghai, PO Box 9022, Warren, MI 48090-9022
CNMI Attorney General, Caller Box 10007, Capitol Hill, Saipan, MP 96950
Mark B. Hanson, PMB 738, PO Box 10,000, Saipan, MP 96950

Robert D. Bradshaw, Plaintiff, Pro Se

26