Received Apr-16-2007 04:00      From-      To-US DISTRICT COURT, N     Page 002

```
                                                    F I L E D
                                                       Clerk
                                                   District Court

Robert D. Bradshaw                                 APR 1 3 2007
PO Box 473, 1530 W. Trout Creek Road
Calder, Idaho 83808                          For The Northern Mariana Islands
Phone  208-245-1691                          By_____
                                                    (Deputy Clerk)
```

Plaintiff, Pro Se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ROBERT D. BRADSHAW ) | Civil Action No. 05-0027 |
| Plaintiff ) | |
| v. ) | |
| COMMONWEALTH OF THE NORTHERN ) | DECLARATION OF ROBERT D |
| MARIANA ISLANDS (hereafter referred to ) | BRADSHAW SUPPORTING THIS |
| as the CNMI); et. al. ) | MOTION FOR CHANGE OF VENUE |
| Defendants ) | |

I, ROBERT D. BRADSHAW, hereby declare:

1. I am the plaintiff in the above captioned case. I submit this declaration in support of Plaintiff's Motion for Change of Venue. I have personal knowledge of the information set forth herein, and if called upon to testify, I would and could competently testify thereto.

2. Attached hereto are true and accurate copies of the following exhibits in support of the Motion for Change of Venue.

    Exhibit A: Plaintiff's letter of Oct 30, 2005 to Chief Justice Demapan on problems in getting documents from the Superior Court on case 96-1320.

    Exhibit B: Plaintiff's letter of Dec 21, 2005 to the Superior Court.

    Exhibit C: Plaintiff's letter of Mar 12, 2006 to the Superior Court.

    Exhibit D: Plaintiff's letter of Jul 13, 2006 to the Superior Court.

1

Received   Apr-16-2007  04:00       From-              To-US DISTRICT COURT, N       Page 003

Exhibit E: Marianas Variety of Jul 12, 2006 on story on case 05-0027.

Exhibit F: Letter of May 5, 2006 from Asst AG Kristin St Peter to Judge Munson.

Exhibit G: Memorandum for Record of Feb 7, 2007 of Plaintiff Bradshaw.

Exhibit H: The CNMI Supreme Court's order of Mar 15, 2007 ordering Mr Bisom to supplement his filings of records in case 05-0006 GA now before the court.

Exhibit I: The cover page and table of contents on the Supplemental Excerpts of Record as filed by Mr Bisom with the CNMI Supreme Court on or about Apr 2, 2007.

Exhibit J: News report from Drudgereport.com on the internet of Mar 28, 2007.

Exhibit K: News report from the Marianas Variety of Apr 13, 2007

3. I furthermore make the following declaration:

### Discrimination Problem Against Outsiders

4. The Commonwealth of the Northern Mariana Islands is a small area with a local indigenous population of 15,000 U.S. citizens (including children) with only some part of them eligible to sit on a federal jury

5. Articles XI and XII of the NMI Constitution cites alienation of land restrictions in that only persons of "Northern Marianas descent" may own land in the NMI. Section 4 of article XII defines a person of Northern Mariana Islands (NMI) descent in terms of blood and race.

6. In the old Trust Territory (TT) government entity, the local TT indigenous citizens were granted employment preference rights (in that jobs had to be filled locally if local indigenous qualified people were available). These restrictions in employment have continued with the NMI. Local indigenous citizens are automatically given job preference rights. Off island (foreign) businesses must employ 20% of their work forces by local citizens.

2

7. In the summer of 2002, the NMI legislature introduced a bill to amend the NMI Constitution to prohibit anyone other than persons of Northern Marianas descent from running for public office. This bill was defeated, but it shows the attitude of local indigenous citizens to discriminate against outsiders.

8. In June 2006, the CNMI legislature passed Senate Bill 15-46 which was signed and became law. It provided that foreigners (which by definition per the law included US citizens of non-NMI descent) could obtain limited ownership interests in condominium apartments above the ground floors. US citizens are the only persons who have citizenship and theoretically the only people who could live on Saipan in a permanent relationship to buy these residential apartments. Thus, foreigners in this bill effectively addressed only US citizens of non NMI descent. US citizens from mainland America are considered foreigners in the eyes of many/most NMI people.

9. The very mention of the definition of the people of the Northern Mariana islands according to blood (Section 4, Article XII, NMI Constitution) precisely raises the issue to one of a racial definition. There is no other way to address the word blood.

10 The land restrictions effectively mean that the government is almost totally controlled by local people of NMI descent. Since non-local people cannot own land, they are limited in their ability to elect government leaders. Thus, the NMI government is almost totally in the hands of local indigenous NMI people.

11. This local control of the NMI government has translated to a situation whereby local preferences prevail in almost all personnel functions in terms of employment. Here local

Received  Apr-16-2007  04:00      From-                              To-US DISTRICT COURT, N    Page 005

means the local people of NMI descent and not necessarily other US citizens simply because the local government is almost totally controlled by local people of NMI descent.

12. In early 2007, people on Saipan have been promoting an initiative for Saipan to have Casinos. But the initiative is worded to restrict such privileges to persons of Northern Mariana's racial descent by requiring that staffing of the gaming commission, ownership of the casinos and employment with the casinos be restricted to persons of Northern Mariana's descent (per the Jan 18, 2007 Marianas Variety). In late Jan 2007, the CNMI legislature addressed a bill which would limit the award of contracts in the CNMI under $500,000 to local businesses (per a story in the Jan 27, 2007 Saipan Tribune).

13. The land restriction laws and preferences to local citizens in employment means that the NMI has a government policy supporting racial, ancestry or national origin discrimination against outsiders or people of non-NMI descent.

14. This blatant discrimination reached the point that mainland US citizens are often looked upon with disdain and contempt and are scornfully called "haoles" and "g-ddam Americans" by many of the local citizens of NMI descent. Some of the local people are more gracious in referring to American outsiders by defining them as "guest" workers as is also true with the thousands of Asians imported to do actual physical work in the CNMI (per the Jan 22, 2007 Marianas Variety).

15. The NMI laws on land restrictions and preferences in employment have created an environment where there is prevailing racial, ancestry or national origin discrimination against outsiders, to include US citizens who are not of NMI racial descent. This prevailing situation constitutes NMI government policy.

16. Per a story in the Saipan Tribune of Aug 11, 2006, the CNMI House of Representatives has passed on first reading House Bill 15-146 which proposes to form a Second Marianas Political Status Commission "to revisit the provisions of the Covenant (with the US) and U.S. government's actions in interpreting and implementing the Covenant, and examine alternative political and economic status options for the Northern Marianas." The bill states "the people (of the NMI) desire to reexamine whether continuing in a 'commonwealth' relationship with the United States pursuant to the terms of the Covenant is in their best interest, or whether some other political status will better enable them to fulfill their aspirations of full and meaningful self-government." The 2007 labor and immigration disputes with the US has accelerated the divide between the NMI and the US.

17. What the above reality means is that the NMI may soon terminate its relationship with the US.

18. The prevailing discrimination adversely affects most outsiders except for some few who have connections with the local power structure. Wealthy outsiders who successfully tie in with the local power structure can often receive favorable treatment in the CNMI.

19. Since Bradshaw has a claim against the CNMI government and its agents for discrimination against outsiders, it is not due process to allow a CNMI jury to address and find on this issue. A CNMI jury has a conflict of interest and could not expect to be impartial and fair in judging an issue about its own government, constitution and people.

### More Serious Threats

20. Messers Bisom and Sorensen obviously received much favorable treatment from (often) Acting Chief Justice Castro in case 96-1320. Bradshaw in his court filings has already

alleged that Justice Castro is both an incompetent and crook. Many people on Saipan share the idea that he is a crook who has used and does use his judicial job to rip off and steal in cases before him. Bribery, payoffs, fraud, etc are common on Saipan.

21. When going thru the 96-1320 file, it is strange that Judge Castro seemed to go out of his way to render stupid/ridiculous decisions which supported Bisom and hurt/damaged Bradshaw. This Castro partiality for Bisom/Sorensen cannot be missed from the file.

22. The CNMI discrimination and Justice Castro problem has created a situation whereby there is a pronounced lack of cooperation from CNMI offices in Bradshaw's efforts to get 96-1320 case file documents from the SC. It eventually caused Bradshaw to have to write to the Supremo Court Chief Judge Demapan on Oct 30, 2005 (see Exhibit A of the supporting declaration hereto).

23. While many of these requested documents were eventually furnished in the months of Dec 2005 and Jan 2006, some problems continued. The supporting declaration also has at Exhibit B (a copy of a letter of Dec 21, 2005 to the SC); Exhibit C (a copy of the letter of Mar 12, 2006 to the SC) and Exhibit D (a copy of the letter to the SC on Jul 13, 2006) over matters still unresolved.

24. One of the primary problems in dealing with the CNMI is that CNMI officials almost never put anything into writing. They can be called on the phone and may say something in answer to a question. But they generally will not put statements into writing. This is certainly true with the AG's office and the Clerk of both the Superior and Supreme Courts (although the new clerk of the Supreme Court seems to be different from his predecessors on this).

6

Received Apr-16-2007 04:00   From-   To-US DISTRICT COURT, N   Page 008

25. Plaintiff believes that Supreme Court Justice Castro is a vindictive and hateful person who will try to hurt Plaintiff's case. Since Castro's actions as a Superior Court judge are at issue in this case and since Judge Castro has shown previous favoritism to defendants Bisom and Sorensen contrary to law, it means that Bradshaw is at a disadvantage in a conflict with Bisom/Sorensen. Judge Castro operating from behind the scenes can influence/control decisions made by a local jury.

26. There is too the reality that this case includes a claim against the CNMI for RICO violations. Since the NMI entity and its government is on trial for RICO, it would not be fair to expect the plaintiff to have to go before a jury made up of NMI people to judge their own selves in the context of RICO. For RICO to be fairly addressed, it must be tried in the US.

27. In court trials in the NMI US District Court, the court has had to on occasion station US marshals in court to protect witnesses and jurors from court room intimidation made by local citizens when their relatives or friends are involved in a trial in the US court. The local people are known to use evil eyes, gestures or other acts to intimidate and threaten witnesses and members of a jury in order to keep witnesses and jurors from telling the truth.

28. Historically, almost any person of non NMI racial descent trying to oppose the local power structure of the NMI finds that he soon will likely come under some type of threat, intimidation, harassment, attack and in some cases even murder as happened to a US citizen of non-NMI racial descent, named Galen Mack, a few years ago who publicly opposed the local power structure and was soon murdered.

29. While rock fights among the local people during political meetings have been common historically, the problem for persons of non NMI racial descent is more serious.

Received Apr-16-2007 04:00 From- To-US DISTRICT COURT, N Page 009

Murders and disappearances of outsiders (persons of non-NMI racial descent) are not uncommon and are reported periodically in the local papers. It is alleged that many of these missing outsiders have ended up feeding the sharks in the ocean.

30. US citizens of non-NMI racial descent working in the Attorney General's office to oppose the corruption of local NMI Court justices (like Asst AG William Bush) and other persons have found themselves under threat, assault and other forms of intimidation.

31. Plaintiff Bradshaw, as the Public Auditor in 1979-1980, came under threat and assault for opposing the corruption of former Governor Carlos Camacho. Bradshaw had his automobile tires spiked twice; and once someone fired a gun through Bradshaw's bedroom window late at night while Bradshaw was asleep. The window was shattered and could have hurt or killed Bradshaw. Yes, a police report was filed on this incident but nothing came of it.

32. Recently, a school teacher named Lisa Black sued the Public School System and a school principal for wrongful discharge with a Federal jury trial that started on Feb 20, 2007.

33. According to the Marianas Variety of Feb 27, 2007, the AG filed criminal charges against Ms Black on the day of closing argument when the case went to the jury. The charge was that Black had hit another teacher, threatened another and "disturbed" several others back on Apr 8, 2006. The CNMI sat on this matter from Apr 8, 2006 until late Feb 2007 when the Black civil action against the school went to the jury. The AG then cleverly filed criminal charges against Black. The jury then found against Black.

### More on the Fair Trial Problem on Saipan

34. Because of the standing local discrimination against outsiders (that is persons of non-NMI descent), it will be impossible for Bradshaw to get a fair trial on Saipan. Because of

8

the role of Supreme Court Acting Chief Justice Castro, a former defendant in this case, and his relatives, colleagues and friends on Saipan, Bradshaw cannot get a fair trial there.

35. The local news publicity on Saipan in cases 96-1320, 05-0084 and 05-0027 has been extensive and much of it unfavorable. The Jul 12, 2006 Marianas Variety (Ex E) is an example of a report on a filing by the AG with a story about the AG's position which played up the idea that Bradshaw's complaint in court was deficient. What was never reported upon was Bradshaw's position or what the court actually found (as it denied many of the items played up in the paper). In other words, media readers were left with the message that Bradshaw's complaint was defective.

36. Defendant Brown was especially proficient in working the newspapers to present favorable coverage of her and her activities.

37. The biased news coverage has affected local citizens to the extent that it will be impossible to panel a fair and impartial jury on the small island of Saipan who has not been exposed to biased news coverage.

38. In the 96-1320 case, Bradshaw was convicted in both the Castro Court and the local media as a anti-Semite and evil Jew hater without due process of law (Ex K, 4th amended complaint). This story already has and will continue to influence local people.

39. The idea of US justice is a jury of one's peers. It will be impossible to panel a jury of plaintiff's peers on Saipan. A US jury would be more fair and impartial.

40. As noted in plaintiff's memorandum in support of this motion--In a Nov 3, 2006 motion to strike certain items in Bradshaw's complaint, defendant Bisom has already went on record that Bradshaw has made "biased criticism of race and culture" (of the local people of

9

Received    Apr-16-2007 04:10       From-       To-US DISTRICT COURT, N       Page 001

NMI descent) and that Bradshaw's complaint involved "interjection of his own obvious animosity towards persons of Northern Mariana descent." Bisom will make this an issue in any local trial.

41. Mr Bisom has a penchant for clandestinely operating in secret to secure information he can twist, distort and use against opponents (as happened when he deceptively entered into the confidence of Guy Gabaldon to try to gain information on Bradshaw, a friend of Gabaldon since 1979; and when he had secret clandestine meetings with the new governor's transition committee in 1993 where he agreed to work against Bradshaw and the auditor's office with the understanding that if he was fired he would be rehired by the new incoming governor).

42 While the allegations (whether true or false) in the Bisom Nov 3, 2006 motion have absolutely nothing to do with this case: are irrelevant to Bradshaw's complaint; and probably would not be allowed into trial by the Court, defendant Bisom can clandestinely raise these allegations to the jury someway and somehow--like maybe in the media, gossip, through some relative of a juror, etc. Once raised, whether true or false, they would damage Bradshaw before a local jury.

### The Prevailing Corruption

43. Both government and private corruption is pervasive and widespread in the CNMI as is publicly known and discussed at length in the CNMI and by Americans who have formerly lived there.

44. Former Attorney General Pamela Brown has publicly acknowledged in several media statements the extensive presence of corruption and the inability of her office to deal

with it. This prevailing corruption will make it impossible for the plaintiff to obtain local witnesses who will, in court, testify against local government officials involved in corruption

45. As recently as July 2006, the local Saipan papers reported on several of the currently acknowledged corruption cases in a 30-day period on going in the CNMI. For example, Crispin Kalpat, Clerk of the Supreme Court, misappropriated some $36,000 from a deceased estate which he administered; Ramon Mafnas, Commissioner of Public Safety, allegedly made off with $650,000 from the estate of his deceased brother; Raajkumar Kurapati, Chief Financial and Administration Officer of the Northern Mariana College, was accused of receiving $7,666 in improper annual leave payment; Benigno Fejeran, Member of Board of Directors of the Commonwealth Ports Authority, was accused of improper business dealings; the Saipan Liberation Day Committee allegedly misused up to $50,000; and eight new corruption cases are being investigated by the Public Auditor.

46. One of plaintiff's claims in the 4th Amended Complaint addresses the RICO problem in the CNMI. Corruption is widespread in the CNMI and involves both government and non-government personnel. Some of it involves individual persons in their personal illegal activities while in other cases the corruption involves collusion with coordinated and conspiratorial illegal actions involving more than one person.

47. While much of the corruption involves local people, some of it also involves mainland Americans on Saipan--who either engage in their own acts or conspire with others to rip off and plunder illegally. Because of the implications of RICO, it will be difficult if not impossible to produce witnesses to carry this claim forward to fruition on Saipan.

48. Plaintiff is in contact with former Americans, including former Assistant Attorney Generals, now residing in the continental U.S., who possess extensive knowledge about the corruption and wrong doing going on in the CNMI and particularly in its courts and the Attorney General's Office. Some of these persons would gladly testify at a trial in the US.

49. There are many Internet web sites which broach this corruption at length (www.saipansucks.com, etc.) and cases in US courts on alleged CNMI corruption (i.e. Wm F Betz v. Commonwealth of the Northern Mariana Islands In the Supreme Court of the State of New York, no. 1044842002, etc.). Some of these parties could testify at a trial in the US.

50. The CNMI garment industry has received wide publicity in the past several years for its exploitation and abuse of workers described in media reports as involving "sweatshop" operations. In 2002, there was much notoriety over the actions of the U.S. District Court to impose judgments on some of the responsible defendants in the lawsuits. Both private and public corruption is common in the CNMI--thus, affecting the matter of finding a local jury uninfluenced by the corruption.

51. The witnesses needed by plaintiff are available in the U.S. to substantiate many of the claims made in this complaint on CNMI fraud and conspiracy. The defendants, who are key witnesses in this case, reside in the US. Bradshaw himself formerly served as Public Auditor and has personal knowledge of some of the government corruption which was reported in audit reports to Federal and local authorities.

52. Plaintiff expects to present evidence from his personal knowledge and from witnesses in the continental U.S. to establish that public officials in the CNMI are in violation of Title 18 of the U.S. Code, sections 1961-1965 (the Racketeer Influenced Corrupt

12

57. The local indigenous people, in control of the local government and general society, routinely discriminate against outsiders as is well known by numbers of persons

[text obscured]

Organizations Act, or RICO) which affects the reality of the violation of Bradshaw's rights and benefits under the U.S. Constitution.

53. It will be impossible for Bradshaw to establish this evidence at a trial in the CNMI, because of Bradshaw's limitations in funding and lack of CNMI government support and/or outright opposition from CNMI government officials.

### Plaintiff's State of Health

54. Plaintiff is in poor health with a stress induced adrenal glands' problem which has seriously impaired plaintiff's whole immune system. Symptoms include general fatigue, diarrhea, coughing and easy chilling. Plaintiff's condition is such that extended airplane travel with the total drain on the human body from the earth change, as required for a trip to and from Saipan, will put an enormous burden on plaintiff which could be catastrophic.

55. Plaintiff's health problems are currently under the care and guidance of Dr Wade H. Lachman, 1624 E. Soltice, Post Falls, Idaho, phone 208-773-9108. Dr Lachman advises against the bodily exhaustion as occurring in extended trips across the ocean. Too, plaintiff is on a strict diet, coupled with a need for rest and some exercise, which may present some problems both in extended travel and with a stay on Saipan.

56. Increasingly, the airlines are taking a dim view of people flying with health problems. Two news reports are included herewith at Exhibits' J and K. J is from the Internal Drudge report of Mar 28, 2007 and K is from the Marianas Variety of Apr 13, 2007. In both instances, people with health problems were not allowed to fly on Continental airplanes.

### Conclusion

57. The local indigenous people, in control of the local government and general society, routinely discriminate against outsiders as is well known by numbers of persons (particularly by Americans and other persons of non-NMI racial descent) who have spent some time in the NMI. It will be impossible to find witnesses in the CNMI who will go into court and testify against the local discrimination being lodged against outsiders and the general corruption prevailing in the NMI These witnesses are available in the U.S.

58. Plaintiff is 73 years old, in poor health, and indigent with total assets of less than $6,000, debt from the effects of this case, and an annual income of about $11,000, mainly from social security. Plaintiff lacks the means and/or abilities to take this case to a CNMI jury and provide the needed witnesses.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Dated this __14th__ day of __APRIL__ 2007 at Calder, Idaho.

_____
Robert D. Bradshaw, Plaintiff Pro Se

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the __14th__ day of __APR__ 2007, I caused to be served a true copy of the foregoing document by US Mail Postage Paid to each of the following:

Jay H. Sorensen, c/o Shanghai, PO Box 9022, Warren, MI 48090-9022
CNMI Attorney General, Caller Box 10007, Capitol Hill, Saipan, MP 96950
Mark B. Hanson, PMB 738, PO Box 10,000, Saipan, MP 96950

_____
Robert D. Bradshaw, Plaintiff, Pro Se

14